**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| EDELSON PC, an Illinois professional corporation, individually, and on behalf of all others similarly situated, | Case No. 1:16-cv-11057 |
| *Plaintiff,* | |
| *v.* | |
| THE BANDAS LAW FIRM PC, a Texas professional corporation, CHRISTOPHER BANDAS, an individual, LAW OFFICES OF DARRELL PALMER PC d/b/a DARRELL PALMER LAW OFFICE, a suspended California professional corporation, JOSEPH DARRELL PALMER, an individual, NOONAN PERILLO & THUT LTD., an Illinois corporation, C. JEFFERY THUT, an individual, GARY STEWART, an individual, and JOHN DOES 1-20, | |
| *Defendants.* | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Edelson PC ("Edelson") individually and on behalf of a class of other similarly situated entities, brings this Class Action Complaint against Defendants The Bandas Law Firm PC, Christopher Bandas, Law Offices of Darrell Palmer PC d/b/a Darrell Palmer Law Office, Joseph Darrell Palmer, Noonan Perillo & Thut Ltd., C. Jeffery Thut, Gary Stewart, and John Does 1-20 (specifically unknown objector associates of the named Defendants) (collectively, "Defendants") based upon Defendants' practice of extorting monetary payments through abuse of the court system and by engaging in vexatious and harassing litigation and wire fraud. Plaintiff, for its Class Action Complaint, alleges as follows upon personal knowledge as to itself and its own acts and experiences and, as to all other matters, upon information and belief,

including investigation conducted by its attorneys.

## NATURE OF ACTION

1.     Defendants are among the most notorious and prolific "professional objectors" in the United States. Together, Defendants plan and coordinate actions to extort profit from legitimate and court-approved class action settlements, and specifically from counsel representing the class such as Plaintiff and the Class here. To further this plan, Defendants, who are serial racketeers, formed an association and enterprise of individuals and entities with the explicit purpose of extorting money through class action objections with no basis in the law ("the Objector Enterprise").

2.     Defendants file last-minute, frivolous objections to class action settlements, have their objections overruled due to their frivolity, and then threaten to or actually appeal the overruling to a higher court unless counsel for the class pays them to go away. Defendants do all of this with no intention of improving the terms of the class action settlement for the betterment of the class members; their only interest is exerting pressure so they can extort a payment for themselves for minimal work.

3.     Defendants know that with their appeal filed, the resolution of the underlying class action is held up until the appeal is decided or withdrawn, which in many instances can be years down the road. Defendants' goal, and the way they fund the Objector Enterprise, then, is to offer to forego or withdraw their appeal at a price. For a fee—sometimes as high as $500,000 in attorneys' fees—Defendants will withdraw their appeal and go away, at least until the next class action settlement.

4.     Defendants' abuse of the system has caused courts across the country to say, for instance, that "Bandas is a professional objector who is improperly attempting to 'hijack' the

settlement of this case from deserving class members and dedicated, hard working counsel, solely to coerce ill-gotten, inappropriate and unspecified 'legal fees.'"[1] And that "Mr. Palmer is likely a serial objector and other courts have recognized similar behavior. …this Court finds such behavior in bad faith and also potentially violative of local and ethical rules."[2]

5.     Through their Objector Enterprise, Defendants have routinely targeted cases where Plaintiff has been appointed class counsel and objected with frivolous arguments. Plaintiff has expended considerable unreimbursed attorney time and out-of-pocket expenses to accumulate the evidence necessary to force Defendants to leave empty-handed. That said, Defendants keep coming back, case after case, and Plaintiff's efforts to contain Defendants' nefarious effects have thus far been unable to prevent their return. *C.f.* Harry S. Miller, *The Cat Came Back* (1893). Even with one of the Defendants, Palmer, suspended from the practice of law, Defendants still conspire to extort Plaintiff by misusing the class action settlement process and the appellate courts.

6.     Recently, Defendants engaged their Objector Enterprise and targeted a court-approved class action settlement where Plaintiff was appointed class counsel. There, Defendants recruited an associate to file a frivolous objection which was overruled by the court. Then, after Defendants made threats to appeal the court's ruling, they contacted Plaintiff over interstate wires with an ultimatum: pay them $225,000 to go away (with nothing benefiting the class) or else they would file a frivolous appeal and hold up, indefinitely, the payment of claims to the class and court-approved attorneys' fees to class counsel. Faced with this lose-lose situation,

---

[1]     *Brown v. Wal-Mart Stores, Inc.*, No. 01 L 85, Order Denying Objections to the Settlement and Fees and the Motion to Intervene and for Pro Hac Vice Admission at 2 (Ill. Cir. Ct. 14th Cir. Oct. 29, 2009) (emphasis added).

[2]     *Heekin v. Anthem, Inc.*, No. 1:05-CV-01908-TWP, 2013 WL 752637, at *3 (S.D. Ind. Feb. 27, 2013).

Plaintiff agreed to pay $225,000 to Defendants and now seeks relief from this Court.

7.      Accordingly, Plaintiff Edelson PC, on behalf of the Class, brings this lawsuit and seeks injunctive relief, pursuant to the All Writs Act, 28 U.S.C. § 1651, labeling Defendants vexatious litigants and prohibiting them from:

    a.      ghostwriting objections for the purpose of making their objections seem *pro se*;

    b.      making or threatening to make objections to class action settlements not for the purpose of improving the settlements but for extracting payments for themselves;

    c.      filing with any court objections to class action settlements or appeals of overruled objections without prior screening or approval by the Court where their status as vexatious litigants must be disclosed along with a copy of the injunction entered pursuant to this suit;

    d.      withdrawing any objection or appeal from the overruling of any objection without disclosing payment in exchange for doing so and any corresponding benefit provided to the class, along with an order awarding damages, and costs and reasonable attorneys' fees.

8.      Plaintiff Edelson PC, on behalf of the Class, also brings this lawsuit under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq*. ("RICO") for acts of extortion under the Hobbs Act (18 U.S.C. § 1951), the unauthorized practice of law under the Illinois Attorney Act (705 ILCS 205/0.01), and Wire Fraud (18 U.S.C. § 1343).

## PARTIES

9.      Plaintiff Edelson PC is a professional corporation incorporated and existing under the laws of the State of Illinois.

10.     Defendant The Bandas Law Firm is a professional corporation incorporated and existing under the laws of the State of Texas with its principal place of business located at 500 N. Shoreline Boulevard, #1020, Corpus Christi, Texas 78401.

11.     Defendant Christopher Bandas is a natural person and citizen of the State of Texas. Defendant Bandas, individually and through his law firm, Defendant The Bandas Law Firm, has repeatedly engaged in the type of misconduct alleged here in Illinois and this District.

12.     Defendant Law Offices of Darrell Palmer PC d/b/a Darrell Palmer Law Office is a suspended professional corporation incorporated and existing under the laws of the State of California with its principal place of business located at 603 North Highway, 101 Suite A, Solana Beach, California 92075.

13.     Defendant Joseph Darrell Palmer is a natural persona and citizen of the State of California. Defendant Palmer, individually and through his law firm, Defendant Law Offices of Darrell Palmer PC d/b/a Darrell Palmer Law Office, has repeatedly engaged in the type of misconduct alleged here in Illinois and this District..

14.     Defendant Noonan Perillo & Thut Ltd., is a corporation incorporated and existing under the laws of the State of Illinois with its principal place of business located at 25 North County Street, Waukegan, Illinois 60085.

15.     Defendant C. Jeffery Thut is a natural person and citizen of the State of Illinois. Defendant Thut, individually and through his law firm, Defendant Noonan Perillo & Thut Ltd., does business in Illinois and this District and has repeatedly engaged in the type of misconduct alleged here in Illinois and this District.

16.     Defendant Gary Stewart is a natural person and citizen of the State of California.

**JURISDICTION AND VENUE**

17.    This Court has original jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 because they arise under RICO (18 U.S.C. §§ 1961, *et seq*.), which is a federal statute. This Court additionally has subject matter jurisdiction over this matter pursuant to 18 U.S.C. § 1964(c) because this case seeks recovery for injuries to business and property caused by violations of RICO (18 U.S.C. §§ 1961, *et seq*.), which states that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court."

18.    The Court has personal jurisdiction over Defendant Noonan Perillo & Thut Ltd. and Defendant Thut because Defendant Noonan Perillo & Thut Ltd., is an Illinois corporation, Defendants Noonan Perillo & Thut Ltd., and Thut do business in Illinois and in this District, Defendant Noonan Perillo & Thut Ltd., is headquartered in Illinois, and Defendants committed tortious acts within and purposefully directed at Illinois, such conduct designed to create an injury in that state. Furthermore, at all relevant times, Defendant Thut coordinated with Defendants to commit the tortious acts in and to target Illinois and this District.

19.    As described more fully below, when the tortious acts were committed, Defendant Thut was acting as the agent of each of the other Defendants. And, for each action, each of the other Defendants gave Thut authority to act as their agent.

20.    The Court has personal jurisdiction over Defendant Bandas because Defendant Bandas has enlisted Defendant Thut to act as his agent in Illinois and this District. At all relevant times, Thut acted with the authority and was in the control of Bandas. Moreover, Defendant Bandas committed tortious acts purposefully directed at Illinois and such conduct was designed to create an injury in Illinois and this District. In addition, Defendant Bandas has availed himself

of Illinois courts by filling admissions to courts throughout Illinois. As such, there exist the minimum contacts necessary to assert jurisdiction.

21.     The Court has personal jurisdiction over Defendant The Bandas Law Firm PC because it ratified the conduct of its principal, Defendant Bandas, at all times know of his actions.

22.     The Court has personal jurisdiction over Defendant Palmer because Defendant Palmer committed tortious acts purposefully directed at Illinois and this District and such conduct was designed to create an injury in Illinois. In addition, Defendant Palmer has availed himself to Illinois courts by filling admissions to courts throughout Illinois. As such, there exist the minimum contacts necessary to assert jurisdiction.

23.     The Court has personal jurisdiction over Defendant Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office because it ratified the conduct of its principal, Defendant Palmer, at all times know of his actions

24.     The Court has personal jurisdiction over Defendant Stewart because Defendant Stewart has committed tortious acts purposefully directed at Illinois and this District and such conduct was designed to create an injury in Illinois.

25.     Venue is proper because Defendants do business in this District and the causes of action arose, in substantial part, in this District. Venue is additionally proper in this District under 28 U.S.C. § 1391 because Noonan Perillo & Thut Ltd., is a resident of this District in that is a corporation organized under the laws of this State and it does business in this District.

## FACTUAL ALLEGATIONS

**I.**   **"Professional Objectors" Abuse Class Action Procedure to Use Objections to Class Action Settlements to Extort an Individual Payment of Fees with No Benefit to the Class.**

26.    Each year, hundreds of consumer class action lawsuits reach settlement. As required by the federal rules and rules of civil procedure of the several states (including the Illinois Code of Civil Procedure), class counsel seek approval of these settlements in courts across the country to provide relief to consumers and closure to defendants. In some cases, as those rules provide, class members file objections to voice displeasure or highlight possible cause for concern.

27.    But while many of the objections made are legitimate and seek to provide a benefit to the class, some attorneys have hijacked the system for profit. Known as "professional objectors," unscrupulous attorneys file a last-minute frivolous objection to a class action settlement, lose (often on purpose), and then threaten to or actually appeal to a higher court, all in an attempt to extort a nuisance payment from class counsel to go away to avoid the delay of the appeals process. Once they're paid to go away, however, the professional objectors return as soon as the next class action seeks court approval for a settlement and begin the entire process anew.

28.    The National Law Review has aptly described the professional objector's modus operandi:

> The broad right of any class action objector to appeal a district court's final judgment approving a settlement has given rise to what are referred to as professional objectors—attorneys who file specious objections for the sole purpose of using appellate delay to hold a class action settlement hostage in order to extort self-interested payments. Unlike legitimate objectors, who help police the class action settlement process, professional objectors engage in what courts

and commentators have characterized as "objector blackmail."[3]

29.     Others have called this scheme for what it is—extortion:

The business of professional objectors is to make insubstantial objections to class settlements on behalf of nonnamed class members, then threaten to appeal the judgment approving the settlement unless paid to desist. The business is extortion, and it is profitable because class counsel have a powerful incentive to avoid the costs that an appeal would impose.[4]

The United States Court of Appeals for the Seventh Circuit reached the same conclusion:

In the context of intervening in a class action settlement, extortion would mean intervening not to increase the value of the settlement, but in order to get paid to go away.[5]

30.     More have warned that attorneys and class members should increasingly "[w]atch

out … for canned objections filed by professional objectors who seek out class actions to simply

extract a fee for lodging generic, unhelpful protests."[6]

31.     The rise in professional objectors has been so great that new rules have been

proposed to Federal Rule of Civil Procedure 23, which governs class actions. In that new rule,

"an objector can't be paid off to drop their objection without approval by the district court," said Leslie Brueckner, senior attorney at Public Justice. "That could have a big impact because it could effectively halt the problem of so-called 'professional objectors,' who basically hold up class action settlements for their own pecuniary gain, by basically exposing that kind of practice to the light of day."[7]

---

[3]      Anna C. Haac, *Ninth Circuit Grants Summary Affirmance In Objectors' Appeal From Class Action Settlement: A Case Study In Dealing With Serial Objectors*, Nat'l L. Rev. (Dec. 12, 2013), https://perma.cc/CE6H-9DWF (emphasis omitted).

[4]      John E. Loptaka & D. Brooks Smith, *Class Action Professional Objectors: What to do about Them?*, 39 Fla. St. U.L. Rev. 863, 929 (2012).

[5]      *Vollmer v. Selden*, 350 F. 3d 656, 660 (7th Cir. 2003).

[6]      Barbara J. Rothstein & Thomas E. Willging, Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges*, at 11 (2005), https://perma.cc/BT93-GV7D.

[7]      Anna C. Haac, *Ninth Circuit Grants Summary Affirmance In Objectors' Appeal From Class Action Settlement: A Case Study In Dealing With Serial Objectors*, Nat'l L. Rev. (Dec. 12, 2013), https://perma.cc/CE6H-9DWF.

32.     As described below, Defendants are extortionists that abuse the system, seeking to profit from the labor of class counsel across the country who prosecute fair and court approved class action settlements.

## II.     Defendants Are Notorious "Professional Objectors" That Abuse Legal Process for Personal Profit

33.     The website SerialObjector.com was created in 2015 to transparently track the filings of professional objectors in courts throughout the country. As the site explains,

> "[s]erial objectors 'subsist primarily off of the skill and labor of, to say nothing of the risk borne by, more capable attorneys. These are the opportunistic objectors. Although they contribute nothing to the class, they object to the settlement, thereby obstructing payment to lead counselor of the class in the hope that lead plaintiff will pay them to go away. Unfortunately, the class-action kingdom has seen a Malthusian explosion of these opportunistic objectors…' Class action settlements are often delayed by serial objectors objecting to the suit.[8]

34.     According to SerialObjector.com's data, Bandas and Palmer are the most prolific of these "opportunistic objectors," filing almost as many objections (103) as the next five top objectors (113).[9] A review of Bandas's and Palmer's, along with their new associate Thut's, objections demonstrate that they add nothing of value to the class actions to which they object but instead "object to the settlement[s] … in the hope that lead plaintiff[s] will pay them to go away."

A.     *Bandas is, ostensibly, the most prolific and notorious professional objector in the country.*

35.     The Bandas law firm, a small Texas outfit headed by Mr. Bandas, is a notorious "professional objector" who abuses the court system to file baseless objections to class action settlements and threatens to appeal their inevitable rejection, all in an attempt to extort a nuisance

---

[8]     *About - Serial Objector Index*, https://perma.cc/8TJS-5GFM.
[9]     *Persons - Serial Objector Index*, https://perma.cc/RY4Q-C93H.

payment from class counsel to go away without ever providing any benefit to the class.

36.     On SerialObjector.com, Bandas is listed as having filed 55 objections over the past decade, almost an objection every other month—the most of any objector. However, these 55 objections likely represent only a small fraction of the total number of objections in which Bandas has been involved.

37.     A review of the objections listed reveals that the vast majority, if not all, of Bandas's objections do not provide any benefit to the settlement class. According to SerialObjector's data, Bandas's objections are overruled, with the subsequent appeal then being withdrawn (assuredly after a coerced payout from class counsel) and/or serve as the basis for motions for sanctions more than 90% of the time. Unfortunately, notwithstanding the impropriety and sanctionable nature of his conduct, Bandas is apparently able to profit from his abuse of the system through the filing of frivolous objections. As noted below, Bandas has likely extracted millions of dollars from class counsel in exchange for going away without providing any corresponding benefit to anyone but himself (and his fellow professional objectors).

38.     And while Bandas makes representations to counsel, courts, and others that he is merely the attorney for an objector who has legitimate criticism of a class action settlement, as described below, nothing could be farther from the truth. Instead, Bandas represents puppet clients who have little to no understanding of the class action settlement to which they're objecting (because they're often not even class members) and, at times, are ignorant that they're objecting at all. And when Bandas successfully extorts class counsel for fees (sometimes as much as $500,000 or more), Bandas's own client retainer agreements limit the amount of the funds that goes to the "client" to only $5,000. As a result, were Bandas to hold up a class action settlement for $500,000, the "client" would get only $5,000 and Bandas would get $495,000.

39.     When courts have had the opportunity to respond to Bandas (i.e., before Bandas extracts a fee to go away and withdraw his objection), the courts don't hold back. For example, one federal judge has found that "Bandas routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain [and] has been excoriated by Courts for this conduct."[10] Another federal judge described Bandas as "a known vexatious appellant" who has been "repeatedly admonished for pursuing frivolous appeals of objections to class action settlements."[11]

40.     Yet another federal judge held that objections filed by Bandas to a class action settlement "were filed for the improper purpose of obtaining a cash settlement in exchange for withdrawing the objections."[12] Specifically, that court found Bandas was attempting to pressure the parties to give him $400,000 as payment to withdraw the objections and go away—Bandas was using the threat of questionable litigation to tie up the settlement unless the payment was made.

41.     In 2009, an Illinois Court took notice of Bandas's conduct and stated:

> The Bandas Objection filed on behalf of Ms. Carlson is a generic boilerplate objection prepared and filed by attorneys working for their own personal benefit and not for the benefit of this Class or for those lawyers' clients. The record before the Court demonstrates that **Bandas is a professional objector who is improperly attempting to 'hijack' the settlement of this case from deserving class members and dedicated, hard working counsel, solely to coerce ill-gotten, inappropriate and unspecified 'legal fees.'**[13]

---

[10]     *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012).

[11]     *In re Gen. Elec. Co. Sec. Litig.*, No. 09 Civ. 1951(DLC), 2014 WL 534970, at *9 (S.D.N.Y. Feb. 11, 2014).

[12]     *In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09md2087 BTM (KSC), 2013 WL 5275618, at *5 (S.D. Cal. Sept. 17, 2013).

[13]     *Brown v. Wal-Mart Stores, Inc.,* No. 01 L 85, Order Denying Objections to the Settlement and Fees and the Motion to Intervene and for Pro Hac Vice Admission at 2 (Ill. Cir. Ct. 14th Cir. Oct. 29, 2009) (emphasis added).

42.     These reactions from the courts are just a sample of the harsh words describing Bandas's conduct. However, they serve to cement Bandas's pattern of abusing the system by filing frivolous objections to class actions for personal profit.

     B.     *Palmer is second only to Bandas in the world of professional objectors.*

43.     Like Bandas, Palmer is a prolific and notorious professional objector. And like his colleague Bandas, Palmer exploits the court system to file frivolous objections to class action settlements to extort nuisance payments without ever providing the class any benefit.

44.     According to SerialObjector.com, Palmer is listed as having filed 48 objections—second only to Bandas—which likely represent only a small of Palmer's total objections. A review of Palmer's objections listed on SerialObjector.com reveals that he too is inept at securing any benefit to the class actions to which he objects: more than 90% of the time, Palmer's objections are withdrawn (likely after payment), overruled, and/or serve as the basis for motions for sanctions.

45.     Courts across the country have admonished Palmer for his exploitative schemes, a sample includes the following:

- "Palmer has been widely and repeatedly criticized as a serial, professional, or otherwise vexatious objector."[14]

- "Mr. Palmer has been deemed a 'serial objector'" with a history of "admitted . . . 'bad faith and vexatious conduct'"[15]

- "Finally, the Court does find evidence of bad faith or vexatious conduct on the part of appellants. Mr. Paul appears to be represented by an attorney who has not entered an appearance in this case. It is worth noting that attorney Darrell Palmer ('Mr. Palmer'), previously requested leave to appear *pro hac vice* in this case. However, this request was withdrawn after the Court scheduled a teleconference to address Mr. Palmer's

---

[14]     *Dennis v. Kellogg Co.*, No. 09-cv-1786, 2013 WL 6055326 (S.D. Cal. Nov. 14, 2013).
[15]     *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 159 n. 40 (E.D. La. Jan.11, 2013).

motion. Despite this, Mr. Palmer is listed as the payor of Mr. Paul's Notice of Appeal filing fee. Mr. Palmer's office also emailed Plaintiffs a notice and copy of Mr. Paul's most recent filing. Plaintiffs have produced evidence that Mr. Palmer is likely a serial objector and other courts have recognized similar behavior. …this Court finds such behavior in bad faith and also potentially violative of local and ethical rules."[16]

46.     Worse, Palmer has a history of secretly objecting through others by "ghostwriting" objections. In a recent case in Illinois, Plaintiff uncovered Palmer's scheme to secretly profit from a court approved and fair class action settlement. Specifically, Plaintiff, discovered that a purportedly *pro se* objection was actually "ghostwritten" by Palmer. Worse, Palmer actively concealed his involvement in writing the objection, and the objector was even not a member of the settlement class. As explained more below, the reason that Palmer concealed his involvement from the Court was not an innocent one—Palmer was then facing attorney disciplinary charges in his home state of California. While such disciplinary charges were pending, Palmer was not eligible under Illinois Supreme Court Rule 707 to receive permission as an out-of-state attorney to provide legal services in Illinois.

47.     Palmer's actions in that case did not go unnoticed by the Court. The Honorable Neil Cohen of this Court appointed the Honorable Gilbert J. Grossi (ret.), as special prosecutor to investigate "whether indirect criminal contempt proceedings are warranted against" Palmer. In his report, Judge Grossi concluded:

> It appears clear from the substance and legal sophistication of the arguments made in the objection, that Ms. House [the objector] did not write this objection without the aid of legal counsel.  This is confirmed by a series of emails sent between [defense counsel] and Joseph Darrell Palmer [].  In these emails, Mr. Palmer acknowledges being Ms. House's attorney in this matter. Mr. Palmer, however, has never filed an appearance before Judge Cohen in this case.

> …

---

[16]     *Heekin v. Anthem, Inc.*, No. 1:05-CV-01908-TWP, 2013 WL 752637, at *3 (S.D. Ind. Feb. 27, 2013).

14

Regarding … Palmer, he acknowledged being Susan House's attorney in an email to [defense counsel]. He clearly composed the objection which Susan House submitted to the Court. Mr. Palmer also never submitted any written documentation to corroborate or substantiate any text supposed to have been received by Ms. House or any notice of her being a class member. When I spoke to Mr. Palmer on March 12, 2014, he refused to answer any questions and referred me to his attorney. After a mediation in California, a settlement was reached. However, to my knowledge, nothing was paid to Ms. House and she has attempted to withdraw her objection before this Court. Mr. Palmer's conduct appears questionable, suspicious and in apparent bad faith. Whether this rises to the level of proof beyond a reasonable doubt is a debatable issue.[17]

48.     Judge Grossi stated that he would submit his report to "any proper authorities in California which may be investigating Mr. Palmer."[18] In fact, soon after Judge Grossi issued his report, the State Bar of California's investigation against Palmer concluded, "finding him culpable of three counts of moral turpitude for the grossly negligent making of false statements in sworn affidavits filed in federal class actions."[19] Mr. Palmer appealed and, just as he does with his objection appeals, lost. In affirming the hearing judge's decision, the State Bar of California Review Department stated:

We … agree with the hearing judge's conclusion that Palmer acted with gross negligence, amounting to moral turpitude, in executing and filing the false affidavits.

…

In 2002, [Palmer] was convicted of a Colorado criminal offense for failing to properly report roughly $4,000 in sales taxes … . As a result of this conviction, the Colorado Supreme Court imposed discipline on Palmer … .

…

Palmer admits that he executed and filed three sworn affidavits, between June

---

[17]     A true and accurate copy of Judge Grossi's Report is attached hereto as Exhibit A. (citations omitted).
[18]     *Id.*
[19]     *In re Palmer*, No. 12-O-16924, 2016 WL 364192 (Cal. Bar Ct. Jan. 6, 2016),

2010 and July 2012, in which he declared falsely that he had never been subject to attorney discipline.

…

[S]uch lack of diligence was common in Palmer's practice. His long-time paralegal, who prepared the affidavits for his approval and signature, testified that Palmer "did not thoroughly review what [she] put in front of him to sign." This lack of attention is substantially below the ethical standard of care required of attorneys when signing and filing documents under oath.

…

For the foregoing reasons, we recommend that Joseph Darrell Palmer be suspended from the practice of law for two years, that execution of that suspension be stayed, and that Palmer be placed on probation for two years on the [meeting of certain] conditions … .[20]

49.     Although Palmer's suspension was to be stayed so long as he fulfilled certain conditions, Palmer apparently failed to meet those admittedly basic conditions placed on him by the State Bar of California. Palmer is still suspended from practicing law in California.

50.     Nevertheless, Palmer disregards his suspended status and continues to practice law by assisting in preparing and filing of objections to class action settlements. On October 26, 2016, Palmer once again was involved in the preparation of an objection, this time in *Clark v. Gannett Co., Inc.*, Case No. 16-CH-06603 (Cir. Ct. Cook Cty.). There, and as described more below, Palmer co-opted a friend, Gary Stewart, into filing a frivolous objection to a class action settlement and had Stewart state he was represented by Bandas and Thut. Notably, Palmer (and Bandas) never filed an appearance with the Court in *Gannett*, nor could he because he is presently suspended from the practice of law. On November 14, 2016, the Honorable Kathleen Kennedy overruled the objection and granted final approval of the *Gannett* settlement (the "*Gannett* Settlement").

---

[20]      *Id.*

16

C.    *Thut has partnered with Bandas and Palmer to quickly become an up-and-coming professional objector.*

51.    Jeff Thut is a former Illinois traffic ticket prosecutor, turned personal injury lawyer, turned professional objector who has repeatedly worked with Bandas and/or Palmer. Like Bandas and Palmer, Thut has filed objections on behalf of himself and his immediate family members, on at least one instance without their knowledge or permission, to attempt to extort a payment in exchange for withdrawing an objection without making any change to the settlement agreement.[21]

52.    Thut's rapid decent into the world of processional objecting caused him to be profiled in a July 2015 Reuters report about professional objectors. There, Thut described how he (and Bandas) attempted to extort payment from class counsel in an Illinois State Court proceeding:

> Jeffrey Thut, who is working with Bandas on the MetLife case, said Bandas is "nothing but professional." He said Bandas first called him to serve as local counsel for [an] objector, after the judge in the case ordered discovery. When he entered an appearance, he said, class counsel [] called to ask if he knew about Bandas' history. Thut, who told me he'd never worked on a class action before the MetLife case, said, "Is Chris Bandas a serial objector? I don't know. I'll let you make up your own mind. In my experience, he knows his stuff. He doesn't have horns."

> Thut said he has tried repeatedly **to convince** [class counsel] **to settle** the MetLife case **and lock in** [class counsel's] **$8.2 million in fees and costs**. He said he believes the settlement approval will be overturned because the trial judge did not permit objectors to inquire into a settlement between class counsel and the Old National Bank, which allegedly held a $3.6 million judgment against the firm.

> [The] serialobjector.com website has a dossier on Thut, too. His class action experience may have begun with the MetLife case but it didn't end there. He and Bandas have since teamed up to represent objectors in two other cases, a Chicago

---

[21]    *See e.g.*, *Wright v. Nationstar*, No. 14-cv-10457, Dkt. 79 (listing Thut as objector represented by Bandas); *In re Lifetime Fitness TCPA Litig.*, No. 14-md-2564, Dkt. 121 (detailing Thut's use of his daughter as an objector without her knowledge)

federal court class action against Chase and a Minnesota class action against Life Time Fitness. (Both are TCPA cases.) The objector Thut and Bandas represent in the Life Time class action is named Lindsey Thut – the same name as a University of Michigan soccer player whose father is Jeff Thut. I asked Thut if Life Time objector Lindsey Thut is his daughter. "I'll let you figure that out on your own," he said.[22]

53.     Discovery into the objection revealed that Lindsey Thut was Thut's daughter, that he personally filed a claim in the case with his personal information and apparently without her knowledge, and that Thut enlisted Bandas to assist him in the objection in order to extort a payment without any corresponding benefit to the class members.

54.     Thut's conduct mirrors the ethically-questionable tactics that have been used by Palmer and Bandas for years. Indeed, while SerialObjector.com's records on Thut show he is just getting started, listing only six recent objections, Thut is as inefficient and ineffective as his associates. Seemingly, none of Thut's objections were meritorious.

## III.     Defendants Coordinate Their Actions in Attempts to Extort Plaintiff and Class Counsel in Illinois and Throughout the Country.

55.     Although the individual actions of Defendants are alarming on their own, Defendants' level of coordination reveals their scheme to extort. As described above, Defendants, through the Objector Enterprise, have made over one hundred objections just in the last decade. Those objections were accomplished through the Objector Enterprise whereby Defendants would seek out which class actions to object to, solicit family, employees, or friends as "clients" to use, agree on which frivolous "arguments" to push, and decide on their pay-off price.

56.     This isn't conjecture. Instead, Defendants' scheme and unlawful Enterprise were

---

[22]     Allison Frankel, A New Way for Class Action Firms to Combat Serial Objectors, Reuters (June 29, 2015), https://perma.cc/RCW8-TZJD.

revealed when a former associate wrote a whistleblower like account, and when Reuters news service obtained previously-secret communications.

57.     After another objector refused to coordinate with Bandas and accept payment to drop an appeal of an overruled objection, that attorney submitted a detailed account of how Bandas and his associates operate, and filed it with the Seventh Circuit Court of Appeals under oath:

> Mr. Bandas proposed that I receive a contingent fee of a share of the proceeds of settled objections in cases where I performed consulting. … However, I grew uncomfortable with receiving a percentage of settled objections, both because I disagreed with the idea of settling objections for money at the expense of the class, and because I was concerned that I was most often being consulted in difficult cases where Mr. Bandas's actions before I became involved was putting him at risk of sanctions and where payment was thus unlikely. In 2013, Mr. Bandas and I agreed to a set of new retainer agreements where I would be paid by the hour, subject to a monthly minimum payment, with separate payments and separate retainers for cases where I made an appearance on behalf of one of Mr. Bandas's clients. The contingent payments I had received to date would be retroactively treated as a partial payment in advance for my appearance and argument in a Seventh Circuit appeal … .
>
> …
>
> I understood that my pay from Mr. Bandas was made possible and would not have occurred without Mr. Bandas profitably settling cases where I was not counsel of record, but rationalized accepting that money because of the benefit to caselaw of victories [] that might not have occurred if I was not assisting Mr. Bandas.
>
> …
>
> I grossed about $33,000 from Mr. Bandas in 2013, $125,000 in 2014, and $95,000 between January 1 and June 4, 2015 … . Mr. Bandas apparently found these profitable sums to pay, because he became very upset when I terminated my business relationship with him.
>
> …
>
> Mr. Bandas indicated to me on numerous occasions, including as recently as June 4, 2015, that I could increase my total income considerably if I … worked for him full-time. Mr. Palmer made me a similar offer in late 2013 or early 2014. I declined both gentlemen's offers.

…

In May 2015, a reporter contacted me and stated that class action attorneys had complained to him that "bad" objectors who settled cases for money were using my name to threaten class counsel into settling. I acknowledged that I had been retained in a number of class action appeals, … explained the limitations on my willingness to represent for-profit class-action objectors, and noted that that threat only made a difference if the underlying objection was meritorious. …[23]

58.     As the author described, the world of professional objectors—and Bandas' and Palmer's Enterprise specifically—is filled with coordinated back-room deals for illicit gain. Indeed, the author described the "threats" used by professional objectors used to get "class counsel into settling." While the author seemingly exhibits remorse from his brief association with Defendant Bandas, he recounts how he reluctantly assisted in Bandas's and Palmer's "profitable" business of objecting that was often "putting [them] at risk of sanctions and where payment was thus unlikely."

59.     That author's story is corroborated by an in-depth report by Reuters (*see* paragraph 52 above). There, Reuters uncovered how Defendants' Objector Enterprise engaged in similar backroom deals, improper use of acquaintances as client objectors, and secret schemes to extract money from legitimate class action settlements. Reuters reports:

In [the] MetLife case, Bandas is not counsel of record for objector [Clayton]. [Thut] signed Clayton's brief to the Illinois appellate court. But Anderson & Wanca obtained Clayton's retainer agreement after the state court judge overseeing the class action ordered discovery from him and another objector. As Clayton conceded at his deposition, Bandas is his lead lawyer. (Clayton said Bandas is a professional acquaintance who decades ago used him as an expert witness in a couple of personal injury suits. He also said he "presumed" Bandas was responsible for filing a previous objection Clayton attempted to bring in a New Jersey class action against Hertz.)

Clayton's retainer agreement in the MetLife case, which was an exhibit at his

---

[23]     A true and accurate copy of the account is attached hereto as Exhibit B.

deposition, included an interestingly vague clause about what reward he could expect as an objector. He could be entitled to an incentive payment from class counsel or the defendants in recognition of his service, the contract said. "Any incentive award or payment sought," the agreement added, "will never exceed $5,000."

Bandas, however, requests much more than $5,000 to settle appeals, based on two cases in which information about his settlements has become public. … Bandas allegedly told a lawyer for the defendant in a false advertising class action against the maker of Hydroxycut dietary supplements that he would withdraw for a payment of about $400,000 … .

The defense lawyer testified at an evidentiary hearing that Bandas subsequently called claiming he'd had a "senior moment" and forgotten their conversation. But the judge concluded that "Mr. Bandas was attempting to pressure the parties to give him $400,000 as payment to withdraw the objections and go away. Mr. Bandas was using the threat of questionable litigation to tie up the settlement unless the payment was made." Judge Moskowitz later denied a motion by class counsel in the Hydroxycut case to sanction Bandas for allegedly falsifying the signature of a client. The judge said he took the allegation very seriously but didn't have jurisdiction over Bandas because Bandas did not enter an appearance before him.[24]

60.     Unfortunately, Bandas, Palmer, and Thut have often avoided sanctions and reprimand from courts. Not from a lack of improper or illegal conduct, but because Defendants routinely and purposely fail to file appearances in cases where they attempt to extort class counsel through improper objections as a means to avoid consequences.

61.     For instance, in the recent *Gannett* case, Defendants' aimed their Objector Enterprise machine at Plaintiff and organized a scheme to misuse the objection system in an attempt to extort funds from it. There, Thut admitted to skirting his obligations as an Illinois attorney in order to assist Bandas and Palmer in filing of Defendant Gary Stewart's objection in the *Gannett* Settlement (the "Stewart Objection"). Upon receiving the Objection, Plaintiff called Thut to attempt to explain the numerous factual misstatements in the brief he signed. But while

---

[24]     Allison Frankel, *A new way for class action firms to combat serial objectors?* (June 29, 2015), https://perma.cc/RCW8-TZJD.

his brief is focused on a claimed "lack of information," Thut refused to discuss the information he claimed was lacking, mistakenly believed the case was about text messaging (it's not), and the only thing Thut could recall about the case was that the settlement website said Plaintiff, as court approved class counsel, were getting $5 million in fees. (This statement was unsurprising, as bad faith objectors like Thut, Bandas, Palmer, and Stewart look solely at fees because of the greater opportunity for extortion.) Thut was candid about why he knew so little about the brief he signed and filed: Bandas wrote the brief and Thut took Bandas's word for everything asserted in the brief without performing any independent investigation of his own. Much of what Thut vouched for without question was wholly meritless.

62.    While the Court in *Gannett* ultimately overruled Defendants' Stewart Objection, Defendants have since threatened to appeal the decision and hold up final resolution of the case.

## IV.    Defendants Propose to Resolve The Stewart Objection Through Mediation But Hijack the Mediation to Extort Plaintiff.

63.    After threatening to appeal the *Gannett* Court's overruling of the Stewart Objection, Defendants contacted Plaintiff to offer a solution: engage in mediation resolve the objection and forego any appeal of the Court's order granting final approval. On November 30, 2016, Defendant Bandas communicated with Plaintiff and proposed that Defendants' Stewart Objection could be resolved through mediation.

64.    Plaintiff accepted this opportunity to allow Defendants to ostensibly inform it of the changes they would like made to the settlement necessary to resolve the objection or obviate the threatened appeal. Although Plaintiff believed that the Court was correct in overruling Defendants' objection on the merits, Plaintiff was (and is) cognizant of its obligation to provide the relief guaranteed through the settlement to the class members with as minimal a delay as possible.

65.     On December 1, 2016, a mediator facilitated a telephonic mediation with Plaintiff and Defendants' representative, Defendant Bandas.

66.     During the mediation, Defendant Bandas demanded that Plaintiff pay between $225,000 and $445,000 to settle outstanding issues. Defendants' demands of $445,000 are more than they could ever have recovered if they were to succeed on appeal (had their objection not been frivolous).

67.     Despite Defendants' prior representations, Defendants, through Defendant Bandas, did not suggest, request, or require that any changes be made to the *Gannett* Settlement in any form in exchange for the $225,000 to $445,000. Instead, Defendants were only negotiating their fee to go away. Defendants made clear that if Plaintiff paid the "settlement" demand of between $225,000 and $445,000, Defendants would not pursue their appeal in *Gannet*. If Defendants did not pursue their appeal, then, *Gannett* class members could finally obtain the relief to which they were entitled. Defendants' demand was made in writing directly through the mediator.

68.     Through this "mediation," Plaintiff accepted Defendants' extortion demand of $225,000 and informed Defendants that it would disclose the agreement and seek approval of the court. In response to Plaintiff's requirement for Court approval, Defendants, again through Defendant Bandas, attempted to back out of the deal, fearing that Defendants' written extortion attempt would be brought to the attention of the Court.

## CLASS ALLEGATIONS

69.     **Class Definition:** Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of itself and a class of similarly situated entities, defined as follows:

All entities that paid or agreed to pay fees to any Defendant, related to an objection in a class action settlement, wherein, as a result of the fee, no modifications were made to the settlement, no benefit was provided to the settlement class, and no court approved the payment.

70.     **Numerosity**: The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of at least 100 entities. Members of the Class can be easily identified through Defendants' records.

71.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

    a.   Whether Defendants' conduct violated RICO;

    b.   Whether Defendants' conduct constituted extortion under the Hobbs Act;

    c.   Whether Defendants took part in or facilitated the unauthorized practice of law in violation of the Illinois Attorney Act;

    d.   Whether Defendants' conduct constituted Wire Fraud;

    e.   Whether a permanent injunction is proper to restrain Defendants' conduct of filing frivolous objections to class action settlements;

    f.   Whether Defendants should be deemed vexatious litigants;

    g.   Whether Defendants have abused the court process; and

    h.   Whether Plaintiff and members of the Class are entitled to damages.

72.     **Adequate Representation**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Proposed Class Counsel is competent

and experienced in complex litigation and class actions.[25] Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages as a result of Defendants' uniform wrongful conduct. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff is committed to vigorously prosecuting this action on behalf of the members of the Class, and it has the resources to do so. Plaintiff does not have any interest adverse to those of the other members of the Class.

73.     **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all parties is impracticable, and the damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered, and uniformity of decisions ensured.

74.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

---

[25]     Putative Class Counsel, Edelson PC, disclaims any interest in attorneys' fees to compensate it for serving as Class Counsel, as well as any interest in an incentive award to compensate it for serving at the Class Representative.

## COUNT I
### RICO § 1962
### As Against All Defendants on Behalf of Plaintiff and on Behalf of the Class

75.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

76.      Defendants are culpable persons or entities who are capable of holding legal or beneficial interests in property.

77.     The Objector Enterprise is an association-in-fact comprised of the Defendants and others, known and unknown, who are engaged in and whose activities affect interstate commerce and which have affected and damaged interstate commercial activity.

78.     To further the goals of the Objector Enterprise, which include (1) earning money through extortion, (2) the unauthorized practice of law, and (3) wire fraud, the Defendants agreed to and did conduct and participate in the conduct of the Objector Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally extorting Plaintiff and members of the Class.

79.     Specifically, the Defendants and other members of the Objector Enterprise willfully and intentionally violated numerous state and federal laws with the goal of obtaining money, directly and indirectly, through a pattern of racketeering activities composed of numerous indictable offenses, including but not limited to violations of the Hobbs Act (18 U.S.C. § 1951) and the Illinois Attorney Act (705 ILCS 205/0.01) and Wire Fraud (18 U.S.C. § 1343).

80.     While operating this pattern of racketeering, the Objector Enterprise has engaged in and affected interstate trade. The Objector Enterprise has transacted business in several states, across state lines, using various instrumentalities of interstate commerce such as telephones, the Internet, email, and the United States mail to communicate in furtherance of the activities of the

Objector Enterprise.

81.    The pattern of racketeering activity conducted by the members of the Objector Enterprise is distinct from the Objector Enterprise itself, as each act of racketeering is a separate offense committed by an entity or individual while the Objector Enterprise itself is an association of entities and individuals. The Objector Enterprise has an ongoing structure and/or organization supported by personnel and/or associates with continuing functions or responsibilities.

82.    The racketeering acts set out in this Complaint, and others, had the same pattern and similar purpose of extorting Plaintiff and members of the Class for the benefit of the Objector Enterprise and its members. Each racketeering act was related, had a similar purpose, involved the same or similar participants and methods of commission, and had similar results affecting Plaintiff and members of the Class. The racketeering acts, including violations of the Hobbs Act and the Illinois Attorney Act and acts of Wire Fraud, also related to each other in that they were part of the Objector Enterprise's goal of reaping illicit and unlawful profits from and through the extortion of Plaintiff and the Class to pay attorneys' fees and other money.

83.    The wrongful conduct of the Defendants and others has been and remains part of the Objector Enterprise's ongoing way of doing business and constitutes a continuing threat to the Plaintiff's and the Class's property. Without the repeated acts of violating the Hobbs Act and the Illinois Attorney Act, acts of Wire Fraud, and intentional coordination between all Defendants, the Objector Enterprise's scheme would not have succeeded.

84.    The pattern of racketeering activity through which the affairs of the Objector Enterprise were conducted and in which the Defendants participated consisted of at least the following:

        a.    Filing frivolous objections in class action settlements for the purpose of

extorting the lawyers representing the class;

b.      Concealing which members of the Objector Enterprise are participating in each class action objection;

c.      Concealing the fact that unlicensed attorneys are representing objectors in sharing in attorneys' fees;

d.      Improperly demanding monetary payments, without any benefit to the settlement class, in order to withdraw each objection;

e.      Threatening to appeal when courts overrule their objections unless they are paid sums to which they have no legal entitlement;

f.      On information and belief, engaging the services of purportedly neutral mediators to add legitimacy to their demands, despite using the same (or several of the same) mediators in over a dozen cases; and

g.      Improperly demanding monetary payments to which they have no legal entitlement, without any benefit to the settlement class, in order to not appeal or to withdraw the appeal.

85.     Each Defendant agreed to conduct the affairs of the Objector Enterprise:

a.      Christopher Bandas agreed to conduct the affairs of the Objector Enterprise by, for example, agreeing to (1) identify class action settlements for the Objector Enterprise to object to, including the *Gannett* Settlement; (2) share in any attorneys' fees or other money obtained through any objections to class action settlements, including the *Gannett* Settlement; (3) threaten to file or actually file frivolous objections to extort payment from class counsel; (4) ghostwrite, in whole or in part, the Stewart Objection to the *Gannett* Settlement; and (5) participate in the "mediation" to

"resolve" the Stewart Objection to the *Gannett* Settlement with the mediator knowing that it would be used for the improper purpose of demanding payment without any benefit to the *Gannett* Settlement class.

b.      The Bandas Law Firm PC agreed to conduct the affairs of the Objector Enterprise by ratifying the actions of its principal, Christopher Bandas, identified, in part, above.

c.      Joseph Darrell Palmer agreed to conduct the affairs of the Objector Enterprise by, for example, agreeing to (1) identify class action settlements for the Objector Enterprise to object to, including the *Gannett* Settlement; (2) share in any attorneys' fees or other money obtained through the any objections to class action settlements, including the *Gannett* Settlement; (3) threaten to file or actually file frivolous objections to extort payment from class counsel; (4) recruit his long-time associate Gary Stewart to file an objection in the *Gannett* Settlement; and (5) ghostwrite, in whole or in part, the Stewart Objection to the *Gannett* Settlement.

d.      Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office agreed to conduct the affairs of the Objector Enterprise by ratifying the actions of its principal, Joseph Darrell Palmer, identified, in part, above.

e.      C. Jeffery Thut agreed to conduct the affairs of the Objector Enterprise by, for example, agreeing to file the objection of Gary Stewart in the *Gannett* Settlement. Moreover, Thut agreed to represent to the *Gannett* Court that he was the only attorney for Stewart despite agreeing to share any recovered attorneys' fees with at least Bandas, Palmer, and their law firms despite knowing that Palmer was then (and still) suspended from the practice of law and Bandas would not file any appearance with the Court.

f.      Noonan Perillo & Thut LTD agreed to conduct the affairs of the Objector Enterprise by ratifying the actions of one of its principals, C. Jeffery Thut, identified, in part, above.

g.      Gary Stewart agreed to conduct the affairs of the Objector Enterprise by, for example, agreeing to be a purported objector in the *Gannett* Settlement. Stewart knew that his objection would be overruled and that he and the rest of the Defendants would profit from his objection being overruled by demanding a payment to go away from Plaintiff. Stewart further was aware that Defendant Palmer was suspended from the practice of law.

**Predicate Acts Violating the Hobbs Act, 18 U.S.C. § 1951**

86.     The Hobbs Act, 18 U.S.C. § 1951, prohibits persons "in any way or degree" from "obstruct[ing], delay[ing], or affect[ing] commerce" by "extortion or attempts or conspires to do so."

87.     The Hobbs Act defines "extortion" to mean "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951 (b)(2).

88.     Defendants, through the Objector Enterprise, intentionally used acts of extortion to deprive Plaintiff and the Class of money and property.

89.     Specific to Plaintiff, through the objection brought by Defendants in *Clark v. Gannett Co., Inc.*, Case No. 16-CH-06603 (Cir. Ct. Cook Cty.), Defendants deprived Plaintiff of $225,000.

90.     Defendants deprived Plaintiff of $225,000 knowingly and willfully through an act of extortion. Specifically, Defendants created a fear of economic harm for Plaintiff that, if the fee

demanded was not paid, Defendants would intentionally delay the *Gannett* Settlement through a frivolous appeal which would cause Plaintiff financial harm in the delay, substantial reduction, or cancellation of court-approved attorneys' fees in the *Gannett* Settlement.

91.     As a result of Defendants' extortion of $225,000 from Plaintiff, the interstate commerce associated with the resolution and final approval of the nationwide *Gannett* Settlement was obstructed and delayed. Defendants' objection has directly delayed the distribution of monetary benefits to Gannett class members across the United States.

92.     Defendants, through the Objector Enterprise, carried out nearly identical violations of the Hobbs Act as against members of the Class. Through dozens of class settlements over a period of years, Defendants have coordinated their efforts through the Objector Enterprise to object to class action settlements, demand monetary payments unrelated to any benefit provided to the settlement class, and after such frivolous objections are overruled, demand monetary payments to not appeal or withdraw such appeals, all without ever adding value to the settlements or benefit to the settlement classes. The Objector Enterprise has successfully extorted millions of dollars in unwarranted fees and other money through Defendants' racketeering activities and violations of the Hobbs Act.

93.     At all times, it was reasonably foreseeable that Defendants' violations of the Hobbs Act would be used to further the racketeering activities. And, as described throughout the Complaint, each Defendant agreed to the commission of the Hobbs Act Violation. For instance:

        a.      Christopher Bandas agreed to coordinate the actions of the Defendants and
        to assist in the preparation and filing of the Stewart Objection despite knowing that it was
        frivolous and that demanding $225,000 to forgo the appeal would cause substantial
        economic fear in Plaintiff and amounted to extortion.

b.      The Bandas Law Firm PC agreed to ratify the actions of its principal, Christopher Bandas, at all times knowing of Defendant Bandas's actions.

c.      Joseph Darrell Palmer agreed to recruit Defendant Stewart to act as the purported objector in the Stewart Objection and to assist in the preparation and filing of the objection, despite knowing that the objection was frivolous and that demanding $225,000 to forgo the appeal would cause economic fear in Plaintiff and amounted to extortion.

d.      Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office agreed to ratify the actions of its principal, Joseph Darrell Palmer, at all times knowing of Defendant Palmer's actions.

e.      C. Jeffery Thut agreed to act as the purported sole representative of Defendant Stewart to the *Gannett* Court despite knowing that the objection was frivolous and that demanding $225,000 to forego the appeal would cause economic fear in Plaintiff and amounted to extortion.

f.      Noonan Perillo & Thut LTD agreed to ratify the actions of one of its principals, C. Jeffery Thut, at all times knowing of Defendant Thut's actions.

g.      Gary Stewart agreed to be the named objector in the Stewart Objection knowing that the objection was frivolous and that demanding $225,000 to forego the threat of appeal would cause economic fear in Plaintiff and amounted to extortion.

94.      Because of their violations of the Hobbs Act, Plaintiff and members of the Class were deprived of money and property as detailed herein.

95.      As described in Section II, Defendants, through the Objector Enterprise, have engaged in the same conduct in over 109 class actions in the past decade. That is, according to

publicly available information, Defendants have filed objections to class action settlements,

demand monetary payments unrelated to any benefit provided to the settlement class, and after

such frivolous objects are overruled, demand monetary payments to not appeal or withdraw such

appeals, all without any value added to the settlements or benefit to the settlement classes.

**Predicate Acts Violating the Illinois Attorney Act**

96.     The Illinois Attorney Act requires that:

> No person shall be permitted to practice as an attorney or counselor at law within
> this State without having previously obtained a license for that purpose from the
> Supreme Court of this State. No person shall receive any compensation directly or
> indirectly for any legal services other than a regularly licensed attorney, nor may
> an unlicensed person advertise or hold himself or herself out to provide legal
> services.
>
> …
>
> Any person practicing, charging or receiving fees for legal services or advertising
> or holding himself or herself out to provide legal services within this State, either
> directly or indirectly, without being licensed to practice as herein required, is
> guilty of contempt of court and shall be punished accordingly.

97.     Defendants and others known and unknown, willfully and knowingly did

combine, conspire, and agree together and with each to violate the Illinois Attorney Act by

facilitating or actually taking part in the unauthorized practice of law. Defendants acts were

intentionally misleading and deceptive, and intended to defraud the court and other litigants.

98.     Such violations include, but are not limited to, the following:

        a.      Since at least January 6, 2016, Defendant Palmer has been suspended from

the practice of law.

        b.      Defendant Palmer and his law firm continue to practice law by assisting in

the preparation and filing of objections to class action settlements nationwide and in the

state of Illinois. On October 26, 2016, Palmer took part in the preparation of an objection

in the *Gannett* case. There, Palmer co-opted a personal friend, Gary Stewart, into filing a frivolous objection to a class action settlement and had Stewart state he was represented by Defendants Bandas and Thut in order to conceal his involvement and deceive the court and the other litigants. Defendant Palmer did not file an appearance in the case.

        c.        Additionally, Defendant Bandas is not licensed to practice law in Illinois, did not move for pro hac vice admission, and did not file an appearance with the Court in *Gannett* in order to avoid submitting himself to the jurisdiction of the court despite acting as counsel for Stewart in the *Gannett* action.

99.     All Defendants have participated in and facilitated the unauthorized practice of law by Defendant Palmer and Defendant Bandas. Each Defendant had knowledge of Palmer's suspended status and took steps to conceal his role in ongoing litigation and objections from the court and other litigants.

100.    Likewise, each Defendant had knowledge that Defendant Bandas had failed to obtain pro hac vice admission and file an appearance in the *Gannett* action.

101.    All Defendants have or will improperly share in attorneys' fees with Defendants Palmer and Bandas even though they had not filed appearances on behalf of Defendant Stewart.

102.    Defendants have improperly acted as legal counsel in numerous class action objections without filing an appearance with the relevant court. Defendants likewise have improperly shared in attorneys' fees in numerous cases without complying with relevant state law concerning the practice of law.

103.    As described throughout the Complaint, each defendant agreed to the commission of the Illinois Attorney Act Violation. For instance:

        a.        Christopher Bandas agreed to coordinate and prepare the Stewart

Objection, represent Defendant Stewart in the objection, and share in any attorneys' fees or other money obtained through the Stewart Objection despite never filing an appearance with the *Gannett* Settlement Court. Moreover, Defendant Bandas knew that Defendant Palmer was suspended from the practice of law but nevertheless agreed to co-representation of Defendant Stewart with Defendant Palmer. As such, Defendant Bandas knew that his actions would contribute to his and Defendant Palmer's unlawful practice of law in Illinois, a violation of the Illinois Attorney Act.

b.      The Bandas Law Firm PC agreed to ratify the actions of its principal, Christopher Bandas, at all times knowing of Defendant Bandas's actions.

c.      Joseph Darrell Palmer agreed to solicit and recruit Defendant Stewart as an objector, prepare the Stewart Objection, represent Defendant Stewart in the objection, and share in any attorneys' fees or other money obtained through the Stewart Objection despite never filing an appearance with the *Gannett* Settlement Court and being suspended from the practice of law. As such, Defendant Palmer knew that his actions would constitute the unlawful practice of law in Illinois, a violation of the Illinois Attorney Act.

d.      Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office agreed to ratify the actions of its principal, Joseph Darrell Palmer, at all times knowing of Defendant Palmer's actions.

e.      C. Jeffery Thut agreed to file an appearance with the *Gannett* Court and represent to the Court to be the only attorney for Defendant Stewart in the Stewart Objection. Despite that representation, Defendant Thut had entered into an agreement with at least Defendant Bandas, who Thut knew would not file an appearance with the

court, and Palmer, who Thut knew was suspended from the practice of law, to represent

Defendant Stewart in the Stewart Objection and to share in any attorneys' fees or other

money obtained through the Stewart Objection. Moreover, Defendant Thut knew that

Defendants Bandas's and Palmer's representation would be concealed from the court. As

such, Defendant Thut knew that his actions would contribute to the unlawful practice of

law in Illinois, a violation of the Illinois Attorney Act.

       f.      Noonan Perillo & Thut LTD agreed to ratify the actions of one of its

principals, C. Jeffery Thut, at all times knowing of Defendant Thut's actions

       g.      Gary Stewart agreed to be the named objector in the Stewart Objection

and to be represented by Defendants Bandas, Palmer, and Thut despite knowing that

Defendant Palmer was suspended from the practice of law and that representation by

Defendants Bandas and Palmer would be concealed from the *Gannett* Settlement Court.

104.    Because of these violations of the Illinois Attorney Act and other forms of

unauthorized practice of law, Plaintiff and members of the Class were deprived of money and

property that they would not otherwise have lost. Indeed, as direct and proximate result of the

Defendants' racketeering activities, Plaintiff and members of the Class have been injured in their

business and property in that, at a minimum, paying fees to the Defendants.

**Predicate Acts of Wire Fraud, 18 U.S.C. § 1343**

105.    Defendants, through the Objector Enterprise, intentionally used acts of artifice or

deceit in attempts to deprive Plaintiff and the Class out of money and property.

106.    At all times, it was reasonably foreseeable that interstate wires would be used to

further these acts of artifice or deceit. For instance, Defendants knew that they would use emails

and interstate phone calls to further their scheme, thereby transmitting electronic signals and oral

communications across interstate wires to communicate with Plaintiff and the Class, and they did in fact send such email communications and make phone calls over interstate wires.

107.    As described herein, Defendants engaged in a plan and scheme to defraud Plaintiff. Specifically, on November 30, 2016, Defendants communicated with Plaintiff via interstate Internet wires and represented that Defendants had a non-frivolous objection to the *Gannett* Settlement that could be resolved to the benefit of the class. Plaintiff accepted Defendants' proposal with the understanding that Defendants would in fact inform them of the changes that Defendants would require in the settlement necessary to resolve the objection and benefit the *Gannett* Settlement class.

108.    With that understanding, on December 1, 2016, Plaintiff participated with Defendants' representative Defendant Bandas in the mediation facilitated over interstate telephone and Internet wire.

109.    During the mediation, Defendants demanded that Plaintiff pay $225,000 in return for Defendants withdrawal of their threat of appeal in the *Gannett* Settlement. Defendants, through Defendant Bandas, did not suggest, request, or require that any changes be made to the *Gannett* Settlement in any form. Defendants' demand was made in writing through the mediator over interstate internet wires.

110.    As a direct and proximate cause of Defendants' plan and scheme, Plaintiff agreed and entered into a binding contract to pay $225,000 to Defendants in exchange for Defendants' withdrawal of their threat of appeal in the *Gannett* Settlement.

111.    Defendants intended to profit from their scheme and obtain property belonging to Plaintiff. Specifically, Defendants intended that Plaintiff would pay to Defendants and Defendants would obtain $225,000 as a result of the purported mediation.

112. As described throughout the Complaint, each Defendant agreed to the commission of the Wire Fraud. For instance:

a. Christopher Bandas agreed to participate, as representative of Defendants, in the purported mediation. Defendant Bandas knew that, despite Defendants' representation that the Stewart Objection was filed as a mechanism to improve the *Gannett* Settlement for the benefit of the class, Defendants demanded $225,000 in exchange for foregoing the appeal without any benefit to the class. Moreover, Defendant Bandas knew that the mediation would and did occur over interstate wires and that Defendants intended to obtain the $225,000 from Plaintiff through a wire transfer over state lines.

b. The Bandas Law Firm PC agreed to ratify the actions of its principal Christopher Bandas, at all times knowing of Defendant Bandas's actions.

c. Joseph Darrell Palmer agreed to allow Defendant Bandas to act as his and the other Defendants' representative in the purported mediation. Defendant Palmer knew that, despite Defendants' representation that the Stewart Objection was filed as a mechanism to improve the *Gannett* Settlement for the benefit of the class, Defendants demanded $225,000 in exchange for forgoing the appeal without any benefit to the class. Moreover, Defendant Palmer knew that the mediation would occur over interstate wires and that Defendants intended to obtain the $225,000 from Plaintiff through a wire transfer over state lines.

d. The Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office agreed to ratify the actions of its principal Joseph Darrell Palmer, at all times knowing of Defendant Palmer's actions.

e. C. Jeffery Thut agreed to allow Defendant Bandas to act as his and the other Defendants' representative in the purported mediation. Defendant Thut knew that, despite Defendants' representation that the Stewart Objection was filed as a mechanism to improve the *Gannett* Settlement for the benefit of the class, Defendants demanded $225,000 in exchange for foregoing the appeal without any benefit to the class. Moreover, Defendant Thut knew that the mediation would occur over interstate wires and that Defendants intended to obtain the $225,000 from Plaintiff through a wire transfer over state lines.

f. Noonan Perillo & Thut LTD agreed to ratify the actions of one of its principals C. Jeffery Thut, at all times knowing of Defendant Thut's actions.

g. Gary Stewart agreed to allow Defendant Bandas to act as his and the other Defendants' representative in the purported mediation. Defendant Stewart knew that, despite Defendants' representation that the Stewart Objection was filed as a mechanism to improve the *Gannett* Settlement for the benefit of the class, Defendants demanded $225,000 in exchange for foregoing the appeal without any benefit to the class. Moreover, Defendant Stewart knew that the mediation would occur over interstate wires and that Defendants intended to obtain the $225,000 from Plaintiff through a wire transfer over state lines.

113. As described in Sections II and III and above, each Defendant knew that their agreement to participate in the commission of the predicate acts described above formed a pattern of racketeering activity. For instance:

a. Christopher Bandas entered into an agreement with Palmer and Thut to secretly represent Stewart in the *Gannett* Objection and to share in recovered attorneys'

fees and other money knowing that (1) Palmer could not represent anyone because he was suspended from the practice of law; (2) he and Palmer (and recently, to a lesser extent, Thut) are notorious "professional" objectors who have been admonished by courts across the country for filing frivolous objections to class action settlements to extract profit through extortion; (3) the objection was frivolous; (4) any appeal of their overruled objection would be baseless; (5) the mediation was based upon fraud (*i.e.*, Defendant Bandas knew that the Objection Enterprise did not seek to improve the *Gannett* Settlement in any way but rather was carried out solely for personal profit); (6) the mediation would use interstate telephone and internet wires; and (7) demanding $225,000 in exchange for foregoing an appeal of the Objection Enterprise's *Gannett* Settlement objection without improving the terms of settlement would cause economic fear in Plaintiff. Those actions fit within and are a continuation of the scheme of Defendants' Objection Enterprise. Prior to agreeing to participate, Defendant Bandas knew of the Objection Enterprise's plan and scheme, and in fact, played a primary role in creating it. As such, Defendant Bandas knew that his agreement to participate in the Hobbs Act Violation, the Illinois Attorney Act Violation, and Wire Fraud was a pattern of racketeering activity.

b. The Bandas Law Firm PC knew that its ratification of the actions of its principal, Christopher Bandas, which constitute the Hobbs Act Violation, the Illinois Attorney Act Violation, and Wire Fraud, was part of a pattern of racketeering activity.

c. Joseph Darrell Palmer entered into an agreement with Bandas and Thut to secretly represent Stewart in the *Gannett* Objection and to share in recovered attorneys' fees and other money knowing that (1) he could not represent anyone because he was

suspended from the practice of law; (2) he and Bandas (and recently, to a lesser extent, Thut) are notorious "professional" objectors who have been admonished by courts across the country for filing frivolous objections to class action settlements to extract profit; (3) the objection was frivolous; (4) any appeal of their overruled objection would be baseless; (5) the mediation was based upon fraud (*i.e.*, Defendant Palmer knew that the Objection Enterprise did not seek to improve the *Gannett* Settlement in any way but rather was carried out solely for personal profit); (6) the mediation would use interstate telephone and internet wires; and (7) demanding $225,000 in exchange for forgoing an appeal of the Objection Enterprise's *Gannett* Settlement objection without improving the terms of settlement would cause economic fear in Plaintiff. Those actions fit within and are a continuation of the scheme of Defendants' Objection Enterprise. Prior to agreeing to participate, Defendant Palmer knew of the Objection Enterprise's plan and scheme, and in fact, played a primary role in creating it. As such, Defendant Palmer knew that his agreement to participate in the Hobbs Act Violation, the Illinois Attorney Act Violation, and Wire Fraud formed a pattern of racketeering activity.

d.      Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office knew that its ratification of the actions of its principal, Joseph Darrell Palmer, which constitute the Hobbs Act Violation, the Illinois Attorney Act Violation, and Wire Fraud, was part of a pattern of racketeering activity.

e.      C. Jeffery Thut entered into an agreement with Bandas and Palmer to represent Stewart in the *Gannett* Objection and to share in recovered attorneys' fees and other money knowing that (1) Bandas and Palmer (and, to a lesser extent, Thut himself) are notorious "professional" objectors who have been admonished by courts across the

country for filing frivolous objections to settlements to extract profit; (2) Palmer was suspended from the practice of law; (3) the objection was frivolous; (4) any appeal of their overruled objection would be baseless; (5) the mediation was based upon fraud (*i.e.*, Defendant Thut knew that the Objection Enterprise did not seek to improve the *Gannett* Settlement in any way but rather was carried out solely for personal profit); (6) the mediation would use interstate telephone and internet wires; and (7) that demanding $225,000 in exchange for foregoing an appeal of the Objection Enterprise's *Gannett* Settlement objection without improving the terms of settlement would cause economic fear in Plaintiff. Those actions fit within and are a continuation of the scheme of Defendants' Objection Enterprise. Prior to agreeing to participate, Defendant Thut knew of the Objection Enterprise's plan and scheme, and in fact, played a primary role in creating it. As such, Defendant Thut knew that his agreement to participate in the Hobbs Act Violation, the Illinois Attorney Act Violation, and Wire Fraud formed a pattern of racketeering activity.

f.      Noonan Perillo & Thut LTD knew that its ratification of the actions of one of its principals, C. Jeffery Thut, which constitute the Hobbs Act Violation, the Illinois Attorney Act Violation, and Wire Fraud, was part of a pattern of racketeering activity.

g.      Gary Stewart has known Palmer for decades and knew that Palmer was suspended from the practice of law, that he along with all other Defendants had no good faith basis for objecting to the class action settlement, and that the goal of the *Gannett* Settlement objection was solely to extract personal profit from Plaintiff. Stewart also knew that demanding a large sum of money ($225,000) in exchange for foregoing an appeal of his objection without adding benefit to the class would cause economic fear in

42

Plaintiff. Those actions fit within and are a continuation of the scheme of Defendants'

Objection Enterprise. And Defendant Stewart knew the plan and scheme for the

Objection Enterprise. As such, Defendant Stewart knew that his agreement to participate

in the Hobbs Act Violation, the Illinois Attorney Act Violation, and Wire Fraud formed a

pattern of racketeering activity.

114.    Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble their damages, plus

interest, costs, and reasonable attorneys' fees.

**COUNT II**
**Permanent Injunction Pursuant to the All Writs Act, 28 U.S.C. § 1651**
**As Against Defendants Christopher Bandas, The Bandas Law Firm PC, Joseph Darrell**
**Palmer, Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office, C. Jeffery**
**Thut, Noonan Perillo & Thut LTD, and John Does 1-20 on Behalf of Plaintiff and the Class**

115.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth

herein.

116.    Defendants Christopher Bandas, The Bandas Law Firm PC, Joseph Darrell

Palmer, Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office, C. Jeffery Thut, and

Noonan Perillo & Thut LTD (the "Attorney Defendants") are vexatious litigants and Plaintiff

and the Class seek a permanent injunction to protect against the Attorney Defendants' conduct.

117.    Under the All Writs Act, this Court "may issue all writs necessary or appropriate

in aid of [its] respective jurisdiction[] and agreeable to the usages and principles of law." 28

U.S.C. § 1651 (a). Courts have read the All Writs Act to authorize the restriction of access to

federal courts to parties who repeatedly file frivolous and vexatious litigation.

118.    State and federal courts look to five factors to determine whether a litigant is a

vexatious litigant and that a pre-filing order should be entered against them. The factors are: (1)

the litigant's history of litigation and in particular whether it entailed vexatious, harassing, or

duplicative suits; (2) the litigant's motive in pursuing the litigation (i.e., whether the litigant had a good faith expectation of prevailing); (3) whether the litigant is represented by counsel; (4) whether the litigant has caused unnecessary expense to the parties or placed a needless burden on the courts; and (5) whether other sanctions would be adequate to protect the courts and other parties.

119.     First, as described herein, the Attorney Defendants have a long history of vexatious and harassing litigation. Specifically, the Attorney Defendants have filed frivolous objections to legitimate class actions settlements throughout the country where Plaintiff and members of the Class are class counsel. Defendant Bandas has filed more than 55 objections within the past decade. Defendant Palmer has filed more than 48 objections within the past decade. Defendant Thut has filed at least six objections just since October 2014. Defendants' filings are all similar in that they are often made without the purported client having standing, are all objections to class action settlements, and are filled with frivolous arguments. As described in Section II, courts around the country have reprimanded the Attorney Defendants for filing frivolous objections to legitimate class actions.

120.     Second, the Attorney Defendants have an unlawful motive in pursuing their objections and do not have good faith expectations of prevailing. Specifically, the Attorney Defendants file their objections knowing that the courts will deny them. That is by design. Should courts sustain the Attorney Defendants' objections, there would likely not be any lucrative payout. But by filing frivolous objections that the courts must overrule, the Attorney Defendants can then file or threaten to file an appeal, knowing that their appeals (and the underlying class actions) will take months or years to be resolved.

121.     At that moment, the Attorney Defendants contact class counsel and offer to

withdraw their objections and threat of or actual appeal for a price. The Attorney Defendants use the threat of appeal of frivolous objections to extort a payment from class counsel. The Attorney Defendants' practice is well documented and noted by courts throughout the country. *See* Sections II and Section III, supra.

122.    Third, courts have looked to whether the litigant is represented by counsel as a factor in determining whether the litigant is vexatious because courts often provide protections to *pro se* litigants. But where the Attorney Defendants are attorneys, as is here, that protection is unwarranted.

123.    Fourth, the Attorney Defendants have caused unnecessary expense to Plaintiff and the Class and have placed a needless burden on the courts. As described above, the Attorney Defendants' filings serve no legitimate purpose and are filed with the Attorney Defendants knowing that the objections will be overruled. Yet, the Attorney Defendants file their frivolous and vexatious objections only to harass and extort money from Plaintiff and the Class and never require any change to a class settlement or benefit to the class in exchange for payment. As a result of each and every objection, Plaintiff and the Class must spend time and money, such as attorney time, hard costs (filing fees, printing costs, and more), and discovery costs, responding to frivolous arguments.

124.    Moreover, the Attorney Defendants have placed needless burden on the court systems. The Attorney Defendants' objections have totaled more than 109 over the past decade and have resulted in almost as many frivolous appeals. Courts and their staff have spent countless hours accepting, reading, filing, addressing, and, ultimately, overruling the Attorney Defendants' objections that are filed for an improper purpose.

125.    Fifth, no other sanctions would be adequate to protect the courts, Plaintiff, and the

Class. The Attorney Defendants often (purposely) fail to file appearances in the courts where they file objections so as to avoid the courts levying sanctions against them. As a result, those forum courts (and the class counsel representing class members settling claims) are left without any other means to prevent the Attorney Defendants from filing frivolous and vexatious objections.

126.    Plaintiff and the Class have already suffered harm by and through the Attorney Defendants' frivolous objections and will suffer irreparable harm if the Attorney Defendants are not enjoined from filing further objections without merit.

127.    Because the Attorney Defendants continue to file frivolous objections, even in the face of repeated judicial reprimand and public disapproval, Plaintiff and the Class have no adequate remedy at law. Extortion and improper use of the judicial process are unlawful, and Plaintiff and the Class have a clear and ascertainable right to be protected from the Attorney Defendants' repeated and wrongful acts.

128.    As such, Plaintiff and the Class seek a permanent injunction labeling the Attorney Defendants' vexatious litigants and prohibiting them from (1) ghostwriting objections for the purpose of making their objection seem *pro se*, (2) making or threatening to make objections to class action settlements not for the purpose of improving the settlement but for extracting a payment for themselves, (3) filing with any court objections to class action settlements or appeals of overruled objections without prior screening or approval by the court where their status as vexatious litigants must be disclosed along with a copy of the injunction entered pursuant to this suit, and (4) withdrawing any objection or appeal from the overruling of any objection without disclosing payment in exchange for doing so and any corresponding benefit provided to the class.

<u>**COUNT III**</u>
**Abuse of Process**
**As Against All Defendants on Behalf of Plaintiff and the Class**

129.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

130.    As described herein, Defendants have instituted proceedings against Plaintiff and the Class for an improper purpose. Specifically, Defendants have filed frivolous objections to legitimate class action settlements throughout the country where Plaintiff are class counsel. Knowing that the courts will deny their objections, Defendants then appeal or threaten to appeal such decisions. Defendants' know that their appeals (and the underlying class action) will take years to be resolved and offer to withdraw their appealed objections for a price. That is, Defendants use the threat of appeal of frivolous objections to extort a payment from class counsel. Defendants never require any change to a class settlement or benefit to the class in exchange for payment.

131.    Defendants have used the class action objection mechanism in a way not proper in the regular prosecution of the proceedings. As described herein, Defendants have engaged in the misapplication of the objection process and have used the objection process to accomplish results (the extortion of class counsel for personal profit) beyond the process's purview. The purpose of the class action objection is, in part, to reveal divergent interests of class members or exhibit the need to alter the class definition or to designate subclasses. In other words, it is not the intended purpose of a class action objection to extort payments from class counsel.

132.    Nevertheless, Defendants have used the class action objection process to accomplish a result the objection itself could not accomplish. Courts award fees to objectors who provide a benefit to the class. When used properly, the objection device cannot be employed to

obtain payment from class counsel or the class without providing a service or benefit to the class. Yet, Defendants have used the class action objection process in an attempt to extort a payment of fees from class counsel without making or seeking to make any change to a class action settlement.

133.    Plaintiff and the Class have been damaged by Defendants' scheme. As a proximate and foreseeable result of the Defendants' abuse of process, Plaintiff and the Class have lost money, paid attorneys' fees, court costs, and suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Edelson PC prays for the following relief:

a.    Certify this case as a class action on behalf of the Class defined above, appointing Edelson PC as representative of the Class, and appointing it as class counsel;

b.    An order under the All Writs Act labeling the Attorney Defendants as vexatious litigants and a judgment for injunctive relief prohibiting the Attorney Defendants from filing objections to class actions without prior screening and approval of the Court, amongst other things;

c.    An order finding that Defendants actions were an abuse of process;

d.    An order finding that Defendants' actions, as set out above, violate RICO, the Hobbs Act, and the Illinois Attorney Act, and constitute Wire Fraud;

e.    Enter judgment against Defendants for monetary, actual, consequential, and compensatory damages caused by their unlawful conduct;

f.    Award Plaintiff reasonable costs;

g.    Award Plaintiff pre- and post-judgment interest;

        h.      Enter judgment for injunctive, statutory and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and,

        i.      Award such other and further relief as equity and justice may require.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.


Respectfully Submitted,

**EDELSON PC**, individually and on behalf of all others similarly situated,

Dated: December 5, 2016        By:  /s/ Rafey S. Balabanian
                         One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin H. Richman
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian
rbalabanian@edelson.com
Eve-Lynn Rapp
erapp@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435