## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| EDELSON PC, an Illinois professional corporation, individually, and on behalf of all others similarly situated, | Case No. 1:16-cv-11057 |
| *Plaintiff*, | Hon. Rebecca R. Pallmeyer |
| *v.* | |
| THE BANDAS LAW FIRM PC, a Texas professional corporation, CHRISTOPHER BANDAS, an individual, LAW OFFICES OF DARRELL PALMER PC d/b/a DARRELL PALMER LAW OFFICE, a suspended California professional corporation, JOSEPH DARRELL PALMER, an individual, NOONAN PERILLO & THUT LTD., an Illinois corporation, C. JEFFERY THUT, an individual, GARY STEWART, an individual, and JOHN DOES 1-20, | |
| *Defendants*. | |

## PLAINTIFF'S COMBINED RESPONSE TO MOTIONS TO DISMISS OF THE BANDAS LAW FIRM PC, CHRISTOPHER BANDAS, NOONAN PERILLO & THUT LTD., C. JEFFREY THUT, AND GARY STEWART

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

    I.   The Illinois Objector Enterprise ................................................................................ 2

        A.   The Boss: Christopher Bandas ......................................................................... 2

        B.   The Associate Attorneys: C. Jeffrey Thut and Joseph Darrell Palmer ............ 4

        C.   The Objectors: Gary Stewart and Others ......................................................... 5

    II.  The Enterprise's Schemes .......................................................................................... 5

    III. Plaintiff Edelson PC and the *Gannett* Litigation ..................................................... 7

ARGUMENT ..................................................................................................................... 9

    I.   The Court Has Jurisdiction Over this Case ................................................................. 9

        A.   The Court Has Federal Question and Diversity Jurisdiction ........................... 9

        B.   The *Rooker-Feldman* Doctrine Does Not Apply ........................................... 11

    II.  Federal Law Does Not Immunize Defendants' Conduct Merely Because Defendants Abuse the Judicial System to Achieve Their Ends ......................................................... 12

        A.   *Noerr-Pennington* Only Applies to Petitioning the Court, Not Private Settlement Negotiations ...................................................................................................... 13

        B.   *Noerr-Pennington* Does Not Protect Defendants' Sham Litigation ............. 15

        C.   If a Federal Common Law Litigation Privilege Exists, Which Is Questionable, It Does Not Apply Here ................................................................................................ 18

    III. Edelson States a Claim for a Direct RICO Violation under 1962(c) ......................... 19

        A.   Activity Related to Litigation Is Commonly Actionable and is Permitted Under RICO's Text ................................................................................................................... 20

B.  The Enterprise Extorted Edelson and Many Others........................................ 22

    1.  Defendants Had No Even Arguably Lawful Claim to $225,000 in
Attorneys' Fees. ........................................................................................ 24

    2.  Holding Defendants Liable for Extortion Would Not Have Any Effect on Bona Fide
Objectors Who Seek to Change a Class Action Settlement ..................... 27

    3.  Malicious Prosecution Does Not Cover Class Action Objections............ 31

C.  The Enterprise Bribes Objectors and Obstructs Justice ................................. 32

D.  Edelson Was Injured by Defendants' Money Laundering............................... 35

E.  Defendants Committed Mail and Wire Fraud to Advance the Enterprise's Interests. .. 36

F.  Defendants Tampered with Witnesses in Federal Proceedings ...................... 39

G.  Defendants Engaged in a Pattern of Racketeering Activity............................ 40

IV.  Edelson Stated a Claim for RICO Conspiracy under 1962(c) ......................... 41

V.  Edelson States a RICO Claim Against Stewart ................................................ 43

A.  Stewart Was More than a Passive Participant in the Enterprise ................... 44

B.  Stewart's Participation in One of the Enterprise's Schemes Is Enough to Hold Him
Liable for Conspiracy .................................................................................... 45

VI.  Defendants Abused Court Process by Using the District Court's Denial of the Stewart
Objection to Extort Money from Edelson........................................................ 47

A.  Edelson States a Claim for Abuse of Process ................................................ 47

B.  Illinois Litigation Privilege Does Not Bar Plaintiff's Claims Against Thut................ 48

VII.  Illinois Did Not—And Cannot—Prevent Adjudication of Unauthorized Practice of Law
Claims in Federal Court .................................................................................. 50

VIII.  The Court Should Exercise Its Discretion to Curb Vexatious Litigants ......................... 52

CONCLUSION..................................................................................................... 54

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) ................................................................................................ 25

*California Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972) ................................................................................. 15, 16, 17

*City of Columbia v. Omni Outdoor Advert., Inc.*,
    499 U.S. 365 (1991) ................................................................................. 15, 16, 17

*Edmond v. United States*,
    520 U.S. 651 (1997) ................................................................................................ 51

*Lance v. Dennis*,
    546 U.S. 459 (2006) ................................................................................................ 11

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    134 S. Ct. 1749 (2014) ........................................................................................... 13

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries*,
    508 U.S. 49 (1993) ........................................................................................... 15, 16

*Railway Co. v. Whitton's Adm'r*,
    80 U.S. (13 Wall.) 270 (1871) .............................................................................. 51

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ................................................................................................ 44

*Salinas v. United States*,
    522 U.S. 52 (1997) ........................................................................................... 46, 47

*Schmuck v. United States*,
    489 U.S. 705 (1989) ................................................................................................ 37

*Tower v. Glover*,
    467 U.S. 914 (1984) ................................................................................................ 18

*United States v. Aguilar*,
    515 U.S. 593 (1995) ................................................................................................ 35

**United States Circuit Court of Appeals Cases**

*Albert Trostel & Sons Co. v. Notz*,
    679 F.3d 627 (7th Cir. 2012) ................................................................................ 51

*Allen v. J.P. Morgan Chase Bank, NA,*
  No. 15-3425, 2015 WL 12714382 (7th Cir. Dec. 4, 2015) ........................................ 4

*Bachman v. Bear, Stearns & Co.,*
  178 F.3d 930 (7th Cir. 1999) ............................................................................ 44

*Baravati v. Josephthal, Lyon & Ross, Inc.,*
  28 F.3d 704 (7th Cir. 1994) .............................................................................. 19

*Bezdek v. Vibram USA, Inc.,*
  809 F.3d 78 (1st Cir. 2015) ............................................................................... 22

*Bible v. United Student Aid Funds, Inc.,*
  799 F.3d 633 (7th Cir. 2015) ...................................................................... 19, 44

*Carr v. Tillery,*
  591 F.3d 909 (7th Cir. 2010) .............................................................................. 9

*Cf. LM Ins. Corp. v. Spaulding Enterprises Inc.,*
  533 F.3d 542, 552 (7th Cir. 2008) .................................................................... 11

*Cole v. Young,*
  817 F.2d 412 (7th Cir. 1987) ............................................................................ 50

*Corley v. Rosewood Care Ctr., Inc. of Peoria,*
  388 F.3d 990 (7th Cir. 2004) ............................................................................ 40

*De Long v. Hennessey,*
  912 F.2d 1144 (9th Cir. 1990) .......................................................................... 53

*Deck v. Engineered Laminates,*
  349 F.3d 1253 (10th Cir. 2003) ................................................................... 28, 38

*DeGuelle v. Camilli,*
  664 F.3d 192 (7th Cir. 2011) ............................................................................ 43

*Domanus v. Locke Lord LLP,*
  847 F.3d 469 (7th Cir. 2017) ............................................................................ 42

*Duhaime v. John Hancock Mut. Life Ins. Co.,*
  183 F.3d 1 (1st Cir. 1999) ................................................................................ 22

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.,*
  831 F.3d 815 (7th Cir. 2016) ............................................................................ 42

*Empress Casino Joliet Corp. v. Johnston*,
    763 F.3d 723 (7th Cir. 2014) ................................................................. 19

*Freeman v. Lasky, Haas & Cohler*,
    410 F.3d 1180 (9th Cir. 2005) ............................................................... 13

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
    806 F.3d 162 (3d Cir. 2015) ............................................................ 16, 17

*Iqbal v. Patel*,
    780 F.3d 728 (7th Cir. 2015) ................................................................. 12

*Johnson v. Pushpin Holdings, LLC*,
    748 F.3d 769 (7th Cir. 2014) ................................................................. 12

*Johnson v. Wattenbarger*,
    361 F.3d 991 (7th Cir. 2004) ................................................................. 10

*Kelley v. Med-1 Sols., LLC*,
    548 F.3d 600 (7th Cir. 2008) ................................................................. 11

*Lightspeed Media Corp. v. Smith*,
    761 F.3d 699 (7th Cir. 2014) ................................................................. 21

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
    431 F.3d 353 (9th Cir. 2005) ................................................................. 21

*Marshall & Ilsley Trust Co. v. Pate*,
    819 F.2d 806 (7th Cir. 1987) ............................................................ 40, 41

*Mirfasihi v. Fleet Mortg. Corp.*,
    551 F.3d 682 (7th Cir. 2008) ............................................................ 24, 25

*Molski v. Evergreen Dynasty Corp.*,
    500 F.3d 1047 (9th Cir. 2007) .......................................................... 52, 53

*New W., L.P. v. City of Joliet*,
    491 F.3d 717 (7th Cir. 2007) ................................................................. 12

*Pace v. Timmermann's Ranch & Saddle Shop Inc.*,
    795 F.3d 748 (7th Cir. 2015) ............................................................ 48, 49

*Pearson v. NBTY, Inc.*,
    772 F. 3d 778 (7th Cir. 2014) ............................................................ 1, 29

*Primetime 24 Joint Venture v. Nat'l Broad. Co.*,
219 F.3d 92 (2d Cir. 2000) ......................................................... 16

*Religious Tech. Ctr. v. Wollersheim*,
971 F.2d 364 (9th Cir. 1992) ....................................................... 18

*Rennell v. Rowe*,
635 F.3d 1008 (7th Cir. 2011) ..................................................... 24

*Reynolds v. Beneficial Nat. Bank*,
288 F.3d 277 (7th Cir. 2002) ................................................. 26, 29

*Richmond v. Nationwide Cassel L.P.*,
52 F.3d 640 (7th Cir. 1995) ......................................................... 44

*Risse Cadek v. Great Lakes Dragaway, Inc.*,
58 F.3d 1209 (7th Cir. 1995) ....................................................... 11

*Rodriguez v. Disner*,
688 F.3d 645 (9th Cir. 2012) ....................................................... 26

*Ryan v. Illinois Dep't of Children & Family Servs.*,
185 F.3d 751 (7th Cir. 1999) ....................................................... 33

*Safir v. U.S. Lines, Inc.*,
792 F.2d 19 (2d Cir. 1986)........................................................... 52

*Skelton v. General Motors Corp.*,
860 F.2d 250 (7th Cir. 1988) ....................................................... 26

*Sosa v. DIRECTV, Inc.*,
437 F.3d 923 (9th Cir. 2006) ....................................................... 38

*Steffes v. Stepan Co.*,
144 F.3d 1070 (7th Cir. 1998) ................................................. 19, 48

*Tri–Corp Hous. Inc. v. Bauman*,
826 F.3d 446 (7th Cir. 2016) ....................................................... 15

*United States v. Blaszak*,
349 F.3d 881 (6th Cir. 2003) ....................................................... 33

*United States v. Cueto*,
151 F.3d 620 (7th Cir. 1998) ............................................. 20, 28, 35

*United States v. Domnenko,*
  763 F.3d 768 (7th Cir. 2014) ............................................................. 36

*United States v. Eisen,*
  974 F.2d 246 (2d Cir. 1992)........................................................... 20, 38

*United States v. Garcia,*
  754 F.3d 460 (7th Cir. 2014) ............................................................. 46

*United States v. LaShay,*
  417 F.3d 715 (7th Cir. 2005) ............................................................. 39

*United States v. Leahy,*
  464 F.3d 773 (7th Cir. 2006) ............................................................. 36

*United States v. Malone,*
  484 F.3d 916 (7th Cir. 2007) ............................................................. 35

*United States v. Pendergraft,*
  297 F.3d 1198 (11th Cir. 2002) ..................................................... 28, 29

*United States v. Powell,*
  576 F.3d 482 (7th Cir. 2009) ............................................................. 36

*United States v. Sturm,*
  870 F.2d 769 (1st Cir. 1989).......................................................... 24, 30

*United States v. Teitler,*
  802 F.2d 606 (2d Cir. 1986).............................................................. 20

*United States v. Turner,*
  551 F.3d 657 (7th Cir. 2008) ............................................................. 37

*USS–POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL–CIO,*
  31 F.3d 800 (9th Cir. 1994) .......................................................... 16, 17

*Vizcaino v. Microsoft Corp.,*
  290 F.3d 1043 (9th Cir. 2002) ........................................................... 26

*Vollmer v. Selden,*
  350 F.3d 656 (7th Cir. 2003) ..................................................... passim

*Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27,*
  728 F.3d 354 (4th Cir. 2013) ............................................................. 16

*Weissman v. Quail Lodge, Inc.*,
  179 F.3d 1194 (9th Cir. 1999) .................................................. 52

*Zahn v. N. Am. Power & Gas, LLC*,
  815 F.3d 1082 (7th Cir. 2016) .............................................. 17, 41

**United States District Court Cases**

*Aranda v. Caribbean Cruise Line, Inc.*,
  No. 12 C 4069, 2017 WL 818854 (N.D. Ill. Mar. 2, 2017) ...................... 7

*Armada (Singapore) PTE Ltd. v. AMCOL Int'l Corp.*,
  No. 13 C 3455, 2013 WL 5781845 (N.D. Ill. Oct. 25, 2013) ................... 38

*Barnes v. Fleetboston Fin. Corp.*,
  No. CA 01-10395-NG, 2006 WL 6916834 (D. Mass. Aug. 22, 2006) .............. 17

*Blevins v. Hudson & Keyse, Inc.*,
  395 F. Supp. 2d 662 (S.D. Ohio 2004) ..................................... 18

*Brook v. Sanofi-Aventis U.S., LLC*,
  No. 2:14-CV-976, 2014 WL 7272243 (S.D. Ohio Dec. 18, 2014) ................ 22

*Chambers v. Whirlpool Corp.*,
  No. CV111733FMOJCGX, 2016 WL 5922456 (C.D. Cal. Oct. 11, 2016) ............. 2

*Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*,
  758 F. Supp. 2d 153 (E.D.N.Y. 2010) .................................... 28, 31

*E. Savings Bank, FSB v. Papageorge*,
  31 F. Supp. 3d 1 (D.D.C. 2014) ........................................... 33

*Gallagher v. Gurstel, Staloch & Chargo, P.A.*,
  645 F. Supp. 2d 795 (D. Minn. 2009) ...................................... 18

*Garber v. Office of Comm'r of Baseball*,
  No. 12-CV-03704 (VEC), 2017 WL 752183 (S.D.N.Y. Feb. 27, 2017) ........... 3, 22

*Garlock Sealing Techs., LLC v. Shein*,
  No. 3:14-CV-137, 2015 WL 5155362 (W.D.N.C. Sept. 2, 2015) ............... 37, 39

*Guaranteed Rate, Inc. v. Barr*,
  912 F. Supp. 2d 671 (N.D. Ill. 2012) ..................................... 40

*Hall Am. Ctr. Assocs. Ltd. P'ship v. Dick*,
  726 F. Supp. 1083 (E.D. Mich. 1989) .................................... 24, 30

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   281 F.R.D. 531 (N.D. Cal. 2012)................................................................................ 2

*In re Gen. Elec. Co. Sec. Litig.*,
   998 F. Supp. 2d 145 (S.D.N.Y. 2014) ...................................................................... 22

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
   No. 09CV1088 BTM KSC, 2013 WL 5275618, at *5 (S.D. Cal. Sept. 17, 2013) ........... 2, 6, 16

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
   No. 09CV1088 BTM KSC, 2014 WL 815394 (S.D. Cal. Mar. 3, 2014) ................................ 3

*In re Initial Pub. Offering Sec. Litig.*,
   728 F. Supp. 2d 289 (S.D.N.Y. 2010) ................................................................ 18, 22

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*,
   No. 13 C 9116, 2014 WL 7237208 (N.D. Ill. Dec. 17, 2014) ..................................... 1

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   968 F. Supp. 2d 367 (D. Mass. 2013) ..................................................................... 13

*In re Polyurethane Foam Antitrust Litig.*,
   178 F. Supp. 3d 635 (N.D. Ohio 2016) ................................................................... 22

*Intercom Ventures, LLC v. FasTV, Inc.*,
   No. 13 C 232, 2013 WL 2357621 (N.D. Ill. May 28, 2013) ..................................... 47

*Kolinek v. Walgreen Co.*,
   311 F.R.D. 483 (N.D. Ill. 2015)................................................................................ 26

*La Suisse, Societe d'Assurances Sur La Vie v. Kraus*,
   No. 06 CIV. 4404 CM GWG, 2014 WL 3610890 (S.D.N.Y. July 21, 2014).................... 24, 30

*Lemelson v. Wang Labs., Inc.*,
   874 F. Supp. 430 (D. Mass. 1994) .......................................................................... 24

*Lockhart v. HSBC Fin. Corp.*,
   No. 13 C 9323, 2014 WL 3811002 (N.D. Ill. Aug. 1, 2014)...................................... 28

*Marconi v. Indiana Mun. Power Agency*,
   No. 14 C 7291, 2015 WL 4778528 (N.D. Ill. Aug. 13, 2015) ................................... 10

*Murphy v. Farmer*,
   176 F. Supp. 3d 1325 (N.D. Ga. 2016) .................................................................. 21

*Nakahara v. Bal*,
    No. 97 CIV. 2027 (DLC), 1998 WL 35123 (S.D.N.Y. Jan. 30, 1998) ................................... 31

*Nesbitt v. Regas*,
    No. 13 C 8245, 2015 WL 1331291 (N.D. Ill. Mar. 20, 2015) ........................................... 44, 45

*NSB Techs., Inc. v. Specialty Direct Mktg., Inc.*,
    No. 03 CV 2323, 2004 WL 1918708 (N.D. Ill. Aug. 20, 2004) ............................................ 19

*Orlando Residence Ltd. v. GP Credit Co., LLC*,
    609 F. Supp. 2d 813 (E.D. Wis. 2009) ............................................................................... 52

*Spiegel v. Cont'l Illinois Nat. Bank*,
    609 F. Supp. 1083 (N.D. Ill. 1985) .................................................................................... 38

*Stone v. Wash. Mut. Bank*,
    No. 10 C 6410, 2011 WL 3678838 (N.D. Ill. Aug. 19, 2011) ............................................. 18

*Toyo Tire & Rubber Co. v. Atturo Tire Corp.*,
    No. 14 C 0206, 2017 WL 1178224 (N.D. Ill. Mar. 30, 2017) ........................................ 13, 14

*USA Satellite & Cable, Inc. v. Mac Naughton*,
    No. 15 C 6331, 2016 WL 3262002 (N.D. Ill. June 14, 2016) ............................................. 49

**State Court Cases**

*Brundidge v. Glendale Fed. Bank, F.S.B.*,
    659 N.E.2d 909 (Ill. 1995) ................................................................................................ 25

*Cmty. Nat. Bank in Monmouth v. McCrery*,
    509 N.E.2d 122 (Ill. App. Ct. 1987) .............................................................................. 47, 48

*Coplea v. Bybee*,
    8 N.E.2d 55 (Ill. App. Ct. 1937) ...................................................................................... 11

*In re Palmer*,
    No. 12-O-16924, 2016 WL 364192 (Cal. Bar Ct. Jan. 6, 2016) ............................................ 5

*In re Weiss*,
    870 N.Y.S.2d 255 (App. Div. 2008) ................................................................................. 21

*Johnson v. Johnson & Bell, Ltd.*,
    7 N.E.3d 52 (Ill. App. Ct. 2014) ...................................................................................... 49

*King v. First Capital Fin. Servs. Corp.*,
    828 N.E.2d 1155 (Ill. 2005) .............................................................................................. 51

*Kumar v. Bornstein*,
    820 N.E.2d 1167 (Ill. App. Ct. 2004) ...................................................... 48

*Morris B. Chapman & Assocs., Ltd. v. Kitzman*,
    739 N.E.2d 1263 (Ill. 2000) ................................................................ 25

*O'Callaghan v. Satherlie*,
    36 N.E.3d 999 (Ill. App. Ct. 2015) ...................................................... 49

*People v. Jackson*,
    596 N.E.2d 1251 (Ill. App. Ct. 1992) .................................................... 34

*People v. Wallace*,
    312 N.E.2d 263 (Ill. 1974) ............................................................ 33, 34

*Richard F. Mallen & Assocs., Ltd. v. Myinjuryclaim.com Corp.*,
    769 N.E.2d 74 (Ill. App. Ct. 2002) ...................................................... 51

*Scholtens v. Schneider*,
    671 N.E.2d 657 (Ill. 1996) ................................................................ 25

*Slovinski v. Elliot*,
    927 N.E.2d 1221 (Ill. 2010) ............................................................... 11

*Thompson v. Frank*,
    730 N.E.2d 143 (Ill. App. Ct. 2000) ..................................................... 49

*Williams v. Ill. State Scholarship Comm'n*,
    563 N.E.2d 465 (Ill. 1990) ................................................................ 50

*Withall v. Capitol Fed. Sav. of Am.*,
    518 N.E.2d 328 (Ill. App. Ct. 1987) .................................................. 31, 32

*Zdeb v. Baxter Int'l, Inc.*,
    697 N.E.2d 425 (Ill. App. Ct. 1998) ..................................................... 49

**Statutory Provisions**

18 U.S.C. § 1503 ............................................................................. 35

18 U.S.C. § 1512 ............................................................................. 39

18 U.S.C. § 1951 ............................................................................. 23

18 U.S.C. § 1956 ............................................................................. 35

18 U.S.C. § 1961 ................................................................................................... 19

18 U.S.C. § 1962 ............................................................................................ passim

18 U.S.C. § 1963 ................................................................................................... 45

18 U.S.C. § 1964 ................................................................................................... 10

18 U.S.C. § 201 ..................................................................................................... 33

28 U.S.C. § 1331 ..................................................................................................... 9

28 U.S.C. § 1651 ................................................................................................... 52

705 ILCS 205 ................................................................................................. 50, 51

720 ILCS 5 ............................................................................................................ 33

**Rules**

Fed. R. Civ. P. 23 ................................................................................................. 31

**Other Authorities**

*Black's Law Dictionary* (7th ed.1999)........................................................... 22, 23

Jonathan D. Glater*, Class-Action Lawyer Gets 30 Months in Prison*,
    N.Y. Times (June 3, 2008), https://nyti.ms/2qqUZD9 ........................................ 21

Plea Agreement and Sentencing Stipulations, *United States v. Steele*, No. 16-cr-00334, dkt. 43
    (D. Minn. Mar. 6, 2017)........................................................................................ 21

Restatement (Second) of Torts § 586 (1977)............................................................. 48

## INTRODUCTION

Class action objectors provide an indispensable service to the courts and to the public by calling attention to weaknesses in class action settlements and preventing class counsel from selling out absent class members. *Pearson v. NBTY, Inc.*, 772 F. 3d 778, 787 (7th Cir. 2014). Indeed, Plaintiff Edelson PC, a law firm that more typically serves in the role of class counsel, has successfully represented objectors who were about to be disadvantaged by an unfair settlement. *See In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, No. 13 C 9116, 2014 WL 7237208, at *10 (N.D. Ill. Dec. 17, 2014) (denying approval of settlement containing terms that were "unreasonable and unfair" to absent class members).

But Defendants here are not that kind of objector. Through their Illinois Objector Enterprise, Defendants are using the objection device to run a protection racket. They swoop in at the very end of a class action, after the case has been settled, and file a baseless objection on behalf of "clients" who are part of the Enterprise. After the objection is invariably overruled, the Defendants demand payment of hundreds of thousands of dollars to themselves from class counsel without ever requesting or obtaining a change to the underlying class action settlement. If they get their take, then they go away. If class counsel refuses to pay up, Defendants abuse the appellate courts to tie up the attorneys' and the class's money for years as retribution. Usually though, that second part never happens, because the economic pressure they exert results in Defendants getting paid.

In response to these allegations, Defendants set forth a scattershot defense, which Edelson addresses in detail below. The main thrust of their briefing, however, is that Defendants cannot be held liable because their racketeering—unlike more traditional organized crime— relies in part on the judicial system to help carry out their threats. Some degree of coercion is

1

inherent in all litigation, but Defendants' scheme doesn't involve filing any lawsuit against any person for any alleged violation of any law. When they demand payment, they do not even pretend that they are seeking to vindicate anyone's legal rights. Instead, they propose an undisguised extortionate transaction: here's how much protection money you have to pay us in order to release your money and the class's money. Edelson urges the Court to reject Defendants' dangerous view that involving the judiciary in their schemes is a free pass to commit extortion (and a host of other crimes) without fear of consequences.

## BACKGROUND

### I. The Illinois Objector Enterprise

This case involves a host of racketeering acts committed by Defendants' Illinois Objector Enterprise (the "Enterprise"), a hierarchical association whose goal is to hold up class action settlements in order to extort an unjustified payment of attorneys' fees. The Enterprise has three types of members: one boss, a handful of associate attorneys, and various objectors.

### A. The Boss: Christopher Bandas

Defendant Christopher Bandas along with his law firm, Defendant The Bandas Law Firm PC, (collectively, in the singular, "Bandas"), is the ringleader of the Illinois Objector Enterprise. (First Amended Complaint ("FAC"), Dkt. 50 ¶ 115.) Federal courts have described Bandas as "a 'professional' or 'serial' objector"[1] who has a "bad motive"[2] for "routinely filing meritless objections to class action settlements for the improper purpose of extracting a fee,"[3] and whose

---

[1]    *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012).
[2]    *In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09CV1088 BTM KSC, 2013 WL 5275618, at *5 (S.D. Cal. Sept. 17, 2013).
[3]    *Chambers v. Whirlpool Corp.*, No. CV111733FMOJCGX, 2016 WL 5922456, at *7 (C.D. Cal. Oct. 11, 2016).

behavior is "unfitting for any member of the legal profession[.]"[4] "[C]ourts throughout the country" have found that "Bandas has orchestrated the filing of … frivolous objection[s] in an attempt to throw a monkey wrench into the settlement process and to extort a pay-off." (FAC ¶ 46) (quoting *Garber*, 2017 WL 752183, at *5). He has coordinated objections to at least 85 class action settlements over the last 10 years, none of which have provided any benefit to the settlement class. (FAC ¶¶ 40-41.)

Bandas and his firm provide the leadership and command of the Enterprise. Bandas decides which class actions to object to, drafts the objections, and conducts the "negotiations" where he extorts or attempts to extort class counsel, who are Plaintiff and the putative class here. (FAC ¶ 120.) Bandas, not the purported client, decides whether to "settle" the objection and how much money to take. (FAC ¶ 115.) When the Enterprise's schemes succeed, money is paid directly to Bandas as "attorneys' fees," and he decides how much to pay to each member. (*Id.*)

Although courts routinely condemn his conduct, Bandas nearly always manages to wriggle out of serious consequences. Often, other members of the Enterprise insulate Bandas from sanctions and reprimand either by submitting objections drafted by Bandas "*pro se*," or, in the case of associate attorneys, by signing the objections instead of Bandas. (FAC ¶¶ 40, 82-83, 127, 241.) He is then able to argue that the court lacks jurisdiction to sanction him.[5] This Court once tried to rein in his frivolous appeal with a substantial bond, which the Seventh Circuit

---

[4]     *Garber v. Office of Comm'r of Baseball*, No. 12-CV-03704 (VEC), 2017 WL 752183, at *5 (S.D.N.Y. Feb. 27, 2017).

[5]     *See, e.g.*, *In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09CV1088 BTM KSC, 2014 WL 815394, at *3 (S.D. Cal. Mar. 3, 2014) ("Because it is doubtful whether the Court has jurisdiction to sanction Mr. Bandas, the Court declines to issue an Order to Show Cause[.]"); *Garber*, 2017 WL 752183, at *6 ("Although Bandas' behavior in this proceeding provides strong indicia of his subjective bad faith, the Court is not convinced that it has jurisdiction to sanction him, given that he has not appeared in this case, and he is not a member of the bar of the Southern District of New York.").

reduced to only $5,000 because "[s]pecial problems related to abuse by class action objectors must be handled in other ways[.]" *Allen v. J.P. Morgan Chase Bank, NA*, No. 15-3425, 2015 WL 12714382, at *1 (7th Cir. Dec. 4, 2015).

### B. The Associate Attorneys: C. Jeffrey Thut and Joseph Darrell Palmer

A revolving cast of associate attorneys assist Bandas in operating the Enterprise. These associates have two main functions. First, they find "clients" who are willing to accept bribes in exchange for putting their names on objections and submitting (often false) sworn statements to state and federal courts. (FAC ¶ 116.) Second, they act as local counsel so that the Enterprise can run its racket in multiple federal districts while hiding its true nature and insulating Bandas from liability or sanctions. (*Id.*) When the Enterprise turns a profit by extorting class counsel, Bandas doles out a portion of the take to the associates involved. (FAC ¶¶ 115, 130, 133.)

Defendant C. Jeffrey Thut along with his law firm, Defendant Noonan Perillo & Thut Ltd. (collectively, in the singular, "Thut"), is currently the Enterprise's primary associate in this role. (FAC ¶ 116.) He took over after the previous associate, Alan Barinholtz, was reprimanded by the Illinois ARDC for his conduct and left the Enterprise. (FAC ¶¶ 116-17 and Ex. I.) Thut has enlisted a number of his acquaintances to be part of the Enterprise, including his own daughter and his longtime business associate Robert Burack. (FAC ¶¶ 59-60.) He has also signed objections so that Bandas can avoid seeking admission to the court. (FAC ¶¶ 82-83.)

Defendant Joseph Darrell Palmer along with his law firm Defendant Law Offices of Darrell Palmer PC (collectively, in the singular, "Palmer") also fills the associate attorney role, although his participation is now more limited than it once was. Palmer's law license was suspended for filing numerous *pro hac vice* applications under oath without disclosing his disciplinary history on the application forms, which included a prior suspension from practice as

4

a result of a criminal conviction in Colorado. (FAC ¶ 118; *In re Palmer*, No. 12-O-16924, 2016 WL 364192 (Cal. Bar Ct. Jan. 6, 2016)). He still recruits objectors for the Enterprise and shares in its profits. (FAC ¶ 118, 130.) Despite losing his law license, Palmer still assists in the preparation and filing of objections, as well as giving legal advice. (FAC ¶¶ 56, 118.)[6]

### C.    The Objectors: Gary Stewart and Others

On the bottom rung of the Enterprise are the supposed clients—the objectors themselves. Although their names appear at the top of the court filings, they agree to relinquish control of their case to Bandas in order to achieve the goals of the enterprise. (FAC ¶¶ 115, 119.) In exchange for their cooperation and their sworn statements, the Enterprise cuts them into the profits when the scheme is successful. (FAC ¶¶ 119, 121.) The objectors are often repeat players, and they are generally friends or other acquaintances of the associate attorneys, since the associate attorneys have primary responsibility for finding the objectors. (FAC ¶¶ 116, 119.) Sometimes, the associate attorneys act as both counsel and objector, as Thut did in *Wright v. Nationstar*. (FAC ¶ 116.) In *Clark v. Gannett*, discussed in detail below, Palmer recruited his longtime friend Defendant Gary Stewart to act as the objector. (FAC ¶ 64.) Having been friends with Palmer for decades, Stewart was well-versed in the operations of the Enterprise when he agreed to participate in its illegal scheme. (FAC ¶ 48-56, 64.)

### II.    The Enterprise's Schemes

The Enterprise has targeted at least 15 class action settlements with a connection to Illinois in the same or substantially similar manner. (FAC ¶ 109.) An objection is filed, generally by someone with a close connection to Thut, Bandas, or one of the other associate attorneys.

---

[6]    Palmer attempted to evade service of the FAC but was eventually served. (Dkts. 58, 59.) As he has not responded, Edelson intends to file a motion for the entry of default against him.

(FAC ¶¶ 60-61, 167.) The court overrules the objection, and Bandas's associate notices an appeal. (FAC ¶ 109.) Then, the appeal is not-so-mysteriously withdrawn and dismissed with prejudice. (FAC ¶ 109.) Although there is no public record about what transpired after the appeal was noticed and then subsequently withdrawn, the withdrawal of the appeal indicates that the Enterprise has successfully extorted a payment from class counsel. (FAC ¶ 182.) If the ransom is not paid, Enterprise members carry out their threat to appeal, where they invariably lose. (FAC ¶ 109.)

This pattern of activity is well-documented. In one of the cases referenced in the complaint, *In re Capital One Telephone Consumer Protection Act Litigation*, an attorney who used to work with Bandas and Palmer detailed how the Enterprise extorted class counsel for at least $200,000, and probably much more. (FAC Ex. H at 17-22.) In connection with a separate racket that Bandas and Palmer ran on the West Coast, Chief Judge Barry T. Moskowitz described nearly exactly the same scheme:

> [Darrell] Palmer indicated that it was [Christopher] Bandas's "show" and that Mr. Bandas was the person best equipped to answer [class counsel's] questions.
>
> Accordingly, [class counsel] contacted Mr. Bandas and spoke with him on the telephone on or about April 22, 2013. Mr. Bandas assured [class counsel] that he spoke for himself and Mr. Palmer and would make sure that Mr. Palmer would get his cut of any settlement payment. When [class counsel] asked Mr. Bandas what his issues were with the proposed settlement, Mr. Bandas said that he didn't care about changing one word of the settlement and that he filed the objections because it was a large settlement and Plaintiff's counsel stood to make millions of dollars. Mr. Bandas said that he was willing to wager that [class counsel's] client would gladly pay him somewhere in the neighborhood of $400,000 to make his objection go away—otherwise, he could hold the settlement process up for two to three years through the appeal process.

*Hydroxycut*, 2013 WL 5275618, at *4-5 (internal record citations omitted).

6

### III. Plaintiff Edelson PC and the *Gannett* Litigation

Plaintiff Edelson PC ("Edelson") is an Illinois law firm and a victim of one of the Enterprise's schemes. (FAC ¶¶ 8, 11, 260.) Edelson's attorneys "are experienced and respected members of the plaintiff's class action bar" who "have extensive experience litigating consumer class actions[.]" *Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 818854, at \*4 (N.D. Ill. Mar. 2, 2017) (Kennelly, J.). In the litigation where the Enterprise extorted Edelson, Edelson's clients, Ramona Clark and Dylan Schlossberg had filed a class action lawsuit against Gannett Co., Inc., the publisher of *USA Today*, for making unlawful autodialed telephone calls promoting its various newspapers. After a few years of litigation a classwide settlement providing substantial cash relief to class members was reached and Circuit Court of Cook County granted preliminarily approval to the agreement on August 4, 2016.

As the deadline to file objections approached, the Enterprise spun into action. Palmer, in his role as associate attorney, recruited his longtime friend Gary Stewart to serve as an objector. (FAC ¶ 56, 129.) Thut, being a licensed Illinois attorney (unlike Palmer and Bandas), agreed that he would file and sign the objection on Stewart's behalf. (FAC ¶ 132.) They all agreed that Bandas, as the leader, would finish off the scheme by extorting class counsel after the objection was overruled, then decide how the spoils would be distributed. (FAC ¶¶ 126, 148.) This was standard operating procedure for Thut, Bandas, and Palmer, who had run the same racket together on a number of other occasions. (FAC ¶ 109.)

On October 21, 2016, without doing any investigation, speaking with Stewart, or even knowing what the case was about, Thut filed an objection to the settlement on behalf of Stewart, which included Stewart's sworn statement. (FAC ¶¶ 135, 203-205.) According to plan, the court overruled Stewart's objection in full and granted final approval of the settlement and Edelson's

fee request on November 14, 2016. (FAC ¶ 56.) After the objection was overruled, Bandas proposed that Stewart's objection could be resolved through mediation with Rodney Max of the Florida- and Alabama-based Upchurch, Watson, White, and Max group of attorney-mediators. (FAC ¶ 86.) Other than that proposal, Bandas refused to communicate with Edelson outside of a mediation. (*Id.*) Edelson agreed to engage in the mediation to allow Bandas an opportunity to suggest changes that could be made to the *Gannett* settlement that would address Stewart's concerns and obviate the need for an appeal. (FAC ¶ 89.) That's not how the mediation went. Unbeknownst to Edelson, Max was in on the scheme. (FAC ¶ 88.) Instead of proposing a change to the *Gannett* settlement or making any other attempt to benefit the settlement class, Bandas demanded $400,000 in attorneys' fees. (FAC ¶ 92.) During the mediation, his only argument to support that demand was that if he was not paid, he would delay the settlement payments to the class and the court-approved fees to Edelson. (*Id.*)

With its back against the wall and cognizant of its obligation to get court-approved relief to the class with a minimum of delay, Edelson agreed, through Max, to pay Bandas $225,000 in attorneys' fees. (FAC ¶¶ 89, 93.) As required by Illinois law, Edelson also informed Bandas that it would seek the court's approval of the payment. (FAC ¶ 93.) Bandas then demanded complete secrecy, especially from the court, and falsely claimed that additional terms remained to be negotiated. (*Id.*)

As a result of the Enterprise's conduct, Edelson now owes Bandas $225,000 in unjustified attorneys' fees. (FAC ¶ 145.) Edelson has also had to pay delay costs, including money spent on the cost of staff to respond to class members who are waiting for their checks (they call daily), printing costs, PACER fees, research fees, transportation fees, and more. (FAC ¶ 6.) Because of the Enterprise's actions, Edelson has also been forced to take on operating debt

and delay paying off existing debt. (FAC ¶¶ 221, 229.) It now seeks relief for Defendants'
unlawful conduct under RICO and Illinois state law, as well as injunctive relief to halt the
vexatious objections and unauthorized practice of law.

## ARGUMENT

**I.      The Court Has Jurisdiction Over this Case.**

To start, Bandas and Thut each submit a cursory argument that this Court lacks subject-
matter jurisdiction. First, Bandas argues that the Court lacks diversity jurisdiction (he has
abandoned his previous position that the Court lacks federal question jurisdiction). Second, Thut
contends that the *Rooker-Feldman* doctrine, which prevents losers in state courts from seeking
federal relief that modifies those judgments, somehow bars this action. Neither argument has
merit, and the Court has jurisdiction to hear this case.

**A.      The Court Has Federal Question and Diversity Jurisdiction.**

Bandas and Stewart previously suggested that the Court lacked federal question
jurisdiction, but they have rightly dropped that argument here. To dispel any lingering doubt,
because the claims in this case arise under RICO, a federal statute, the Court has jurisdiction
pursuant to 28 U.S.C. § 1331. *Carr v. Tillery*, 591 F.3d 909, 917-18 (7th Cir. 2010) (holding that
federal courts have jurisdiction over RICO cases unless they are "*utterly* frivolous," such as a
"dispute over bananas described by the parties as 'securities' so that they could litigate their
dispute in the federal courts under federal securities law").

Although Bandas raises the issue of supplemental jurisdiction over Edelson's state law
abuse of process claim, there is no reason to consider that argument because the Court also has
diversity jurisdiction over the entire action. "[I]n the class action context, under CAFA, federal
courts may exercise jurisdiction over actions in which *any* member of the plaintiff class is a

citizen of a State different from *any* defendant, as long as the amount in controversy exceeds $5,000,000, exclusive of interest and costs." *Marconi v. Indiana Mun. Power Agency*, No. 14 C 7291, 2015 WL 4778528, at *4 (N.D. Ill. Aug. 13, 2015) (Pallmeyer, J.). The jurisdictional minimum in a diversity case relates to "the *case*, rather than the *claim*," so "subject-matter jurisdiction must be ascertained at the outset; [and] events after the suit begins do not affect the diversity jurisdiction." *Johnson v. Wattenbarger*, 361 F.3d 991, 993 (7th Cir. 2004).

Nobody disputes that the parties are sufficiently diverse (Edelson is from Illinois, Bandas is from Texas, and Stewart and Palmer are both from California), but Bandas argues that there is less than $5,000,000 in controversy. That argument misunderstands CAFA. Edelson alleges that it was extorted for $225,000 in the *Gannett* incident, that plaintiff's counsel in *In re Capital One* were extorted for $400,000 (FAC ¶¶ 79, 92), and that on at least twelve other occasions, the Enterprise was successful in extorting a payment from other members of the putative class, evidenced by the dismissal of an appeal before ruling. (FAC ¶ 109.) Edelson is entitled to the reasonable inference that Bandas demanded roughly the same amount of money from putative class members for withdrawing the appeal of each of those objections, putting between $8.1 million and $14.4 million in controversy after trebling the damage amount pursuant to 18 U.S.C. § 1964(c), without including delay costs. These amounts alone end the inquiry.

In addition, Edelson requests punitive damages, which are both available and hardly out of the question given Defendants' egregious conduct. "Where punitive damages are required to satisfy the jurisdictional amount in a diversity case, a two-part inquiry is necessary. The first question is whether punitive damages are recoverable as a matter of state law. If the answer is yes, the court has subject matter jurisdiction unless it is clear beyond a legal certainty that the plaintiff would under no circumstances be entitled to recover the jurisdictional amount." *Risse*

*Cadek v. Great Lakes Dragaway, Inc.*, 58 F.3d 1209, 1211-12 (7th Cir. 1995) (internal quotation marks omitted). In Illinois, punitive damages are available for an abuse of process claim. *Coplea v. Bybee*, 8 N.E.2d 55, 61 (Ill. App. Ct. 1937); *see also Slovinski v. Elliot*, 927 N.E.2d 1221, 1225 (Ill. 2010) (holding that punitive damages are available in tort when the defendant acts with malice). Even at a 1:1 ratio of compensatory to punitive damages, twelve extortions at $225,000 each satisfies the $5,000,000 minimum, without including delay costs. *Cf. LM Ins. Corp. v. Spaulding Enterprises Inc.*, 533 F.3d 542, 552 (7th Cir. 2008) (finding amount in controversy satisfied where punitive damages would have to be at a ratio of 2.75:1 to meet jurisdictional minimum). It can therefore not be said to a legal certainty that the amount in controversy is not met, and the Court has diversity jurisdiction.

> **B.    The *Rooker-Feldman* Doctrine Does Not Apply.**

Thut alone challenges this Court's jurisdiction based on the *Rooker-Feldman* doctrine, arguing that the proceedings in *Gannett* bar Edelson's claims in this Court. (Dkt. 70 at 14-15.) This assertion is meritless. *Rooker-Feldman* "is a narrow doctrine, 'confined to cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Kelley v. Med-1 Sols., LLC*, 548 F.3d 600, 603 (7th Cir. 2008) (quoting *Lance v. Dennis*, 546 U.S. 459, 464 (2006)). The Supreme Court has "held *Rooker–Feldman* inapplicable where the party against whom the doctrine is invoked was not a party to the underlying state-court proceeding" even if that person "could be considered in privity with a party to the judgment." *Lance*, 546 U.S. at 464, 466.

Here, *Rooker-Feldman* cannot bar Edelson's claims because Edelson was not a party to the *Gannett* action. Its involvement was solely as counsel. In any event, because this "suit does

11

not seek to disturb the judgment of the state court," (indeed, Edelson's clients *won* in state court, as the court approved the settlement and the full amount of attorneys' fees over Stewart's objection), *Rooker-Feldman* cannot apply. *See, e.g.*, *Johnson v. Pushpin Holdings, LLC*, 748 F.3d 769, 773 (7th Cir. 2014) (rejecting a *Rooker-Feldman* challenge to jurisdiction in a suit that sought "damages for a fraud that resulted in a judgment adverse to the plaintiff"); *accord Iqbal v. Patel*, 780 F.3d 728, 730 (7th Cir. 2015) (refusing to apply *Rooker-Feldman* where the plaintiff sought "damages for activity that (he alleges) predates the state litigation and caused injury independently of it"). Accordingly, the Court has subject matter jurisdiction to consider the merits of Edelson's federal and state law claims. Federal Law Does Not Immunize Defendants' Conduct Merely Because Defendants Abuse the Judicial System to Achieve Their Ends.

Bandas and Thut both contend that the federal law grants them blanket immunity for all of the criminal actions enumerated in Edelson's complaint because the use of courts is inherent in their scheme. Both make arguments related to the *Noerr-Pennington* doctrine, which "protects litigation, lobbying, and speech[,] … has been extended beyond the antitrust laws, where it originated, and is today understood as an application of the first amendment's speech and petitioning clauses." *New W., L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007). But the immunity is not unlimited, and here, it does not apply. First, *Noerr-Pennington* does not immunize conduct in out-of-court settlement negotiations, where much of the unlawful conduct at issue in this lawsuit took place. Second, the objections are not bona fide attempts to petition government for a redress of grievances, but shams not entitled to First Amendment protection. Finally, Thut alone argues that a federal common law privilege separate from *Noerr-Pennington* protects him. If such a privilege even exists (the weight of authority says it doesn't), it only applies to defamation-type claims not implicated by this lawsuit.

12

## II. *Noerr-Pennington* Only Applies to Petitioning the Court, Not Private Settlement Negotiations.

First, the *Noerr-Pennington* doctrine cannot apply to Bandas and Thut's conduct during settlement negations, because Bandas, acting for Thut and Stewart, insisted as a condition of settlement that its terms could never be disclosed to the court. *Noerr-Pennington* protects the right to petition government—including courts—for a redress of grievances. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757 (2014). However, "[c]ourts are largely uniform in their view that private settlement agreements entered into during the pendency of litigation that are neither presented to nor approved by the judge presiding over the dispute fall outside the ambit of *Noerr–Pennington* immunity." *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 395 (D. Mass. 2013). Thus *Noerr-Pennington* immunity does not apply to "private contracts entered into between private parties… because, in such cases, the parties dictate the terms of the settlement and their actions are not intended to persuade a judicial officer to obtain a redress of grievances." *Toyo Tire & Rubber Co. v. Atturo Tire Corp.*, No. 14 C 0206, 2017 WL 1178224, at *7 (N.D. Ill. Mar. 30, 2017).

Here, Bandas and Thut's actions are "not in any sense a communication to the court and [are] therefore not a petition" protected by *Noerr-Pennington*. *See Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005). Although Thut claims that his and Bandas's "actions were incidental to [their] petitioning of the courts on behalf of their client," (dkt. 70 at 4), the settlement payment they extorted was for attorneys' fees only, not to advance any of the interests their "client" set out in his objection. (FAC ¶ 89.) The settlement negotiations and mediation had nothing to do with the relief sought in those objections, so "[t]he First Amendment values that lawsuits and similar agency proceedings implicate—notably, compensation for violated rights and interests, the psychological benefits of vindication, [and]

public airing of disputed facts,—will not be undermined by refusing to immunize [Defendants']
settlement conduct[.]" *See Toyo*, 2017 WL 1178224, at *8 (internal citation and quotation marks
omitted).

More importantly though, Defendants cannot claim *Noerr-Pennington* immunity because
they take pains to make sure that the settlements they enter into *never* go before any court. After
Bandas extorted the $225,000 settlement out of Edelson in the *Gannett* litigation, Edelson
informed him that it would disclose the agreement to the Circuit Court of Cook County and seek
approval of the deal. (FAC ¶ 93.) In response, Bandas—on behalf of Thut and Stewart—
demanded that nothing be reported to the court and stated their position that the settlement
agreement was not final unless Edelson agreed to those additional terms. (*Id.*) Whether or not the
contract is enforceable, one thing is clear from this exchange: Defendants did not want the judge
to review the settlement agreement between them and Edelson. They therefore could not have
been petitioning that court for First Amendment purposes.

To be clear, this holds true not only for what happened in the *Gannett* litigation, but also
the Enterprise's other endeavors. As Edelson alleged, the Enterprise has used almost the exact
same pattern—object, lose, mediate, extort, and demand confidentiality—to turn a profit in a
number of cases. (FAC ¶ 109.) In each one, the actions the Enterprise took during the sham
mediations were not part of any bona fide attempt to petition the court. (FAC ¶ 188.) Rather, they
insisted on secrecy to prevent courts from even knowing what they were doing and the profits
they were amassing. (FAC ¶ 168.) Having disclaimed the intention to petition the court or any
other governmental entity for anything in regard to the settlement agreements they negotiate (by
way of extortion), Defendants cannot now claim that a doctrine specifically designed to protect
First Amendment rights immunizes their actions.

### A. *Noerr-Pennington* Does Not Protect Defendants' Sham Litigation.

*Noerr-Pennington* cannot immunize Defendants' conduct for a second reason: the pattern of litigation that they are engaged in is a sham. A litigant whose conduct involves "a pattern of baseless, repetitive claims … which leads the factfinder to conclude that the administrative and judicial processes have been abused," cannot "acquire immunity by seeking refuge under the umbrella of 'political expression.'" *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972). Accordingly, *Noerr-Pennington* does not provide immunity where "the proposal to the governmental body is a sham and the speech itself imposes costs independent of what the governmental body does—for example, a lawsuit designed to make the other litigant bear the costs of mounting a defense, even though the suit has no chance of success." *Tri–Corp Hous. Inc. v. Bauman*, 826 F.3d 446, 450 (7th Cir. 2016). "A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all[.]" *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (internal quotation marks, citations, and emphasis omitted). "A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay." *Id.*

Trying to avoid the clear application of *California Motor* to the Enterprise's conduct, Bandas contends that the sham litigation exception is cabined based on the two-part test articulated in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries*, 508 U.S. 49, 57 (1993). (Dkt. 64 at 27.) Not so. As every circuit to consider the issue has held, "the two-step inquiry in *Professional Real Estate* applies to the evaluation of a single suit or legal proceeding," but "when a party alleges a series of legal proceedings, … the sham litigation standard from *California Motor* should govern." *Hanover 3201 Realty, LLC v. Vill.*

*Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015).[7] "Unlike the inquiry from *Professional Real Estate,* this inquiry is prospective" and considers whether the filings were made without "a genuine interest in redressing grievances[.]" *Id.* To make that determination, "a court should perform a holistic review that may include looking at the defendant's filing success—i.e., win-loss percentage" as well as "other evidence of bad-faith" and "the magnitude and nature of the collateral harm imposed on plaintiffs by defendants' petitioning activity." *Id.* at 181.

As Edelson alleged and Bandas agrees, there is a series of legal proceedings at issue here. (FAC ¶ 109; dkt. 64 at 25 ("[T]he amended complaint has alleged a pattern of activity[.]").) Therefore, the *California Motor* standard applies. And under that standard, the Enterprise's pattern of litigation is a total sham. Just as in the Supreme Court's "classic example" cited in *City of Columbia*, Defendants' objections to class action settlements are not actually aimed at procuring a favorable government action. That is, Defendants have no interest at all in having the court change or reject the class action settlements that they object to. (FAC ¶ 2.) *See also Hydroxycut*, 2013 WL 5275618, at *5 (noting Bandas and Palmer's "bad motive" for filing objections in their separate West Coast racket). In fact, that would thwart their objective. As Edelson alleged, Defendants' intention is to see their objections overruled, because that allows them to achieve their real goal: noticing an appeal so that they can use the delay and costs inherent in the appeal process to extort a payment of attorneys' fees from class counsel far beyond what they could get if successful in their objection. (FAC ¶¶ 2, 80-82.) In other words, they are using "the governmental *process*—as opposed to the *outcome* of that process"— as a

---

[7]     *Accord Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27,* 728 F.3d 354, 363-364 (4th Cir. 2013); *Primetime 24 Joint Venture v. Nat'l Broad. Co.,* 219 F.3d 92, 101 (2d Cir. 2000); *USS–POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL–CIO,* 31 F.3d 800, 810-11 (9th Cir. 1994)

"weapon" to benefit themselves personally. *See City of Columbia*, 499 U.S. at 380. That has

nothing to do with petitioning the government for a redress of grievances, and the *Noerr-*

*Pennington* doctrine does not protect their conduct.

The rest of the factors identified in *Hanover* also weigh in favor of finding the

Enterprise's litigation to be a sham. For one, as pleaded in the complaint, the Enterprise's win-

loss ratio is zero. (FAC ¶ 109.) Bandas may later attempt to point an extraordinarily small

number of occasions where he claims (falsely) that his work has produced favorable results for

classes, but that is not appropriate for a motion to dismiss. *See, e.g.*, *Zahn v. N. Am. Power &*

*Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016) (courts reviewing a complaint on a 12(b)(6

motion must "construe it in the light most favorable to the nonmoving party, accept well-pleaded

facts as true, and draw all inferences in her favor"). In any event, "the fact that a small number in

the series of lawsuits turn out not to be frivolous will not be fatal to a claim under *California*

*Motor Transport*; even a broken clock is right twice a day." *USS-POSCO*, 31 F.3d at 811. As

alleged, Bandas's clock is right considerably less often than twice a day.

Finally, courts nationwide have recognized the massive collateral harm caused by the

type of sham objection that the Illinois Objector Enterprise engages in. (FAC ¶¶ 42-47.) This

conduct causes collateral damage to the millions of class members whose payments they disrupt.

*Barnes v. Fleetboston Fin. Corp.*, No. CA 01-10395-NG, 2006 WL 6916834, at *1 (D. Mass.

Aug. 22, 2006) (Gertner, J.) ("[P]rofessional objectors can levy what is effectively a tax on class

action settlements, a tax that has no benefit to anyone other than to the objectors. Literally

nothing is gained from the cost: Settlements are not restructured and the class, on whose behalf

the appeal is purportedly raised, gains nothing."). There is also damage to the judicial system as

a whole, because Defendants "undermine the administration of justice by disrupting settlement in

the hopes of extorting a greater share of the settlement for themselves and their clients." *In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d 289, 295 (S.D.N.Y. 2010). Defendants therefore cannot claim immunity based on their sham objections.

**B.     If a Federal Common Law Litigation Privilege Exists, Which Is Questionable, It Does Not Apply Here.**

Rounding out the claims of federal privilege, Thut alone contends that his actions are protected by a purported federal common law litigation privilege conferring absolute immunity on private actors in litigation. (Dkt. 70 at 6-7.) There is scant evidence that such a privilege even exists under federal common law, and courts nationwide have repeatedly refused to recognize it, especially for statutory violations. *See, e.g.*, *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367 n.10 (9th Cir. 1992) (finding "no cases … indicating such a privilege has been recognized as a matter of federal common law."); *Stone v. Wash. Mut. Bank*, No. 10 C 6410, 2011 WL 3678838, at *16 (N.D. Ill. Aug. 19, 2011) (Kennelly, J.) ("[D]efendants have cited no binding or persuasive authority establishing that plaintiffs' claims are subject to a federal common law privilege[.]"); *Blevins v. Hudson & Keyse, Inc.*, 395 F. Supp. 2d 662, 668 n.2 (S.D. Ohio 2004) ("Nor can the Court discern any federal common law litigation privilege that could apply here."); *Gallagher v. Gurstel, Staloch & Chargo, P.A.*, 645 F. Supp. 2d 795, 804 (D. Minn. 2009) (collecting cases for the proposition that "common-law immunity for the litigation-related activities of counsel does not overcome the plain language the FDCPA," a federal statute).

Even if such a privilege did exist, there is no reason to believe that it would extend beyond the realm of defamation, which is the traditional purview for litigation immunity. At common law, privately retained attorneys "benefited from immunity for defamatory statements made in the course of judicial proceedings," but they "never enjoyed immunity from liability for intentional misconduct." *Tower v. Glover*, 467 U.S. 914, 921-22 (1984). The single case Thut

cites recognizing the existence of a federal litigation privilege is a defamation case. *See NSB Techs., Inc. v. Specialty Direct Mktg., Inc.*, No. 03 CV 2323, 2004 WL 1918708, at *4 (N.D. Ill. Aug. 20, 2004) ("The Court finds that federal common law recognizes a litigation privilege barring the defamation claims stemming from statements … that are related to judicial proceedings."). But even in the defamation context, the Seventh Circuit has twice declined to recognize a federal common law litigation privilege for private attorneys. *See Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 707 (7th Cir. 1994); *Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998).

Here, Edelson has sued Thut for intentional torts, based on a federal statute, none of which have anything to do with defamation. *See Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 733 (7th Cir. 2014) (treating civil RICO claims as an intentional tort). There is simply no authority to suggest that a federal common law privilege immunizes Thut's conduct solely because he chose to use courts to further his racketeering enterprise and abuse of Illinois process. Accordingly, federal common law provides him with no immunity—absolute or otherwise.

## III. Edelson States a Claim for a Direct RICO Violation under 1962(c).

There are four elements to a RICO claim under 18 U.S.C. § 1962(c): "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655 (7th Cir. 2015). Nearly all of Defendants' briefing centers around the fourth element, which the statute defines to include a long list of federal and state crimes. *See* 18 U.S.C. § 1961(a). The main thrust of both Bandas and Thut's motions is that their conduct did not constitute racketeering activity because it was not illegal.[8]

---

[8]     Stewart alone contests the first element, but as he raises solely issues unique to him, Edelson responds to his arguments in Section V below.

Enterprise members did, in fact, commit a host of felonies in furtherance of their common purpose that are also RICO predicate acts and therefore constitute racketeering activity.[9] First, there is no blanket immunity to RICO liability just because litigation is involved. Second, the Enterprise extorted Edelson when it demanded $225,000 without providing any benefit to the class. Third, the Enterprise bribed Gary Stewart and others to file objections and submit sworn testimony. Fourth, the Enterprise committed money laundering by using illicit profits from their past schemes to finance more schemes. Fifth, the Enterprise committed wire and mail fraud to further its schemes. Sixth, it engaged in witness tampering in multiple federal suits. And finally, all of these acts put together constitutes a pattern of racketeering activity.

A.   **Activity Related to Litigation Is Commonly Actionable and is Permitted Under RICO's Text.**

Bandas and Thut each argue that "litigation activities cannot constitute predicate acts of racketeering activity" and insist that "filing meritless litigation is not a criminal act." (Dkt. 64 at 4, 7; dkt. 70 at 8). The Seventh Circuit has squarely rejected this argument. *United States v. Cueto*, 151 F.3d 620, 631-32 (7th Cir. 1998) ("recogniz[ing] that a lawyer's misconduct and criminal acts are not absolutely immune from prosecution"). True, merely filing a meritless lawsuit against another person might not be criminal. But a lawyer's extortion, bribery, money laundering, obstruction, wire fraud, and mail fraud are all felonies, even if they happen to involve a pattern of meritless court filings. *See United States v. Eisen*, 974 F.2d 246, 254 (2d Cir. 1992); *United States v. Teitler*, 802 F.2d 606 (2d Cir. 1986) (affirming lawyers' convictions for

---

[9]   Although Edelson raised a number of predicate acts and addresses them all here, the Court need not consider them all in order to deny Defendants' motions to dismiss. For example, if the Court determines that the Enterprise's 15 schemes each involved bribery and money laundering, that would more than satisfy the requirement of a pattern of racketeering activity, and there would be no need to consider any of the other predicate acts.

RICO and RICO conspiracy for defrauding insurance companies to obtain better settlements through acts of suborned perjury, falsification of documents, and wire fraud). Other lawyers have found this out the hard way. One prominent class action attorney was convicted of racketeering for, like Bandas here, paying individuals to serve as clients in class action litigation, a felony for which he sentenced to 30 months imprisonment. *In re Weiss*, 870 N.Y.S.2d 255, 256 (App. Div. 2008); *see generally* Jonathan D. Glater*, Class-Action Lawyer Gets 30 Months in Prison*, N.Y. Times (June 3, 2008), https://nyti.ms/2qqUZD9. Another attorney who ran an infamous "porn troll" operation similar to the racket used by Defendants here, *see Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 705 (7th Cir. 2014), recently pled guilty to conspiracy to commit mail fraud and wire fraud and conspiracy to commit money laundering in connection with his repeated filing of sham copyright infringement lawsuits. Plea Agreement and Sentencing Stipulations, *United States v. Steele*, No. 16-cr-00334, dkt. 43 at 1-3 (D. Minn. Mar. 6, 2017). That attorney waived his right to appeal any prison sentence of less than 60 months. *Id.* at 24.

Moreover, Bandas and Thut's position that involving courts in their racketeering activity provides them with full immunity cannot be squared with RICO's text. "In fact, the RICO statute, itself, provides that conduct relating to prior litigation may constitute racketeering activity," including witness tampering, which Edelson has alleged here. *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 365 (9th Cir. 2005). Even Bandas agrees that the federal witness tampering statute "appl[ies] to federal judicial proceedings." (Dkt. 64 at 19.) Indeed, Defendants have "not cited any federal case which holds that a party's litigation conduct in a prior case is entitled to absolute immunity and cannot form the basis of a subsequent federal civil RICO claim." *Living Designs*, 431 F.3d at 364; *see also Murphy v. Farmer*, 176 F. Supp. 3d 1325, 1344 (N.D. Ga. 2016) (rejecting the "general argument that [the plaintiff's] RICO claims

should be dismissed because they are related to abusive litigation").[10] There can be no question, therefore, that RICO can apply to litigation-related activity, and Defendants' blanket argument fails as a matter of simple statutory interpretation.

### B. The Enterprise Extorted Edelson and Many Others.

Bandas spends most of his brief arguing that because his extortionate acts are litigation-related, they are not extortion. As an initial matter, the Seventh Circuit views the Enterprise's schemes as extortion:

> Extortion is the act or practice of obtaining something or compelling some action by illegal means, as by force or coercion. *Black's Law Dictionary* (7th ed.1999). **In the context of intervening in a class action settlement, extortion would mean intervening not to increase the value of the settlement, but in order to get paid to go away.** As the district court's order correctly suggested, this would be an improper purpose for intervening. This is, in part, because it would benefit only the intervenors at the expense of all other parties to the litigation.

*Vollmer v. Selden*, 350 F.3d 656, 660 (7th Cir. 2003) (emphasis added).[11] Bandas argues that

*Vollmer* is irrelevant because the Court considered the Black's Law Dictionary definition of

---

[10] Thut's legal argument in support of this position consists almost entirely of a page-long string citation to cases about mail and wire fraud without any explanation as to how those cases support or even relate to the general proposition that RICO cannot be applied to "litigation activities." (Dkt. 70 at 8.) "This essentially perfunctory method of briefing fails to constitute developed arguments," and Thut's argument should therefore be considered waived. *Brook v. Sanofi-Aventis U.S., LLC*, No. 2:14-CV-976, 2014 WL 7272243, at *2 n.3 (S.D. Ohio Dec. 18, 2014). In any event, those predicate acts are addressed in Section III.E, *infra*.

[11] Courts nationwide agree. *See, e.g.*, *Garber*, 2017 WL 752183, at *6 (describing Bandas's attempt to "extort a pay-off"); *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 84 n.3 (1st Cir. 2015) ("[O]bjectors can, by holding up a settlement for the rest of the class, essentially extort a settlement of even unmeritorious objections."); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 6 (1st Cir. 1999) (describing objections appealed for the purpose of extracting a fee as "extortive legal proceedings"); *In re Gen. Elec. Co. Sec. Litig.*, 998 F. Supp. 2d 145, 152 (S.D.N.Y. 2014) ("[P]rofessional objectors to class action settlement may extort payments from a class simply by filing frivolous appeals."); *In re Polyurethane Foam Antitrust Litig.*, 178 F. Supp. 3d 635, 639 (N.D. Ohio 2016) ("The serial objector's ultimate goal is extortion."); *In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d at 295 ("[P]rofessional objectors undermine the

extortion as opposed to the Hobbs Act definition. (Dkt. 64 at 12.) But he fails to recognize that the Hobbs Act definition—"obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right"—is materially indistinguishable from Black's Law definition the *Vollmer* court considered. *See* 18 U.S.C. § 1951(b)(2).

Defendants obtained an agreement to pay $225,000 from Edelson, and it did so by threatening to hold up both the funds that the court approved for the class and class counsel's court-approved attorneys' fees unless they were paid to go away. (FAC ¶¶ 85-93.) They exploited the fear of economic harm that they wrongfully created, and they did so for the sole purpose of turning a profit for the Enterprise. (FAC ¶ 145.) They have engaged or attempted to engage in substantially the same scheme at least 14 other times. (FAC ¶ 109.)

Even setting *Vollmer* aside, Bandas and Thut's argument that any activities related to the judicial system automatically falls outside the ambit of the Hobbs Act is unpersuasive. The concerns underpinning courts' reluctance to find extortion where one private party sues another do not apply to Defendants' conduct here, which come in the entirely different context of objections to class action settlements. First, regardless of Defendants' use of the court system, they knew they had no conceivable "claim of right" to the money they demanded. Second, there is no chance that holding Defendants liable here would create a "chilling effect" on legitimate objectors or even the filing of meritless objections. Third, there can be no concern about trampling upon state law malicious prosecution claims, because the strict elements of that tort do not cover class action objections.

---

administration of justice by disrupting settlement in the hopes of extorting a greater share of the settlement for themselves and their clients.").

### 1. Defendants Had No Even Arguably Lawful Claim to $225,000 in Attorneys' Fees.

"With what can only be described as *chutzpah*," *see Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682, 687 (7th Cir. 2008), Bandas contends that he could not have extorted the $225,000 in attorneys' fees from Edelson because he had a "claim of right" to the money he demanded. (Dkt. 64 at 13.) Whether Defendants had a claim of right to the money they demanded is important because "where the defendant has a claim of right to property and exerts economic pressure to obtain that property, that conduct is not extortion and no violation of the Hobbs Act has occurred." *Rennell v. Rowe*, 635 F.3d 1008, 1012 (7th Cir. 2011). That's clear enough; you can't extort something that's already yours (or at least reasonably could be). But "[i]f a defendant has no claim of right to property, the use of fear to obtain that property—including the fear of economic loss—may … amount to extortion" under the Hobbs Act. *Id.* Courts regularly find litigation-related conduct to be wrongful extortion under the Hobbs Act where the defendant knows that he does not have a claim of right to the money demanded. *See, e.g.*, *La Suisse, Societe d'Assurances Sur La Vie v. Kraus*, No. 06 CIV. 4404 CM GWG, 2014 WL 3610890, at *10 (S.D.N.Y. July 21, 2014); *United States v. Sturm*, 870 F.2d 769, 774 (1st Cir. 1989) ("Two parties, A and B, enter into a contract. A sincerely believes that B has breached the contract, and threatens litigation unless B abides by A's interpretation of the contract. B refuses to do so, and the judgment in the ensuing lawsuit indicates that B had not breached the contract. May A then be convicted of attempted extortion based on the threat of litigation? … It would be unjust to convict A of extortion *unless she knew she had no claim to the property that she allegedly sought to extort*.") (emphasis added); *Lemelson v. Wang Labs., Inc.*, 874 F. Supp. 430, 434 (D. Mass. 1994) (finding that allegations of a pattern of extortionate litigation stated a RICO claim); *Hall Am. Ctr. Assocs. Ltd. P'ship v. Dick*, 726 F. Supp. 1083, 1094 (E.D. Mich. 1989) (same).

Nobody in the Enterprise has a claim of right to the $225,000 they extorted from Edelson, and they all knew it. (FAC ¶ 148.) The sum of money Bandas demanded during the *Gannett* mediation was attorneys' fees, out of which he would pay the rest of the Enterprise. (FAC ¶ 92.) Regardless of his client's standing to object to the settlement, Bandas had no legal right to demand a portion of the class action settlement for the Enterprise without providing any benefit to the class.[12] His claim to the contrary is "preposterous." *Cf. Mirfasihi*, 551 F.3d at 687 (describing as "preposterous" a request for hundreds of thousands of dollars in attorneys' fees where the objector *did* provide some benefit to the class).

"In general, each party to litigation in the United States"—plaintiff, defendant, objector— "bears its own attorney fees, absent a specific fee-shifting statute." *Scholtens v. Schneider*, 671 N.E.2d 657, 662 (Ill. 1996); *accord Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). However, "a well-recognized exception to [that] general principle" is the "common-fund doctrine," which provides that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing*, 444 U.S. at 478; *accord Morris B. Chapman & Assocs., Ltd. v. Kitzman*, 739 N.E.2d 1263, 1271 (Ill. 2000). The doctrine "is founded on the rationale that successful litigants would be unjustly enriched if their attorneys were not compensated from the common fund created for the litigants' benefit." *Brundidge v. Glendale Fed. Bank, F.S.B.*, 659 N.E.2d 909, 911 (Ill. 1995); *accord Boeing*, 444 U.S. at 478. In other words, a common fund in a class action settlement is created for the benefit of class members, and the only reason that class

---

[12]    The only amount Mr. Stewart is entitled to from the settlement fund is the $175 he is owed for his claim, certainly not $225,000.

counsel is entitled to any of that money is because their litigation efforts increased the value of that fund, benefiting the class.

That logic is not limited to class counsel, and the law allows other "lawyers who contribute materially to the proceeding to obtain a fee." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 288 (7th Cir. 2002). Accordingly, objectors can "claim entitlement to fees on the same equitable principles as class counsel." *Rodriguez v. Disner*, 688 F.3d 645, 658 (9th Cir. 2012). Those principles "require, however, that the objectors produce an improvement in the settlement worth more than the fee they are seeking; otherwise they have rendered no benefit to the class." *Reynolds*, 288 F.3d at 288. "In the absence of a showing that objectors substantially enhanced the benefits to the class under the settlement, as a matter of law they [are] not entitled to fees." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002); *see also Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 503–04 (N.D. Ill. 2015) (Kennelly, J.) (denying award of fees to objector where any "conceivable benefit [he] might have secured for the class [was] marginal at best").

Bandas's authority to the contrary is thin. He cites cases for the proposition that objectors are permitted to appeal their objections to class action settlements—a point nobody disputes. He then relies on *Skelton v. General Motors Corp.*, 860 F.2d 250, 259 (7th Cir. 1988), for the proposition that "the law allows parties to reach settlement agreements that waive their right to appeal." (Dkt. 64 at 13.) True, but irrelevant. Nothing in *Skelton* suggests that the right to object, the right to appeal, or the right to enter into a settlement waiving an appeal confers any "claim of right" for attorneys' fees upon an objector (or anyone else). Bandas cites not a single case that holds that an attorney who represents an objector whose objection is overruled in full has any right to any portion of a common fund whatsoever, let alone $225,000 or more.

As a matter of law, Bandas and the Enterprise have no legal claim to attorneys' fees in *Gannett* or any of the other cases where the Enterprise's objections were overruled, because he provided no benefit at all to the class. (FAC ¶¶ 39, 49, 59, 88, 150, 161.) An objector might validly enter into a settlement agreement waiving the right to appeal in exchange for a meaningful change to the settlement agreement or reduction in class counsel's fees that provide some benefit to the class as a whole, but in *Gannett* and the other cases enumerated in the complaint, Bandas and the Enterprise did not. (*Id.*) They did not increase the value of the settlement fund. (FAC ¶ 88.) They did not change any terms of the settlement agreement. (FAC ¶ 90.) They did nothing except for file an objection, watch the court overrule it, then demand money for not holding up the proceedings further. (FAC ¶¶ 5-6, 8, 147-150.)

Despite his protestations after the fact through counsel, Bandas has been well aware since at least 2009 that he had no claim of right to attorneys' fees from a class action settlement without producing a benefit for the class. (FAC ¶¶ 45, 161.) That is one of the reasons he goes through such great lengths to keep his scheme from courts. Courts that have found out anyway have explained to him on the record that he has no claim to attorneys' fees without benefiting the class. (FAC ¶¶ 43-46.) It is simply implausible that Bandas or Thut believed they had a claim of right to $225,000 in attorneys' fees in the *Gannett* case.

The Enterprise isn't engaged in "hard bargaining" for a "claim of right to property." (Dkt. 64 at 13.) It is running an extortion racket. *See Vollmer*, 350 F.3d at 660.

> ## 2. Holding Defendants Liable for Extortion Would Not Have Any Effect on Bona Fide Objectors Who Seek to Change a Class Action Settlement.

The remainder of Bandas's arguments are policy arguments. According to Bandas, holding him liable for extortion-based racketeering would "impose a chilling effect upon all

litigants who may have meritorious claims[.]" (Dkt. 64 at 8.) In theory, it's a valid concern. Open access to courts is, after all, a central tenet of our democracy, and "[i]f any litigant's or attorney's pleading and correspondence in an unsuccessful lawsuit could lead to drastic RICO liability in a private right of action, litigants might hesitate to avail themselves of the courts and available legal remedies or be unable to find representation to help vindicate their rights." *Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 173 (E.D.N.Y. 2010). That said, "[i]f lawyers are not punished for their criminal conduct and corrupt endeavors to manipulate the administration of justice, the result would be the same: the weakening of an ethical adversarial system and the undermining of just administration of the law." *Cueto*, 151 F.3d at 632.

Regardless, the cases Bandas cites all have to do with one person filing a civil lawsuit against another person. *See, e.g.*, *Curtis*, 758 F. Supp. 3d at 173 (considering the public policy implications of RICO liability for "unsuccessful lawsuits"); *Deck v. Eng'd Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003) (considering RICO liability for "the filing of a groundless lawsuit"); *Lockhart v. HSBC Fin. Corp.*, No. 13 C 9323, 2014 WL 3811002, at *7 (N.D. Ill. Aug. 1, 2014) (considering RICO liability for "filing and prosecuting a civil complaint"). In standard civil litigation, one party accuses another party of some kind of legal wrongdoing and demands money or other relief. That is a far superior way of resolving disputes than the alternative— resorting to violent self-help. *See United States v. Pendergraft*, 297 F.3d 1198, 1206 (11th Cir. 2002). So superior, in fact, that courts apply a light touch when considering whether to sanction frivolous litigation, so as to encourage the judicial method of dispute resolution. *See id.* at 1206-07. That is the reasoning behind all the cases that Bandas cites in favor of the proposition that lawsuits and threats to file even the most baseless lawsuits are not typically considered extortion.

But as the Seventh Circuit has recognized, class actions are different from other kinds of litigation—especially when they settle—and managing them can require departure from previous norms. *See Pearson*, 772 F.3d at 787. Part of the paradigm of almost any civil lawsuit is that the plaintiff claims that the defendant owes her money and will, at some point, demand that money. Some consideration of allegations pleaded below the word "complaint" is required to determine whether the plaintiff's demand for money is meritorious or non-meritorious, plausible or frivolous, legitimate or fraudulent. As a society, we trust the judicial process to answer these questions fairly and reliably. *Pendergraft*, 297 F.3d at 1206.

However, a secret demand for money for the objector or her counsel is not part of the class action objection paradigm. A class action objector serves the court and the class by pointing out ways that a settlement might be collusive, unfair, or otherwise not sufficiently beneficial to the class as a whole. *Vollmer*, 350 F.3d at 660 ("Intervenors counteract any inherent objectionable tendencies by reintroducing an adversarial relationship into the settlement process and thereby improving the chances that a claim will be settled for its fair value."); *Reynolds*, 288 F.3d at 288 ("It is desirable to have as broad a range of participants in the fairness hearing as possible because of the risk of collusion over attorneys' fees and the terms of settlement generally. This participation is encouraged by permitting lawyers who contribute materially to the proceeding to obtain a fee."). The goal for any objection must be either to convince the litigants change the settlement or to convince the court not to approve it, thereby forcing a more favorable resolution through continued litigation or a revised settlement. There is *never* a legitimate reason for a class action objector or her counsel to demand monetary compensation directly from class counsel, because the objector's role in the lawsuit is not one that involves a demand for money.

29

Indeed, courts have distinguished situations where the extortion is only tangentially related to the litigation or threatened litigation and in such circumstances permitted Hobbs Act claims to proceed. For example, in *La Suisse, Societe d'Assurances Sur La Vie v. Kraus*, the defendants, who were insurance brokers, had filed lawsuits against an insurance company that they claimed were on behalf of policyholders. 2014 WL 3610890, at *1-5. In reality, the brokers never intended to give money to any of the policyholders and were "engaged in a calculated effort to use these lawsuits to force [the insurance company] to make payments directly to them." *Id.* at *5. The insurance company brought a RICO claim alleging extortion under the Hobbs Act, and while the court considered cases holding that litigation could not be extortion, it concluded that those cases were inapposite because the defendants "did not commence [the underlying suit] for the benefit of … policyholders; rather, they initiated and were financing it as a tool to extort additional money from [the insurance company]." *Id.* at *10; *see also Sturm*, 870 F.2d at 774 (noting that threats to sue can violate the Hobbs Act); *Hall*, 726 F. Supp. at 1096 (same).

Just as in *La Suisse*, Bandas and Thut "have attempted to leverage their control and influence" over Stewart "in an attempt to extort [Edelson] into making payments directly to [Bandas and Thut]." *See* 2014 WL 3610890, at *10. To that end, Bandas "attempted to negotiate a payment directly to himself and [his co-defendant] in exchange for the withdrawal of" Stewart's objection after it was overruled. *See id.* As the *La Suisse* court recognized, that conduct is "different in kind" from other "trumped-up complaint[s] about frivolous litigation" and is extortion under the Hobbs Act. *See id.* at *9.

By holding Defendants liable for improperly using the class action device to extort money without any benefit to the class, there is no chance that a legitimate objection will be chilled. Unlike the cases involving standard bi-lateral litigation, neither the filing of the objection

30

nor the threat to file an objection could ever lead to liability, because filing an objection (even a baseless objection) on its own is not wrongful. The extortionate act occurs when, after the objection is overruled, the objector demands cash in exchange for not delaying the distribution of the settlement by appeal or other means, without securing any change at all to the settlement itself.[13] No matter how frivolous the objection, no objector who was using the device for its proper purpose would *ever* engage in this activity.

### 3. Malicious Prosecution Does Not Cover Class Action Objections.

Bandas also latches on to another policy point raised by several of the cases he cites: that allowing RICO claims based on the Hobbs Act for frivolous lawsuits would encroach on the state law tort of malicious prosecution. *See, e.g.*, *Nakahara v. Bal*, No. 97 CIV. 2027 (DLC), 1998 WL 35123, at *8 (S.D.N.Y. Jan. 30, 1998) ("[P]laintiffs' Complaint, when read as a whole, pleads a claim for malicious prosecution[.]"); *Curtis*, 758 F. Supp. 2d at 172 (finding RICO claims to be "essentially claims of malicious prosecution"). But malicious prosecution could never apply to class action objections, which is why Edelson does not allege that tort here.

*Withall v. Capitol Fed. Sav. of Am.*, 518 N.E.2d 328, 330 (Ill. App. Ct. 1987), illustrates the point well. There, the Illinois Appellate Court found that a motion for sanctions could not form the basis for a malicious prosecution suit for two reasons. First, "an original judicial prosecution could never be commenced" under the portion of the civil procedure code that allows a sanctions motion. *Id.* Same with a class action objection. Second, the court found that in order to satisfy the element, "the original action must have been prosecuted to its termination *by the current defendant* in the malicious prosecution action." *Id.* at 331 (emphasis added). In a

---

[13]     The Enterprise's objectors do not try to resolve the objection before being overruled because objections may only be withdrawn with court approval. *See* Fed. R. Civ. P. 23(e)(5).

class action objection, the original action is not brought or prosecuted by the objector. It is brought and prosecuted by class counsel on behalf of the plaintiff and the class. Accordingly, Edelson would never be able to make out a malicious prosecution claim for Defendants' actions.

Considering the purpose of the tort of malicious prosecution, this is not a surprising result. The tort exists for the "limited purpose" of "compensat[ing] parties who are forced to defend against frivolous lawsuits." *Withall*, 518 N.E.2d at 332. In each of the RICO cases that Bandas cites, courts are reluctant to impose RICO liability based on a claim that falls *directly* into this limited purpose. Here, Edelson is not looking for compensation for being "forced" to defend against the Enterprise's objections—however frivolous. To the contrary, Edelson accepts its responsibility to demonstrate the fairness of class action settlements to the court, and that includes explaining why each objection to a settlement does not warrant denying approval. Even class members who raise concerns that have no legal basis are entitled to an explanation as to why the settlement should be approved over their objection.

If all the Defendants did was file meritless objections and lose, then Edelson would have no basis to sue them. It is the extortion and other attendant crimes that creates liability under RICO here.

### C. The Enterprise Bribes Objectors and Obstructs Justice.

As Edelson alleged, members of the Enterprise bribe objectors in order to be able to effectuate their scheme. Neither Thut nor Stewart address these allegations, and the bulk of Bandas's argument is that paying clients to object to class actions is not a crime. (Dkt. 64 at 23-24.) The only case Bandas cites in support of that proposition, *Vollmer v. Selden*, has nothing at all to do with bribery. And as noted above, paying clients to serve as figureheads in class actions

is a serious racketeering crime that other lawyers have been convicted and disbarred for committing.

Instead of providing relevant case law, Bandas states without citation to any authority that Edelson "cannot sustain a bribery allegation because there was no false testimony involved." (Dkt. 64 at 22.) That is wrong as a matter of law. Under federal law, a person who:

> directly or indirectly, demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon any such trial, hearing, or other proceeding, or for or because of such person's absence therefrom

has committed bribery. 18 U.S.C. § 201(c)(4).[14] The statute contains no requirement that the paid-for testimony be false. *Blaszak*, 349 F.3d at 887. Rather, it "clearly prohibits demanding or accepting anything of value in exchange for testimony," a "meaning [that] should be clear to a person of common intelligence because it is neither overly technical nor obscure." *Id.*

Similarly, under Illinois law, "[a] person commits bribery when … With intent to cause any person to influence the performance of any act related to the … function of any … witness, he or she promises or tenders to that person any property or personal advantage which he or she is not authorized by law to accept." 720 ILCS 5/33-1. "The mere offer or promise with the requisite intent is sufficient to constitute the completed offense of bribery." *People v. Wallace*, 312 N.E.2d 263, 266 (Ill. 1974). For example, offering to pay a prospective witness to convince a

---

[14]     Although Edelson referenced 18 U.S.C. § 201(b)(4) in its complaint, the offense delineated in § 201(c)(4) is a lesser included offense of the same crime and is therefore implied by the allegation that (b)(4) was violated. *See United States v. Blaszak*, 349 F.3d 881, 887 (6th Cir. 2003). Even if the court determines the wrong statute was identified in the complaint, it is irrelevant because plaintiffs do not have to plead legal theories, the "allegations gave notice of a legally sufficient claim," and Edelson "brought the legal support for [its] claim to the district court's attention in [its] response[.]" *See Ryan v. Illinois Dep't of Children & Family Servs.*, 185 F.3d 751, 764 (7th Cir. 1999) (internal citation omitted). Accordingly, *Eastern Savings Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 14 (D.D.C. 2014), is unpersuasive here because it focuses solely on the "corruptly" and "intent to influence" elements that are absent from (c)(4).

prosecutor to drop charges is bribery, regardless of the truth or falsity of the statements made to the prosecutor. *See id.*[15]

Here, Bandas and Thut paid or offered to pay Stewart and others to submit sworn statements to a Court in connection with their objections. (FAC ¶¶ 207-208.) Stewart, for his part, agreed to receive money in exchange for these statements. (FAC ¶ 121.) Both are bribery, regardless of the truth or falsity of the testimony offered.

In any event, Stewart did offer false testimony. Although Bandas argues that Edelson "does not allege that the Illinois Objector Enterprise paid or promised to pay its client objectors to give false testimony before the Court or provide false statements within their objections," that is demonstrably wrong. (Dkt. 64 at 22.) Edelson alleged the following: "Defendants and other members of the Illinois Objector Enterprise promise to pay, promised to pay, or actually paid purportedly good-faith objectors for false testimony." (FAC ¶ 201.) Specifically, the objectors signed statements under penalty of perjury that they objected for the reasons stated in the objection, when they were in fact objecting because they had been promised a share in the Enterprise's profits. (FAC ¶¶ 202-203.) Even if falsity were an element of state or federal bribery (which it is not), those allegations are sufficient. If Bandas wishes to contest the truth of those matters, he can do so at trial.

Finally these bribes were paid in an attempt to delay court-ordered payments to absent class members and class counsel. That means that the bribes here also constitute obstruction of justice because they were "specifically intended to influence, obstruct, or impede, the due

---

[15]     Perhaps Bandas has bribery confused with "communicating with a witness" which requires "an attempt to prevent a witness from testifying freely, fully, and truthfully," *People v. Jackson*, 596 N.E.2d 1251, 1253 (Ill. App. Ct. 1992), or subornation of perjury, which requires "induc[ing] another to make a statement" under oath "which the person knows to be false," 720 ILCS 5/32-3. Bandas committed those felonies too, but they are not RICO predicate acts.

administration of justice." *United States v. Aguilar*, 515 U.S. 593, 616-17 (1995) (Scalia, J., concurring in part and dissenting in part) (analyzing 18 U.S.C. § 1503 in relation to bribery); *see also Cueto*, 151 F.3d at 631 (affirming lawyer's conviction for obstruction of justice resulting from traditional litigation-related conduct). Edelson has therefore adequately pleaded predicate acts of Bribery and Obstruction of Justice.

### D. Edelson Was Injured by Defendants' Money Laundering.

In addition to extortion, bribery, and obstruction, Edelson alleges predicate acts of money laundering. To have committed money laundering under 18 U.S.C. § 1956(a)(1)(A)(i), one of the defendants must have "1) conducted a financial transaction with the proceeds of an illegal activity; 2) [known] that the property represented illegal proceeds; and 3) conducted the transaction with the intent to promote the carrying on of the unlawful activity." *United States v. Malone*, 484 F.3d 916, 920 (7th Cir. 2007). Here, all or almost all of Bandas's income comes from extortion rackets, making the money illegal proceeds. (FAC ¶ 210.) Bandas conducted a financial transaction when he used $2,500 of that ill-gotten money to pay Rodney Max his mediation fee. (FAC ¶ 214.) As the leader of the Enterprise, Bandas knew that the money represented illegal proceeds. (FAC ¶ 209.) Bandas made the payment to Max with the intent to promote the unlawful scheme described in detail above. (FAC ¶ 214.) Bandas's use of the mediator to maintain secrecy is an integral part of his scheme, so his money laundering directly caused Edelson's injury. (FAC ¶ 88.) That is enough to plead money laundering.

Bandas's only argument to the contrary is to repeat his incorrect assertion that he did nothing illegal. (Dkt. 64 at 24-25.) Nobody makes any other argument about money laundering. In particular, they do not contest that Edelson sufficiently alleges that the money from previous extortions was used to pay for the sham mediation in *Gannett*. (FAC ¶¶ 209-215.) Therefore, as

long as the Court finds that Edelson states a claim with regard to at least one other predicate act, then the Court should also find that it states a claim with regard to money laundering.

### E. Defendants Committed Mail and Wire Fraud to Advance the Enterprise's Interests.

*Gannett* and other schemes also involved mail and wire fraud. The elements of mail and wire fraud are "(1) a scheme to defraud; (2) an intent to defraud; and (3) use of the mails or wires in furtherance of the scheme." *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006). Defendants' conduct satisfies all three.

First, "[a] scheme to defraud requires the making of a false statement or material misrepresentation, or the concealment of a material fact." *United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009) (internal quotation marks omitted). Here, Edelson alleges that in their dealings with class counsel, Enterprise members—particularly Bandas, but also the associate attorneys and objectors—falsely represent that they are or that they represent good-faith objectors to the class action settlement. (FAC ¶¶ 153, 167.) In particular, in connection with the *Gannett* case, Bandas misrepresented that Stewart had a good-faith objection to the settlement that could be resolved to the benefit of the class in a mediation conducted by a neutral third party. (FAC ¶ 153.) In fact, the objection was always for the purpose of extortion, Enterprise members never had any intention of benefiting the class, and the purportedly neutral mediator was bought and paid for. (FAC ¶ 156.) That is a scheme to defraud.

The second element, intent to defraud, "requires a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Domnenko*, 763 F.3d 768, 772 (7th Cir. 2014). "The intent to defraud may be established both from circumstantial evidence and inferences drawn by examining the scheme itself." *Id.* Here, there can be no question about

intent. Enterprise members have operated the same scheme for profit more than a dozen times, enriching themselves to the determinant of class counsel. (FAC ¶ 109.)

The final element, use of mail or wire in furtherance of the scheme, is also easily satisfied here. To satisfy the "in furtherance" element, "[t]he use of the mail or wire need not be an indispensable part of the fraud … it need only be incident to an essential part of the scheme or a step in the plot." *United States v. Turner*, 551 F.3d 657, 666 (7th Cir. 2008) (internal quotation marks and alterations omitted). "The mailing or use of the wires need not itself contain false or fraudulent material; a 'routine or innocent' mailing or use of the wire can supply this element of the offense, as long as the use of the mail or wire is part of the execution of the scheme." *Id.* (quoting *Schmuck v. United States*, 489 U.S. 705, 714-15 (1989)).

Here, Bandas communicated with Edelson by email (which is a type of wire communication) on multiple occasions, including to demand the use of the mediator, to conduct the mediation itself, and to demand secrecy at the end of the mediation. (FAC ¶¶ 152-156.) In at least one other case, Thut used an interstate wire to submit a claim form on behalf of his daughter without her knowledge or consent in furtherance of a scheme. (FAC ¶¶ 162-166.) Enterprise members also use the United States mail to send their bogus objections to class counsel and the court, which is another part of the execution of the scheme. (FAC ¶ 170.)

Mirroring the rest of his brief, Bandas's only response is that what he calls "litigation activities" and "litigation documents" are exempt from the wire and mail fraud statutes. (Dkt. 64 at 14-19.) Thut appears to agree. (*See* dkt. 70 at 8-9) (setting forth a page-long string citation of wire and mail fraud cases without analysis as to how those cases relate to Thut's actions).

Such an exception would be absurd. "[T]here exists no broad shield from RICO for attorney advocacy." *Garlock Sealing Techs., LLC v. Shein*, No. 3:14-CV-137, 2015 WL

5155362, at *3 (W.D.N.C. Sept. 2, 2015) (internal quotation marks omitted). Perhaps, as Bandas points out, attorneys "dealing at arm's length on behalf of their parties" might have some defense to mail or wire fraud claims. (Dkt. 64 at 15) (quoting *Spiegel v. Cont'l Illinois Nat. Bank*, 609 F. Supp. 1083, 1089 (N.D. Ill. 1985)). But the attorneys here were not in any way acting at "arm's length," nor were they acting legitimately as attorneys on behalf of clients. All three were actively engaged in a criminal enterprise in which they reaped the lion's share of the profits. (FAC ¶ 42.) Further, Edelson specifically alleged that Thut's actions were not related to the provision of professional legal services and that both Bandas and Palmer were practicing law without a license. (FAC ¶¶ 133, 253.) In any event, mail or wire fraud in connection with settling a lawsuit is still fraud, and it is still a RICO predicate act. *Deck*, 349 F.3d at 1259 (holding allegations of wire fraud in connection with a settlement agreement to be "proper predicate acts").

Nevertheless, Bandas is partially correct that "[c]ourts have … refused to allow 'litigation activities' such as filing fraudulent documents or engaging in baseless litigation to serve as predicate acts for RICO." *Armada (Singapore) PTE Ltd. v. AMCOL Int'l Corp.*, No. 13 C 3455, 2013 WL 5781845, at *6 (N.D. Ill. Oct. 25, 2013) But that is true "*only in circumstances where such acts constitute the only allegedly fraudulent conduct*." *Id.* (emphasis added); *see also Eisen*, 974 F.2d at 254 (holding that mail and wire fraud related to a series of perjuries in state court proceedings could be RICO predicate acts). Defendants' conduct constitutes mail and wire fraud despite their relation to court activity because their actions are merely "predicate acts in a larger scheme" of extortion, bribery, money laundering, and other crimes. *See Armada*, 2013 WL 5781845, at *6. That is particularly true here because the pattern of litigation is a sham. *See, e.g.*, *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 940 (9th Cir. 2006) (recognizing that conduct in sham

litigation can be mail and wire fraud). Far from "routine litigation activities," therefore, "Defendants are accused of committing rampant fraud over the course of several years in various state [and federal] court proceedings. These allegations suffice to state a claim for civil RICO." *See Garlock*, 2015 WL 5155362, at *3. Plaintiff has thus adequately pleaded predicate acts of Wire and Mail fraud.

### F. Defendants Tampered with Witnesses in Federal Proceedings.

Edelson also alleges predicate acts of witness tampering under 18 U.S.C. § 1512. A person is guilty of witness tampering if he "knowingly … corruptly persuades another person, or attempts to do so … with intent to … influence … the testimony of any person in an official proceeding[.]" 18 U.S.C. § 1512(b). Witness tampering requires that "1) [the objector] was a witness or prospective witness; 2) [Defendants] attempted to persuade [the objector] to provide false testimony; and 3) [Defendants] acted knowingly and with the intent to influence [the objector's] testimony." *United States v. LaShay*, 417 F.3d 715, 718 (7th Cir. 2005). Here, Edelson alleges that 1) the objectors make declarations under oath, making them witnesses, (FAC ¶ 183), 2) that Defendants pay the objectors to falsely testify that they are filing the objections because they actually take issue with the terms of the class action settlement (FAC ¶ 179, 181), and 3) that Defendants do so knowingly and specifically to induce this false testimony (FAC ¶ 186-87). That is witness tampering, and the FAC sufficiently alleges this predicate act as well.

Bandas's counterargument—that the witness tampering statute applies only to federal proceedings—is a red herring. (Dkt. 64 at 19-20.) Edelson did not allege witness tampering as a predicate act that caused it direct injury. Rather, those allegations are to demonstrate the required pattern of racketeering activity. As explained in section G below, allegations of conduct that did

not directly injure Edelson (such as the Enterprise's repeated witness tampering in federal court) can still be used to demonstrate such a pattern.

### G. Defendants Engaged in a Pattern of Racketeering Activity.

Edelson must also allege facts showing that Defendants engaged in a "pattern of racketeering activity." "A pattern of racketeering activity requires at least two predicate acts of racketeering within a ten year period" and can be established by showing that the defendants committed "a series of related predicate acts extended over a substantial period of time[.]" *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 689 (N.D. Ill. 2012) (Pallmeyer, J.). Neither Bandas nor Thut contest that they were engaged in a pattern of activity together (Bandas specifically concedes the existence of a pattern, dkt. 64 at 25). They argue only (and in a conclusory manner) that the pattern of activity they engaged in was not racketeering activity because the series of related acts were not predicate acts. As explained in detail above, they committed several predicated acts.

Bandas and Thut also argue that Edelson "has no standing to assert a RICO claim by relying on" predicate acts that the Enterprise committed against other people. (Dkt. 64 at 20; *accord* dkt. 70 at 11.) The Seventh Circuit considered and rejected this exact argument in *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806 (7th Cir. 1987), which neither Bandas nor Thut cites. *Pate* considers "whether a plaintiff, after proving predicate acts sufficient to constitute a pattern … must prove that *every* act involved in the pattern also caused a direct injury to the plaintiff." *Id.* at 809 (emphasis in original). The answer is no, because "[i]t would be illogical to require a plaintiff to show that all the acts adding up to a 'pattern' injured him[.]" *Id.*; *accord Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1004 (7th Cir. 2004). Under Defendants' interpretation, "if a plaintiff could prove the existence of an ongoing criminal

40

scheme primarily involving, for example, the hijacking of liquor shipments, but the only injury to the plaintiff was the burning down of his liquor store in the furtherance of the scheme, this single racketeering act would not permit plaintiff to recover RICO damages." *Pate*, 819 F.2d at 810. To avoid this "incorrect" result, a plaintiff, "need not prove that it suffered injury from each (or more than one) predicate act constituting the pattern." *Id.*

Here, Edelson alleges that it was injured by the Enterprise's racketeering activity in the *Gannett* litigation. (FAC ¶ 8.) To satisfy RICO's pattern requirement, Edelson has listed a number of other occasions on which the Enterprise has pulled exactly the same scheme on others. (FAC ¶ 109.) While those allegations might be relevant later for other reasons (especially during class certification), on the motions to dismiss, they relevant only to the question of whether Defendants engaged in a pattern of racketeering activity. Any attempt to limit Edelson's pattern allegations to only instances where Edelson was directly harmed cannot be squared with *Pate* and must be rejected.

## IV.    Edelson Stated a Claim for RICO Conspiracy under 1962(c).

In addition to alleging direct violations of RICO, Edelson also alleged that Defendants engaged in RICO conspiracy, which is prohibited by 18 U.S.C. § 1962(d).

Thut makes no arguments with regard to conspiracy other than to repeat his incorrect contention that Edelson pleads no predicate acts. (Dkt. 70 at 10.) Most of Bandas's arguments regarding conspiracy directly contradict the allegations in the complaint and should be disregarded. *Zahn*, 815 F.3d at 1087. For example, Bandas contends that the complaint does not "plead any facts indicating an agreement among the defendants." (Dkt. 64 at 29.) Actually, the complaint contains many, detailed allegations that Defendants agree and coordinate among themselves. (FAC ¶ 216(a) ("Christopher Bandas entered into an agreement with Palmer and

Thut…"); *id.* ¶ 216(e)( "C. Jeffery Thut entered into an agreement with Bandas and Palmer…"); *see also id.* ¶¶ 121, 139, 148.) Bandas also argues that the complaint lacks "any discussion of which defendants would play which roles." (Dkt. 64 at 29.) However, there is an entire section of the complaint entitled "Structure of the Illinois Objector Enterprise," which contains a detailed discussion of which defendants played which roles in the Enterprise. (FAC ¶¶ 114-121.) Bandas complains about the length of the Amended Complaint, but the only way that he could be unaware of which role he is accused of playing is if he skipped the section entitled "Illinois Objector Enterprise Members Bandas and the Bandas Law Firm." (FAC ¶¶ 122-128.)

Setting aside Defendants' ignoring of the allegations of the FAC, Edelson states a claim under § 1962(d). RICO's "conspiracy provision is concerned with the agreement to participate in an endeavor, which if completed would violate a substantive provision of the Act." *Domanus v. Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017). The Seventh Circuit recently set out a concise statement of what is required to plead a violation of § 1962(d):

> A RICO conspiracy requires proof that (1) the defendants agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendants further agreed that someone would commit at least two predicate acts to accomplish these goals.

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 823 (7th Cir. 2016) (internal quotations marks and citations omitted).

The first element does not require that each defendant "agree to personally participate in the operation or management of the enterprise. Rather, [he] must knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner." *Id.* (internal citation and quotation marks omitted). As described in detail above, Bandas, Thut, Palmer, and Stewart agreed that Bandas would lead the Enterprise and that the other three would participate in particular roles. (FAC ¶¶ 114-121.) Further, each member of the

42

Enterprise maintained an interest in it and turned a profit when one of the Enterprise's schemes succeeded. (FAC ¶¶ 115, 119.) As to Thut specifically, Edelson alleges that Thut agreed to participate in the affairs of the Enterprise by recruiting objectors (including his own daughter) to participate in the Enterprise's schemes and by signing objections in order to put Bandas in position to extort money for their mutual benefit. (FAC ¶¶ 58-60, 83-84.)

As to the second element, "[t]he defendant need not personally commit a predicate act; rather, a plaintiff must allege that the defendant agreed that *someone* would commit at least two predicate acts in furtherance of the conspiracy." *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (emphasis in original). Edelson so alleges. For example, on multiple occasions Thut and Palmer sought out "clients" and agreed that Bandas would use the objections to extort class counsel in a sham mediation. (FAC ¶ 75, 116-121, 130, 133.) Thut also agreed that Bandas would bribe Stewart with the proceeds of that extortion, and Stewart agreed to accept that bribe. (FAC ¶¶ 57, 148, 216(e).) Defendants' own actions demonstrate the degree of agreement and coordination. For instance, Thut did not review or investigate the objection he signed and filed on behalf of Stewart, because he had already agreed with Bandas that the purpose of the objection was extortion and that there was no reason to try and win in court. (FAC ¶¶ 83-84.) Further, Thut and Bandas have attempted this scheme together at least nine times, including once with Thut himself as the objector. (FAC ¶ 109.)

## V.     Edelson States a RICO Claim Against Stewart.

Thut and Bandas's briefs are largely similar, but as Stewart's brief contains arguments distinct to him, Edelson addresses them separately. Stewart's brief raises only two reasons why the claims against him should be dismissed. First, he claims to be a mere "hireling" of the Enterprise as opposed to a member, which is not possible because the Enterprise could not have

legitimately hired him for anything. Second, he ignores controlling Supreme Court and Seventh

Circuit case law to argue that he cannot be held liable for his participation in only one of the

Enterprise's many schemes. Edelson has stated a RICO claim against Stewart.

### A. Stewart Was More than a Passive Participant in the Enterprise.

"To be liable under § 1962(c), [a] person must participate in the operation or

management of the enterprise itself," *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 646 (7th

Cir. 1995). "An enterprise is 'operated' not just by upper management but also by lower rung

participants in the enterprise who are under the direction of upper management." *Reves v. Ernst*

*& Young*, 507 U.S. 170, 184 (1993). For example, "[a]n enterprise also might be 'operated' or

'managed' by others 'associated with' the enterprise who exert control over it as, for example, by

bribery." *Id.*

Here, Edelson alleges that Bandas and Thut bribed Stewart to submit false testimony and

file an objection to further the Enterprise's affairs. Signing and filing the objection is a core

component of the "operation" of the Enterprise, since it is the tool that the Enterprise uses to

make money. By signing as he was told (in the hopes of turning a profit), Stewart helped to

operate the Enterprise.

If, as Stewart argues, he was a "hireling" of the Enterprise, then he is certainly liable,

because that means he received a bribe. A "hireling" is someone who "only received its 'normal

fee'" for its participation in a RICO enterprise. *Nesbitt v. Regas*, No. 13 C 8245, 2015 WL

1331291, at *11 (N.D. Ill. Mar. 20, 2015) (quoting *Bachman v. Bear, Stearns & Co.*, 178 F.3d

930, 933 (7th Cir. 1999)). If a defendant receives a fee only in the course of "the parties' normal

commercial relationships," then he might not be liable. *Id.* at *8; *accord Bible*, 799 F.3d at 655-

56. But clients pay attorneys, not the other way around. If Stewart charged his lawyers a "fee"

44

for submitting a sworn statement and an objection in a class action, that is not a normal commercial relationship between attorney and client. It is accepting a bribe. There is no legitimate way that Stewart could be a "hireling" of the Enterprise.

Bizarrely, Stewart also attempts to argue that he cannot be held liable because "Edelson fails to show why the [Enterprise] could not simply have convinced a different member of the class to act as the named objector." (Dkt. 67 at 7.) Some other *Gannett* class member theoretically *could* have joined the Enterprise, but most people are reluctant to commit a felony that carries a possible 20-year prison sentence. *See* 18 U.S.C. § 1963(a). Stewart is the only one who actually did.

The purported legal basis for this argument comes from *Nesbitt v. Regas*, 2015 WL 1331291, at *8, where the court considered whether a "particular defendant played a fungible role that could have been performed by outsiders" in trying to decide if that defendant "participated in the enterprise's affairs, rather than its individual affairs." But here, the role never could have been played by an outsider, because the Enterprise relied on Stewart's willingness to submit false testimony and to withdraw the appeal of his objection at the proper time to allow the extortion to work. (FAC ¶¶ 135, 148, 216(g).) Stewart's close relationship with Palmer is also strong evidence that Stewart was no outsider. (FAC ¶ 216(g).) Further, and as explained above, *Nesbitt* rests on the idea that the defendant's conduct could be part of an "ordinary commercial relationship," 2015 WL 1331291, at *8, which being paid to object to class action settlements never could.

### B.    Stewart's Participation in One of the Enterprise's Schemes Is Enough to Hold Him Liable for Conspiracy.

Stewart's only other contention is that he cannot be held liable for racketeering conspiracy under § 1962(d) because he only participated in one of the Enterprise's schemes.

(Dkt. 67 at 10.) Although Stewart couches his argument in the language of "open-ended" and "close-ended" continuity, that is a red herring. His analysis is based on the false premise that because "[t]here are no allegations that he was involved in any of the [Enterprise's] other prior schemes," those schemes are not relevant to whether he is liable for conspiracy. (Dkt. 67 at 10.)

The Supreme Court considered and rejected this exact argument 20 years ago in *Salinas v. United States*, 522 U.S. 52, 61-66 (1997). In that case, a county sheriff was running a racket in which he accepted bribes from prisoners. The defendant, his deputy, was convicted of conspiracy under § 1962(d), but argued that his conviction had to be thrown out because "the jury was not instructed that he must have committed or agreed to commit two predicate acts himself[.]" *Salinas*, 522 U.S. at 63. The Supreme Court rejected this premise in no uncertain terms, holding that § 1962(d) does not require the defendant to "commit or agree to commit the two or more predicate acts requisite to the underlying offense[.]" *Id.* at 65. The Court then upheld the deputy's conviction because "[t]he evidence showed that [the sheriff] committed at least two acts of racketeering activity when he accepted numerous bribes and that [the deputy] knew about and agreed to facilitate the scheme." *Id.* at 66.

In other words, conspiracy requires knowing participation "in the *enterprise's* pattern of racketeering activity," not that each defendant engaged in a pattern of his own. *United States v. Garcia*, 754 F.3d 460, 477 (7th Cir. 2014) (emphasis added). This principle is now so well-established that a recent Seventh Circuit case found that a contrary argument "require[d] little comment." *Id.* With regard to conspiracy, Edelson only needs to plead that "another member of the enterprise committed the two predicate acts and that [Stewart] 'knew about and agreed to facilitate the scheme.'" *See id.* (quoting *Salinas*, 522 U.S. at 552)).

As discussed above, Bandas, Thut, and Palmer have committed many predicate acts in a pattern of racketeering activity that goes back years. Even though Stewart, like the deputy in *Salinas*, may have taken only one bribe, he did so with the knowledge that Bandas, Thut, and Palmer were running an enterprise that was engaged in a pattern of racketeering activity. Edelson alleges that Stewart knew about the scheme, and that he agreed to facilitate the scheme by allowing Thut and Bandas to file an objection in *Gannett* under his name. (FAC ¶ 227.) Having known Palmer for decades, Stewart was well aware of the Enterprise and how it operated. (FAC ¶ 216(g).) He participated in it with full knowledge that Bandas would use the order overruling the objection to extort Edelson, that Bandas had agreed to bribe him, and that Enterprise members would commit the other predicate acts described above. (*Id.*) That is RICO conspiracy and Stewart played a culpable role in it.

**VI.    Defendants Abused Court Process by Using the District Court's Denial of the Stewart Objection to Extort Money from Edelson.**

In addition to its federal claims, Edelson also alleges that Defendants committed the tort of abuse of process under Illinois law. Bandas and Thut each disagree. Stewart does not seek dismissal of the abuse of process claims against him, making his answer due 14 days after ruling on these motions. *Intercom Ventures, LLC v. FasTV, Inc.*, No. 13 C 232, 2013 WL 2357621, at *7 (N.D. Ill. May 28, 2013). First, and contrary to Bandas and Thut's arguments, Edelson sets out a prima facie case for abuse of process. Second, no state-law litigation privilege immunizes Thut's actions.

**A.    Edelson States a Claim for Abuse of Process.**

Bandas and Thut each argue that Edelson does not state a claim for abuse of process because it does not allege that Defendants misused an "official act of the court." (Dkt. 64 at 32; *accord* dkt. 70 at 13-14.) To the contrary, that is exactly what Edelson alleges.

"The usual case of abuse of process is one of some form of extortion[.]" *Cmty. Nat. Bank in Monmouth v. McCrery*, 509 N.E.2d 122, 124 (Ill. App. Ct. 1987). "Under Illinois law, '[t]he *only* elements necessary to plead a cause of action for abuse of process are: (1) the existence of an ulterior purpose or motive and (2) some act in the use of legal process not proper in the regular prosecution of the proceedings.'" *Pace v. Timmermann's Ranch & Saddle Shop Inc.*, 795 F.3d 748, 757 (7th Cir. 2015) (quoting *Kumar v. Bornstein*, 820 N.E.2d 1167, 1173 (Ill. App. Ct. 2004)) (emphasis in original). In order to satisfy the second element—which is what Thut and Bandas challenge—"the plaintiff must show that the process was used to accomplish some result that is beyond the purview of the process." *Kumar*, 820 N.E.2d at 1173.

Thut and Bandas are correct that the objections they file are not process because "[p]rocess is issued by the court, under its official seal." *Cmty. Nat. Bank in Monmouth*, 509 N.E.2d at 124. Here's what *is* process: a court order overruling the Enterprise's objections. And as Edelson alleged, Defendants are using the court's order overruling their objection to accomplish a result—payment of attorneys' fees—that is entirely beyond the purview of the process. Yet Defendants use that very order as leverage to extort a payment of attorneys' fees that it could clearly could never entitle them to. (FAC ¶ 248.) That is abuse of process and Edelson has adequately stated a claim for that tort against Defendants.

### B.    Illinois Litigation Privilege Does Not Bar Plaintiff's Claims Against Thut.

Thut contends that the abuse of process claim against him is barred by Illinois litigation privilege.[16] (Dkt. 70 at 5-6.) It is not. The "necessarily narrow" absolute litigation privilege in

---

[16]    Thut casts this argument as relating to "Plaintiffs' state law claims," but abuse of process is the only state law claim Edelson has alleged against Thut. Federal claims, of course, cannot be barred by state law litigation privilege. *Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th Cir. 1998)

Illinois, which is based on Restatement (Second) of Torts § 586 (1977), "provides a complete bar

to a claim for defamation" stemming from statements "concerning another in communications

preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as

a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the

proceeding." *Thompson v. Frank*, 730 N.E.2d 143, 145 (Ill. App. Ct. 2000). "The privilege is

limited … to instances where the administration of justice and public service require immunity."

*O'Callaghan v. Satherlie*, 36 N.E.3d 999, 1008 (Ill. App. Ct. 2015).

Thut cites no case where an Illinois court has applied the absolute privilege to a claim

even remotely similar to abuse of process. Although Thut "maintains that the absolute privilege

allowed in defamation actions under section 586 has been extended by Illinois courts to causes of

actions other than defamation," that argument is "misleading" here. *See Zdeb v. Baxter Int'l, Inc.*,

697 N.E.2d 425, 430 (Ill. App. Ct. 1998). Those cases all involve a party's attempts to "recast its

cause of action to avoid the privilege's effect." *O'Callaghan*, 36 N.E.3d at 1008; *see also*

*Johnson v. Johnson & Bell, Ltd.*, 7 N.E.3d 52, 57 (Ill. App. Ct. 2014) (distinguishing cases that

do not "deal with the recasting of a defamation claim in order to avoid the absolute litigation

privilege").

Thut also cites Illinois law that states that "[t]here is no civil cause of action for

misconduct which occurred in prior litigation" (Dkt. 70 at 6) (quoting *USA Satellite & Cable,*

*Inc. v. Mac Naughton*, No. 15 C 6331, 2016 WL 3262002, at *4 (N.D. Ill. June 14, 2016)). But

Illinois recognizes the tort of abuse of process, of which one element is "some act in the use of

the legal process which is not proper in the regular prosecution of the proceedings." *Pace v.*

---

("A state absolute litigation privilege purporting to confer immunity from suit cannot defeat a
federal cause of action.").

*Timmermann's Ranch & Saddle Shop Inc.*, 795 F.3d 748, 757 (7th Cir. 2015). Thut's broad

reading of the general statement he quotes would abrogate that tort, which is both contrary to

Illinois Supreme Court authority, *see Williams v. Ill. State Scholarship Comm'n*, 563 N.E.2d 465,

484 (Ill. 1990) (recognizing the tort of abuse of process), and extremely unlikely to be the court's

intention, *see Cole v. Young*, 817 F.2d 412, 420 (7th Cir. 1987) ("We decline to assume that the

[state appellate court] would overrule one of its precedents in so casual and offhand a manner,

much less *sub silentio*."). Much more likely, that statement refers to liability for defamation and

defamation-like claims.

Here, Edelson does not allege a defamation claim, nor does it allege a claim that is in any

way similar to a defamation claim, such as invasion of privacy or infliction of emotional distress.

Edelson alleges a common law cause of action—abuse of process—that exists solely to punish

conduct that occurs during litigation. If all litigation activities were protected by absolute

immunity, such a tort could not exist. Thut's argument thus fails.

## VII. Illinois Did Not—And Cannot—Prevent Adjudication of Unauthorized Practice of Law Claims in Federal Court.

Because Bandas is practicing law in Illinois without a license, Edelson also seeks an

injunction to end his unauthorized practice. Bandas argues that Edelson's unauthorized practice

of law claims are "not properly brought before this Court" because the Illinois Attorney Act

includes a venue provision that requires claims to be filed in certain Illinois circuit courts. (Dkt.

64 at 33.) That conclusion would compel an unconstitutional reading of the Attorney Act and is

wrong as a matter of law.

The Attorney Act provides that "[n]o person shall be permitted to practice as an attorney

or counselor at law within this State without having previously obtained a license for that

purpose from the Supreme Court of this State." 705 ILCS 205/1. "Because the practice of law by

an entity not licensed constitutes an infringement upon the rights of those who are properly licensed, attorneys and law firms have standing to bring a cause of action for such unauthorized practice." *Richard F. Mallen & Assocs., Ltd. v. Myinjuryclaim.com Corp.*, 769 N.E.2d 74, 76 (Ill. App. Ct. 2002).[17] Here, Edelson—an Illinois law firm owned and operated by Illinois-licensed attorneys—seeks an injunction to stop Bandas from his continued unauthorized practice of law in Illinois. (FAC ¶¶ 260-63.)

As Bandas points out, the Attorney Act has a provision requiring that in the Illinois court system, litigation under the Act should be conducted in the circuit court of the county where the alleged unauthorized practice occurred. 705 ILCS 205/1. Such a rule cannot apply in federal court. *Railway Co. v. Whitton's Adm'r*, 80 U.S. (13 Wall.) 270, 286 (1871). ("Whenever a general rule as to property or personal rights, or injuries to either, is established by State legislation, its enforcement by a Federal court in a case between proper parties is a matter of course, and the jurisdiction of the court, in such case, is not subject to State limitation."). "Treating the statute as a claim by a state to oust the jurisdiction of the federal courts would simply render it unconstitutional" as a violation of the Supremacy Clause. *Albert Trostel & Sons Co. v. Notz*, 679 F.3d 627, 629 (7th Cir. 2012) (citing *Railway Co.*). To avoid that problem, it is "best to read language" limiting jurisdiction to a certain county court "as allocating authority within [the state's] own judiciary" and not as an attempt to place an unconstitutional restriction on the federal judiciary. *Id.*; *see also Edmond v. United States*, 520 U.S. 651, 658 (1997) (holding that courts must avoid interpreting a statute "in a manner that would render it clearly unconstitutional … if there is another reasonable interpretation available"). The venue provisions

---

[17] The Attorney Act does not provide a cause of action for damages, but it does allow for injunctive relief. *King v. First Capital Fin. Servs. Corp.*, 828 N.E.2d 1155, 1169 (Ill. 2005).

in the Attorney Act therefore do not apply in federal court and do not affect this Court's ability to

hear Edelson's Attorney Act claim.

## VIII.   The Court Should Exercise Its Discretion to Curb Vexatious Litigants.

Finally, Bandas and Thut each push a narrow and incorrect view of the All Writs Act, 28

U.S.C. § 1651 in an attempt to avoid being labeled vexatious litigants—a label they richly

deserve.[18] "Under the All Writs Act, district courts retain the 'inherent power to enter pre-filing

orders against vexatious litigants.'" *Orlando Residence Ltd. v. GP Credit Co., LLC*, 609 F. Supp.

2d 813, 816 (E.D. Wis. 2009) (internal citation omitted) (quoting *Molski v. Evergreen Dynasty

Corp.*, 500 F.3d 1047, 1057 (9th Cir. 2007)); *accord Safir v. U.S. Lines, Inc.*, 792 F.2d 19, 23 (2d

Cir. 1986) ("That the district court possessed the authority to enjoin Safir from further vexatious

litigation is beyond peradventure."). The Court should apply that label to Bandas and Thut here.

While it is true that the Ninth Circuit determined that an attorney could not be sanctioned

as a vexatious litigant in *Weissman v. Quail Lodge, Inc.*, 179 F.3d 1194, 1197 (9th Cir. 1999),

that holding is not binding on this Court, and the nature of Bandas's conduct, in particular,

warrants departing from that holding. *Weissman* assumes that the vexatious litigant statute need

not apply to attorneys because attorneys can be sanctioned or disciplined by the courts before

which they practice. *See* 179 F.3d at 1196-1200 (concluding that the district court's order against

an attorney must have been a sanctions order). But that doesn't work on Bandas. Again and

again, he has managed to weasel out of sanctions and discipline by claiming that he is providing

"unbundled" legal services and is therefore not subject to the jurisdiction of the courts before

which he practices. He has pulled or attempted to pull this stunt in at least two different states.

---

[18]      Bandas implies that Edelson has only brought an All Writs Act claim for purposes of
jurisdictional gamesmanship. (*See* dkt. 64 at 30-31.) That is not the case (and wouldn't work
anyway). Edelson requests Bandas and Thut be branded vexatious litigants.

(FAC ¶¶ 46, 79.) By requesting relief under the All Writs Act, Edelson is asking the Court to finally nail him down.

Four factors are relevant in determining whether a pre-filing order against a vexatious litigant is appropriate:

> First, the litigant must be given notice and a chance to be heard before the order is entered. [*De Long v. Hennessey*, 912 F.2d 1144, 1147 (9th Cir. 1990)]. Second, the district court must compile "an adequate record for review." *Id.* at 1148. Third, the district court must make substantive findings about the frivolous or harassing nature of the plaintiff's litigation. *Id.* Finally, the vexatious litigant order "must be narrowly tailored to closely fit the specific vice encountered." *Id.*

*Molski*, 500 F.3d at 1057. Here, by the time the Court rules on the substantive issues, all four factors will be met. The first two factors are irrelevant on a motion to dismiss. Bandas will have ample opportunity to be heard, and after trial, there will certainly be an adequate factual record.

As far as the third factor, Edelson has pleaded more than enough information that, if true, will allow the Court to make substantive findings about the nature of the litigation Bandas conducts. Specifically, Edelson alleges in detail that Bandas files objections in bad faith for the purpose of eventually extorting money from class action settlements. In support of these allegations, Edelson included a ruling from the ARDC, calling Bandas's conduct into serious question. (FAC, Ex. I.)

Finally, the order that Edelson requests is narrowly tailored to ensure that Bandas and Thut can continue to practice in a legitimate manner. It would not prevent them from representing bona fide objectors or otherwise advocate for their clients in a legal, legitimate matter. Rather, it adds a few safeguards to make sure that they do not continue their undesirable behavior. Specifically, it prohibits them from ghostwriting objections for the purpose of fooling courts and counsel into believing that the objector is *pro se*—an unethical practice in any event. It disallows them from making or threatening objections for the improper purpose of extracting a

53

payout for themselves, which courts have repeatedly warned Bandas to stop doing (to no avail). It requires that Bandas obtain prior approval from the court before which he seeks to file an objection, which, if the objection is truly legitimate, should be a very low threshold. And it prohibits him from withdrawing an objection or appeal without disclosing whether he received payment or benefited the class, a requirement so reasonable that it is likely to be part of Rule 23 by the time this suit is finished. (FAC ¶ 35.)

Because the requested pre-filing order is authorized by the All Writs Act and meets the factors required for granting such an order, the claim should not be dismissed.

## CONCLUSION

Because the Court has jurisdiction and Plaintiffs state a claim under RICO and applicable state and federal law, Defendants' motions to dismiss should be denied.

Respectfully Submitted,

**EDELSON PC**, individually and on behalf of all others similarly situated,

Dated: May 15, 2017      By:  /s/ Alexander G. Tievsky
           One of Plaintiff's Attorneys

Benjamin H. Richman
brichman@edelson.com
Alexander G. Tievsky
atievsky@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

**CERTIFICATE OF SERVICE**

     I, Alexander G. Tievsky, an attorney, hereby certify that on May 15, 2017, I caused to be served the above and foregoing by causing a true and accurate copy of such paper to be filed and transmitted on all counsel of record via the court's CM/ECF electronic filing system.

/s/ Alexander G. Tievsky       