| | | |
|---|---|---|
| **EDELSON PC, an Illinois professional corporation, individually, and on behalf of all others similarly situated,** | ) ) ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 16 C 11057** |
| | ) | |
| **THE BANDAS LAW FIRM PC, a Texas professional corporation, CHRISTOPHER BANDAS, an individual, LAW OFFICES OF DARRELL PALMER PC d/b/a DARRELL PALMER LAW OFFICE, a suspended California professional corporation, JOSEPH DARRELL PALMER, an individual, NOONAN PERILLO & THUT LTD, an Illinois corporation, C. JEFFREY THUT, an individual, GARY STEWART, an individual and JOHN DOES 1-20,** | ) ) ) ) ) ) ) ) ) ) ) ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Many of the parties in this case are frequent participants in class action litigation. Plaintiff Edelson PC is an Illinois law firm whose attorneys have extensive experience bringing class actions on behalf of consumer plaintiffs. Defendant Christopher Bandas frequently represents objectors to class action settlements.[1] In this lawsuit, Plaintiff alleges that Bandas's class-settlement-objection practice constitutes criminal racketeering. The scheme Plaintiff alleges works as follows: Bandas orchestrates the filing of meritless objections to proposed class action settlements on behalf of purported class members. Bandas files the meritless objections with the expectation that the trial court will overrule them, setting up a basis for

---

[1] As a result of their litigation activities over the years, Edelson and Bandas have developed divergent reputations within the legal profession. Edelson's attorneys are regarded as "experienced and respected members of the plaintiff's class action bar." *Aranda v. Carribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 818854, at *4 (N.D. Ill. Mar. 2, 2017) (Kennelly, J.). Bandas, by contrast, has been characterized as a "serial" objector who pursues personal financial gain by routinely filing frivolous, bad-faith objections to proposed class settlements and generally engaging in behavior "unfitting for any member of the legal profession." *Garber*, 2017 WL 752183, at *5 (S.D.N.Y. Feb. 27, 2017).

appeal. Before appealing the ruling (or while an appeal is pending), Bandas offers to forego appeal (or withdraw a pending appeal) in exchange for "attorney's fees." Though convinced that the appeal would be meritless, class counsel often agrees to pay Bandas to avoid the delay in payment to the class and class counsel that would result from the appeal process. From Plaintiff's perspective, when Bandas leverages the delay of a frivolous appeal on behalf of a purported class member to demand payment for himself, he is engaging in extortion. Plaintiff itself became the victim of Bandas's allegedly extortionate scheme when it paid Bandas $225,000 to withdraw an appeal arising from class litigation in Illinois state court.

Plaintiff brings this putative class action against Bandas and his law firm (The Bandas Law Offices) (collectively "Bandas"), as well as two attorneys, Jeffrey Thut and Darrell Palmer, and their law firms (Noonan Perillo & Thut Ltd and Law Offices of Darrell Palmer) (collectively "Thut" and "Palmer", respectively), who have assisted Bandas in finding potential objectors and filing objections in courts throughout the country. Plaintiff has also sued Bandas's objector clients, including Gary Stewart, the objector in the Illinois state court litigation that resulted in Edelson's payment to Bandas. Alleging that each Defendant has played an active role in advancing Bandas's scheme, Plaintiff asserts claims against all of them for engaging in a pattern of racketeering activity in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). According to Plaintiff, Defendants' acts of racketeering include extortion, mail and wire fraud, obstruction of justice, witness tampering, bribery, and money laundering. Plaintiff also alleges that Defendants conspired to engage in the pattern of racketeering activity, in violation of 18 U.SC. § 1962(d). In addition to the RICO claims, Plaintiff asserts state-law claims for abuse of process and unauthorized practice of law. Plaintiff also urges the court to label Bandas, Palmer, and Thut vexatious litigants and enjoin their behavior pursuant to the All Writs Act, 28 U.S.C. § 1651.

Defendants Bandas [63], Thut [69], and Stewart [66] have moved to dismiss. They argue that Plaintiff has not alleged a single RICO predicate act, let alone a pattern of

racketeering activity. Once the court dismisses the federal RICO claims, the only remaining claims will be state-law claims over which the court lacks jurisdiction, Defendants contend. In any event, they argue, Plaintiff has failed to state a claim for abuse of process or unauthorized practice of law.

For purposes of these motions, the court is required to accept Plaintiff's troubling allegations as true. Moreover, the court's own experience with Bandas and Thut, as well the accounts of other courts that have condemned Bandas's practices, provide independent grounds for crediting these allegations. *See, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012) (noting that Bandas has been "excoriated by Courts for [his] conduct"). The alleged conduct appears to be in bad faith, to have no genuine social value, and to be inconsistent with the ethical standards of the legal profession. Gaming the rules of the legal system solely for personal self-enrichment wastes the time and money of courts and attorneys, wrests funds away from deserving litigants, and tarnishes the public's view of the legal process. Nevertheless, as vexing as the court finds the behavior of Defendants and other "serial objectors," the court is unable to find that the alleged conduct constitutes racketeering activity. For the reasons discussed in greater detail below, the court grants Defendants' motions to dismiss with respect to Plaintiff's claims that arise under federal law and directs Plaintiff to show cause why the state law claims should not be dismissed.

## BACKGROUND

Plaintiff alleges it was injured by Defendants' conduct following the settlement of a class action lawsuit in Illinois state court. Attorneys affiliated with Plaintiff acted as class counsel in *Clark v. Gannett Co. Inc.*, Case No. 16-CH-06603 (Cir. Ct. Cook Cty., Ill.), a case concerning allegedly unlawful autodialed telephone calls. After years of litigation, the parties in *Gannett* reached a classwide settlement, which the Circuit Court of Cook County preliminarily approved in August 2016. (Pl.'s Combined Resp. to Mots. to Dismiss [76] (hereinafter "Pl.'s Resp.") at 7.) Before the state court granted final approval of the settlement, Thut filed an objection on behalf

of Stewart, who purported to be a class member. (First Am. Compl. [50] (hereinafter "FAC") ¶¶ 56, 132.) Plaintiff here alleges that Palmer solicited his friend Stewart as the class member who could file the objection (*id.* ¶ 56), and that it was Bandas who actually coordinated and prepared the objection. (*Id.* ¶ 259a.) Neither Palmer nor Bandas, however, filed an appearance with the court in *Gannett*. (*Id.* ¶ 56.) According to Plaintiff, Stewart's objection was part of a scheme to extract a payment from Plaintiff to Defendants.

Plaintiff has not provided details concerning the nature of Stewart's objection. Plaintiff does allege that in November 2016, the judge in the *Gannett* case overruled it. (*Id.*) According to Plaintiff, Defendants expected, and even intended, that the objection would be overruled so that they could threaten to appeal the ruling and demand payment from Plaintiff. (*Id.* ¶ 8.) Soon after the court overruled Stewart's objection, Bandas communicated with Plaintiff via telephone and e-mail and proposed that the parties enlist a professional mediator to assist them in resolving Stewart's objection without pursuing the appeal process. (*Id.* ¶ 86.) Plaintiff accepted Bandas's proposal and engaged in a telephone mediation session with Bandas and Bandas's proposed mediator, Rodney A. Max, on December 1, 2016. (*Id.* ¶ 90.) Plaintiff avers that when it agreed to participate in the mediation, it was not aware that Max and Bandas had worked together before and that Max and Bandas would attempt to use a "confidentiality" agreement to shield their conduct during the mediation from courts. (*Id.* ¶¶ 87–88.)[2] According to Plaintiff, during the mediation, Bandas never proposed any changes to the class action settlement that Plaintiff had negotiated on behalf of the class members. (*Id.* ¶ 91.) Instead, he simply demanded tribute; he asked for payment of $400,000 in "attorneys' fees" from Plaintiff and threatened to delay settlement payments to the class (and attorneys' fees to Plaintiff) by pursuing an appeal if Plaintiff refused to pay. (*Id.* ¶ 92.) To avoid a delay in distribution of the

---

[2]    The complaint does not provide the terms of the alleged confidentiality agreement; nor does it make clear whether Plaintiff was a party to the agreement. Plaintiff simply alleges that Max "forwarded a 'confidentiality' agreement" and that "he and Bandas knew [the agreement] would allow them to claim the [alleged] extortion could not be disclosed." (FAC ¶ 87.)

settlement proceeds to the class, Plaintiff capitulated, agreeing to pay Bandas $225,000. (*Id.* ¶ 93.) Plaintiff claims it had no real choice other than to pay Bandas: The costs of delaying the agreed settlement payments to the class and to class counsel, Plaintiff explains, would have jeopardized the law firm's ability to improve its infrastructure, cover operating its expenses, and pay off existing debt. Delay would impose additional costs, as well, including the cost of staff resources devoted to responding to class members awaiting the settlement recovery. (*Id.* at ¶ 6.) Plaintiff alleges that when it informed Defendants that it would disclose the parties' agreement and seek approval of the court, Bandas responded by falsely claiming that additional terms still needed to be negotiated[3] and demanding that nothing about the agreement be reported to the court. (*Id.* ¶ 93.)

Plaintiff maintains that the $225,000 payout Defendants received from Plaintiff was the product of an unlawful and extortionate scheme. Plaintiff also asserts that Defendants' conduct in the *Gannett* litigation is not an isolated instance of unseemly behavior but is rather part of a consistent pattern of racketeering activity conducted by an "objector enterprise." (*Id.* ¶ 1.) Plaintiff has identified at least fourteen other cases in which Bandas has engaged in similar conduct—filing frivolous objections to class action settlements for the purpose of extorting the attorneys representing the class. (*Id.* ¶ 109.) Bandas, according to Plaintiff, serves as the "boss" of the enterprise, providing leadership and overall command. (*Id.* ¶ 120.) Associates like Thut and Palmer allegedly coordinate with Bandas and each other to find objectors, sign documents, file appearances, and appeal overruled objections. (*Id.* ¶ 121.) Bandas and Palmer often "ghostwrite" the objections without signing the filed documents, or without even filing an appearance in the case, according to Plaintiff, in order to avoid the risk that they might be sanctioned by the court or to make it appear that the objections were filed *pro se*. (*Id.* ¶¶ 51, 82, 127.) Plaintiff also alleges that the objector clients, including Stewart, are participants in the illegal enterprise. According to Plaintiff, objectors like Stewart agree to accept thousands of

---

3    Plaintiff does not explain what "additional terms" Bandas identified as still to be negotiated.

dollars in return for acting as good-faith objectors to settlements, although they are not. (*Id.* ¶¶ 180–81.) Because the objectors will receive a portion of the enterprise's payout, Plaintiff alleges, they withdraw their objections once class counsel agrees to the enterprise's payment demands. (*Id.* ¶ 182.)

Plaintiff characterizes this conduct as a pattern of racketeering activity in violation of the federal RICO statute, and Plaintiff lists a number of Defendants' alleged predicate RICO acts in its complaint. According to Plaintiff, by threatening to intentionally delay payment to class members and class counsel, Defendants create a fear of economic harm and constitute unlawful "extortion" under the Hobbs Act, 18 U.S.C. § 1951. Plaintiff also alleges that Defendants committed wire fraud under 18 U.S.C. § 1343, and mail fraud under 18 U.S.C. § 1341, by using interstate wires and the United States mail as part of their scheme to mislead Plaintiff and others into believing that the class objectors were good-faith objectors and that Defendants intended to engage in good-faith mediation to resolve their objections. In addition, Plaintiff asserts that the solicitation of objector clients to submit false and misleading objections in exchange for payment constitutes obstruction of justice under 18 U.S.C. § 1503, witness tampering under 18 U.S.C. § 1512, and bribery under both the federal bribery statute, 18 U.S.C. § 201(b)(3), and the Illinois bribery statute, 720 Ill. Comp. Stat. 5/33-1. Plaintiff also alleges that Defendants' use of profits from prior extortionate schemes to pay for Max's mediation services constitutes money laundering under 18 U.S.C. § 1956. In addition to asserting that Defendants engaged in the above racketeering acts, Plaintiff claims that Defendants conspired with each other to engage in a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

Defendants deny that their alleged conduct amounts to any pattern of racketeering activity. They also emphasize that courts are reluctant to impose RICO liability on defendants for actions taken during the course of litigation. Indeed, Defendants maintain that the so-called *Noerr-Pennington* doctrine immunizes Defendants' litigation conduct from any RICO liability and requires dismissal of the RICO allegations.

The court should dismiss Plaintiff's RICO claims, Defendants contend, and will then lack jurisdiction over Plaintiff's remaining claims. Plaintiff's effort to invoke the court's authority under the All Writs Act fails, Defendants assert, because the All Writs Act itself does not provide any private right of action, and therefore does not support entry of an injunction. Plaintiff has also asserted state-law claims for unauthorized practice of law under the Illinois Attorney Act, 705 Ill. Comp. Stat. 205/1, and for abuse of process; Defendants argue that the court lacks jurisdiction over those claims because the parties are not completely diverse and Plaintiff has not satisfiedfy the amount-in-controversy requirement of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). In any event, Defendants argue, Plaintiff has not stated a claim for abuse of process because Defendants' alleged scheme does not rely upon any "process" issued by the court. Nor, they argue, does the Illinois Attorney Act authorize claims under that statute to be filed in federal court. Contending that Plaintiff has failed to state a claim or that the court otherwise lacks subject-matter jurisdiction over Plaintiff's claims, Defendants have moved under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss Plaintiff's First Amended Complaint in its entirety.

## DISCUSSION

When reviewing a motion to dismiss, a court treats all well-pleaded allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Jakupovic v. Curran*, 850 F.3d 898, 902 (7th Cir. 2017). Before addressing the state-law claims, the court first considers whether Plaintiff has adequately alleged a claim under the federal RICO statute.

## I.     RICO Claims

It is unlawful, under section 1962(c), "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Thus, to state a civil RICO claim under section 1962(c), a plaintiff must adequately allege four elements: "(1) conduct (2) of an enterprise (3)

through a pattern (4) of racketeering activity." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655 (7th Cir. 2015). Section 1961(1) lists the criminal acts that are considered "racketeering activity" under the RICO Act. 18 U.S.C. § 1961(1). In this case, Defendants' alleged racketeering activities include extortion, mail and wire fraud, witness tampering, obstruction of justice, bribery, and money laundering.

Defendants' primary challenge to Plaintiff's RICO allegations is that the alleged conduct does not amount to criminal racketeering. As an initial matter, however, Defendants argue that even if their alleged conduct were to be considered racketeering activity, the conduct took place in the context of litigation and is therefore immunized from liability. They argue that their conduct is shielded by the *Noerr-Pennington* doctrine, which originated in the antitrust context but has been extended to other domains and which safeguards the First Amendment right to petition the courts by immunizing certain litigation activity from liability. *See, e.g.*, *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757, 188 L. Ed. 2d 816 (2014) (doctrine protects defendants "engaging in conduct (including litigation) aimed at influencing decisionmaking by the government"). Thut, for his part, adds that litigation privileges established by Illinois state law and federal common law shield him from liability for the alleged conduct.

The court is not persuaded that any formal, absolute privilege or immunity doctrine immunizes Defendants from liability. Plaintiff has alleged that Defendants acted to conceal their settlement negotiations and agreements from court scrutiny. (*See* FAC ¶¶ 93, 168.) Given that the purpose of the *Noerr-Pennington* doctrine is to protect communications *with* the government, the doctrine should not be interpreted as protecting conduct Defendants engaged in during the course of negotiations they tried to hide from courts. The doctrine is also inapplicable where the litigation at issue is a sham—"for example, a lawsuit designed to make the other litigant bear the costs of mounting a defense, even though the suit has no chance of success." *Tri–Corp Hous. Inc. v. Bauman*, 826 F.3d 446, 450 (7th Cir. 2016). Meritless class-

action objections designed to make the class bear the costs of defending the objection on appeal appear to fit squarely within the "sham litigation" exception to the *Noerr-Pennington* doctrine. As for Thut's assertions of privilege, Illinois' state-law privilege "cannot defeat a federal cause of action" and thus does not warrant dismissal of Plaintiff's RICO claims. *See Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th Cir. 1998). Thut also has not identified any Seventh Circuit authority for the proposition that a federal common-law privilege exists to bar claims other than defamation. *Cf. NSB Techs., Inc. v. Specialty Direct Mktg., Inc.*, No. 03 CV 2323, 2004 WL 1918708, at *4 (N.D. Ill. Aug. 20, 2004) (recognizing litigation privilege under federal common law for defamation claims arising from statements related to judicial proceedings).

The reach of *Noerr-Pennington* is not the end of the inquiry, however. Even if Defendants' conduct is not protected *per se* because it relates to litigation, numerous courts throughout the country have concluded that conduct similar to that of Defendants, though reprehensible, is not criminal or actionable under RICO. *See, e.g.*, *Deck v. Engineered Laminates*, 349 F.3d 1253, 1257–58 (10th Cir. 2003) (affirming dismissal of RICO claims brought against defendant who threatened to "tie [the plaintiff] up in court" and allegedly initiated meritless lawsuit using false and misleading allegations). Courts have declined to treat abusive litigation tactics as criminal in part because of the possibility that doing so would chill valuable litigation activity by "subject[ing] almost any unsuccessful lawsuit to a colorable . . . [RICO] claim." *Id.* at 1258; *see also United States v. Pendergraft*, 297 F.3d 1198, 1208 (11th Cir. 2002) ("[P]rosecuting litigation activities as federal crimes would undermine the policies of access and finality that animate our legal system.")

As noted above, the court perceives no social value in Defendants' alleged schemes. Yet it is not clear that Defendants' conduct violates any of RICO's predicate criminal statutes, and the rule of lenity favors interpreting those statues favorably for Defendants. *See United States v. Santos*, 553 U.S. 507, 514 (2008) ("[Interpreting ambiguous criminal laws in

defendants' favor] vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed."). In addition, the merits of Defendants' own specific conduct aside, objectors to class action settlements—even those who object regularly—can and do play a legitimate role in the legal system. *See Eubank v. Pella Corp.*, 753 F.3d 718, 720–21 (7th Cir. 2014) (noting the importance of objectors to judges evaluating fairness of settlement agreement where parties to agreement are no longer in adversarial posture toward each other); Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403, 409, 427–434 (2003) (noting potential costs objectors may impose on administration of class actions and suggesting ways to curb "extortionist" or "free riding" behavior, but concluding that objectors' ability to "create an adversary contest" can allow them to "perform a positive function").[4] Imposing RICO liability on objectors like Defendants could chill valuable good-faith objections from class members with legitimate concerns by exposing them to colorable RICO claims and associated treble damages awards. With this general concern in mind, the court turns to discuss the specific predicate acts alleged in Plaintiff's complaint.

### A. Hobbs Act

The Seventh Circuit has not addressed the question of whether abusive litigation practices of the type alleged in this case can constitute extortion under the Hobbs Act. But the overwhelming weight of authority from other circuits, as well as from courts within this district, supports Defendants' position that bringing or threatening to bring wrongful litigation in order to

---

[4] At least some commentators have suggested that one who views class actions as themselves extortionate might conclude from a purely welfarist perspective that even extortionate serial objectors could "produce net positive value" by deterring the filing of extortionate class actions. John E. Lopatka & D. Brooks Smith, *Class Action Professional Objectors: What to Do About Them?,* 39 FLA. ST. U. L. REV. 865, 888 (2012). The court notes, however, that from the same perspective, extortionate class actions may themselves provide positive value to the extent that they deter the illicit behavior of potential class action defendants.

extract money from the target of the litigation does not amount to a RICO predicate act of criminal extortion. *See, e.g., Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003) (joining "multitude of other courts in holding that meritless litigation is not extortion under [the Hobbs Act]"); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) ("A threat of litigation if a party fails to fulfill even a fraudulent contract . . . does not constitute extortion."); *I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265, 267 (8th Cir. 1984) (groundless threat to sue, made in bad faith, "may be tortious under state law, but we decline to expand the federal extortion statute to make it a crime"); *Harris Custom Builders, Inc. v. Hoffmeyer*, No. 90 C 0741, 1994 WL 329962, at *4 (N.D. Ill. July 7, 1994) ("alleged scheme of filing lawsuits to enforce an allegedly illegally obtained copyright does not constitute a predicate act of racketeering for purposes of RICO."); *Universal Mfg. Co. v. Douglas Press, Inc.*, No. 89 C 3354, 1991 WL 83156, at *2 (N.D. Ill. May 8, 1991) (following lead of other courts in finding that "the threat to file a lawsuit, or filing a lawsuit, cannot constitute extortion under [the Hobbs Act]"); *FindTheBest.com, Inc. v. Lumen View Tech. LLC*, 20 F. Supp. 3d 451, 457 (S.D.N.Y. 2014) (striking allegations of predicate acts premised on the Hobbs Act, including allegations that defendants filed frivolous patent infringement lawsuits and demanded nuisance settlements, because "the instigation of meritless litigation cannot constitute extortion under the Hobbs Act").

In a case involving extortion charges brought against a criminal defendant, the Eleventh Circuit explained why bad-faith litigation threats are not criminal under the Hobbs Act. *See Pendergraft*, 297 F.3d at 1205–08. The defendant in *Pendergraft*, a physician who operated an abortion clinic, sued the local county officials for an injunction that would allow him to hire off-duty police officers to protect the clinic from protestors. While the litigation was pending, the physician and his business associate allegedly authored affidavits falsely accusing the county's board chairman of making violent threats against the clinic and one of the physician's business associates. The physician and his attorney then allegedly pressured the county to settle by threatening to file an amended complaint, supported by the false affidavits, seeking millions of

dollars in damages. The government charged the physician with, among other things, attempted extortion under the Hobbs Act.

As the Eleventh Circuit recognized, many of the courts to consider whether threats of meritless litigation constitute predicate acts for civil RICO claims "have recharacterized the extortion charges as actions for malicious prosecution" and rejected the notion that malicious prosecution is racketeering activity. 297 F.3d at 1205. The court in *Pendergraft*, however, was unwilling to recast the criminal extortion charges brought against the defendant in that case as civil claims of malicious prosecution. *Id.* The Eleventh Circuit was therefore required to confront directly the question of whether the Hobbs Act criminalizes bad-faith threats of litigation. The court concluded that it does not, reasoning that threats to litigate—even bad-faith threats supported by fabricated evidence—do not constitute "wrongful" threats under the Act. *See* 18 U.S.C. § 1951(b)(2) (defining "extortion" as obtaining another's property through "wrongful use of actual or threatened force, violence, or fear, or under color of right"). Where a party threatens litigation in bad faith, the court explained, it is up to "the courts, and their time-tested procedures" to reliably resolve the matter, "separating validity from invalidity, honesty from dishonesty." *Pendergraft*, 297 F.3d at 1206. The court also expressed a concern that "[a]llowing litigants to be charged with extortion would open yet another collateral way for litigants to attack one another" and noted "[t]he reality . . . that litigating parties often accuse each other of bad faith." *Id.* at 1207. Based on similar reasoning, in the context of a civil RICO claim, the Tenth Circuit agreed with the court in *Pendergast* that the adjective "wrongful" in the Hobbs Act was not intended to apply to allegations of bad-faith litigation, even if "it would be fair, at least in other contexts," to characterize the alleged conduct as "wrongful." *See Deck*, 349 F.3d at 1258.

Plaintiff attempts to sidestep the authority cited above by distinguishing the filing of frivolous civil lawsuits from the filing of meritless objections in class-action settlements, noting that the Seventh Circuit has recognized the unique challenges that class litigation, and class

settlements, can pose. *See Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014). But Plaintiff has not explained why bad-faith objectors are so different from bad-faith litigants generally that the former's conduct should be criminalized while the latter's is not. Although there are differences between bringing a civil lawsuit and objecting to a class settlement, there are important similarities: Both can result in economic loss, and thus the effect on the target of the filing would be similar. It costs time and resources to defend against a civil lawsuit or to respond to an objection to a class settlement, regardless of a complaint's or an objection's merits. And an appeal in either situation can increase those costs by delaying a final resolution.

The court recognizes that, as Plaintiff observes, in assessing the cost of a delayed resolution, class counsel must consider its fiduciary responsibility to the class members, as well as the administrative costs of responding to class members asking when they will receive their share of the settlement fund. But these potential additional costs of delay are different only in degree, not in kind, from the delay costs faced by a traditional defendant in a civil lawsuit. In addition to producing similar effects, both the filing of lawsuits and the raising of objections to class settlements can have social value. Courts are thus appropriately wary of doctrines that unnecessarily discourage that activity. In fact, although Plaintiff points out that the Seventh Circuit in *Pearson* recognized the different challenges posed by class litigation and traditional civil litigation, the court there recognized the value of class-action objectors, acknowledging that "objectors play an essential role in judicial review of proposed settlements of class actions" precisely because class actions diverge from the standard adversarial model once the defendant and the class reach a settlement agreement. *Id.* at 787.

This court, too, declines to interpret the Hobbs Act as covering the alleged conduct in this case where that might subject good-faith objectors like the one in *Pearson* to "a colorable extortion (and often a RICO) claim" for every unsuccessful objection. *Deck*, 349 F.3d at 1258. The objector in *Pearson* has, himself, objected to class action settlements "at least eleven times" and has seen his arguments rejected by a number of other courts. *Kumar v. Salov N.*

13

*Am. Corp.*, No. 14-CV-2411-YGR, 2017 WL 2902898, at *4 (N.D. Cal. July 7, 2017). It does not follow from that history, however, that he has engaged in criminal extortion. Plaintiff's proposed interpretation of the Hobbs Act sweeps too broadly: on Plaintiff's view, an objector with a losing record who seeks to settle an objection out of court could face potential criminal and RICO liability or an allegation that the objector acted in bad faith, which, the court notes, a plaintiff need only allege generally. *See* FED. R. CIV. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

In attempting to distinguish Defendants' conduct from other civil litigation and from the conduct of good-faith objectors, Plaintiff emphasizes that an objector's "secret demand for money . . . is not part of the class action paradigm" and that an objector who does not seek to improve a settlement agreement but only seeks money does not provide any value. (Pl.'s Resp. at 29; *see id.* ("There is *never* a legitimate reason for a class action objector or her counsel to demand monetary compensation directly from class counsel, because the objector's role in the lawsuit is not one that involves a demand for money.").) A demand for payment unaccompanied by any substantive proposed amendment to the settlement agreement does appear to be meretricious, but it is difficult to distinguish that alleged behavior from lawful hard bargaining. *Cf. Rennell v. Rowe*, 635 F.3d 1008, 1011 (noting difficulty of distinguishing hard bargaining and extortion in general). A party with a good-faith objection may similarly try to extract the most favorable changes to the settlement agreement by initially taking the position that it is willing to see the objection through an appeal and will only accept a large monetary payment to withdraw the objection. Though that objector might ultimately be willing to accept smaller substantive changes to the settlement in a subsequent round of negotiating, the objector would risk RICO liability after the first round of negotiations under Plaintiff's proposed approach.

It is also difficult to distinguish the alleged settlement demands in this case from demands to settle ordinary frivolous lawsuits, which courts do not consider extortion. *See FindTheBest.com*, 20 F. Supp. 3d at 454, 457. The court is skeptical, for example, of Plaintiff's

assertion that class actions are different because the objector's role, unlike the role of a plaintiff, is not one that involves a demand for money. On the contrary, an objection to a class action can often involve a claim that the objector and other class members are entitled to greater sums of money because, for example, the portion of the settlement fund designated for attorney fees is too high. *See, e.g.*, *Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 1369741, at *1 (N.D. Ill. Apr. 10, 2017) (objector represented by Bandas seeking to reduce class counsel's attorney fee award by millions of dollars). In theory, at least, all good-faith objections have some value to the objectors, and objectors may therefore have legitimate reasons to demand monetary compensation in exchange for withdrawing what they believe to be a valuable objection. In short, though Plaintiff emphasizes the distinction between good-faith or "bona fide" objectors and bad-faith objectors, courts have rejected the significance of that distinction in the context of litigation threats generally. *See, e.g.*, *Deck*, 349 F.3d at 1259 ("[A]llegations of bad-faith litigation do not state the predicate act of extortion."). As the Eleventh Circuit recognized in *Pendergraft*, it is simply too common and too easy for "litigation parties [to] accuse each other of bad faith." 297 F.3d at 1207.

The court thus declines to depart from the long line of precedent under which demanding payment while threatening to bring or continue litigation does not constitute a predicate act of extortion. Attempting to distinguish that precedent, Plaintiff insists that courts "regularly find litigation-related conduct to be wrongful extortion under the Hobbs Act where the defendant knows that he does not have a claim of right to the money demanded." (Pl.'s Resp. at 24.) But the fact that a claim of right precludes a finding of criminal extortion does not establish that a demand for money absent a claim of right to that money is sufficient to establish wrongful extortion. In the cases the court discussed above, for example, the courts assumed that the defendants had no claim of right to the money demanded—and at least in the cases of *Pendergraft*, *Deck*, and *I.S. Joseph*, assumed that the defendants *knew* they had no claim of right—but nevertheless concluded that the litigation-related conduct did not constitute criminal

extortion.  *See, e.g.*, *Deck*, 349 F.3d at 1259 (finding no extortion despite threat of "meritless," "bad-faith" litigation); *Pendergraft*, 297 F.3d at 1208 (no extortion for threat to file litigation made in bad faith and supported by false affidavits); *Vemco*, 23 F.3d at 134 (no extortion for threatening litigation based on breach of a "fraudulent contract"); *I.S. Joseph*, 751 F.2d at 267 (assuming "threat to sue was groundless and made in bad faith" but declining "to expand the federal extortion statute to make [that conduct] a crime").

The cases upon which Plaintiff relies are either distinguishable or unpersuasive.  In *United States v. Sturm*, the First Circuit reversed a conviction for attempted extortion where the defendant refused to return part of the collateral for a loan unless he was paid a fee to which the defendant genuinely believed he was entitled.  870 F.2d 769, 774 (1st Cir. 1989).  The court in *Sturm* concluded that the defendant's genuine belief that he was entitled to a fee precluded a conviction for attempted extortion, and opined that it would be "unjust" to convict a litigant of extortion "unless she knew she had no claim to the property that she allegedly sought to extort." *Id.*  Plaintiff seizes upon that last portion of the First Circuit's dictum as support for the proposition that a conviction charge is proper against a party who does know he has no legal claim to property but demands the property under threat of litigation.  But the issue of whether litigation activities can constitute extortion was not squarely before the court in *Sturm*, and the First Circuit's discussion of a hypothetical lawsuit does not grapple with the public policy concerns this court addressed above.  The court's observation that it would not be "unjust" to convict someone of extortion for threatening meritless litigation does not require the conclusion that such a conviction would be appropriate in any case or that the Hobbs Act was intended to cover cases like this one.

Another case Plaintiff cites, *Lemelson v. Wang Labs, Inc.*, 874 F. Supp. 430 (D. Mass. 1994), similarly contains little analysis of the issues presented here.  In that case, the court denied a motion to dismiss a RICO claim based on allegations that a party had extorted millions of dollars in settlement funds through a pattern of litigation based on fraudulently obtained

patents.  *Id.* at 434.  The *Lemelson* court addressed the issues of whether a pattern of activity existed, whether the alleged association constituted a RICO enterprise, and whether the party asserting the claim had suffered an injury.  *See id.* at 432–34.  What the court did not address, despite the fact that extortion was the alleged predicate act, was whether the alleged litigation activities constituted criminal extortion.  The case, therefore, is not particularly instructive.  One other district court has so noted, concluding that *Lemelson* does not support a claim that threats to file lawsuits or other litigation activity could be RICO predicate acts.  *See B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 170 (S.D.N.Y. 1995).  And to the extent *Sturm* or *Lemelson* suggest that threats to initiate or continue litigation may constitute criminal extortion, the First Circuit appears to have distanced itself from that notion by signaling its agreement with the Eighth Circuit that "a threat to sue, if groundless and made in bad faith, may be tortious under state law, [but] it is not extortion under federal law."  *Dias v. Bogins*, No. 97-1612, 1998 WL 13089, at *1 (1st Cir. 1998) (unpublished opinion) (citing *I.S. Joseph Co.*, 751 F.2d 265).

Plaintiff relies on two other cases in which courts found that a RICO claim predicated on extortion could be based in part on alleged litigation activities, but those cases involved unique circumstances not present here.  *See La Suisse, Societe D'Assurances Sur La Vie v. Kraus*, No. 06 CIV. 4404 CM GWG, 2014 WL 3610890, at *9 (S.D.N.Y. July 21, 2014); *Hall Am. Ctr. Assocs. Ltd. P'ship v. Dick*, 726 F. Supp. 1083, 1097 (E.D. Mich. 1989).  In *Hall*, the court found that the plaintiffs had adequately alleged a RICO predicate act under the Hobbs Act for a scheme in which the defendants filed lawsuits and notices of lis pendens against the plaintiffs as part of a scheme to force a sale of plaintiffs' real property.  726 F. Supp. at 1097.  But the court emphasized that those litigation activities were only "*part* of an extortionate scheme to obtain property to which they were not entitled."  *Id.* (emphasis in original).  The larger scheme included "the defendants' interference with the [plaintiffs'] Joint Venture, the defendants' attempt to involve the United States Attorney in the matter, and other harassment of third persons

involved with the Property [at issue]." *Id.* *Hall* is thus unlike this case, in which every aspect of the alleged extortionate scheme is related to litigation activities and involves no other unrelated threats or harassment.

*LaSuisse* also differs from this case. In *LaSuisse*, an insurance broker and a brokerage firm allegedly used their control and influence over their policyholders to initiate policyholder litigation against an insurer, "and otherwise threaten[ed the insurer] in an attempt to extort [the insurer] into making payments directly to [the broker and the brokerage firm]." *LaSuisse*, 2014 WL 3610890, at *10. In finding that the lawsuits constituted extortion, the court in *LaSuisse* acknowledged that courts are "nearly unanimous in the view that the pursuit of frivolous litigation does not constitute the predicate RICO act of extortion." *Id.* at *9. But the court distinguished the situation in *LaSuisse* from those other cases on the basis that only the policyholders in *LaSuisse* could rightfully bring a lawsuit under the terms of the insurance policies, and thus the threatened lawsuits had "no nexus to [the RICO defendants] or the personal payment demanded by [them] to make them go away." *Id.*

The magistrate judge in *LaSuisse* reasoned that there was "no risk of a 'chilling' effect of the sort posited by *Deck*" because the court would not be "punishing the parties who could rightfully bring any lawsuit under the terms of the insurance policies at issue—the policyholders." *Id.* According to that court, the case was more like one in which a defendant who alleged the existence of an oral contract did not threaten to sue to enforce the contract "but rather 'threatened unrelated lawsuits alleging sexual harassment.'" *Id.* (quoting *United States v. Tobin*, 155 F.3d 636, 640 (3d Cir. 1998)). By contrast, in this case, there is no allegation that Stewart, for example, was not entitled to raise his objection as a member of the *Gannett* class. One could argue, using *LaSuisse* as an analogy, that allowing the RICO claims in this case to proceed against Bandas, Thut, and Palmer (but not Stewart) would not have a chilling effect because the court would only be punishing the attorneys who unjustly demanded payment rather than "the parties who could rightfully bring" objections—the objectors. Appealing as that

proposal is, it does not appear to eliminate the risk of a chilling effect. Imposing RICO liability on objectors' attorneys would discourage attorneys from representing good-faith objectors for fear that attempts to settle objections that are ultimately overruled could be understood as bad-faith attempts by the attorneys to demand money for which they "could not have any claim of right." *Id.* at *10. Thus, to the extent the opinion in *La Suisse* is inconsistent with this court's ruling, the court respectfully declines to follow it.

Plaintiff also relies on one case from the Seventh Circuit, in which the court cited the definition of "extortion" from *Black's Law Dictionary* and noted that "[i]n the context of intervening in a class action settlement, extortion would mean intervening not to increase the value of the settlement, but in order to get paid to go away." *Vollmer v. Selden*, 350 F.3d 656, 660 (7th Cir. 2003). But the Seventh Circuit concluded only that "this would be an improper purpose for intervening," not that it would constitute a crime. *Id.* There is no indication that the Seventh Circuit was referring to the criminal definition of extortion in its discussion of intervention, and the cited definition of extortion from *Black's Law Dictionary* was importantly different from that found in the Hobbs Act. *Compare id.* ("Extortion is the act or practice of obtaining something or compelling some action by illegal means, as by force or coercion."), *with* 18 U.S.C. § 1951(b)(2) ("The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."). Thus the Seventh Circuit did not address the question of whether "the adjective 'wrongful' in the [Hobbs Act] was not intended to apply to litigation." *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003). Again, for the reasons discussed above, the court "join[s the] multitude of other courts" in concluding that conduct of the type alleged here, however distasteful, does not amount to extortion under the Hobbs Act. *Id.*

**B.      Mail and Wire Fraud**

Plaintiff also characterizes aspects of Defendants' conduct as mail and wire fraud: specifically, Plaintiff alleges that Defendants fraudulently used interstate wires and the mail

when they represented to Plaintiff that Stewart had a good-faith objection to the *Gannett* settlement that could be resolved in mediation conducted by a neutral mediator. According to Plaintiff, these representations were false and misleading because Stewart's objection was not made in good faith, Defendants had no intention to resolve the objection through a change in the settlement terms, and the proposed mediator was not neutral. (FAC ¶¶ 153, 168.)

In assessing whether these allegations support a fraud claim, the court notes, first, that Plaintiff has not adequately alleged that the misrepresentations were "material" ones. *See Neder v. United States*, 527 U.S. 1, 25 (1999) ("[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."). Statements about the mediator's purported neutrality or Defendants' own good faith were not obviously material to Plaintiff's decision to pay Defendants. According to Plaintiff, it agreed to pay Defendants out of a fear of economic harm, not out of faith in the neutrality of the mediator or confidence in the other side's good faith. Indeed, by the time Plaintiff agreed to pay Defendants, Plaintiff certainly knew that Defendants were not acting in good faith and that the mediation was a sham. The court concludes that Plaintiff has failed to allege that any of Defendants' purported misrepresentations could form the basis for a federal mail or wire fraud charge.

In addition, to the extent Plaintiff's fraud allegations are based on purported misrepresentations about Defendants' intentions or good faith, the fraud claims suffer from the same infirmities that infect the Hobbs Act claim: "[s]ubjecting [the conduct] in issue to the mail [and wire] fraud statute[s] would chill an attorney's efforts and duty to represent his or her client in the course of pending litigation." *Spiegel v. Cont'l Illinois Nat. Bank*, 609 F. Supp. 1083, 1089 (N.D. Ill. 1985); *see id.* at 1088 (mail fraud statute not intended to cover scheme "to embezzle thousands of dollars . . . under the guise of claiming it as attorneys' fees" even though scheme was allegedly furthered by attorney's mailed letters). As discussed above, parties to litigation, including objectors to class settlements, must have the freedom to negotiate and settle their disputes outside of court, and criminalizing a person's lack of candor regarding negotiating

positions may compromise that freedom.  *See United States v. Weimert*, 819 F.3d 351, 354 (7th Cir. 2016) (bank executive who misrepresented how important his participation would be to the success of a transaction deceived others about "negotiating positions" or "preferences, values, and priorities" but did not engage in "material" deception for purpose of wire fraud).  Put simply, parties "will often try to mislead the other party about the prices and terms they are willing to accept.  Such deceptions are not criminal."  *Id.* at 357.  Treating Defendants' representations about their good faith and willingness to negotiate as fraudulent could expose to RICO liability numerous litigation parties who attempt to coax their opponents into settlement negotiations by exaggerating the strength of their positions or their negotiating flexibility.

### C.    Witness Tampering, Obstruction of Justice, and Bribery

Plaintiff also asserts that Defendants engaged in predicate acts of tampering with a witness under 18 U.S.C. § 1512, obstruction of justice or influencing an officer under 18 U.S.C. § 1503, and bribery under 18 U.S.C. § 201(b)(3) and 720 Ill. Comp. Stat. 5/33-1.  The same basic allegation underlies each of these purported predicate acts:  according to Plaintiff, Bandas and his associates promised to pay clients in exchange for the clients' agreement to pose as good-faith objectors acting of their own accord.  (*See* FAC ¶¶ 172, 179, 181 190.)  The federal bribery statute prohibits "directly or indirectly, corruptly giv[ing], offer[ing], or promis[ing] anything of value to any person, or offer[ing[ or promis[ing] such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation . . . as a witness upon a trial, hearing, or other proceeding."  18 U.S.C. § 201(b)(3).[5]  The Illinois statute

---

[5]     In its complaint, Plaintiff alleges that Defendants violated 18 U.S.C. § 201(b)(3) but argues in its brief that the applicable provision in this case is section 201(c)(4).  Plaintiff says that the latter section describes a lesser included offense of the crime established in section 201(b)(3) and does not require the alleged offer or promise to be made "corruptly."  The court presumes that Plaintiff meant to refer to section 201(c)(3); there is no section 201(c)(4).  But even section 201(c)(3) is not applicable to this case.  That section criminalizes the *receipt* of a bribe; Plaintiff, by contrast, alleges that Defendants' enterprise *offered* bribes.  *Compare* 18 U.S.C. § 201(c)(3) (applying to those who "demand[], seek[], receive[], accept[], or agree[] to receive or accept" bribes), *with* (FAC ¶¶ 189–208 (describing promises to pay or actual payments as the predicate acts of bribery)).  The court therefore analyzes the sufficiency of Plaintiff's allegations in light of section 201(b)(3), the provision identified in its complaint.

similarly prohibits "promis[ing] or tender[ing] to [a witness] any property or personal advantage which he or she is not authorized by law to accept [with intent to influence the performance of any act related to the witness' function]." 710 Ill. Comp. Stat. 5/33-1(a). Federal law also prohibits tampering with a witness, including by "knowingly . . . corruptly persuad[ing] another person, or attempt[ing] to do so . . . with intent to influence . . . the testimony of any person in an official proceeding." 18 U.S.C. § 1512(b)(1). By Plaintiff's account, paying a witness to swear falsely that he is a good-faith objector constitutes bribery and witness tampering. In addition, because Plaintiff asserts that the alleged bribery was part of a scheme to delay court-ordered payments to class counsel and the class, the bribery also constitutes obstruction of justice.

Plaintiff concedes that "merely filing a meritless lawsuit against another person might not be criminal." (Pl.'s Resp. at 20.) Plaintiff contends, however, that promising to pay someone to submit a meritless court filing can nevertheless constitute criminal racketeering. But Plaintiff has not cited any other case in which the basis for a RICO claim was an attorney's act of persuading a client to submit a frivolous court filing,[6] and the court is not inclined in this case to find that a frivolous court filing can be criminal simply because the attorney and the client who made the filing had an agreement about how proceeds from litigation would be shared. As Plaintiff Edelson itself undoubtedly recognizes, it is common for plaintiffs and their attorneys to enter into agreements about how a potential award from a lawsuit will be divided between the client and the attorney. It is also likely the case that most plaintiffs bring lawsuits in the hope of receiving some money, and monetary gain is not an improper motivation for filing a civil suit.

---

[6] Plaintiff has identified a case in which an attorney who paid plaintiffs was convicted of racketeering conspiracy. *See In re Weiss*, 58 A.D.3d 203, 203, 870 N.Y.S.2d 255, 256 (2008) (granting state disciplinary committee's petition to strike attorney's name from state roll of attorneys and discussing attorney's conviction, upon his guilty plea, in the Central District of California for violation of section 1962(d)). It does not appear, however, that the act of payment in exchange for filing the suits was the basis of that conviction. Rather, in that case, the plaintiffs who received payments falsely certified to the court "that they would not accept any payment for serving as a representative party beyond their pro rata shares of recovery." *Id.* at 205, 870 N.Y.S.2d at 257. It was those false certifications that "constituted four racketeering acts" supporting the attorney's RICO conviction. *Id.*

*See Vollmer*, 350 F.3d at 660.

As discussed above, filing a meritless lawsuit is not, by itself, a criminal act. That does not change simply because the plaintiff filed suit with the hope of getting paid and entered into an agreement with his attorney about how the proceeds from a successful suit would be shared. The opposite conclusion would open the door to waves of RICO lawsuits against unsuccessful plaintiffs and their attorneys who had contingency fee arrangements and economic motivations for filing suit. The court is therefore unwilling to interpret 18 U.S.C. § 201(b)(3), 18 U.S.C. § 1512(b)(1), or 720 Ill. Comp. Stat. 5/33-1(a) in a way that would treat the alleged conduct as constituting "corruptly . . . promis[ing]" a thing of value (section 201(b)(3)), "corruptly . . . influenc[ing]" testimony (section 1512(b)(1)), or promising a witness a "personal advantage which he . . . is not authorized by law to accept" (section 33-1(a)).[7] Because the alleged bribery provides the basis for Plaintiff's obstruction of justice allegations, Plaintiff has also failed to adequately allege obstruction as a RICO predicate act.

In one case cited by Plaintiff, an attorney was convicted of obstruction of justice in part for filing meritless lawsuits with the purpose of advancing his and his client's own financial interest. *See United States v. Cueto*, 151 F.3d 620 (7th Cir. 1998). But the financial interest at stake in *Cueto* was not the mere interest in obtaining a settlement award from the litigation the attorney initiated, and the litigation activities in that case formed only a part of the alleged scheme. In *Cueto*, the attorney defendant was motivated by a personal financial interest in his client's illegal gambling operation, and he attempted to use the power of his office to impede an

---

[7]    In its complaint, Plaintiff suggests that the objecting client would not be authorized by law to accept the money promised to him because the money would come from "attorneys' fees," which cannot be shared with non-lawyers. (FAC ¶¶ 65, 204 (citing ABA MODEL RULES OF PROF. CONDUCT RULE 5.4(a) ("A lawyer or law firm shall not share legal fees with a nonlawyer.").) But regardless of what Bandas allegedly calls the fees he demands (and regardless of how the settlement funds Bandas targets have been characterized), it is not apparent that the sum he extracts in consideration for dismissing his objection actually constitutes "legal fees." The funds do not, for example, come from a client in exchange for legal services and are not awarded by a court on the basis of representations about the attorney's work. It is thus difficult to distinguish the fund from which Bandas allegedly promises to pay objectors from traditional settlement payouts in everyday litigation.

FBI investigation into that illegal enterprise. *Id.* at 631–32. Those factors are significant. *Cueto* does not hold that traditional litigation activities can be characterized as obstruction.

### D. Money Laundering

Plaintiff alleges that Bandas engaged in unlawful money laundering by using funds from his previous extortionate schemes to promote additional schemes by paying the mediator to conduct a sham mediation. *See* 18 U.S.C. § 1956(a)(1)(A)(i) (prohibiting knowingly conducting financial transaction involving proceeds of unlawful activity "with the intent to promote the carrying on of specified unlawful activity"). As explained above, however, the court has already concluded that Defendants' alleged schemes do not constitute criminal extortion, or any other RICO predicate act. Plaintiff has failed to adequately allege that the money provided to the mediator was a "transaction involving proceeds of unlawful activity" within the scope of the money laundering statute, and thus money laundering cannot serve as a predicate act in this case.

## II. RICO Conspiracy

It appears to be well-established, and Plaintiff does not deny, that if a section 1962(d) RICO conspiracy claim is based on the same allegations underlying a section 1962(c) claim, the conspiracy claims "must fail if the substantive claims are themselves deficient." *Nat'l Council on Comp. Ins., Inc. v. Am. Int'l Grp., Inc.*, No. 07 C 2898, 2009 WL 466802, at *15 (N.D. Ill. Feb. 23, 2009) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993), and citing cases from other circuits). Because the court concludes that Plaintiff has not adequately alleged a claim under section 1962(c), and its section 1962(d) claims are based on alleged agreements to commit the alleged acts underlying those section 1962(c) claims, Plaintiff's RICO conspiracy claims must also be dismissed.

## III. All Writs Act

The All Writs Act authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28

U.S.C. § 1651(a). Plaintiff urges the court to use its authority under that Act to issue an injunction labeling the Defendants as vexatious litigants and prohibiting them from engaging in their abusive litigation practices Plaintiff alleges. (FAC ¶ 244.) The All Writs Act, however, does not provide an independent basis for jurisdiction and does not create a private cause of action. *See West v. Spellings*, 480 F. Supp. 2d 213, 218 (D.D.C. 2007). Thus the court may only provide a remedy under the All Writs Act if it has some other basis for jurisdiction. As discussed above, the court concludes that Plaintiff has failed to state a claim on its other federal causes, and the court explains below why it appears to lack original subject-matter jurisdiction over Plaintiff's state-law claims. Unless Plaintiff satisfies the court that there is jurisdiction over one of the state-law claims, the court must dismiss the claim under the All Writs Act as well.

## IV.    State-Law Claims

Having concluded that Plaintiff has not adequately pleaded any claim that would secure federal-question jurisdiction, the court must consider whether it has subject-matter jurisdiction over Plaintiff's remaining state-law claims. The "general rule is that, when federal-law claims are dismissed before trial, the pendent claims should be left to the state courts." *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1252 (7th Cir. 1994). None of the parties in this case has argued that considerations of "judicial economy, convenience, fairness[, or] comity" weigh in favor of exercising pendent jurisdiction. *Id.* Instead, Plaintiff argues that the court has original subject-matter jurisdiction over the state-law claims under CAFA because the parties are minimally diverse. *See* 28 U.S.C. § 1332(d)(2)(A). Bandas (and Stewart, by incorporation) responds that the court does not have original jurisdiction, even under CAFA, because Plaintiff has not demonstrated that the amount in controversy is greater than CAFA's $5 million requirement. *See id.* § 1332(d)(2). That requirement is satisfied, however, unless "there is a legal certainty that [a potential] judgment will be less" than the statutory threshold. *Kessler v. Am. Resorts International's Holiday Network, Ltd.*, No. 05 C 5944, 2007 WL 4105204, at *10 (N.D. Ill. Nov. 14, 2007) (Kennelly, J.) (internal quotation marks omitted). Given that Plaintiff

allegedly suffered at least $225,000 in damages, the number of other potential class members who allegedly suffered similar injuries, and the possibility of a significant punitive damages award, there is no legal certainty here that damages would be less than $5 million.

Yet, for a different reason, the court remains uncertain that it has jurisdiction under CAFA. The Act does not apply to class actions in which the number of proposed plaintiffs is below 100. 28 U.S.C. § 1332(d)(5)(B). Regarding the number of plaintiffs in the putative class, Plaintiff's complaint says only that "the exact number of members of the Class is unknown" but "likely consists of at least 40 persons." It thus appears likely that the class is not sufficiently numerous to allow the exercise of CAFA jurisdiction. None of the Defendants raised this issue in their briefs, but "federal courts are obligated to inquire into the existence of jurisdiction *sua sponte*." *Evergreen Square of Cudahy v. Wisconsin Hous. & Econ. Dev. Auth.,* 776 F.3d 463, 465 (7th Cir. 2015). Where a court doubts its own jurisdiction, it is ordinarily prudent to "solicit the parties' views on the subject prior to ruling." *Id.* The court therefore orders Plaintiff to show cause within 21 days why the court should not dismiss Plaintiff's state-law claims for lack of subject-matter jurisdiction.

## V.    Alternative Remedies

Assuming the truth of the allegations in the complaint, Defendants have engaged in a pattern of reprehensible conduct that has harmed Plaintiff and others and benefits no one other than Defendants themselves. The court is therefore troubled by the fact that its decision appears to leave Plaintiff without a remedy, at least in federal court, for this apparent wrong. Plaintiff's options may also be limited in state court. As Plaintiff acknowledges, a suit for malicious prosecution may be unavailable under Illinois law because the underlying class action was not "prosecuted to its termination by [the party who would be the] defendant in the malicious prosecution action." *Withall v. Capitol Fed. Sav. of Am.*, 164 Ill. App. 3d 851, 855, 518 N.E.2d 328, 331 (1987). And as Defendants point out, Plaintiff may have difficulty satisfying the elements of an abuse of process claim, which is "strictly construed" in Illinois. *Neurosurgery &*

*Spine Surgery, S.C. v. Goldman*, 339 Ill. App. 3d 177, 183, 790 N.E.2d 925, 930 (2003). Specifically, it is not clear that Defendants' alleged scheme relied on the misuse of legal process, defined as "any means used by the court to acquire or to exercise its jurisdiction over a person or over specific property." *Id.*

Bandas has also managed to evade sanctions despite "strong indicia of his subjective bad faith" by finding ways to proceed without filing appearances in the class actions where his clients file objections. *Garber*, 2017 WL 752183, at *6. In a previous case, this court recognized the harmful delay generated by Bandas's decision to pursue what appeared to be a doomed appeal. In an effort to shift the cost and discourage his frivolous appeal, the court set a substantial appeal bond, but the Seventh Circuit swiftly reversed that decision, explaining that "[s]pecial problems related to abuse by class action objectors must be handled in other ways[.]" *Allen v. J.P. Morgan Chase Bank, NA*, No. 15-3425, 2015 WL 12714382, at *1 (7th Cir. Dec. 4, 2015) (unpublished opinion). The Seventh Circuit suggested the primary way to deal with appeals from abusive objectors is a motion for sanctions under Federal Rule of Appellate Procedure 38. *Id.* The court notes that briefing a Rule 38 motion may itself impose a costly delay of payments for the class and class counsel.

Where a federal appeal is truly frivolous, however, and is filed by an objector with a long history of abusive conduct, class counsel's best option might be to place its trust in "the courts, and their time-tested procedures," *Pendergraft*, 297 F.3d at 1206, by seeing the appeal of an objection through to its resolution. After prevailing, class counsel can then recoup its expenses, including the administrative costs associated with delay, by pursuing recovery of "damages and single or double costs." FED. R. APP. P. 38. In cases involving meritless, bad-faith objections, the likelihood of prevailing on appeal and recovering damages would likely be high. Rejecting a bad-faith objector's demands would, therefore, be fully consistent with class counsel's fiduciary obligations.

In cases where attorneys like Bandas avoid appearing or signing their name in cases in

which they participate, Plaintiff is free to seek sanctions against the attorneys who do appear. If it is Bandas who is responsible for wrongdoing, those attorneys who file appearances and are sanctioned will presumably have every incentive to seek contribution from Bandas and others of his ilk. Indeed, at the time the parties briefed this motion, Plaintiff itself had a motion for sanctions against Thut pending in the *Gannett* case; the *Gannett* court ultimately denied the motion for sanctions, finding that Thut did not file his objection with an improper purpose. Commentators have proposed other approaches to dealing with the problem of serial objectors, including amending the Federal Rules of Appellate Procedure to allow for more effective use of appeal bonds to deter abuse. *See* Lopatka & Smith, *supra*, at 928. The court is hopeful that, if there is ultimately no remedy for Plaintiff in this case, courts presiding over class actions will craft effective means to deter the alleged behavior of Bandas, Palmer, and other attorneys who seek private gain at the expense of deserving class members.

## CONCLUSION

For the reasons stated above, the court grants Defendants' motions [63] [66] [69] to dismiss except with respect to counts three and five of Plaintiff's complaint. Plaintiff is ordered to show cause, in writing, by February 22, 2018, why those counts should not also be dismissed for lack of subject-matter jurisdiction.

ENTER:

Dated: February 6, 2018

_____
REBECCA R. PALLMEYER
United States District Judge