**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| EDELSON PC, an Illinois professional corporation, individually, and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>THE BANDAS LAW FIRM PC, a Texas professional corporation, CHRISTOPHER BANDAS, an individual, LAW OFFICES OF DARRELL PALMER PC d/b/a DARRELL PALMER LAW OFFICE, a suspended California professional corporation, JOSEPH DARRELL PALMER, an individual, NOONAN PERILLO & THUT LTD., an Illinois corporation, C. JEFFERY THUT, an individual, GARY STEWART, an individual, and JOHN DOES 1-20,<br><br>　　　　　Defendants. | Case No.  1:16-cv-11057<br><br>Hon. Rebecca R. Pallmeyer |

**AMENDED ANSWER, AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL AND COUNTERCLAIM**

NOW COMES Defendants the Bandas Law Firm, PC and Christopher Bandas (collectively "Defendants"), by and through their attorneys, and for their Amended Answer to Plaintiffs' First Amended Class Action Complaint and Demand for Jury Trial and Counterclaim ("Complaint") state as follows:

**NATURE OF ACTION**

1.　　Defendants are among the most notorious and prolific "professional objectors" in the United States. Together, Defendants plan and coordinate actions to extort unjustified profits for themselves from legitimate and court-approved class action settlements, including Plaintiff and the Class here. To further this plan, Defendants formed

an association and enterprise of individuals and entities with the explicit purpose of extorting money for themselves through class action objections ("the Illinois Objector Enterprise").

**ANSWER:**   Denied.

2.     Defendants file last-minute objections to class action settlements, intend that their objections will be overruled, and then threaten to or actually appeal the overruling of the objection to a higher court unless counsel agrees to participate in a "mediation." During these sham mediations, Defendants make threats of economic harm that will be carried out unless they are paid protection money in the form of "attorney's fees" which they are not entitled to by law. Defendants do all of this with no intention of improving the terms of the class action settlement for the betterment of the class members; their only interest is setting up "settlement negotiations" that they claim must be kept secret, and where they extort unjustified payments for themselves for minimal work.

**ANSWER:**   Denied.

3.     Defendants know that the merit of their objection is irrelevant because the threat of an appeal of the underlying class action will delay payment to the class and class counsel for years. Defendants' goal, and the way they fund the Illinois Objector Enterprise, then, is to offer to forego or withdraw their appeal for a payment of "attorneys' fees"-sometimes as high as $500,000-which they would be unable to obtain even if their objection or appeal had merit and was successful.

**ANSWER:**   Denied.

4.     Defendants' actions have caused courts across the country to determine, for instance, that "Bandas is a professional objector who is improperly attempting to 'hijack' the

settlement of this case from deserving class members and dedicated, hardworking counsel, solely to coerce ill-gotten, inappropriate and unspecified 'legal fees." "And that "Mr. Palmer is likely a serial objector and other courts have recognized similar behavior. … this Court finds such behavior in bad faith and also potentially violative of local and ethical rules."

**ANSWER:**    Denied.

5.    A material part of this scheme relies on clients who collude with Defendants to extort class counsel. These clients represent to the court and class counsel that they are class members and good-faith objectors with legitimate concerns about the pending settlement (e.g., that the class is getting a bad deal). However, these objectors and their testimony are bought and paid for by the Illinois Objector Enterprise. Defendants use the Illinois Objector Enterprise to find dodgy clients who, in exchange for the promise of thousands of dollars, are willing to, among other things, (i) file objections to class actions without cause, (ii) file objections with false and misleading testimony, and (iii) drop their objection and/or appeals after the Illinois Objector Enterprise has been paid.

**ANSWER:**    Denied.

6.    Through their Illinois Objector Enterprise, Defendants have routinely targeted cases where Plaintiff has been appointed class counsel abused the objection devise to obtain unjustified "attorneys' fees" for themselves without ever requesting or securing any benefit for the class. Plaintiff has expended considerable unreimbursed attorney time and out-of-pocket expenses to accumulate the evidence necessary to force Defendants to leave empty-handed. Each day that Defendants delay court-approved payments to the class and class counsel causes economic harm to Plaintiff. For instance, Plaintiff has been hampered in its ability to improve firm infrastructure, cover its operating expenses without taking on debt, and pay off existing

debt. The delay caused by the Defendants' scheme also harms Plaintiff and class members by requiring them to spend money on costs of staff required to respond to the waiting class members, printing costs, PACER fees, research fees, transportation fees, and more ("Delay Costs").

**ANSWER:**     Denied.

7.     That said, Defendants keep coming back, case after case, and Plaintiffs efforts to contain Defendants' nefarious effects have thus far been unable to prevent their return. *Cf* Harry S. Miller, *The Cat Came Back* (1893). Even with Defendant Palmer suspended from the practice of law, Defendants (including Palmer) still conspire to extort Plaintiff.

**ANSWER:**     Denied.

8.     Recently, the Illinois Objector Enterprise targeted a class action settlement where Plaintiff was appointed class counsel. There, Defendants filed an objection which, as they intended, was overruled by the court. Then, after Defendants made threats to appeal the court's ruling, they engaged with Plaintiff over interstate wires with an ultimatum: pay them $225,000 in unjustified "attorneys' fees" (with no benefit the class) or else they would file an appeal and hold up, indefinitely, the payment of claims to the class and court-approved attorneys' fees to class counsel. Faced with this lose-lose situation, Plaintiff agreed to pay $225,000 to Defendants and has incurred Delay Costs for which they now seek relief from this Court.

**ANSWER:**     Denied.

9.     Accordingly, Plaintiff Edelson PC, on behalf of the Class, brings this lawsuit under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO") for acts of extortion under the Hobbs Act (18 U.S.C. § 1951), Wire Fraud (18 U.S.C. § 1343), Mail Fraud (18 U.S.C. § 1341), and acts in violation of 18 U.S.C. § 1503 (influencing

an officer), 18 U.S.C. § 1512 (tampering with a witness), 18 U.S.C. § 201(b)(3) (bribery), 720 ILCS5/33-1 (bribery), and 18 U.S.C. § 1956 (money laundering). Also on behalf of the Class, Edelson PC brings a claim for common law abuse of process under Illinois law and seeks injunctive relief pursuant to the All Writs Act, 28 U.S.C. § 165 labeling Defendants vexatious litigants and prohibiting them from:

a)      making or threatening to make objections to class action settlements not for the purpose of improving the settlements but for extracting payments for themselves;

b)      filing with any court objections to class action settlements or appeals of overruled objections without prior screening or approval by the Court where their status as vexatious litigants must be disclosed along with a copy of the injunction entered pursuant to this suit;

c)      withdrawing any objection or appeal from the overruling of any objection without disclosing payment in exchange for doing so and any corresponding benefit provided to the class, along with an order awarding damages, and costs and reasonable attorneys' fees;

d)      ghostwriting objections for the purpose of making their objections seem *prose*.

**ANSWER:**      The allegations of paragraph 9 have been dismissed as failing to state a cause of action under the law and they are denied.

10.     On an individual basis, Plaintiff also seeks an order pursuant to the Illinois Attorney Act, 705 ILCS 205, enjoining Christopher Bandas and Joseph Darrell Palmer (and their respective firms) from continuing their unauthorized practice of law in Illinois.

**ANSWER:**    Defendants admit that Plaintiff seek an order pursuant to the Illinois Attorney Act, and deny the remaining allegations of paragraph 10 of the Complaint.

## PARTIES

11.     Plaintiff Edelson PC is a professional corporation incorporated and existing under the laws of the State of Illinois with its principal place of business at 350 N LaSalle Street, 13th Floor, Chicago, Illinois 60654.

**ANSWER:**    Admitted.

12.     Defendant The Bandas Law Firm is a professional corporation incorporated and existing under the laws of the State of Texas with its principal place of business located at 500 N. Shoreline Boulevard, #1020, Corpus Christi, Texas 78401.

**ANSWER:**    Admitted.

13.     Defendant Christopher Bandas is a natural person and citizen of the State of Texas. Defendant Bandas, individually and through his law firm, Defendant The Bandas Law Firm, has repeatedly engaged in the type of misconduct alleged here in Illinois and this District.

**ANSWER:**    Defendants admit that Christopher Bandas is a natural person and citizen of the state of Texas, and deny the remaining allegations of paragraph 13 of the Complaint

14.     Defendant Law Offices of Darrell Palmer PC d/b/a Darrell Palmer Law Office is a suspended professional corporation incorporated and existing under the laws of the State of California with its principal place of business located at 603 North Highway, 101 Suite A, Solana Beach, California 92075.

**ANSWER:**   The allegations of paragraph 14 are not directed to the Defendants and therefore they neither admit nor deny the same.

15.     Defendant Joseph Darrell Palmer is a natural person and citizen of the State of California. Defendant Palmer, individually and through his law firm, Defendant Law Offices of Darrell Palmer PC d/b/a Darrell Palmer Law Office, has repeatedly engaged in the type of misconduct alleged here in Illinois and this District.

**ANSWER:**   The allegations of paragraph 15 are not directed to the Defendants and therefore they neither nor admit nor deny the same.

16.     Defendant Noonan Perillo & Thut Ltd., is a corporation incorporated and existing under the laws of the State of Illinois with its principal place of business located at 25 North County Street, Waukegan, Illinois 60085.

**ANSWER:**   The allegations of paragraph 16 are not directed to the Defendants and therefore they neither nor admit nor deny the same.

17.     Defendant C. Jeffery Thut is a natural person and citizen of the State of Illinois. Defendant Thut, individually and through his law firm, Defendant Noonan Perillo & Thut Ltd., does business in Illinois and this District and has repeatedly engaged in the type of misconduct alleged here in Illinois and this District.

**ANSWER:**   The allegations of paragraph 17 are not directed to the Defendants and therefore they neither nor admit nor deny the same.

18.     Defendant Gary Stewart is a natural person and citizen of the State of California.

**ANSWER:**   Admitted.

**JURISDICTION AND VENUE**

19.     This Court has original jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 because they arise under RICO (18 U.S.C.§§ 1961, *et seq.),* which is a federal statute. This Court additionally has subject matter jurisdiction over this matter pursuant to 18 U.S.C. § 1964(c) because Plaintiff seeks recovery for injuries to business and property caused by violations of RICO (18 U.S.C. §§ 1961, *et seq.),* which states that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court."

**ANSWER:**     Defendants admit that this Court had original jurisdiction over Plaintiffs' RICO claims which have been dismissed. Defendants deny the remaining allegations of paragraph 19 of the Complaint.

20.     In the alternative, the Court has original jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332(d)(2) because (a) at least one member of the putative Class is a citizen of a state different from a Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

**ANSWER:**     Denied.

21.     The Court has personal jurisdiction over Defendant Noonan Perillo & Thut Ltd. because it is a corporation incorporated and existing under the laws of the State of Illinois.

**ANSWER:**     The allegations of paragraph 21 are not directed to the Defendants and therefore they neither nor admit nor deny the same.

22.     The Court has personal jurisdiction over Defendant Thut because he is a resident of the State of Illinois and an attorney licensed to practice in the State of Illinois.

**ANSWER:**     The allegations of paragraph 22 are not directed to the Defendants and therefore they neither nor admit nor deny the same.

23.     The Court also has personal jurisdiction over Defendant Thut and Defendant Noonan Perillo & Thut Ltd., because they do business in Illinois and in this District and committed tortious acts within and purposefully directed at Illinois that were designed to create an injury in this state.

**ANSWER:**     The allegations of paragraph 23 are not directed to the Defendants and therefore they neither nor admit nor deny the same.

24.     The Court has personal jurisdiction over Defendant Bandas because Defendant Bandas has enlisted Defendant Thut to act as his agent in Illinois and this District. Moreover, Defendant Bandas committed tortious acts purposefully directed at Illinois and such conduct was designed to create an injury in Illinois and this District. In addition, Defendant Bandas regularly conducts business in Illinois and has availed himself of Illinois courts.

**ANSWER:**     Denied.

25.     The Court has personal jurisdiction over Defendant The Bandas Law Firm PC because it ratified the conduct of its principal, Defendant Bandas, and at all times know [sic] of his actions. Further, Defendant The Bandas Law Firm PC regularly conducts business in the State of Illinois and employs one or more attorneys who are admitted to practice before this Court and/or the United States Court of Appeals for the Seventh Circuit.

**ANSWER:**     Denied.

26.     The Court has personal jurisdiction over Defendant Palmer because Defendant Palmer committed tortious acts purposefully directed at Illinois and this District, and such conduct was designed to create an injury in Illinois. In addition, Defendant Palmer regularly conducts business in Illinois and has availed himself of Illinois courts.

**ANSWER:**   The allegations of paragraph 26 are not directed at the Defendants and therefore they neither nor admit nor deny the same.

27.   The Court has personal jurisdiction over Defendant Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office because it ratified the conduct of its principal, Defendant Palmer, and at all times know of his actions.

**ANSWER:**   The allegations of paragraph 27 are not directed at the Defendants and therefore they neither nor admit nor deny the same.

28.   The Court has personal jurisdiction over Defendant Stewart because Defendant Stewart has committed tortious acts purposefully directed at Illinois and this District and such conduct was designed to create an injury in Illinois. The Court also has personal jurisdiction over Defendant Stewart because he purposefully availed himself of the laws of the State of Illinois by his participation in a lawsuit in an Illinois court.

**ANSWER:**   Mr. Stewart has been dismissed from this case and he is no longer a party to this action. In addition, because the allegations of paragraph 28 are not directed at the Defendants, they neither nor admit nor deny the same.

29.   Venue is proper because Defendants do business in this District and the causes of action arose, in substantial part, in this District. Venue is additionally proper in this District under 28 U.S.C. § 1391 because Noonan Perillo & Thut Ltd., is a resident of this District in that is a corporation organized under the laws of this State and it does business in this District.

**ANSWER:**   Denied.

## FACTUAL ALLEGATIONS

30.   Each year, thousands of class action lawsuits reach settlement. As required by Civil Rule 23 and rules of civil procedure of the several states (including the Illinois Code of Civil Procedure), class counsel seek approval of these settlements in courts across the country to provide

-10-

relief to consumers and closure to defendants. Class members are allowed to file objections to voice displeasure or highlight possible cause for concern.

**ANSWER:**    Admitted.

31.    While many objections are legitimate and seek to provide a benefit to the class, some people like Defendants and others in their enterprise use the objection process as a stepping stone to reach "settlement discussions" that allow them to extort unjustified attorneys' fees for themselves while keeping their actions hidden from the courts. Known as "professional objectors," these attorneys file a last-minute objection to a class action settlement, lose (on purpose), and then threaten to or actually appeal to a higher court. The goal is to extort an unjustified payment of attorneys' fees from class counsel who have a fiduciary duty to the class to avoid substantial delay in payments to their clients that will be cause by the appeal. Once they've received their unjustified payments, the professional objectors move on to their next target, dropping their objection and leaving the underlying settlement unchanged.

**ANSWER:**    Denied.

32.    The National Law Review has aptly described the professional objector's modus operandi:

> The broad right of any class action objector to appeal a district court's final judgment approving a settlement has given rise to what are referred to as professional objectors-attorneys who file specious objections for the sole purpose of using appellate delay to hold a class action settlement hostage in order to extort self-interested payments. Unlike legitimate objectors, who help police the class action settlement process, professional objectors engage in what courts and commentators have characterized as "objector blackmail.

**ANSWER:**    The Defendants admit that the passage recited in paragraph 32 of the Complaint appeared in the cited document and deny the substance of that passage and therefore deny paragraph 32 of the Complaint.

33.    Others have called this scheme for what it is-extortion:

> The business of professional objectors is to make insubstantial objections to class settlements on behalf of non named class members, then threaten to appeal the judgment approving the settlement unless paid to desist. The business is extortion, and it is profitable because class counsel have a powerful incentive to avoid the costs that an appeal would impose.

**ANSWER:** The Defendants admit that the passage recited in paragraph 33 of the Complaint appeared in the publication referenced in the Complaint and deny the substance of that passage and therefore deny paragraph 33 of the Complaint.

**UN-NUMBERED ALLEGATION:**

The United States Court of Appeals for the Seventh Circuit reached the same conclusion:

> In the context of intervening in a class action settlement, extortion would mean intervening not to increase the value of the settlement, but in order to get paid to go away.

**ANSWER:** The Defendants admit that the passage recited above appeared in the case referenced in the Complaint and deny the substance of that passage and therefore deny this unnumbered paragraph of the Complaint.

34. More have warned that attorneys and class members should increasingly "[w]atch out … for canned objections filed by professional objectors who seek out class actions to simply extract a fee for lodging generic, unhelpful protests."

**ANSWER:** The Defendants admit that the passage recited above appeared in the publication referenced in the Complaint and deny the substance of that passage and therefore deny paragraph 34 of the Complaint.

35. The rise in professional objectors has been so great that new rules have been proposed to Federal Rule of Civil Procedure 23, which governs class actions. In that new rule,

> an objector can't be paid off to drop their objection without approval by the district court," said Leslie Brueckner, senior attorney at Public Justice. "That could have a big impact because it could effectively halt the problem of so-called professional objectors,' who basically hold up class action settlements for their own pecuniary gain, by basically exposing that kind of practice to the light of day.

**ANSWER:** The Defendants admit that the passage recited above appeared in the publication referenced in the Complaint and deny the substance of that passage and therefore deny paragraph 35 of the Complaint.

36. As described below, Defendants are extortionists, seeking to unjustifiably profit from the labor of class counsel across the country who prosecute fair and court approved class action settlements.

**ANSWER:** Denied.

37. The website SerialObjector.com was created in 2015 to transparently track the filings of professional objectors in courts throughout the country. As the site explains,

> [s]erial objectors "subsist primarily off of the skill and labor of, to say nothing of the risk borne by, more capable attorneys. These are the opportunistic objectors. Although they contribute nothing to the class, they object to the settlement, thereby obstructing payment to lead counsel or the class in the hope that lead plaintiff will pay them to go away. Unfortunately, the class-action kingdom has seen a Malthusian explosion of these opportunistic objectors…" Class action settlements are often delayed by serial objectors objecting to the suit.

**ANSWER:** The Defendants admit that the passage recited above appeared in the publication referenced in the Complaint and deny the substance of that passage and therefore deny paragraph 37 of the Complaint.

38. According to Serial Objector.com's data, Bandas and Palmer are the most prolific of these "opportunistic objectors," filing almost as many objections (103) as the next five top objectors (113). A review of Bandas's and Palmer's, along with their new associate Thut's, objections demonstrate that they add nothing of value to the class actions to which they object but instead "object to the settlement[s] … in the hope that lead plaintiff[s] will pay them to go away."

**ANSWER:** Denied.

39.     The Bandas Law Firm, a small Texas outfit headed by Mr. Bandas, is a notorious "professional objector" who abuses the court system to file baseless objections to class action settlements and threatens to appeal their inevitable rejection, all in an attempt to extort an unjustified payment of attorneys' fees from class counsel through sham settlement mediations without ever providing any benefit to the class or informing the court.

**ANSWER:**    Denied.

40.     On SerialObjector.com, Bandas is listed as having filed 66 objections over the past decade, almost an objection every other month-the most of any objector. However, these 66 objections likely represent only a small fraction of the total number of objections in which Bandas has been involved-Plaintiffs internal investigation reveals at least 85 cases to which Bandas and associates have objected to, with more that they can't find because either Defendants acted as ghostwriters or because they were filed in state court.

**ANSWER:**    Denied.

41.     A review of the objections listed reveals that **none** of Bandas's objections have provided any benefit to the settlement class. According to SerialObjector's data, Bandas's objections are overruled, a notice of appeal is filed, and then it is subsequently withdrawn, which means that Bandas successfully coerced payout from class counsel. As noted below, Bandas has likely extracted millions of dollars from class counsel in exchange for going away without providing any corresponding benefit to anyone but the Illinois Objector Enterprise.

**ANSWER:**    Denied.

42. Bandas makes false representations to counsel, courts, and others that he is an attorney for an objector who has legitimate criticism of a class action settlement. Instead, Bandas represents puppet clients who have little to no understanding of the class action settlement to which they're objecting (because they're often not even class members), have no understanding of the basis for the objections that are being made by Bandas, and, at times, are ignorant that they're objecting at all. And when Bandas successfully extorts class counsel for fees (sometimes as much as $500,000 or more), Bandas's own client retainer agreements limit the amount of the funds that goes to the "client" to only $5,000. As a result, were Bandas to hold up a class action settlement for $500,000 in protection money, the "client" would get only $5,000 and Bandas would get $495,000.

**ANSWER:**     Denied.

43. Courts routinely criticize Bandas for his actions, but nonetheless he persists. For example, one federal judge has found that "Bandas routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain [and] has been excoriated by Courts for this conduct." Another federal judge on the other side of the country described Bandas as "a known vexatious appellant" who has been "repeatedly admonished for pursuing frivolous appeals of objections to class action settlements."

**ANSWER:**     The Defendants admit that the passage recited above appeared in the citation referenced in the Complaint and deny the substance of that passage and therefore deny paragraph 43 of the Complaint.

44. Yet another federal judge held that objections filed by Bandas to a class action settlement "were filed for the improper purpose of obtaining a cash settlement in exchange for withdrawing the objections." Specifically, that court found Bandas was attempting to pressure the

parties to give him $400,000 as payment to withdraw the objections and go away-Bandas was using the threat of questionable litigation to tie up the settlement unless the payment of an unjustifiable sum of attorneys' fees was made to Bandas.

**ANSWER:** The Defendants admit that the passage recited above appeared in the citation referenced in the Complaint and deny the substance of that passage and therefore deny paragraph 44 of the Complaint.

45. In 2009, an Illinois Court took notice of Bandas's conduct and stated:

> The Bandas Objection filed on behalf of Ms. Carlson is a generic boilerplate objection prepared and filed by attorneys working for their own personal benefit and not for the benefit of this Class or for those lawyers' clients. The record before the Court demonstrates that Bandas is a professional objector who is improperly attempting to 'hijack' the settlement of this case from deserving class members and dedicated, hard-working counsel, solely to coerce ill-**gotten, inappropriate and unspecified 'legal** fees.'

**ANSWER:** The Defendants admit that the passage recited in paragraph 45 of the Complaint appeared in the case cited and deny the substance of that passage and therefore deny paragraph 45 of the Complaint.

46. And in February 2017, the United States District Court for the Southern District of New York determined that while it lacked jurisdiction to sanction Bandas:

> This Court joins the other courts throughout the country in finding that Bandas has orchestrated the filing of a frivolous objection in an attempt to throw a monkey wrench into the settlement process and to extort a pay-off. His plan was thwarted when the Court permitted discovery to proceed on the sanctions motions, which ultimately, apparently, created more risk for Bandas than he was prepared to endure. [Bandas's client] testified that in Bandas' numerous representations of him in objections to class action settlements, [Bandas's client] has never received funds from the settlement of any of his objections, whereas Bandas has. See Deposition of Sean Hull at 44:1-45:8.13 That testimony, if true, is gravely concerning. **It** indicates that Bandas' settlement of objections has been without any benefit to his client … or to the class, supporting the conclusion that many, if not most, of the objections being raised by Bandas are not being pursued in good faith.

**ANSWER:** The Defendants admit that the passage recited in paragraph 46 of the Complaint appeared in the case cited and deny the substance of that passage and therefore deny paragraph 46 of the Complaint.

47. These reactions from the courts are just a sample of the harsh words describing Bandas's conduct. However, they serve to cement Bandas's pattern of using objections to class actions as a stepping-stone to extort legally unjustified money for the Illinois Objector Enterprise.

**ANSWER:** Denied.

48. Like Bandas, Palmer is a prolific and notorious professional objector. And like his colleague Bandas, Palmer files objections to class action settlements as a stepping-stone to later extorting legally unjustifiable payments for the Illinois Objector Enterprise without even providing the class any benefit.

**ANSWER:** The allegations of paragraph 48 are not directed to the Defendants and therefore they neither admit nor deny the same.

49. According to SerialObjector.com, Palmer is listed as having filed 53 objections-second only to Bandas-which likely represent only a small of Palmer's total objections. A review of Palmer's objections listed on SerialObjector.com reveals that he too nearly always has his objection overruled, notices an appeal, and then withdraws the appeal after extorting a payment without benefit to the class or informing the court.

**ANSWER:** The allegations of paragraph 49 are not directed to the Defendants and therefore they neither admit nor deny the same.

50. Courts across the country have admonished Palmer for his exploitative schemes, a sample includes the following:

- "Palmer has been widely and repeatedly criticized as a serial, professional, or otherwise vexatious objector."

- "Mr. Palmer has been deemed a 'serial objector" with a history of "admitted `bad faith and vexatious conduct"

- Finally, the Court does find evidence of bad faith or vexatious conduct on the part of appellants. Mr. Paul appears to be represented by an attorney who has not entered an appearance in this case. It is worth noting that attorney Darrell Palmer ('Mr. Palmer'), previously requested leave to appear pro hac vice in this case. However, this request was withdrawn after the Court scheduled a teleconference to address Mr. Palmer's motion. Despite this, Mr. Palmer is listed as the payor of Mr. Paul's Notice of Appeal filing fee. Mr. Palmer's office also emailed Plaintiffs a notice and copy of Mr. Paul's most recent filing. Plaintiffs have produced evidence that Mr. Palmer is likely a serial objector and other courts have recognized similar behavior....this Court finds such behavior in bad faith and also potentially violative of local and ethical rules.

**ANSWER:** The allegations of paragraph 50 are not directed to the Defendants and therefore they neither admit nor deny the same.

51.    Worse, Palmer has a history of secretly objecting through others by "ghostwriting" objections. In a recent case in Illinois, Plaintiff uncovered Palmer's scheme to secretly profit from a court approved and fair class action settlement. Specifically, Plaintiff, discovered that a purportedly prose objection was actually "Palmer actively concealed his involvement in writing the objection, and the objector was even not a member of the settlement class. As explained more below, the reason that Palmer concealed his involvement from the court was not an innocent one-Palmer was then facing attorney disciplinary charges in his home state of California. While such disciplinary charges were pending, Palmer was not eligible under Illinois Supreme Court Rule 707 to receive permission as an out-of-state attorney to provide legal services in Illinois.

**ANSWER:** The allegations of paragraph 51 are not directed to the Defendants and therefore they neither admit nor deny the same.

52.    Palmer's actions in that case did not go unnoticed by the court. The Honorable Neil Cohen appointed the Honorable Gilbert J. Grossi (ret.), to investigate "whether indirect criminal contempt proceedings are warranted against" Palmer. In his report, Judge Grossi concluded:

-18-

> It appears clear from the substance and legal sophistication of the arguments made in the objection, that Ms. House [the objector] did not write this objection without the aid of legal counsel. This is confirmed by a series of emails sent between [defense counsel] and Joseph Darrell Palmer []. In these emails, Mr. Palmer acknowledges being Ms. House's attorney in this matter. Mr. Palmer, however, has never filed an appearance before Judge Cohen in this case.
>
> …
>
> Regarding ... Palmer, he acknowledged being Susan House's attorney in an email to [defense counsel]. He clearly composed the objection which Susan House submitted to the Court. Mr. Palmer also never submitted any written documentation to corroborate or substantiate any text supposed to have been received by Ms. House or any notice of her being a class member. When I spoke to Mr. Palmer on March 12, 2014, he refused to answer any questions and referred me to his attorney. After a mediation in California, a settlement was reached. However, to my knowledge, nothing was paid to Ms. House and she has attempted to withdraw her objection before this Court. Mr. Palmer's conduct appears questionable, suspicious and in apparent bad faith. Whether this rises to the level of proof beyond a reasonable doubt is a debatable issue.

**ANSWER:** The allegations of paragraph 52 are not directed to the Defendants and therefore they neither admit nor deny the same.

53. Judge Grossi stated that he would submit his report to "any proper authorities in California which may be investigating Mr. Palmer." In fact, soon after Judge Grossi issued his report, the State Bar of California's investigation against Palmer concluded, "finding him culpable of three counts of moral turpitude for the grossly negligent making of false statements in sworn affidavits filed in federal class actions." Mr. Palmer appealed and in affirming the hearing judge's decision, the State Bar of California Review Department stated:

> We ... agree with the hearing judge's conclusion that Palmer acted with gross negligence, amounting to moral turpitude, in executing and filing the false affidavits.
>
> …
>
> In 2002, [Palmer] was convicted of a Colorado criminal offense for failing to properly report roughly $4,000 in sales taxes .... As a result of this conviction, the Colorado Supreme Court imposed discipline on Palmer ....
>
> …

Palmer admits that he executed and filed three sworn affidavits, between June 2010 and July 2012, in which he declared falsely that he had never been subject to attorney discipline.

…

[S]uch lack of diligence was common in Palmer's practice. His long-time paralegal, who prepared the affidavits for his approval and signature, testified that Palmer "did not thoroughly review what [she] put in front of him to sign." This lack of attention is substantially below the ethical standard of care required of attorneys when signing and filing documents under oath.

…

For the foregoing reasons, we recommend that Joseph Darrell Palmer be suspended from the practice of law for two years, that execution of that suspension be stayed, and that Palmer be placed on probation for two years on the [meeting of certain conditions ....

**ANSWER:**    The allegations of paragraph 53 are not directed to the Defendants and therefore they neither admit nor deny the same.

54.    Although Palmer's suspension was to be stayed so long as he fulfilled certain conditions, Palmer apparently failed to meet them. Palmer is still suspended from practicing law in California.

**ANSWER:**    The allegations of paragraph 54 are not directed to the Defendants and therefore they neither admit nor deny the same.

55.    This Court's Local Rule 83.26(a) requires attorneys admitted to the bar of this Court to notify the clerk when they are subjected to public discipline, and Local Rule 83.13 requires attorneys who are transferred to inactive status to notify the clerk. However, the Northern District of Illinois's website still indicates that Palmer is an active member of this Court's general bar.

**ANSWER:**    The allegations of paragraph 55 are not directed to the Defendants and therefore they neither admit nor deny the same.

56.    Palmer also disregards his suspended status and continues to practice law by assisting in preparing and filing of objections to class action settlements. On October 26, 2016, Palmer once again was involved in the preparation of an objection, this time in *Clark v. Gannett*

*Co., Inc.*, Case No. 16-CH-06603 (Cir. Ct. Cook Cty., Ill.). There, and as described more below, Palmer co-opted a friend, Gary Stewart, into filing an objection to a class action settlement and had Stewart state he was represented by Bandas and Thut. Notably, Palmer (and Bandas) never filed an appearance with the Court in Gannett, nor could he because he is presently suspended from the practice of law. On November 14, 2016, the Honorable Kathleen Kennedy overruled the objection and granted final approval of the Gannett settlement (the "Gannett Settlement").

**ANSWER:**    The Defendants admit that Judge Kennedy overruled the objection of Mr. Stewart and that Mr. Bandas did not file an appearance in the *Clark v. Gannett*.  The Defendants deny the remaining allegations of paragraph 56.

57.    Jeff Thut is a former Illinois traffic ticket prosecutor, turned personal injury lawyer, turned professional objector who has repeatedly worked with Bandas and/or Palmer. Like Bandas and Palmer, Thut has filed objections on behalf of himself and his immediate family members, on at least one instance without their knowledge or permission, to attempt to extort a payment in exchange for withdrawing an objection without making any change to the settlement agreement.

**ANSWER:**    Insofar as the allegations of paragraph 57 are directed at the Defendant, they deny the same. Insofar as the allegations of paragraph 57 are not directed at the defendants they neither admit nor deny the same.

58.    Thut's rapid descent into the world of professional objecting caused him to be profiled in a July 2015 Reuters report about professional objectors. There, Thut described how he (and Bandas) attempted to extort payment from class counsel in an Illinois State Court proceeding:

> Jeffrey Thut, who is working with Bandas on the MetLife case, said Bandas is "nothing but professional." He said Bandas first called him to serve as local counsel for [an] objector, after the judge in the case ordered discovery. When he entered an appearance, he said, class counsel [] called to ask if he knew about Bandas' history. Thut, who told me he'd never worked on a class action before the MetLife case, said, "Is Chris Bandas a serial

objector? I don't know. I'll let you make up your own mind. In my experience, he knows his stuff. He doesn't have horns."

Thut said he has tried repeatedly **to convince** [class counsel] **to settle** the MetLife case **and lock in** [class counsel's] $**8.2 million in fees and costs**.....

[The] serialobjector.com website has a dossier on Thut, too. His class action experience may have begun with the MetLife case but it didn't end there. He and Bandas have since teamed up to represent objectors in two other cases, a Chicago federal court class action against Chase and a Minnesota class action against Life Time Fitness. (Both are TCPA cases.) The objector Thut and Bandas represent in the Life Time class action is named Lindsey Thut - the same name as a University of Michigan soccer player whose father is Jeff Thut. I asked Thut if Life Time objector Lindsey Thut is his daughter. "I'll let you figure that out on your own," he said.

**ANSWER:**    The allegations of paragraph 58 are not directed to the Defendants and therefore they neither admit nor deny the same.

59.    Discovery into the objection revealed that Lindsey Thut was Thut's daughter, that he personally filed a claim in the case with his personal information and apparently without her knowledge, and that Thut enlisted Bandas to assist him in the objection in order to extort a payment without any corresponding benefit to the class members.

**ANSWER:**    Insofar as the allegations of paragraph 59 are directed at the Defendant, they deny the same. Insofar as the allegations of paragraph 59 are not directed at the Defendants they neither admit nor deny the same.

60.    In other cases, Thut has turned to business associates to serve as purportedly good-faith objectors. In Allen v. JPMorgan Chase, 13-cv-08285 (N.D. Ill.) and Birchmeierv. Caribbean Cruise Line 12-cv-04069 (N.D. Ill.), Thut-at the behest of Bandas and other members of the Illinois Objector Enterprise-solicited longtime associate and client Robert Burack to file objections to settlements.

**ANSWER:**    The allegations of paragraph 60 are not directed at the Defendants and therefore they neither admit nor deny the same.

61.    An integral part of Defendants' scheme is the cooperation of at least one class member per class action settlement. These class members represent to the courts that they are objecting to class action settlements in good faith. Yet, deposition testimony and obtained retention agreement reveal that their testimony has been bought by the Enterprise.

**ANSWER:**    Denied.

62.    For example, in *Chambers v. Whirlpool Corporation*, No. 11-cv-01733-FMO (C.D. Cal. 2016), a pair of objectors, Christine Knott and Kimberly Smith, filed with the court affidavits "declar[ing] under penalty of perjury under the laws of the United States of America that the foregoing is true and correct" that they objected to the class action settlement "for the reasons stated in my objection." See Exhibit B. In their objection, Knott and Smith state, among other things, that they object to the settlement agreement "reward[ing] class representative, Steve Chambers, a remarkable $100,000 for two websites ...." Exhibit C at 2. However, in her deposition, Knott admitted that she did not know of the website sale and she did not have "an opinion one way or the other whether it was appropriate for Whirlpool to make that purchase [of Chambers' websites] if the settlement is approved." Exhibit D at 149.

**ANSWER:**    Defendants lack knowledge or information sufficient to answer the allegations of paragraph 62 of the Complaint and therefore deny the same.

63.    Indeed, as the Court stated, "During a deposition on June 30, 2016, Knott contradicted the allegations in the Objection, stating that Whirlpool's purchase of the lead plaintiffs website 'makes sense[,]' and that she would not object even if the court awarded more in attorney's fees than class counsel had requested." Exhibit E at 1 (citations omitted). Knott's ignorance is understandable considering (1) she is "good friend[s]" with Bandas's paralegal, Exhibit D at 34:19-23 and (2) she was promised cash for her testimony.

**ANSWER:**     Insofar as the allegation in paragraph 63 are directed at the Defendants, they deny the same. Insofar as they are not directed at the Defendants, they neither admit nor deny the same.

64.     As the Whirlpool case demonstrates, the objectors are not independent parties seeking to bring additional benefits to members of a class. Instead, they are invariably related in some way to Bandas and his associates. For instance:

- Kimberly Smith objected to Whirlpool case but then "On November 23, 2016 objector Kimberly Smith withdrew her objection and appeal. At her deposition, taken at her husband's law office, Ms. Smith had confirmed that her husband Perry Smith is an attorney." Exhibit F. Perry Smith is a known associate of Defendant Thut.

- Lindsey Thut objected to In re Lifetime TCPA. She is Defendant Thut's daughter.

- Aaron Petrus objected to *Walker v. Discover Financial Services*. He is related to Bandas's office manager, Jan Petrus.

- Gary Stewart objected to the Gannett Settlement. He is Palmer's longtime friend.

**ANSWER:**     Insofar as the allegation in paragraph 64 are directed at the Defendants, they deny the same. Insofar as they are not directed at the Defendants, they neither admit nor deny the same.

65.     Beyond having relations with Bandas and company, the objectors all have been bought and paid for. As a part of Defendants' scheme, objectors sign retainer agreements with at least Bandas's law firm. In that document, Bandas makes the objector agree that they will not receive more than $5,000 from their objection, and that it will be in the form of a court-approved incentive award. But, under closer scrutiny of the retainer and how Defendants' schemes operate, it is evident that objectors are not paid from any court-approved fund. Instead, objectors receive a

cut of the "attorneys' fees" extorted, an unethical practice. See ABA Model Rules of Professional

Conduct Rule 5.4(a) ("A lawyer or law firm shall not share legal fees with a nonlawyer.").

> **ANSWER:** Denied.

66.     For example, Exhibit G is a retainer agreement between Judd Clayton (the objector

in *Fauley v. Met Life*, 14-ch-1518 (Lake Cnty, Ill.)) and the Bandas Law Firm, P.C. It states that

Bandas "may petition the Court for a payment to you, or may ask class counsel or defendant(s) to

make a payment to you, in recognition of your service as an objector and/or for other factors related

to your service as an objector." *Id*. at 3.2. It goes on that the payment "will never exceed $5,000."

> **ANSWER:** Admitted.

67.     As Exhibit H describes though, Bandas failed to deny the allegation that he was

offering $25,000 out of the funds he received from class counsel to payoff an objector. Exhibit H

¶76 ("I jokingly said to Mr. Bandas that I wondered whether this was a settlement offer coming

from him, rather than from class counsel. He became very defensive, but also said that if the offer

had been from him, he would have offered $100,000 to make sure there was no chance Mr. Collins

would decline the offer. From this statement I infer that Mr. Bandas is being offered at least

$200,000, and likely much more, to dismiss his appeal.")

> **ANSWER:** Denied.

68.     And in the *Gannett* Settlement, described more below, Bandas never negotiated for

a separate fee for the objector Stewart, let alone a court approved fee. Instead, Bandas insisted that

he did not want to file anything with any court and negotiated only for a single $225,000 fee.

**ANSWER:** Subject to and without waiving the parties' confidentiality agreement regarding the settlement conference, the Defendants deny the allegations contained in paragraph 68 of the Complaint.

69. In addition, Amirali Jabrani (husband of Janet Jabrani, the objector in *Allen v. JP Morgan Chase Bank, N.A.*, 13-cv-08285-RRP (N.D. Ill.)) testified in a deposition as to his understanding of this fee sharing arrangement with Bandas:

> Q:     So how would you get an incentive as an objector?
>
> A:     I'm not asking, if that's what [Bandas's] taking the case you know, and he's awarding me $5,000, I will take $5,000, whatever it is.
>
> Q:     Who's that from, from Mr. Bandas will give you $5,000?
>
> A:     Could be anything, whatever it says there.
>
> Q:     I want to know your understanding.
>
> A:     It could be anybody, it could be Wells Fargo, it could be you, it could be Chris Bandas, it could be anybody, I don't know exactly.

Dep. Tr. of Amirali Jabrani at 22:18-23:4, *Fladell, et al., v. Wells Fargo Bank, N.A.*, 13-cv-60721 (S.D. Fla.).

**ANSWER:** The Defendants lack sufficient information or knowledge to either admit or deny the allegations in paragraph 68 of the Complaint and therefore deny the same.

70. A review of publicly available deposition transcripts and other documents demonstrates that the objectors are invariably ignorant of their objections at the time they make them, have only the vaguest understanding of class actions, and fail to review settlement documents, but file testimony with courts representing specific objections to complex deals.

**ANSWER:** Denied.

71. In deposition after deposition, a pattern emerges:

> Q: Have you actually ever read the settlement?

A: No, sir, just read through here. I don't know the actual facts about it. ... My attorney [Bandas] is the one that ... went through this.

Dep. Tr. of Ronnie Garcia at 47:13--48:1, *In re Chinese-Manufactured Drywall Products Liability Litigation*, 09-md-02047-EEF-JCW (B.D. La.).

Q: Let me ask you this then. We'll start with, did you ever review the settlement agreement in this case?

A:No.

Dep. Tr. of Arnirali Jabrani at 56:1-5 *In re: CertainTeed Fiber Cement Siding Litigation*, 11-md-02270-TON (E.D. Penn.)

Q: Now, in this case you've testified under oath that you did not read the stipulation of settlement in this case. Right?

A: Yes.

Dep. Tr. of Christina Knott at 163:11-14, *Chambers v. Whirlpool Corporation*, et al., 11- cv-01733-FMO-JCG (C.D. Cal.).

Q: Have you read the settlement agreement in this matter, Everbank?

A: I did.

Q. You did. Did you review it before you filed your objection?

A: I can't remember.

Dep. Tr. of Arnirali Jabrani at 33:12-21, *Wilson et al., v Everbank, NA.,* et al., 14-cv- 22264-BB (S.D. Fla.).

Q: And at the time that you signed this document and the one for Wells Fargo, tell me everything you had personally looked at in connection with the Wells Fargo and SunTrust settlements?

A: Nothing

Dep. Tr. Janet Jabrani at 25:16-20, *Fladell, et al., v. Wells Fargo Bank*, NA., 13-cv-60721 (S.D. Fla.).

Q: Have you ever visited the settlement website at www.LifeTimeTCPAsettlernent.corn?

A: I have not.

Q: Have you ever read the long form notice available on the website?

A: No, I have not.

Q: Have you ever read the consolidated complaint in this litigation?

A: I don't know what a consolidated complaint is.

Q: Have you ever read any complaint in this litigation?

A: No.

Q: Have you ever read the settlement agreement in this litigation?

A: No.

Q: Have you ever read class counsel's fee petition in this litigation?

A: No.

Q: What documents have you viewed related to this litigation?

A: I'm not sure.

Q: Have you reviewed any documents related to this litigation?

A: I don't really know what I reviewed and what I have not reviewed.

Q: But you know you haven't reviewed the things we just discussed?

A: Yes.

Dep. Tr. of Lindsey Thut at 34:16-35:18, In re Life Time Fitness Inc., TCPA Litigation, 14-md-02564-JNE-SER (D. Minn.).

A: I know that any claim that was filed by me would have been filed by Bandas's law firm.

Q: Did you do any research in the underlying case?

A: I did not other than what we've already referred to in previous exhibits.... All documents I received in connection with this case came from Chris Bandas's office.

> Q: Okay. The second paragraph, the second sentence reads: "This is a settlement with a difficult and burdensome claims process where the defendant has a reversionary interest in the unclaimed funds and there is also a cy pres component." Do you see that?
>
> A: I do.
>
> Q: How was the claims process difficult and burdensome?
>
> A: I don't know. Whoever wrote that can answer that question.
>
> Q: But you did not write that, correct?
>
> A: Obviously not.

Dep. Tr. of Judd Clayton, Jr. at 35:21-7,52:7-16, 87:12-24, *Fauley et al., v. Metropolitan Life Insurance Company, et al.*, 14-CH-1518 (Lake Cty., Ill.).

**ANSWER:** The Defendants lack sufficient information or knowledge to either admit or deny the allegations in paragraph 71 of the Complaint and therefore deny the same.

72.     Other documents show that the objectors will often contradict their own objection when challenged:

> During a deposition on June 30, 2016, Knott contradicted the allegations in the Objection, stating that Whirlpool's purchase of the lead plaintiffs website "makes sense[,]" and that she would not object even if the court awarded more in attorney's fees than class counsel had requested.

Civil Minutes Order Re: Pending Motions [for Sanctions], *Chambers v. Whirlpool Corp.*, 11-cv-1733-FMO (C.D. Cal. Aug. 6, 2016).

**ANSWER:** The Defendants admit that the passage recited in paragraph 72 of the Complaint appeared in the transcript cited and deny the remaining allegations of paragraph 72 of the Complaint.

73.     As these examples demonstrate, objections orchestrated by Defendants are not examples of attorneys zealously advocating for their clients. Legitimate objections seek to root out collusion or unfairness in class action settlements. And with attorney assistance, they put forth arguments that identify potential problems can be explained with reference to facts and buttressed by citations to case law. Implicit in that type of legitimate objection, though, is that the objector

has agency in his or her testimony and has a basic knowledge of the settlement to which he or she objects.

**ANSWER:**   Insofar as the allegation in paragraph 73 are directed at the Defendants, they deny the same. Insofar as they are not directed at the Defendants, they neither admit nor deny the same.

74.    Defendants' objectors are different. Despite attesting that their objections are true and correct, the objectors are ignorant of the arguments, purported problems in the settlements, and, sometimes, of the case itself. Courts across the country have caught on to this and have stated, for example:

> THE COURT: --was it your client or someone else's that objected without even reading the settlement agreement?
>
> MR. MANOCHI [Bandas's local attorney]: Well, that's why they-- that's why they hire counsel, Your Honor.
>
> THE COURT: Well, you object without even knowing what you're objecting to.

And,

> THE COURT:  No, Mr. Bandas.  When pressed over whether there was a probability of reversing the decision of Judge Scheindlin to do an injunctive-only class, you said you had no idea, which means you did not do your homework. You had no idea to advise your client. Mr. Hull [the objector] is not the issue. The issue is you. This is not Mr. Hull. You wrote the objection. You were the one who advised that he had an objection. You are one that is defending that this is a good-faith objection.

**ANSWER:**   The Defendants admit that the passage recited in paragraph 74 of the Complaint appeared in the record cited and deny the remaining allegations of paragraph 74 of the Complaint.

75.    Although the individual actions of Defendants are alarming on their own, Defendants' level of coordination reveals their scheme to profit through acts of extortion, wire and mail fraud, bribery, corrupt influence of courts, tampering with witnesses (purported good- faith objectors), money laundering, and bribery of purported good-faith objectors. As described above,

Defendants, through the Illinois Objector Enterprise, have schemed to make at least 15 objections since 2009. Those objections were accomplished through the Illinois Objector Enterprise whereby Defendants would seek out which class actions to object to, solicit family, employees, or friends as "clients" to use, agree on which "arguments" to push, arrange sham "mediations" in order to shield their actions from the courts, and decide on their pay-off price.

**ANSWER:** The allegations of paragraph 75 have been dismissed as failing to state a cause of action under the law and they are denied.

76. Defendants' scheme and unlawful Illinois Objector Enterprise were revealed when a former associate wrote a whistleblower-like account to the United States Court of Appeals for the Seventh Circuit, and when Reuters news service obtained previously-secret communications.

**ANSWER:** Denied.

77. After another attorney refused to coordinate with Bandas and accept payment to drop an appeal of an overruled objection, that attorney submitted a detailed account of how Bandas and his associates operate, and filed it with the United States Court of Appeals for the Seventh Circuit under penalty of perjury:

> Mr. Bandas proposed that I receive a contingent fee of a share of the proceeds of settled objections in cases where I performed consulting.... However, I grew uncomfortable with receiving a percentage of settled objections, both because I disagreed with the idea of settling objections for money at the expense of the class, and because I was concerned that I was most often being consulted in difficult cases where Mr. Bandas's actions before I became involved was putting him at risk of sanctions and where payment was thus unlikely. In 2013, Mr. Bandas and I agreed to a set of new retainer agreements where I would be paid by the hour, subject to a monthly minimum payment, with separate payments and separate retainers for cases where I made an appearance on behalf of one of Mr. Bandas's clients. The contingent payments I had received to date would be retroactively treated as a partial payment in advance for my appearance and argument in a Seventh Circuit appeal ....
> …
> I understood that my pay from Mr. Bandas was made possible and would not have occurred without Mr. Bandas profitably settling cases where I was not counsel of record, but

rationalized accepting that money because of the benefit to caselaw of victories [] that might not have occurred if I was not assisting Mr. Bandas.

…

I grossed about $33,000 from Mr. Bandas in 2013, $125,000 in 2014, and $95,000 between January 1 and June 4, 2015 .... Mr. Bandas apparently found these profitable sums to pay, because he became very upset when I terminated my business relationship with him.

…

Mr. Bandas indicated to me on numerous occasions, including as recently as June 4, 2015, that I could increase my total income considerably if I ... worked for him full-time. Mr. Palmer made me a similar offer in late 2013 or early 2014. I declined both gentlemen's offers.

In May 2015, a reporter contacted me and stated that class action attorneys had complained to him that "bad" objectors who settled cases for money were using my name to threaten class counsel into settling. I acknowledged that I had been retained in a number of class action appeals, ... explained the limitations on my willingness to represent for-profit class-action objectors, and noted that that threat only made a difference if the underlying objection was meritorious...."

**ANSWER:**   The Defendants admit that the passage recited in paragraph 77 of the Complaint appeared in the "account" referred to in the Complaint and deny the substance of that passage and deny the remaining allegations of paragraph 77 of the Complaint.

78.    As the author described, the world of professional objectors-and Defendants' Illinois Objector Enterprise specifically-is filled with coordinated back-room deals for illicit gain. Indeed, the author described the "threats" used by professional objectors used to get "class counsel into settling." While the author seemingly exhibits remorse from his brief association with Defendant Bandas, he recounts how he reluctantly assisted in Bandas's and Palmer's "profitable" business of objecting that was often "putting [them] at risk of sanctions and where payment was thus unlikely."

**ANSWER:**   Denied.

79.    That author's story is corroborated by an in-depth report by Reuters (see paragraph 58 above). There, Reuters uncovered how Defendants' Illinois Objector Enterprise engaged in similar backroom deals, improper use of acquaintances as client objectors, and secret schemes to extract money from legitimate class action settlements. Reuters reports:

In [the] MetLife case, Bandas is not counsel of record for objector [Clayton]. [Thut] signed Clayton's briefto the Illinois appellate court. But Anderson & Wanca obtained Clayton's retainer agreement after the state court judge overseeing the class action ordered discovery from him and another objector. As Clayton conceded at his deposition, Bandas is his lead lawyer. (Clayton said Bandas is a professional acquaintance who decades ago used him as an expert witness in a couple of personal injury suits. He also said he "presumed" Bandas was responsible for filing a previous objection Clayton attempted to bring in a New Jersey class action against Hertz.)

Clayton's retainer agreement in the MetLife case, which was an exhibit at his deposition, included an interestingly vague clause about what reward he could expect as an objector. He could be entitled to an incentive payment from class counsel or the defendants in recognition of his service, the contract said. "Any incentive award or payment sought," the agreement added, "will never exceed
$5,000."

Bandas, however, requests much more than $5,000 to settle appeals, based on two cases in which information about his settlements has become public. . .. Bandas allegedly told a lawyer for the defendant in a false advertising class action against the maker of Hydroxycut dietary supplements that he would withdraw for a payment of about $400,000 ....

The defense lawyer testified at an evidentiary hearing that Bandas subsequently called claiming he'd had a "senior moment" and forgotten their conversation. But the judge concluded that "Mr. Bandas was attempting to pressure the parties to give him $400,000 as payment to withdraw the objections and go away. Mr. Bandas was using the threat of questionable litigation to tie up the settlement unless the payment was made." Judge Moskowitz later denied a motion by class counsel in the Hydroxycut case to sanction Bandas for allegedly falsifying the signature of a client. The judge said he took the allegation very seriously but didn't have jurisdiction over Bandas because Bandas did not enter an appearance
before him.

**ANSWER:**   Denied.

80.    Bandas and employees of the Bandas Law Firm have admitted in open court that he has no legal basis to seek hundreds of thousands of dollars in fees. On February 23, 2017, attorney Robert Clore, who works for the Bandas Law Firm, appeared before Hon. Matthew F. Kennelly of this District on behalf of an objector at a final fairness hearing. When asked by Judge Kennelly whether the Bandas Law Firm would seek an award of attorneys' fees in connection with its representation of the objector, Clore at first declined to answer. After a brief pause, during

which Clore spoke to Bandas by telephone at the court's request, Clore advised Judge Kennelly that:

> If the Court were to reduce [class counsel's fees] and it were based on that- what you discussed, and we actually would intend on applying an application [for attorneys' fees]. We would request an opportunity - we haven't done the legal research on the appropriate methodology if we're entitled to anything at all[.]

Bandas and his firm, in other words, have been demanding attorney's fees for years both in this District and in other districts without having ever done legal research that would demonstrate that they are entitled to any money at all.

**ANSWER:** Denied.

81.     In the same case before Judge Kennelly, Bandas himself appeared the following week. At that appearance, he indicated that if he and his firm sought fees from the Court, they would ask for only their lodestar with no multiplier-a far lower sum than Bandas has demanded when extorting class counsel after appealing.

**ANSWER:**     Denied.

82.     Unfortunately, members of the Illinois Objector Enterprise have often avoided sanctions and reprimand from courts. Not from a lack of improper or illegal conduct, but because Defendants routinely and purposely fail to file appearances in cases where they attempt to extort class counsel through improper objections as a means to avoid consequences.

**ANSWER:**     Denied.

83.     For instance, in the recent Gannett case, Defendants aimed their Illinois Objector Enterprise machine at Plaintiff and organized a scheme to misuse the objection process to put them into a situation where they could extort a profit for the Illinois Objector Enterprise. There, Thut

admitted to skirting his obligations as an Illinois attorney in order to assist Bandas and Palmer in filing of Defendant Gary Stewart's objection in the Gannett Settlement (the "Stewart Objection"). Upon receiving the Objection, Plaintiff called Thut to attempt to explain the numerous factual misstatements in the brief he signed. But while his brief is focused on a claimed "lack of information," Thut refused to discuss the information he claimed was lacking, mistakenly believed the case was about text messaging (it's not), and the only thing Thut could recall about the case was that the settlement website said Plaintiff, as court approved class counsel, were getting $5 million in fees. (This statement was unsurprising, as bad faith objectors like Thut, Bandas, Palmer, and Stewart look solely at fees because of the greater opportunity for extortion.) Thut was candid about why he knew so little about the brief he signed and filed: Bandas wrote the brief and Thut took Bandas's word for everything asserted in the brief without performing an independent investigation of his own.

**ANSWER:**   Denied.

84.   The reason Thut conducted no independent investigation-despite his duty to his client and the court to do so--is that the Illinois Objector Enterprise didn't need him to. The objection itself is not the Illinois Objector Enterprise's goal; it's merely a tool that the enterprise uses to position itself to extort money. Thut's role in the Illinois Objector Enterprise is not to zealously advocate for his client's stated position in the objection filed on his behalf. It's to help make sure that the objection gets denied, so that Bandas can threaten to appeal and extort a payment from class counsel.

**ANSWER:**   Denied.

85.     Consistent with the operation of their scheme, after the Gannett Court overruled the Stewart Objection, Defendants proposed that Plaintiff engage in mediation resolve the objection and forego any appeal of the Court's order granting final approval.

**ANSWER:**     Denied.

86.     Specifically, on November 17, 2016 and November 30, 2016, Defendant Bandas communicated with Plaintiff via telephone and email. As a result of these exchanges, Plaintiff was told that Bandas would not discuss anything outside the presence of a mediator. Bandas then proposed that Defendants' Stewart Objection could be resolved through mediation with Rodney A. Max of the Florida- and Alabama-based Upchurch, Watson, White, and Max mediation group.

**ANSWER:**     Defendants admit that Rafey S. Balabanian called Mr. Bandas on November 17, 2016 and that on November 30, 2016 Mr. Balabanian initiated an email communication with Mr. Bandas. In that email exchange, Mr. Balabanian specifically proposed that the parties mediate Mr. Stewart's objection stating, "…I wanted you to know that we're on board with mediating Stewart's objection. Do you have a preferred mediator? I'd prefer to use someone you're comfortable with so we don't waste time trying to feel out the situation. If you are interested in moving with it, please give me a name and I'll reach out and set it up." In response to Mr. Balabanian's request, Mr. Bandas emailed Mr. Balabanian mediator Rod Max's contact information. Defendants deny any remaining allegations of paragraph 85 of the Complaint.

87.     On November 30, 2016, Mr. Max agreed to conduct the mediation and had [sic] forwarded a "confidentiality" agreement that he and Bandas knew would allow them to claim the Illinois Objector Enterprise's extortion could not be disclosed.

**ANSWER:**     Insofar as the allegation in paragraph 87 are directed at the Defendants, they deny the same. Insofar as they are not directed at the Defendants, they neither admit nor deny the same.

88.     At the time Plaintiff agreed to the "mediation," it was unaware that Mr. Max was had [sic] repeatedly accepted money to assist Bandas in extorting class counsel with full knowledge that the "attorneys' fees" Bandas demanded has no basis in law, that no benefit to the

class was ever demanded or obtained, and that Bandas would use Max to shield his actions from courts.

**ANSWER:**    Insofar as the allegation in paragraph 87 are directed at the Defendants, they deny the same. Insofar as they are not directed at the Defendants, they neither admit nor deny the same.

89.    Plaintiff accepted this opportunity to allow Defendants to ostensibly inform it of the changes they would like made to the settlement necessary to resolve the objection or obviate the threatened appeal. Although Plaintiff believed that the Court was correct in overruling Defendants' objection on the merits, Plaintiff was (and is) cognizant of its obligation to provide the relief guaranteed through the settlement to the class members with as minimal a delay as possible.

**ANSWER:**    Denied.

90.    On December 1, 2016, Mr. Max facilitated a telephonic mediation with Plaintiff and Defendants' representative, Defendant Bandas [sic].

**ANSWER:**    The Defendants admit that there was a telephonic mediation conducted by Mr. Max on December 1, 2016 which Mr. Bandas participated in from his offices in Corpus Christi Texas.

91.    At no time during the settlement negotiation did Mr. Bandas suggest any change or improvement to the class action settlement agreement.

**ANSWER:**    Communications at the mediation were subject to the parties' confidentiality agreement and Mr. Bandas's communications with the mediator are also subject to that agreement. Subject to that confidentiality agreement, the Defendants deny the allegations contained in paragraph 91 of the Complaint.

92.    During the mediation, Defendant Bandas demanded that Plaintiff pay $400,000 to settle outstanding issues. Bandas's only argument at mediation to support his demand of $400,000 in attorneys' fees was that if the fees aren't paid, he would delay the settlement payments to the

class and the court-approved fees to Class Counsel. Defendants' demands are more than they could ever have been awarded by a Court if they were to have succeeded on their objection or its appeal.

**ANSWER:** Communications at the mediation were subject to the parties' confidentiality agreement and Mr. Bandas's communications with the mediator are also subject to that agreement. Subject to that confidentiality agreement, the Defendants deny the allegations contained in paragraph 92 of the Complaint.

93. Through this "mediation," Plaintiff accepted Defendants' extortion demand of $225,000 and informed Defendants that it would disclose the agreement and seek approval of the court as required by Illinois law. In response to Plaintiff's statements that it was required to seek Court approval, Defendants, again through Defendant Bandas and his counsel in this case, demanded that nothing be reported to the court and falsely claimed additional terms remained to be negotiated.

**ANSWER:** Denied.

## CLASS ALLEGATIONS

94. **Class Definition**: Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of itself and a class of similarly situated persons, defined as follows:

> Any individual or entity that was deprived or money or property by the Illinois Objector Enterprise in the form of a payment of attorney fees, expended uncompensated attorney time, mediation expenses, threat of economic harm, or other compensable damages related to an objection in a class action settlement, wherein, the Illinois Objector Enterprise agreed to not pursue its objections and no modifications were made to the settlement and/or no court approved any payment.

**ANSWER:** Insofar as the allegation in paragraph 94 are directed at the Defendants, they deny the same. Insofar as they are not directed at the Defendants, they neither admit nor deny the same.

95.    **Numerosity**: The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of at least 40 persons. Members of the Class can be easily identified through Defendants' records.

**ANSWER:**    Insofar as the allegation in paragraph 95 are directed at the Defendants, they deny the same. Insofar as they are not directed at the Defendants, they neither admit nor deny the same.

96.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

a)    Whether Defendants' conduct violated RICO;

b)    Whether Defendants' conduct constituted extortion under the Hobbs Act;

c)    Whether Defendants' conduct constituted Wire Fraud;

d)    Whether Defendants' conduct constituted Mail Fraud;

e)    Whether Defendants' conduct violated 18 U.S.C. § 1503 (influencing an officer);

f)    Whether Defendants' conduct violated 18 U.S.C. § 1512 (tampering with a witness);

g)    Whether Defendants' conduct violated 18 U.S.C. § 201(b)(3) (bribery);

h)    Whether Defendants' conduct violated 18 U.S.C. § 1956 (laundering of monetary instruments)

i)    Whether a permanent injunction is proper to restrain Defendants' conduct of filing vexatious objections to class action settlements;

j)    Whether Defendants should be deemed vexatious litigants;

k)    Whether Defendants have abused the court process; and

l)  Whether Plaintiff and members of the Class are entitled to damages.

**ANSWER:** Insofar as the allegation in paragraph 96 are directed at the Defendants, they deny the same. Insofar as they are not directed at the Defendants, they neither admit nor deny the same.

97. **Adequate Representation**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Proposed Class Counsel is competent and experienced in complex litigation and class actions. Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages as a result of Defendants' uniform wrongful conduct. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff is committed to vigorously prosecuting this action on behalf of the members of the Class, and it has the resources to do so. Plaintiff does not have any interest adverse to those of the other members of the Class.

**ANSWER:** Insofar as the allegation in paragraph 97 are directed at the Defendants, they deny the same. Insofar as they are not directed at the Defendants, they neither admit nor deny the same.

98. **Superiority:** This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all parties is impracticable, and the damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties

and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered, and uniformity of decisions ensured.

**ANSWER:**     Insofar as the allegation in paragraph 98 are directed at the Defendants, they deny the same. Insofar as they are not directed at the Defendants, they neither admit nor deny the same.

99.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "ClassDefinition" based on facts learned through additional investigation and in discovery.

**ANSWER:**     Insofar as the allegation in paragraph 99 are directed at the Defendants, they deny the same. Insofar as they are not directed at the Defendants, they neither admit nor deny the same.

## COUNT I
### RICO 18 U.S.C. § 1962(c)
**As Against All Defendants on Behalf of Plaintiff and on Behalf of the Class**

100.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

**ANSWER:**     Defendants incorporate by reference the foregoing answers as if fully set forth herein.

101-222.   Pursuant to this Court's order of February 6, 2018 Order, Count I of the Complaint was dismissed and therefore no answer is required.

## COUNT II
### RICO § 1962(d)
**As Against All Defendants on Behalf of Plaintiff and on Behalf of the Class**

223.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein, explicitly including all of Count I.

**ANSWER:** Defendants incorporate by reference the foregoing answers as if fully set forth herein.

224-230. Pursuant to this Court's orders of February 6, 2018, Count II of the Complaint was dismissed and therefore no answer is required.

## COUNT III

**Permanent Injunction Pursuant to the All Writs Act, 28 U.S.C. §
1651 As Against Defendants Christopher Bandas, The Bandas
Law Firm PC, Joseph Darrell Palmer, Law Office of Darrell
Palmer PC d/b/a Darrell Palmer Law Office, C. Jeffery Thut,
Noonan Perillo & Thut LTD, and John Does 1-20 on Behalf of
Plaintiff and the Class**

231.   Plaintiff incorporates by reference the foregoing allegations as if fully set

forth herein.

**ANSWER**: Defendants incorporate by reference the foregoing answers as if fully set forth herein.

232-244.   Pursuant to this Court's orders of February 6, 2018 order, Count III of the Complaint was dismissed and therefore no answer is required.

## COUNT IV
**Abuse of Process
As Against All Defendants on Behalf of Plaintiff and the
Class**

245.   Plaintiff incorporates by reference the foregoing allegations as if fully set

forth herein.

**ANSWER**: Defendants incorporate by reference the foregoing answers as if fully set forth herein.

246-250.     Pursuant to this Court's orders of February 6, 2018, Count IV of the Complaint was dismissed and therefore no answer is required.

**COUNT V**
**The Unauthorized Practice of Law**
**As Against Defendants The Bandas Law Firm PC, Christopher Bandas,**
**Law Offices of Darrell Palmer PC d/b/a Darrell Palmer Law Office,**
**Joseph Darrell Palmer, and John Does 1-20**
**On Behalf of Plaintiff**
**(For Injunctive Relief)**

251.    Plaintiff incorporates by reference the foregoing allegations as if fully set

forth herein.

**ANSWER**: Defendants incorporate by reference the foregoing answers as if fully set forth herein.

252.    The Illinois Attorney Act, 705 ILCS 205/1 requires that:

No person shall be permitted to practice as an attorney or counselor at law within this State without having previously obtained a license for that purpose from the Supreme Court of this State. No person shall receive any compensation directly or indirectly for any legal services other than a regularly licensed attorney, nor may an unlicensed person advertise or hold himself or herself out to provide legal services.

Any person practicing, charging or receiving fees for legal services or advertising or holding himself or herself out to provide legal services within this State, either directly or indirectly, without being licensed to practice as herein required, is guilty of contempt of court and shall be punished accordingly.

**ANSWER:** Admitted.

253.    Defendants The Bandas Law Firm PC, Christopher Bandas, Law Offices of

Darrell Palmer PC d/b/a Darrell Palmer Law Office, Joseph Darrell Palmer ("Unauthorized

Defendants") and others known and unknown, willfully and knowingly did combine,

conspire, and agree together and with each to violate the Illinois Attorney Act by

facilitating or actually taking part in the unauthorized practice of law. The Unauthorized

-43-

Defendants' acts were intentionally misleading and deceptive, and intended to defraud the court and other litigants.

**ANSWER:** Denied.

254.    Such violations include, but are not limited to, the following:

a.      Since at least January 6, 2016, Defendant Palmer has been suspended from the practice of law.

b.      Defendant Palmer and his law firm continue to practice law by assisting in the preparation and filing of objections to class action settlements nationwide and in the state of Illinois. On October 26, 2016, Palmer took part in the preparation of an objection in the *Gannett* case. There, Palmer co-opted a personal friend, Gary Stewart, into filing an objection to a class action settlement and had Stewart state he was represented by Defendants Bandas and Thut in order to conceal his involvement and deceive the court and the other litigants. Defendant Palmer did not file an appearance in the case.

c.      Additionally, Defendant Bandas is not licensed to practice law in Illinois, did not move for pro hac vice admission, and did not file an appearance with the Court in Gannett in order to avoid submitting himself to the jurisdiction of the court despite acting as counsel for Stewart in the Gannett action.

**ANSWER**: The Defendants admit that Mr. Palmer was suspended from the practice of law as of January 6, 2016 and deny the remaining allegations contained in paragraph 254 for the Complaint.

255.    All Unauthorized Defendants have participated in and facilitated the unauthorized practice of law by Defendant Palmer and Defendant Bandas. Each Defendant

had knowledge of Palmer's suspended status and took steps to conceal his role in ongoing litigation and objections from the court and other litigants.

**ANSWER**: Insofar as the allegation in paragraph 255 are directed at the Defendants, they deny the same. Insofar as they are not directed at the Defendants, they neither admit nor deny the same.

256. Likewise, each Unauthorized Defendants had knowledge that Defendant Bandas had failed to obtain pro hac vice admission and file an appearance in the *Gannett* action.

**ANSWER:** The Defendants admit that they had knowledge that they did not seek to obtain pro hac vice admission or file an appearance in the *Gannett* action. Insofar as the allegations of paragraph 256 are not directed to the Defendants, they neither admit nor deny the same.

257. All Unauthorized Defendants have or will improperly share in attorneys' fees with Defendants Palmer and Bandas even though they had not filed appearances on behalf of Defendant Stewart.

**ANSWER:** Denied.

258. Unauthorized Defendants have improperly acted as legal counsel in numerous class action objections without filing an appearance with the relevant court. Defendants likewise have improperly shared in attorneys' fees in numerous cases without complying with relevant state law concerning the practice of law.

**ANSWER:** Denied.

259. As described throughout the Complaint, each Unauthorized Defendants agreed to the commission of the Illinois Attorney Act Violation. For instance:

a. Christopher Bandas agreed to coordinate and prepare the Stewart Objection, represent Defendant Stewart in the objection, arrange the mediation, appear

at the mediation, agree to a settlement for payment of attorneys' fees, and share in any attorneys' fees or other money obtained through the Stewart Objection despite never filing an appearance with the *Gannett* Settlement Court. Moreover, Defendant Bandas knew that Defendant Palmer was suspended from the practice of law but nevertheless agreed to co-representation of Defendant Stewart with Defendant Palmer. As such, Defendant Bandas knew that his actions would contribute to his and Defendant Palmer's unlawful practice of law in Illinois, a violation of the Illinois Attorney Act.

  b.  The Bandas Law Firm PC agreed to ratify the actions of its principal, Christopher Bandas, at all times knowing of Defendant Bandas's actions.

  c.  Joseph Darrell Palmer agreed to solicit and recruit Defendant Stewart as an objector, prepare the Stewart Objection, represent Defendant Stewart in the objection, and share in any attorneys' fees or other money obtained through the Stewart Objection despite never filing an appearance with the *Gannett* Settlement Court and being suspended from the practice of law. As such, Defendant Palmer knew that his actions would constitute the unlawful practice of law in Illinois, a violation of the Illinois Attorney Act.

  d.  Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office agreed to ratify the actions of its principal, Joseph Darrell Palmer, at all times knowing of Defendant Palmer's actions.

  **ANSWER:** The Defendants admit that Mr. Stewart received notice of the proposed settlement in the Clark v. Gannett case as a member of the class of plaintiffs in that matter, that he found the terms of the proposed settlement, particularly including the excessive attorney's fees, to be unreasonable, that he asked Mr. Palmer about his ability to represent him in objecting to the proposed settlement, that Mr. Palmer advised Mr. Stewart that he was suspended from the practice of law and could not represent Mr. Stewart in his objection, that Mr. Stewart asked Mr. Palmer if he could recommend another lawyer who could represent him,

that Mr. Palmer provided Mr. Stewart with Mr. Bandas's contact information, that Mr. Stewart contacted Mr. Bandas who agreed to represent Mr. Stewart, that Mr. Bandas contacted Mr. Thut to act as Illinois counsel, that Mr. Bandas and his colleagues made the initial draft of the objection to be filed on behalf of Mr. Stewart in their Corpus Christi Texas offices, that they sent that draft to Mr. Thut, that Mr. Thut reviewed that draft objection, confirmed that it was in compliance with Illinois law, and signed and filed that pleading, that Mr. Bandas did not and was not required to seek pro hoc vice admission unless and until he "practiced as an attorney or counselor at law within this State of Illinois," and that he never practiced as an attorney or counselor at law within the state of Illinois in connection with *Clark v. Gannett* matter and deny the remaining allegations contained in paragraph 259 of the Complaint.
.

260.   Plaintiff is an Illinois law firm. All of its shareholders and all of the attorneys in its Illinois office are licensed to practice law in the State of Illinois.

**ANSWER:** The Defendants lack sufficient information or knowledge to either admit or deny the allegations in paragraph 260 of the Complaint and therefore deny the same.

261.   As an Illinois law firm, Plaintiff suffers irreparable harm from the Unauthorized Defendants' continued and unlawful provision of legal services in Illinois without the requisite expertise, competence, or licensure.

**ANSWER:** Denied.

262.   Any remedy available at law is inadequate to compensate for the injury Plaintiff suffers by way of the Unauthorized Defendants' unlawful practice of law.

**ANSWER:** The Defendants deny that the Plaintiff suffered any damages and therefore deny the allegations contained in paragraph 262 of the Complaint.

263.   Because the unauthorized practice of law causes irreparable harm to the public and the judicial system, equity and the public interest support enjoining the Unauthorized Defendants from the practice of law in Illinois unless and until they obtain authorization from the Supreme Court of Illinois to practice law.

**ANSWER:** Denied.

**WHEREFORE,** the Defendants, Christopher Bandas and the Bandas Law Firm, PC pray that this Court enter judgment in their favor and against the Plaintiff, Edelson PC and that the Defendant be granted any further relief that this Court determines to be necessary and just, including, without limitation, fees and interest.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming any burden of proof not otherwise legally assigned to them, the Defendants asserts the following defenses to the allegations in the Complaint:

### FIRST DEFENSE

The actions of the Defendants were lawful and in compliance with Illinois Attorney Act, 705 ILCS 205/1.

### SECOND DEFENSE

Any alleged injury to Plaintiff was the result of its own conduct, including but not limited to, Plaintiff's unreasonable and excessive claim for attorney's fees and its refusal to provide Lodestar data in the *Clark v. Gannett* case.

### THIRD DEFENSE

Plaintiff cannot recover because they it did not suffer any actual damages as a result of any act or omission by the Defendants.

### FOURTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because its alleged damages, if any, are speculative, and because of the impossibility of the ascertainment of those alleged damages.

### FIFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the equitable doctrines of laches, unclean hands, waiver and/or estoppel.

## SIXTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because they are based on fraudulent misrepresentations by the Plaintiff concerning the mediation alleged to have taken place at paragraphs 85 through 93 of the Complaint. Plaintiff's fraud, includes, but is not limited to, Plaintiff's fraudulent allegation that "Defendants proposed that Plaintiff engage in mediation [sic] resolve the objection and forgo any appeal of the Court's order granting final approval," when, in fact, as Plaintiff well knows, Plaintiff sought out and proposed to the Defendants that Mr. Stewart's objection be mediated through a phone call initiated by Rafey S. Balabanian to Mr. Bandas on November 17, 2016 and through Mr. Balabanian's and email to Mr. Bandas on that same date at 2:36 PM. Plaintiff's fraud also includes its false allegation that "... Defendant Bandas communicated with plaintiff via telephone and email, when in fact, Plaintiff well knows that Plaintiff called Mr. Bandas and Plaintiff emailed Mr. Bandas to pursue the mediation. Plaintiff's fraud also includes its false allegation that "Bandas then proposed that Defendants' Stewart [sic] Objection could be resolved through mediation with Rodney A. Max of the Florida-and Alabama based Upchurch, Watson, White, and Max mediation group," when, in fact, Plaintiff, Rafey S. Balabanian, emailed Mr. Bandas stating, "Not sure if you spoken to him yet, but I spoke with Bill Audet yesterday, and I wanted to let you know that we are on board with mediating Stewart's objection. Do you have a preferred mediator? I prefer to use someone you're comfortable with so we don't waste time trying to feel out the situation. If you're interested in moving forward with it please give me a name and I'll reach out and set it up." Plaintiff's fraud also includes its allegation that "on November 30, 2016, Mr. Max agreed to conduct the mediation and had forwarded a

"confidentiality" agreement that he and Bandas knew would allow them to claim the Illinois Objector Enterprises extortion could not be disclosed," when, in fact, Plaintiff knew that the mediation proposed by Mr. Max included a confidentiality agreement, which Plaintiff accepted by executing the "confidentiality" agreement and engaging in a mediation with Mr. Max. Plaintiff's fraud also includes its allegation that it was unaware that Mr. Max had acted as a mediator in other cases in which Mr. Bandas had represented objectors, when in fact, Plaintiff knew that Mr. Max had acted as a mediator in cases involving Mr. Bandas previously. Plaintiff's fraud also includes its false allegation that it was unaware that the mediation would be subject to a confidentiality agreement, where in fact, at the time of the mediation, Plaintiff had already executed and committed to the terms of the confidentiality agreement. Plaintiff's fraud also included its false allegation that it accepted the opportunity to mediate with the Defendants to "ostensibly inform it of the changes they would like made to the settlement," when, in fact, Plaintiff proposed and pursued the mediation in order to create a false premise upon which to file its RICO class action complaint just a few days after the mediation against the Defendants thereby causing great monetary, business interruption, and emotional distress damages to the Defendants.

The Defendants expressly reserves the right to raise and assert any additional affirmative and other defenses and any counterclaims which may become apparent through discovery in the course of this lawsuit.

## COUNTERCLAIMS

-50-

Bandas Law Firm PC and Christopher Bandas (collectively "Plaintiffs") bring these counterclaims against Defendants Edelson PC, Jay Edelson, Rafey Balabanian, Alex Tievsky, Ryan Andrews, Benjamin Richmond, and Eve-Lynn Rapp, (collectively "Defendants") based on the Defendants' practice of extorting monetary payments to themselves to which they have no legal right and their practice of harassing, intimidating, oppressing, and imposing undue burden and expense on any one standing in their way of collecting their ill-begotten gains, including through fraudulent means. Plaintiffs, for their Counterclaims, alleges as follows upon personal knowledge as to themselves and their own acts and experiences and, as all other matters, on information and belief, including investigation conducted by Plaintiffs' attorneys.

## NATURE OF ACTION

1.    Defendants' are among the most notorious and prolific serial class action litigators in the United States who focus on exploiting dubious, lightweight TCPA cases. Together, Defendants' plan and coordinate actions to extort unjustified profits for themselves by greatly prejudicing the very consumers who are Defendants' clients because Defendants extort money from companies almost exclusively for Defendants' personal gain, while duping its clients by withholding any meaningful information about its lodestar and leaving such consumers with little, if any value.

2.    To protect their ill-gotten gains and to intimidate anyone who might stand in their way of extorting money from class defendants as well as taking advantage of their own clients, Defendants employed ruthless and unprincipled attacks against both class members and the lawyers represent them.

3.    One of the dozens, if not hundreds, of these dubious TCPA case that Defendants use as a vehicle for extorting fees for itself was *Clark v. Gannett Co., Inc.*, Case No. 16-CH-06603 (Cir. Ct. Cook Cty., Ill.) There, Defendants sought to jam through a dubious settlement so that

Defendants could extort $5.38 Million in fees for themselves without revealing that they invested so little time and costs on behalf of the class that such a payment would be a grotesque windfall to Defendants, while leaving their clients with less than $175 each.

4. When one of Defendants' clients, however, raised his voice in opposition to the Defendants' grotesque money grab, Defendants pulled out all of the stops and opened their bag of dirty tricks to intimidate and ward off Mr. Stewart.

5. In the process, however, Defendants conspired to and perpetrated a fraud on Mr. Stewart and his attorneys, fraudulently induced Mr. Stewart's attorneys to engage in a bogus mediation, staged by Defendants' to fuel their scheme of generating and protecting their grotesque windfall, breached their contract pursuant to which that mediation took place, fraudulently pled that the mediation was pursued and arranged by Mr. Stewart's attorney when, in fact, it was pursued and arranged by the Defendants and filed a RICO Class Action lawsuit against Mr. Stewart and his attorneys for the improper purpose of harassment, unnecessary delay, and imposing an undue burden and expense on Mr. Stewart and his attorneys and for the improper purpose of protecting Defendants' $5.38 million in attorney's fees.

6. Accordingly, Bandas Law Firm PC and Mr. Christopher Bandas, bring this counterclaim pursuant to Illinois law against Edelson PC, Jay Edelson, Rafey Balabanian, Alex Tievsky, Ryan Andrews, Benjamin Richmond, and Eve-Lynn Rapp for:

        *a.*   Conspiracy to commit fraud;

        *b.*   Fraud/Fraudulent inducement;

        *c.*   Breach of contract;

7.   Plaintiff Bandas Law Firm PC is a professional corporation incorporated and existing under the laws of the State of Texas with its principal place of business at  500 N. Shoreline, Suite 1020 Corpus Christi, TX 78471,.

8.   Defendant Edelson PC is a professional corporation incorporated and existing under the laws of the State of Illinois with its principal place of business at 350 N. LaSalle Street, 13 Ford, Chicago, Illinois 60654.

9.   Defendant Jay Edelson is a natural person and citizen of the State of Illinois. Defendant Edelson, individually and through his law firm, Defendant Edelson PC, has repeatedly engaged in the type of misconduct alleged here in Illinois and this District.

10. Defendant Rafey Balabanian is a natural person and a citizen of the State of California. Defendant Balabanian, individually and through his law firm, Defendant Edelson PC, as repeatedly engaged in the type of misconduct alleged here in Illinois and this District.

11. Defendant Alex Tievsky is a natural person and citizen of the State of Illinois. Defendant Tievsky, individually and through his law firm, Defendant Edelson PC, has repeatedly engaged in the type of misconduct alleged here in Illinois and this District.

12. Defendant Ryan Andrews is a natural person and citizen of the State of Illinois. Defendant Andrews, individually and through his law firm, Defendant Edelson PC, has repeatedly engaged in the type of misconduct alleged here in Illinois and this District. Defendant Benjamin Richmond is a natural person and citizen of the State of Illinois. Defendant Richmond, individually and through his law firm, Defendant Edelson PC, has repeatedly engaged in the type of misconduct alleged here in Illinois and this District.

13. Defendant Eve-Lynn Rapp, is a natural person and citizen of the State of Illinois. Defendant Rapp, individually and through her law firm, Defendant Edelson PC, has repeatedly engaged in the type of misconduct alleged here in Illinois and this District.

14. This Court has jurisdiction over the claims in this action pursuant to Fed. R. Civ. Pro. 13.

15. The Court has personal jurisdiction over Defendant Edelson PC because it is a corporation incorporated and existing under the laws of the State of Illinois.

16. The Court has personal jurisdiction over Defendant Jay Edelson, because he is a resident of the State of Illinois and an attorney licensed to practice in the State of Illinois.

17. The Court has personal jurisdiction over Defendant Rafey Balabanian, because Defendant Balabanian has enlisted Defendant Edelson and defendant Edelson PC as his agent in Illinois and in this District. Moreover, defendant Balabanian committed tortious acts purposely directed in Illinois and such conduct was designed to create an injury in Illinois and in this District. In addition defendant Balabanian regularly conducts business in Illinois and has availed himself of Illinois courts.

18. The Court has personal jurisdiction over Defendant Alex Tievsky because he is a resident of the State of Illinois and an attorney licensed to practice in the State of Illinois.

19. The Court has personal jurisdiction over Defendant Ryan Andrews because he is a resident of the State of Illinois and an attorney licensed to practice in the State of Illinois.

20. The Court has personal jurisdiction over Defendant Benjamin Richmond because he is a resident of the State of Illinois and an attorney licensed to practice in the State of Illinois.

21. The Court has personal jurisdiction over Eve-Lynn Rapp because she is a resident of the State of Illinois and attorney licensed to practice in the State of Illinois.

22. Venue is proper because defendants do business in this District and the cause of action arose, in substantial part, in this District. Venue is additionally proper in this District under 28 U.S.C. section 1391 because Edelson PC is a resident of this District in that it is a corporation organized under the laws of this State and does business in this District.

23. Each year, the Defendants recruit consumers to act as "lead plaintiffs," and file federal and state class actions from the improper purpose of extorting money from unwilling defendants and duping its own clients.

24. To help keep the Defendants another would-be class-action attorneys honest, Federal Rule of Civil Procedure 23 provides that "any class member may object to the proposal if it requires court approval under the sub-division (e); the objection may be withdrawn only with the court's approval."

25. Nothing in Rule 23 imposed upon Mr. Stewart, as a member of the class in *Clark v. Gannett,* any duty to other class members. Similarly, nothing in Rule 23 allowed Mr. Stewart's attorneys to compromise Mr. Stewart's objection for the benefit of class members who they did not represent. Nor could Mr. Stewart's attorneys ethically compromise his claim for the benefit of other class members they did not represent.

26. The Defendants, have a tremendous incentive to beat down, villainize, and intimidate any class member, regardless of the fact that the Defendants represent those individuals, should they stand in the Defendants' way of collecting truly outrageous sums of money as so-called attorney's fees.

27. Indeed, as occurred here, the Defendants had a tremendous incentive to distract the Illinois Circuit Court as well as this Court with false and exaggerated claims against Mr. Stewart and his counsel to detract from the truly grotesque windfall they sought to protect.

*28.* In their unbridled attempt to ward off Mr. Stewart in his attorneys, however, the Defendants conspired to commit a fraud on Mr. Stewart and his counsel, and, in fact defrauded Mr. Stewart and his counsel, fraudulently concealed information from Mr. Stewart and his counsel, breached their agreement regarding the bogus mediation they staged, and filed a RICO class action in violation of Rule 11.

## <u>COUNT I</u>
Conspiracy to Commit Fraud

29. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

30. Defendants are culpable persons or entities who are capable of holding a legal or beneficial interest in property.

31. Defendants formed a combination of two or more persons for the purpose of accomplishing the unlawful purpose of falsely inducing Mr. Stewart and his attorneys to conduct a mediation that was a pretense for filing a RICO class action and Illinois Rule 137 Motion against Mr. Stewart and his attorneys, for making false and misleading allegations in those federal and state court actions about that mediation, and for tortuously interfering with Mr. Stewart's right to pursue his objection to the Defendants' proposed settlement including its $5.38 million in attorney's fees which has caused injury to the Plaintiffs.

32. Specifically, on or about October 26, 2016 Defendants Jay Edelson, Rafey Balabanian, Benjamin Richmond, Ryan Andrews, Eve-Lynn J. Rapp, and Alex Tievsky spoke in person and by telephone at Edelson PC's offices in Chicago and San Francisco to lay a predicate for their conspiracy to falsely induce Mr. Stewart's attorneys into a mediation that they intended to use as part of their scheme to bring RICO class action and Illinois Rule 137 Motions based on false representations about that mediation.

33. In fact, in an October 27, 2016 letter authored by Mr. Edelson and copied to Defendants Rafey Balabanian, Benjamin Richmond, Ryan Andrews, and Eve-Lynn J. Rapp, Mr. Edelson revealed the Defendants' conspiratorial scheme referencing the fact that the Defendants fully intended to breach any confidentiality agreement they made with regard to the mediation that was the focus of their conspiracy.

34. Thereafter, specifically to induce Mr. Stewart and his attorneys into the mediation trap being pursued by the conspirators, Mr. Balabanian chased after Mr. Thut in the Daily Center in Chicago, Illinois following the fairness hearing in the *Clark v. Gannett* matter and Mr. Balabanian told Mr. Thut, "We want to settle this case… We want to settle Stewart's objection."

35. On or about November 17, 2016, Defendant Balabanian furthered the Defendants' conspiracy to commit fraud by calling Defendant Bandas and entreating him to settle Mr. Stewart's objection.

36. That same day, at 2:36 PM, Defendant Balabanian emailed Mr. Bandas stating, "Thanks for taking my call, though I'm not sure why it ended so abruptly. Beyond the dealings between our two firms more generally, I also wanted to discuss Stewart's objection and the potential for resolving. If you are not interested, then that's fine, but thought I did ask before we move forward. Thanks. Rafey."

37. On November 17, 2016 at 3:19 PM, Mr. Bandas emailed Defendant Balabanian stating, "I don't trust you and I have no patients for riddles and nonsensical phone calls. If you want to talk to me about anything, pick a mediator and have them reach out to me. In the interim, move forward. We are. This will be my last direct communication with you."

38.    On or before November 30, 2016 Defendant Balabanian contacted a colleague of Mr.
Bandas's in an attempt to induce Mr. Bandas to mediate Mr. Stewart's objection and fall prey to
the conspiracy that awaited him.

39.    On November 30, 2016 at 2:50 PM, Defendant Balabanian sought to further induce Mr.
Bandas into a mediation of Mr. Stewart's objection in pursuit of the Defendants' conspiracy,
writing in an email that, "not sure if he spoke to him yet, but I spoke with Bill Audet yesterday,
and I wanted to let you know that we're on board with mediating Stewart's objection. Do you
have a preferred mediator? I prefer to use someone you're comfortable with so we don't waste
time trying to feel out the situation. If you're interested in moving forward with it, please give
me a name and I'll reach out and set it up. Thanks. Rafey"

40.    Thus, Defendant Balabanian's communication with Mr. Bandas reveals the Defendants'
conspiracy as in their RICO class action complaint the Defendants' would allege that Mr. Bandas
pursued and set up a mediation with his preferred mediator, Rodney Max, and that Mr. Bandas's
participation in that mediation was part of a RICO enterprise and constituted the unauthorized
practice of law.

41.    In reliance upon the Defendants' fraudulent misrepresentations, Mr. Bandas responded to
Defendant Balabanian's request that Mr. Bandas identified a mediator with which he was
comfortable. In a November 30, 2016 email at 1:49 PM stating simply "Rod Max."  Defendant
Balabanian responded at 5:32 PM that day stating "Rod Max is fine. Can you set it up with his
office? Thus, despite his earlier assertion that he would communicate with a mediator, Defendant
Balabanian induced Mr. Bandas to contact the mediator so that the Defendants' conspiracy to be
furthered with the false claim that Mr. Bandas set up the mediation.

42.   From on or about October 26, 2016 at the offices of Defendant Edelson PC in Chicago and in San Francisco, Defendants Jay Edelson, Rafey Balabanian, Ryan Andrews, Benjamin Richmond, Alex Tievsky, and Eve-Lynn Rapp acted in furtherance of the Defendants' conspiracy to fraudulently induce Mr. Steward and his attorneys into a trap mediation by researching and drafting a 49 page complaint that would be filed a day after the bogus mediation was orchestrated by the Defendants, specifically containing false claims that the mediation had been pursued and arranged by Mr. Steward and his attorneys and that the mediation was a basis for the Defendants' RICO class action complaint and their Illinois Rule 137 Motion against Mr. Steward and his counsel.

43.   Beginning on December 2, 2016 and continuing through Sunday, December 4, Defendants Balabanian, Jay Edelson, Benjamin Richmond, Alex Tievsky, Ryan Andrews, and Eve-Lynn Rapp from their offices and homes in Chicago and San Francisco engaged in the sham mediation that was the product of their conspiratorial conduct while preparing their RICO class action complaint and their Rule 137 Motion containing false and misleading statements that Mr. Bandas had pursued and arrange the mediation, that his participation in that mediation was part of a RICO enterprise as well as an active unauthorized practice of law under the Illinois attorney act.

44.   Although these claims of a RICO enterprise and unauthorized practice of law were made virtually contemporaneously with this sham mediation when the Defendants filed their 49 page RICO class action complaint and there Rule 137 Motion the next day on December 5, 2016,, none of the Defendants raised any such claims during the mediation.

45.   As a result of the Defendants' conspiracy to commit fraud and their overt acts in furtherance of that conspiracy, the Plaintiffs have suffered considerable damages, including but not limited to their attorney's fees and costs incurred in defending against the Defendants' false

and misleading allegations, the costs and time associated with participating in the mediation, and other and further damages as will be proven at the trial of this matter.

## COUNT II
Fraud/Fraudulent Inducement

46. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

47. As detailed above, the Defendants made false statements of material fact specifically including Defendant Balabanian's statements to Mr. Thut and Mr. Bandas that Defendants wanted to mediate Mr. Stewart's objection for the purposes of reaching a possible settlement. Instead, the Defendants intended that the mediation would be used as a predicate for their RICO class action and Rule 137 filings.

48. As is also detailed above, the Defendants knew that their these statements of material fact were false because during that mediation Defendants Alex Tievsky, Ryan Andrews, Benjamin Richmond, Eve-Lynn Rapp in consultation with the Defendants Jay Edelson and Balabanian were researching and drafting Defendants' 49-page RICO class action complaint and their Rule 137 filing, containing false and misleading representations about the mediation itself.

49. That the Defendants intended that their statements would induce the Plaintiff to act, is shown by Defendant Balabanian's repeated statements both oral and written attempting to induce Mr. Stewart's counsel to participate in the mediation where he quite literally requests that they do so thereby revealing the Defendants' intent to induce the Plaintiffs to act.

50. Plaintiff's reliance upon the truth of the Defendants' false statements is demonstrated through Mr. Bandas' skepticism about the Defendants' intentions as expressed in his email

communications and Defendant Balabanian's attempt to overcome that skepticism through contact with Mr. Bandas's colleague, Bill Audet.

51.   Plaintiff's damages resulting from reliance on the Defendant's false statements is manifest by the false and misleading RICO class action complaint in the false and misleading Rule 137 Motion filed by the Defendants within hours of the mediation containing false claims that the mediation was pursued and set up by Mr. Bandas, when in fact it was pursued and set up by the Defendants, and that Mr. Bandas's participation in the mediation constituted the unauthorized practice of law in violation of the Illinois attorney act with the defendants both induced Mr. Bandas to participate in the mediation and never raised any such issue during the course of the mediation.

52.   In addition, the Defendants' perpetrated additional fraud through the allegations made in their RICO class action complaint signed by Defendant Balabanian containing false and misleading statements about the sham mediation.

53.   For example, at paragraph 85 of Defendant's First Amended Complaint and Demand for Jury Trial, the Defendants falsely stated that "Consistent with the operation of their scheme, after the *Gannett* court overruled Stewart Objection, Defendants proposed that plaintiff engage in mediation [to] resolve the objection and forego any appeal of the Court's and order granting final approval."

54.   As a result of the Defendants' fraud on the Plaintiffs, the plaintiffs have suffered considerable damages, including but not limited to their attorney's fees and costs incurred in defending against the Defendants' false and misleading allegations, the costs and time associated with participating in the mediation, and other and further damages as will be proven at the trial of this matter.

## COUNT III
Breach of Contract

55.  Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

56.  Defendants entered into a written agreement with Plaintiffs and mediator Rodney Max on or before December 3, 2016 pursuant to which the Defendants promised and agreed as follows:

> Mediation Confidentiality Agreement
>
> The above styled cases is in mediation for the purpose of attempting to achieve resolution. During the period of this mediation (which period includes commencement, preparation, conduct and past-mediation efforts) all communications and exchanges of information whether verbal or in writing shall be and remain confidential. Said communication shall be inadmissible in a court of law and at no time disclosed to the judge, jury, or any appellate court…. This Mediation Confidentiality Agreement shall remain in effect regardless of the termination of the mediation. To the extent that any party wishes to terminate their participation while others continue the mediation process, said terminating party shall be excluded from any communications will mediation communications continue under the terms of this agreement. Once the mediation is terminated in full, this Mediation Confidentiality Agreement shall continue to protect all communications made from the commencement of the mediation through the date of said termination.

57.  Plaintiffs attendant and participated in the mediation and performance of all of their contractual obligations pursuant to the parties' agreement including abiding by its confidentiality provisions.

58.  In direct and intentional breach of their contractual agreement, the Defendants immediately breached the confidentiality provisions of the agreement not only revealing confidential communications, but intentionally and fraudulently misrepresenting those communications in their RICO class action complaint and their Rule 137 filing in which the Defendants falsely claimed that Mr. Bandas had pursued and arrange the mediation, and that Mr. Bandas had engaged in the unauthorized practice of law by participating in the mediation.

59.   As a direct result of the Defendants' breach of their contract, Plaintiffs have suffered significant damages including but not limited to their attorney's fees and costs incurred in defending against the Defendants' false and misleading allegations, the costs and time associated with participating in the mediation, and other and further damages as will be proven at the trial of this matter.

WHEREFORE, the Plaintiff's, the Bandas Law Firm PC and Christopher Bandas respectfully requests the following relief:

1. That this Court enter a judgment declaring the Defendant's acts and practices complained of herein to constitute conspiracy to commit fraud;

2. That this Court enter a judgment declaring the Defendants' acts and practices complained of herein to constitute fraud and fraudulent inducement;

3. That this Court to enter a judgment declaring the Defendants' acts and practices complained of herein to constitute breach of contract;

4. Award the Bandas Law Firm PC and Christopher Bandas damages resulting from Plaintiff's conspiracy to commit fraud, fraud/fraudulent inducement, and breach of contract; costs, attorney's fees, and any other relief this Hon. Court deems just and appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,


CHRISTOPHER BANDAS and BANDAS
LAW FIRM P.C.

/s/ Darren VanPuymbrouck
   One of their attorneys.

Darren M. VanPuymbrouck
Falkenberg Ives LLP
30 N. LaSalle St., Suite 4020
Chicago, IL  60602
312-566-4805
dvan@falkenbergives.com

Dated: December 3, 2018

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that on December 3, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following counsel of record:

Ryan D. Andrews
Alexander Glenn Tievsky
Edelson PC
350 N. LaSalle Street, 13th Floor
Chicago, IL 60654
(312) 589-6370
randrews@edelson.com
atievsky@edelson.com
***Attorneys for Plaintiff***

/s/ Darren VanPuymbrouck