```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   EDELSON PC, an Illinois        )
     professional corporation,      )
 4   individually and on behalf     )  Docket No. 16 C 11057
     of all others similarly        )
 5   situated,                      )
                                    )
 6                  Plaintiff,      )
                                    )
 7           vs.                    )
                                    )
 8   THE BANDAS LAW FIRM PC, et     )
     al.,                           )  Chicago, Illinois
 9                                  )  July 11, 2017
                    Defendants.     )  10:04 a.m.
10

11          TRANSCRIPT OF PROCEEDINGS - Oral Argument
            BEFORE THE HONORABLE REBECCA R. PALLMEYER
12

13   APPEARANCES:

14   For the Plaintiff:      EDELSON PC
                             BY:  MR. ALEXANDER G. TIEVSKY
15                                MR. RYAN D. ANDREWS
                             350 North LaSalle Street, Suite 1300
16                           Chicago, Illinois  60654

17   For the Defendants      FALKENBERG IVES LLP
     Christopher Bandas and  BY:  MR. DARREN VAN PUYMBROUCK
18   The Bandas Law Firm:    30 North LaSalle Street, Suite 4020
                             Chicago, Illinois  60602
19
                             FREEBORN & PETERS
20                           BY:  MR. ALEXANDER S. VESSELINOVITCH
                                  MR. MATTHEW T. CONNELLY
21                           311 South Wacker Drive, Suite 3000
                             Chicago, Illinois  60606
22
     For the Defendants      JOHNSON & BELL, LTD.
23   Noonan Perillo &        BY:  MR. JOSEPH R. MARCONI
     Thut Ltd. and C.             MR. VICTOR J. PIOLI
24   Jeffery Thut:           33 West Monroe Street, Suite 2700
                             Chicago, Illinois  60603
25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Court Reporter:                    FRANCES WARD, CSR, RPR, RMR, FCRR
23                                 Official Court Reporter
                                   219 S. Dearborn Street, Suite 2144D
24                                 Chicago, Illinois  60604
                                   (312) 435-5561
25                                 frances_ward@ilnd.uscourts.gov

1           THE CLERK:  16 C 11057, Edelson PC versus The

2    Bandas Law Firm for oral argument.

3           MR. TIEVSKY:  Good morning, your Honor.

4           Alexander Tievsky for the plaintiff.

5           THE COURT:  Good morning.

6           MR. ANDREWS:  Ryan Andrews for the plaintiff.

7           THE COURT:  Good morning.

8           MR. VESSELINOVITCH:  Good morning.

9           Alex Vesselinovitch for the Bandas defendants.

10          MR. VanPUYMBROUCK:  Good morning, your Honor.

11          Darren VanPuymbrouck for Mr. Stewart.

12          MR. CONNELLY:  Good morning, your Honor.

13          Matthew Connelly for the Bandas defendants.

14          MR. PIOLI:  Good morning, Judge.

15          Victor Pioli, P-i-o-l-i, on behalf of Noonan

16   Perillo & Thut and Jeffrey Thut.

17          MR. MARCONI:  Joe Marconi for Thut and his firm.

18          THE COURT:  Okay.  Good morning.

19          We are here for arguments on the motions -- the

20   various motions to dismiss that have been filed.  I have read

21   the briefs.  I am ready to hear your arguments.

22          Before I do that, let me just ask -- this is a

23   question for the Bandas people -- are your clients still

24   doing this stuff?

25          MR. VESSELINOVITCH:  Well, as far as I know, they

1    are still actively working as lawyers.  There is a case in

2    the state court, which, of course, is *Clark v. Gannett,* which

3    is still proceeding, and that's a subject of the complaint.

4    But that case is still going forward.

5              THE COURT:  The reason I ask that is, I began by

6    reading the defendants' briefs.  And I see a lot of arguments

7    about various defenses that could have a lot of merit, but I

8    never see anything about how this is actually prosocial

9    activity or the kind of thing that we want to see lawyers

10   engaged in or anything like that.

11             Now, I realize you are assuming the truth of the

12   allegations and not admitting anything.  And whether or not

13   there is a RICO claim here, one really wonders what's the

14   positive that's being accomplished by Mr. Bandas' activities

15   in these class actions?

16             There is a legitimate purpose for objections.  No

17   question about that.  I myself have sustained objections in

18   class action settlements more than once.  I'm suspicious of

19   plaintiffs' lawyers in class actions.  There is a very good

20   basis for that.  But that doesn't seem to be what's animating

21   Mr. Bandas' activities.

22             MR. VESSELINOVITCH:  Well, but I think going sort

23   of beyond the four corners of the complaint here is that

24   there has been a number of cases where the Bandas firm has

25   been involved where the class action objections have been

1    sustained, and they have been upheld.  So it's not -- you

2    know, the picture that's painted here is they are always

3    denied or overruled, and that isn't accurate.  So I mean --

4              THE COURT:  You are right.  That is the picture

5    that's painted.

6              MR. VESSELINOVITCH:  So whenever there is a class

7    objector, I mean, there is always an issue of, sometimes they

8    work, and sometimes the class objections are upheld.  But

9    that's not part of the four corners of this complaint.

10             THE COURT:  Well, no, because one of the

11   allegations that the plaintiff is making in this complaint,

12   as I understand it, is that often the precise terms of the

13   resolution are not disclosed to the Court at Bandas'

14   insistence.  In other words, whatever the resolution of the

15   objection, the Court doesn't get to know about it.

16             MR. VESSELINOVITCH:  Well, I think -- I mean, I

17   have to accept that allegation, I think, for purposes of

18   today because I think that's what's alleged in this

19   complaint.  I don't know and I don't think that's always the

20   case.  But for purposes of this complaint, I think I have to

21   assume it is.

22             THE COURT:  Does that make a difference with

23   respect to your observation about the merit of the activity?

24             MR. VESSELINOVITCH:  It actually doesn't.  Not

25   really.  Because part of the reason -- I mean, I'm jumping

1    ahead a bit.  But part of the reason we wanted to supplement

2    the record with this latest Eastern District of Pennsylvania

3    case called *Rougvie* is because it makes clear that Mr. Bandas

4    and his lawfirm's fiduciary duty is to the objector, not to

5    the class.

6              So there is some question.  Is there positive -- in

7    looking at the prism of who's gaining from this, the correct

8    prism is to say, well, Bandas doesn't owe any duty to the

9    class as a matter of law.  He owes his duties to the objector

10   he represents.

11             THE COURT:  I would agree with that.  I would agree

12   with that observation.

13             All right.  Well, this is the defendants' motion.

14   Why don't we let you make the first argument, we will hear

15   from the plaintiff in response, and then there can be a

16   reply, if that makes sense to all of you.

17             MR. VanPUYMBROUCK:  Judge, we thought we would have

18   the Bandas defendants put forth the greatest amount of time.

19   I will stand up for Mr. Stewart, to the extent you will allow

20   me to add to the record.

21             THE COURT:  Sure.

22             MR. VanPUYMBROUCK:  And I think Mr. Pioli --

23             MR. PIOLI:  I will supplement as well.

24             MR. VanPUYMBROUCK:  -- will supplement.

25             THE COURT:  I know that -- just so you are clear, I

1    know that we don't want to be here all day, but I don't have

2    another matter that people are going to be coming in.  I do

3    want to get the issues developed effectively.

4              MR. VESSELINOVITCH:  I am going to try -- I don't

5    want to grab most or all the time.  I think what I would like

6    to do is maybe take 20 minutes for the Bandas defendants, and

7    then I would give the chair to -- the floor to

8    Mr. VanPuymbrouck for Gary Stewart.

9              THE COURT:  Good.  Okay.

10             MR. VanPUYMBROUCK:  Very good.

11             MR. VESSELINOVITCH:  Judge, as I said before, I'm

12   Alex Vesselinovitch.  I represent Christopher Bandas and The

13   Bandas Law Firm with respect to this case and the motion to

14   dismiss this federal complaint.

15             The principal point that I would like to start with

16   is that the overwhelming weight of authority of the case law

17   has found that litigation activities such as this -- even

18   aggressive litigation activities among aggressive counsel

19   cannot and should not constitute predicate criminal acts for

20   the purposes of racketeering activity in a civil RICO case.

21             We would submit that that's especially true and

22   should be applied here to these facts because I think three

23   key points are undisputed by the counsel.

24             And I think those undisputed points are, first,

25   that the class objector, like Mr. Stewart here, is allowed to

1    object to a class settlement as a matter of law.

2              Secondly, that that class objector, like

3    Mr. Stewart here, is allowed to appeal a trial court's denial

4    of that objection.  There is no question they have a right to

5    appeal the denial of such an objection.

6              And third, that the class objector is allowed to

7    settle the prospective appeal with a monetary payment.  Just

8    as in almost any civil litigation sometimes attorneys use

9    this prospect of appeal as a leverage point to extract a

10   settlement from the opposing party.  That happens all the

11   time.

12             THE COURT:  Right.

13             MR. VESSELINOVITCH:  The *Eubank* case in the Seventh

14   Circuit has recognized that class objectors play a useful

15   role.  They especially can play a useful role where the class

16   counsel, at times, violate their fiduciary duty to the class

17   by disproportionately diverting proceeds to cover their

18   attorneys' fees.  And so it does play -- and class objectors

19   do play a role.  That's been recognized as a matter of law as

20   a valuable one.

21             Now, I won't get too much in the weeds with some of

22   the cases.  And I don't want to do that.  I know that you

23   have read the briefs.  But I want to start with the first and

24   I think principal predicate act that they allege here, which

25   is that of extortion under Hobbs Act.

1          The threat of an appeal or making a threat of
2     appeal where you have a right to appeal is not extortion, and
3     it can't be.  RICO predicates like this have been dismissed
4     where cases found that threatening litigation doesn't amount
5     to a pattern of racketeering activity.

6          Even threats of meritless litigation -- even where
7     the threat of, let's say, frivolous litigation does not
8     amount to criminal extortion under the Hobbs Act, and the
9     overwhelming weight of federal courts agree with that.

10          One of the judges who summarized the case at least
11     as of three years ago was Judge Cote in the Southern District
12     of New York in the case called *FindTheBest* where she looked
13     at the case law.

14          She had a civil RICO case that had very similar
15     predicates here -- an extortion Hobbs Act, a mail fraud, a
16     wire fraud.  And in that case, I would submit really quickly
17     the facts were even more egregious, if you will.  That was a
18     patent troll case -- so-called patent trolls -- where the
19     defendants were writing threatening letters that they would
20     increase their settlement demand if the litigation were to
21     continue, if the other side weren't to settle.

22          But more importantly, they put in the letter if the
23     other side chose to litigate, they were going to contact the
24     other side's customers.  Go to the customers, let them know
25     about this, and escalate the settlement demand.

1    All those facts and threats did not amount to a

2   Hobbs Act according to Judge Cote.  But also more

3   importantly, through the weight of authority that she

4   analyzed and reviewed, she found that the instigation of

5   meritless litigation cannot constitute extortion even if it's

6   filed with wrongful intent.  And we think that that's very

7   much the law.

8    Also a case called *Pendergraft* in the Eleventh

9   Circuit, a 2002 case, had the same predicate act.  That was a

10   criminal RICO.  But it found that the Hobbs Act doesn't

11   criminalize bad faith threats to sue or to litigate.

12    And similarly -- both those cases, by the way, in

13   *FindTheBest*, Southern District of New York, *Pendergraft*,

14   Eleventh Circuit 2002, also had predicate acts, like here, of

15   mail and wire fraud in addition to the Hobbs Act extortion.

16   And they had the same analysis that they applied to the mail

17   and wire fraud, and found that courts have -- courts have

18   consistently refused to recognize as mail and wire fraud even

19   litigation activities that rise to the level of malicious

20   prosecution.

21    And just because mail or wires are used in the

22   perpetration of that kind of malicious prosecution, it didn't

23   make it a mail or wire fraud.  It was turned down in

24   *FindTheBest*.  It was turned down in Pendergraft.

25    And even here in the Northern District of Illinois

1  I think there is an applicable case called *Spiegel*.  It came

2  out in 1985.  But in the *Spiegel* case, the court said in this

3  district that communications between two attorneys in the

4  midst of a litigation cannot constitute wire fraud.

5  Statements made in negotiations regarding their position for

6  purposes of negotiating a settlement cannot constitute fraud.

7  And that was even affirmed by the Seventh Circuit in a case

8  called *Weimert* in 2016.

9           The point here is, the overwhelming authority has

10  always and consistently refused to recognize extortion or

11  mail or wire fraud in this kind of setting where there is

12  even meritless litigation, frivolous litigation,

13  litigation -- threats of litigation instituted with what's

14  sometimes known as wrongful intent.

15           And part of the reason, I think -- not to get too

16  much into that -- is there is an alternative.  I mean, the

17  alternative is really, are you really talking about a tort of

18  malicious prosecution?  Are you really talking about

19  violations of the professional rules of conduct for

20  attorneys?

21           If you really are doing that and you are trying to

22  dress those up as criminal federal offenses to predicate a

23  RICO activity, that's frowned upon and it's been rejected.

24           THE COURT:  Okay.  An allegation of a professional

25  conduct violation wouldn't support relief in any event.  You

1 have to find a basis for -- I mean, the claim here is -- the

2 Edelson claim is that Edelson has been harmed by this

3 activity.

4 MR. VESSELINOVITCH: Well, people are always harmed

5 when they have to settle a case under very difficult

6 circumstances. I mean, if it's economic harm we are talking

7 about, that happens a lot, and that happens all the time. We

8 don't think it's enough.

9 THE COURT: It isn't just the economic harm here

10 either.

11 What I understand the plaintiffs to be saying is

12 that the Bandas activities require them to either pay out the

13 money that they claim has been extorted from them on the one

14 hand or hold up the resolution of the class action on the

15 other, thereby breaching their own fiduciary responsibilities

16 to class members.

17 To say, well, there are other avenues of relief

18 after all -- I think what you are saying is, after all,

19 Edelson and others could make claims of professional

20 responsibility violations somewhere. True. That wouldn't

21 provide a basis for relief.

22 MR. VESSELINOVITCH: A malicious prosecution case

23 would provide a basis for relief. I mean, that's what the

24 courts have sort of said. They say you can't criminalize

25 conduct that really is basically founded on malicious

1  prosecution.  And it's a tort.  Like any tort, it provides

2  relief.

3          I don't want to be cute here, but let me be a bit

4  cute.  You know, what is to stop Mr. Edelson, who is no

5  delicate flower, from turning down the demand?  He could turn

6  down the demand.  He could tell Mr. Bandas or any other

7  counsel for objectors to fly a kite.

8          I mean, it's not as though he is being extorted

9  under threat of violence or personal harm.  So, I mean, there

10  is that.

11          And when they also have the predicates of

12  obstruction of justice under this scenario, as well as

13  witness tampering, those predicates have also been turned

14  down.  We can't find a single case that's upheld them for a

15  civil RICO predicate.

16          Obstruction of justice and both witness tampering,

17  I should say quite quickly, only apply to federal

18  proceedings, not to state court proceedings.  The underlying

19  proceeding here was *Clark v. Gannett* in the state court.

20          THE COURT:  In the state court, right.

21          MR. VESSELINOVITCH:  And part of the policy here --

22  part of the thing that's troubling to the courts is, what are

23  we really talking about here?

24          What we are talking about is that the Edelson

25  plaintiffs are trying to collateral attack a state court

1    proceeding through the mechanism of a civil RICO action.  And

2    it's this kind of collateral attack and the fact that that's

3    what it results in that's been turned down and rejected by

4    cases like the Eleventh Circuit, the *Pendergraft* decision,

5    saying, we're really concerned when you are using RICO as a

6    mechanism to launch a collateral attack on another case.

7         In the case of -- a Fifth Circuit called *Snow*

8    *Ingredients*, 2016 case.  I mention it for a couple reasons.

9    Number one, it's recent.  And number two, it had the same

10   predicates as we are facing with here:  Obstruction of

11   justice and witness tampering.

12        And they analyzed those predicates in this -- in a

13   similar context.  They said no criminal activity could be

14   found there either for obstruction of justice or witness

15   tampering.  At most, the defendant there perpetrated a series

16   of obstructive acts in different civil actions, but those are

17   not criminal conduct.  There was no civil RICO.

18        And again, that was -- I think trademark and other

19   things were brought, I think, frivolously or possibly in bad

20   faith in other -- in a civil proceeding in front of certain

21   administrative boards, and the court -- the Fifth Circuit

22   rejected those as predicates of obstruction of justice and

23   witness tampering because they found they were only

24   obstructive acts.  Maybe they are not attractive acts.  They

25   are not nice acts.  They are not proper acts.  But they

1    weren't criminal, and they weren't going to criminalize this

2    kind of activity in that *Snow Ingredients* case.

3    If you get now down the list to the bribery

4    predicate act under Section 201 of Title 18, there is no case

5    we could find -- and I'm always hesitant to say that because

6    as soon as I do, maybe there is one. But we couldn't find a

7    case where bribery under Section 201 was sustained as a

8    predicate act for a civil RICO case. Not one.

9    We did find a case that said the contrary, and that

10   was *Eastern Savings Bank v. Papageorge*. It's a District

11   Court of DC case from 2014. And in that *Papageorge* case they

12   did analyze a bribery as a predicate act in a civil RICO case

13   and refused to apply it, refused to sustain it.

14   The case that -- the kind of theme that I was

15   talking about earlier is, you know, violations of the rules

16   of professional responsibility do not amount to patterns of

17   racketeering activity. That was also affirmed by the Fifth

18   Circuit in the *St. Germain* case.

19   If in this bribery predicate what the Edelson firm

20   is effectively doing is challenging the client fee

21   arrangement between Mr. Bandas and his client Gary Stewart,

22   that may, at most, amount to an infraction of a model rule of

23   professional conduct, maybe 5.4, but such violations of those

24   rules are not a basis for RICO -- for a civil RICO case.

25   We think Mr. Edelson -- plaintiffs are really

1    attacking the intent behind the objections, not the content.

2    At most, again, we think what they are really alleging and

3    what this amounts to is a malicious prosecution.

4           And some of the cases have recognized that if you

5    are going to allow bribery or these kinds of predicates in

6    this kind of litigation context, that would have a chilling

7    effect on future objectors.

8           If this is deemed to be bribery between the

9    objector and his counsel, what effect would that have on

10   future objectors getting into a fee arrangement with their

11   counsel?

12          THE COURT:  Well, hold on.  Hold on.  I have got a

13   question about that.

14          I'm fuzzy on the facts on this issue, but I thought

15   that plaintiffs were saying that in some instances The Bandas

16   Law Firm would pay the objectors.

17          MR. VESSELINOVITCH:  Directly?

18          THE COURT:  Directly or indirectly.

19          MR. VESSELINOVITCH:  I think that's right.  I think

20   that's correct.

21          THE COURT:  Well, that's not a fee arrangement.

22   That's kind of the reverse.  I mean, when is the last time

23   your clients -- you paid your clients for the privilege of

24   representing them?  That's not how it works.

25          MR. VESSELINOVITCH:  I think the arrangement here

1    that they are alleging was that the monies paid to settle the

2    prospective appeal of the class objection was to be paid from

3    the attorneys' fees that the Edelson firm was going to get,

4    not from the class settlement that was going to the class.

5    The monies were going from the attorneys.  That would be the

6    Edelson firm.

7          THE COURT:  The Bandas clients were the objectors,

8    though.

9          MR. VESSELINOVITCH:  Yes.  There was a fee

10   arrangement, you can presume, between -- and there was --

11   between Mr. Bandas and his client.

12         THE COURT:  Right.

13         MR. VESSELINOVITCH:  Yes.

14         And if that's --

15         THE COURT:  And that fee arrangement was a fee

16   arrangement in which the client -- the money flowed from

17   client to lawyer, which would be the typical situation, and

18   I'm hoping is the situation in your own case,

19   Mr. Vesselinovitch.

20         MR. VESSELINOVITCH:  I think -- I'm not sure about

21   that.  And I don't know how to answer that, but I think

22   Mr. VanPuymbrouck might know that with respect to

23   Mr. Stewart.

24         THE COURT:  I would just observe that if the

25   arrangement is one in which the lawyer is paying the client,

1    I wouldn't regard that as a fee arrangement.  I would call

2    that something else.  It might be reimbursement of something,

3    but I wouldn't call it a fee arrangement.

4            MR. VESSELINOVITCH:  Okay.  And I think that for

5    the exact arrangement, how it's alleged or it was between

6    Mr. Stewart and Mr. Bandas and his law firm --

7            THE COURT:  Right.

8            MR. VESSELINOVITCH:  -- I'm not clear on that, but

9    Mr. Stewart's counsel might know.

10           I also wanted to get really quickly to the other --

11   another predicate act they are alleging, which is money

12   laundering.

13           THE COURT:  Right.

14           MR. VESSELINOVITCH:  And the money laundering is,

15   we think, an incredible stretch.  We have seen no support for

16   this in this context whatsoever.

17           These are not proceeds derived from unlawful

18   activity.  All these proceeds arose from litigation activity

19   and settlement negotiations.

20           We think it's incredibly expansive and unsupported

21   to say that Mr. Bandas' payment of the mediator's fees here

22   is somehow laundering of funds.  No court has embraced that

23   misguided view.  I can't even conceive of it.  It's not as

24   though Mr. Bandas has been alleged to be a heroin or cocaine

25   dealer laundering funds through a mediator or anything of the

1    sort.  So we don't think -- we think that amounts to almost a

2    frivolous predicate allegation.

3         We also want to make clear that, in our view, if

4    there is no RICO here, because there is no pattern of

5    predicate activity -- recognized predicate criminal

6    activity -- there is no pattern.  There are no predicate acts

7    that amount to recognized predicates under RICO.  There is no

8    RICO conspiracy either under the *Goren v. New Vision* case.  I

9    don't think I need to spend a lot of time on that.

10        THE COURT:  You are right about that.  If I don't

11   find RICO predicate acts, we don't need to go down the road

12   of finding conspiracy.

13        MR. VESSELINOVITCH:  A couple of quick points on

14   the Noerr-Pennington doctrine.  We do raise it.  And we think

15   it does apply here.  We think Noerr-Pennington protects

16   settlement agreements because this settlement agreement was

17   incidental to the underlying litigation.

18        They cite *Toyo Tire*.  It's a different case because

19   there there were third-party rights implicated.  The

20   settlement here is solely between the parties involved in the

21   underlying proceeding.  It's incidental to that underlying

22   lawsuit.

23        We also think that the sham litigation exception

24   under Noerr-Pennington does not apply here.  The standard for

25   that is no longer really the *California Motor Transport* case

1    from 1972.  Rather, it's been superseded in the Supreme Court

2    by *Professional Real Estate Investors* case about 1993.

3        And basically what you look at is whether the

4    underlying suit is objectively baseless before you even

5    examine the subjective intent for a sham litigation.  And

6    there is absolutely no evidence here that the underlying suit

7    was objectively baseless.

8        The *Rubloff* case in this district sort of

9    recognizes a little bit indirectly that the good law now is

10   from *Professional Real Estate Investors*, and that you have to

11   look at whether the underlying suit is objectively baseless.

12       So, in our view, Noerr-Pennington does apply and

13   the sham exception does not.

14       With respect to federal jurisdiction separate and

15   apart from the RICO cases, I just -- RICO claims, I just want

16   to make a few quick points.

17       If there is no RICO and then no RICO conspiracy,

18   this Court, respectfully, lacks subject matter jurisdiction.

19   And the reason for that is, there is no diversity here under

20   the Class Action Fairness Act because Edelson plaintiffs have

21   not met their burden to provide a plausible explanation that

22   the amount in controversy would exceed $5 million in this

23   purported class action.  And that's from the *Spivey* case in

24   the Seventh Circuit.

25       These delay costs, these punitive damages are

1    undetermined.  They are vague.  They are not going to be

2    recognized as amounting to something that can be -- that can

3    fulfill the $5 million requirement.  And so we would submit

4    that there is no diversity jurisdiction if the RICO counts

5    fail.

6         The All Writs Act here, we think, does not apply.

7    Private parties cannot bring claims under the All Writs Act,

8    and Count III should be dismissed on that basis alone with

9    prejudice.

10        And with that, unless there are other questions, I

11   wasn't going to allow Mr. VanPuymbrouck to address his

12   arguments for Mr. Gary Stewart.

13        THE COURT:  My only question -- I think you just

14   answered it.  It's your position that there is no private

15   right of action under the All Writs Act?

16        MR. VESSELINOVITCH:  Yes, that's our position.

17        THE COURT:  All right.  Thank you.

18        MR. VESSELINOVITCH:  Thank you.

19        MR. VanPUYMBROUCK:  Thank you, your Honor.  My name

20   is Darren VanPuymbrouck, and I'm here on behalf of Mr. Gary

21   Stewart.

22        Your Honor, we will adopt the arguments made on

23   behalf of the Bandas defendants because we believe that they

24   compel the dismissal of the complaint against all the

25   defendants, including Mr. Stewart.  But there are some

1    additional grounds that I want to bring to the Court's

2    attention that further compel dismissal of the plaintiff's

3    first amended complaint against Mr. Stewart.  There are at

4    least two of those, and they go to the conduct prong and the

5    pattern requirement.

6            And, your Honor, the complaint itself -- the first

7    amended complaint makes very clear that Mr. Stewart never was

8    involved in directing the affairs of the enterprise.  And I

9    am going to indulge myself a little bit, Judge, if you don't

10   mind, and just read a couple of the allegations from the

11   complaint.

12           At Paragraph 42 on Page 12 the complaint alleges,

13   "Bandas makes false representations to counsel, courts, and

14   others that he is an attorney for an objector who has a

15   legitimate criticism of a class action settlement.  Instead,

16   Bandas represents puppet clients, who have little to no

17   understanding of the class action settlement to which they

18   are objecting because they are often not even class members,

19   have no understanding of the basis for the objections that

20   are being made by Bandas, and at times are ignorant that they

21   are objecting at all."

22           The next allegation in the complaint with regard to

23   Mr. Stewart's role in this is that --

24           THE COURT:  Which paragraph was that?  Tell me

25   again.

1          MR. VanPUYMBROUCK:   42 --

2          THE COURT:  All right.  Thank you.

3          MR. VanPUYMBROUCK:  -- Page 12.

4          THE COURT:  And the next one.  Go ahead.

5          MR. VanPUYMBROUCK:  Paragraph 115, Pages 40 and 41,

6  "As the current leader of the Illinois objector enterprise,

7  Bandas has final say over the actions of the enterprise,

8  including when to file objections and how much money to

9  accept as a payment for 'settling' the objection.  The

10 purported client" -- that would be Mr. Stewart -- "does not

11 have the final decision as to when to settle his case or

12 waive his right to appeal.  Bandas does.  Bandas also doles

13 out the profits of the Illinois objector enterprise to the

14 other members."

15          Every other allegation in the complaint -- and I

16 will recite a few more of those, your Honor -- talks about

17 agreements that Mr. Stewart made not about conduct.

18          At Paragraph 135, the first amended complaint

19 alleges -- and I will read this slowly because the language

20 is a little tricky, Judge -- "Gary Stewart agreed to conduct

21 the affairs of the Illinois objector enterprise."  So it

22 sounds like they are alleging that he conducted the affairs.

23          The next line, "For example, agreeing to be a

24 purported objector in the *Gannett* settlement."  No conduct,

25 your Honor.  Passive agreement.

1    The next paragraph I will direct the Court's

2    attention to is 148 at Page 50.  It alleges that Gary Stewart

3    agreed to be the named objector in the Stewart objection.

4    Again, no indication anywhere in the first amended complaint

5    that Mr. Stewart directed the affairs of the enterprise.

6    And there are other examples.  At Paragraph 161,

7    Subpart (g), "Gary Stewart agreed to allow Defendant Bandas

8    to act as his and the other defendants' representatives in

9    the purported mediation."  Again, affirmatively showing that

10   Mr. Stewart did not take any active role in directing the

11   affairs of the enterprise.

12   And then at Paragraph 227 on Page 76, the first

13   amended complaint says specifically, "Defendant Stewart

14   knowingly agreed to allow Bandas and Thut to file an

15   objection in *Gannett* under his name for the purpose of

16   facilitating the activities of the Illinois objector

17   enterprise, including the unlawful predicate acts described

18   above."  Again, Mr. Stewart agreed, did not direct.

19   The Seventh Circuit case in *Slaney v. The*

20   *International Amateur Athletic Federation* is absolutely on

21   all fours with this case, your Honor.

22   Judge Flaum's opinion makes clear that the conduct

23   prong of 1962 Section (c) requires that a defendant "must

24   have asserted some control over the enterprise."

25   Just as with the plaintiff's first amended

1  complaint here, the court there observed that Slaney's

2  complaint failed to allege any control of the USOC over the

3  Olympic movement enterprise.

4  In *Slaney* -- and I'm old enough to remember who she

5  is -- plaintiffs allege that the USOC carried out the drug

6  testing required by the IOC that was part of the Olympic

7  movement and that the USC, therefore, are "persons" -- in

8  quotes -- associated with an "enterprise" -- in quotes --

9  that is the Olympic movement.

10  Just as plaintiffs allege here, *Slaney* alleged that

11  the USOC's drug testing was indispensable to the operation of

12  the Olympic movement enterprise.

13  The court, however, noted that *Slaney*'s description

14  of the Olympic movement suggested a structure in which the

15  USOC could not have directed the enterprise's affairs,

16  exactly as described in the complaint here.

17  The court said, "The complaint suggests the

18  movement as operating 'under the supreme authority of the

19  IOC,' who has sole responsibility for allowing members into

20  the movement.  The USOC is described as merely a 'domestic

21  representative or agent responsible for carrying out the

22  mission of the IOC.'  The complaint is devoid of any

23  suggestion that, as an agent, the USOC took part in

24  management of the movement."

25  Here the plaintiff's first amended complaint

1  alleges that Mr. Stewart is a puppet with little, if any,

2  information or understanding about class action settlements

3  with no authority to settle or to dismiss his appeal and with

4  no control over how much he would be paid.

5      At most, what the plaintiff's first amended

6  complaint alleges is that Mr. Stewart agreed to object to the

7  *Gannett* settlement, knowing the illicit nature of the

8  Illinois objector enterprise.  Those are the allegations,

9  Judge.

10      But as the *Slaney* court held, simply performing

11  services for an enterprise, even with knowledge of the

12  enterprise's illicit nature, is not enough to submit an

13  individual to RICO liability under Section 1962(c).

14      So because the plaintiff's first amended complaint

15  fails to allege that Mr. Stewart conducted the affairs of the

16  IOE, the Illinois objector enterprise, Counts I and II,

17  sounding and RICO, must be dismissed.

18      Edelson's arguments that Stewart was more than a

19  passive participant in the enterprise failed because the

20  first amended complaint fails to allege anything more.

21      Edelson argues that -- his arguments about

22  Mr. Stewart being a hireling are really a red herring, Judge,

23  because no matter how you characterize Mr. Stewart, you must

24  allege and show that he directed the affairs of the

25  enterprise, and that has not been done.

1      There is another reason, of course, that the

2  complaint must be dismissed against Mr. Stewart, and that

3  goes to the need for the plaintiffs to allege a pattern of

4  RICO activity by Mr. Stewart.

5      And what is singular about the allegations in the

6  first amended complaint with regard to Mr. Stewart is that he

7  is singular.  There is no allegation that he participated in

8  any of the 15 Illinois objector enterprise class action

9  settlements but for the single case that we are here about

10  now, your Honor, the one that's pending in the circuit court.

11      And as the court held in *Slaney*, a "single

12  fraudulent scheme with only one injury to one victim" is not

13  a pattern of racketeering activity under Section 1962(c).

14      Edelson makes an argument based on *Salinas*, a case

15  from 20 years ago, for the proposition that a plaintiff does

16  not have to allege the commission of two or more predicate

17  acts by a defendant in order to state a RICO cause of action.

18      What *Salinas* says is, while you may not have to

19  allege the actual commission of the acts by the defendant,

20  you have to show that the defendant agreed to facilitate

21  those acts.

22      And here, the only acts that are being alleged to

23  have been facilitated or agreed to be facilitated by

24  Mr. Stewart relate to the *Gannett* case.

25      Judge, there are arguments that we make about

1    open-ended continuity and closed-end continuity.  Those cases

2    are very -- RICO cases are very regularly decided on those.

3    The allegations make very clear that this could not be an

4    open-ended continuity.  There is no allegation that

5    Mr. Stewart has agreed to work with the enterprise to file

6    objections in the future.  And, in fact, if you think about

7    it, he'd only have a basis to do that if he was a class

8    member.  And that's not something over which he has control.

9          Nor is this a closed-ended continuity situation,

10   because here, your Honor, the alleged closed -- or the

11   alleged activity took place over a little more than a month.

12         So, your Honor, together, these two grounds, we

13   believe, compel the dismissal of the RICO complaint against

14   Mr. Stewart, and I will leave it at that.

15         THE COURT:  All right.  Thank you.

16         MR. PIOLI:  Good morning again, Judge.

17         Victor Pioli on behalf of Jeff Thut and Noonan

18   Perillo & Thut.

19         Likewise, I join the arguments made by Mr. Bandas'

20   counsel and Mr. Stewart's counsel because I think they do

21   compel dismissal of the case against Mr. Thut and Noonan

22   Perillo & Thut, but I do want to highlight a couple of things

23   that are specific to Mr. Thut and his firm.

24         Specifically, Judge, the allegations against

25   Mr. Thut and his firm are especially thin.  There is

1    really -- when you look at the first amended complaint, there

2    is one predicate act that's pled against Mr. Thut and his

3    firm, and that's located at Paragraphs 162 to 166 of the

4    first amended complaint, and it's an allegation of wire fraud

5    related to Mr. Thut's filing of an objection in a case in

6    Minnesota on behalf of his daughter.

7            As we stated in our briefs, merely filing a

8    frivolous claim is not criminal and doesn't -- is not

9    actionable under RICO. And that's a point that was conceded

10   by the plaintiff in their response brief on Page 20.

11           In addition, this lone predicate act against

12   Mr. Thut is insufficiently pleaded. Nowhere in that -- in

13   the first amended complaint is it stated what statement in

14   that form that was submitted is allegedly false.

15           As support for their claim, they state that

16   Ms. Thut gave a deposition where she stated that, "I'm not

17   sure" and "I don't know." I don't know how that transforms

18   something into a fraud claim, though, Judge. And it's

19   nowhere alleged, once again, what was in that form claim that

20   was false that was submitted by Mr. Thut on behalf of his

21   daughter.

22           So for those reasons, it's not sufficiently pleaded

23   against Mr. Thut and his firm.

24           Further, Judge, this whole -- speaking a little

25   more broadly about the entire alleged scheme that they are

1    claiming in the first amended complaint, this notion that you

2    file an objection that you know is frivolous and it's going

3    to be overruled and then you file an appeal to try to

4    negotiate and extort a high settlement value, it just doesn't

5    apply to Mr. Thut.  And in our reply brief we did attach the

6    affidavit that Mr. Thut submitted in the *Clark v. Gannett*

7    case, and we believe you can take judicial notice of that.

8            And you will see that this whole pattern, Mr. Thut

9    has never engaged in it, and he filed a sworn affidavit to

10   that effect.

11           There is nothing in the complaint to show a case

12   where Mr. Thut participated in this alleged scheme where you

13   file an objection, know that it's going to be overruled, and

14   then try to negotiate a high settlement when it's on appeal.

15   And, in fact, Mr. Thut has testified that he has never

16   participated in such a case, and there is no allegation in

17   the complaint that he did so.

18           So for those reasons, there is no predicate act

19   against Mr. Thut.  He didn't participate in this -- in really

20   the overall scheme.

21           There were a couple of specific arguments that we

22   made in our brief that weren't made by the other defendants.

23   And I want to touch upon those briefly.

24           We move to dismiss the case based on state court

25   and federal court litigation privileges.  In response, the

1    plaintiffs say that it's really just a narrow privilege only

2    applicable to defamation cases.  Judge, I think you will see

3    from the cases that we cited in our brief that it's not so

4    narrowly construed.

5         The plaintiffs are correct.  And actually we cited

6    the case in our reply brief, which states that the litigation

7    privilege cannot bar an abuse of process claim, because

8    obviously an abuse of process claim is based upon conduct in

9    litigation.

10        However, the other claims at issue in this case,

11   including the RICO claim, can and should be barred by the

12   litigation privilege.  We cited the *Christonson* case to that

13   effect where they barred the RICO claim based on a state

14   court litigation privilege.

15        In addition, we moved to dismiss under the

16   Rooker-Feldman doctrine on jurisdictional grounds.

17   Plaintiffs state in their response brief that, since they won

18   the *Clark v. Gannett* case, there can't be an application of

19   the Rooker-Feldman doctrine.

20        I don't agree with that, Judge, because I don't

21   think that's been adjudicated yet.  The sanctions motion is

22   what we were getting at when we moved under the

23   Rooker-Feldman.  That's a separate basis for jurisdiction and

24   a separate basis for appeal.  So that case -- that's still

25   ongoing.

1    And Mr. Vesselinovitch talked about malicious

2 prosecution being an alternate avenue for them to address

3 their wrongs.  And I would also put in there, Judge, there is

4 also Rule 11.

5    And we are going to be in court next week -- in

6 state court -- on July 19th before a judge in state court in

7 the *Clark v. Gannett* case, and we are going to be deciding a

8 Rule 137 motion against Mr. Thut.  So they do have an

9 alternate avenue to pursue their claims.

10    Now, as far as Rooker-Feldman, perhaps we did jump

11 the gun a little bit because we do have to get a decision in

12 that case before there can be application of it.  But at the

13 very least, Judge, there is going to be issue and claim

14 preclusion issues that are going to be raised by the *Clark v.*

15 *Gannett* case and the disposition of that sanctions motion

16 next week.

17    Finally, Judge, I just want to touch upon the other

18 claims in the case.

19    With regard to the All Writs Act, this is, once

20 again, an issue, Judge, where they -- all the allegations are

21 against Mr. Bandas.  They have detailed a litany of cases

22 where Mr. Bandas allegedly engaged in this objectionable

23 conduct, but they don't really allege anything against

24 Mr. Thut which would warrant application of the All Writs

25 Act.

1          As we stated in the affidavit, Mr. Thut has been

2     active.  He has been a practicing attorney since 1984.  There

3     have been exactly five cases where he has filed objections

4     over the course of that time.  It's hardly this egregious

5     case which would warrant application of the All Writs Act, in

6     addition to all the other reasons why it's inapplicable, as

7     counsel has already stated.  But as to Mr. Thut, it's simply

8     not pleaded sufficiently.

9          Finally, with the abuse of process claim against

10    Mr. Thut, the plaintiff concedes that the abuse of process

11    cannot be the filing of a claim.  But they argue in their

12    response brief that the actual abuse of process that they are

13    filing their claim under is the denial of the objections in

14    the underlying case.

15         And, Judge, even if that's true, even if that's

16    what they are moving under, that's not sufficient under

17    Illinois law.  The abuse of -- the process that implicates an

18    abuse of process claim under Illinois law -- and we cited to

19    it in our reply brief -- it has to compel the party against

20    whom it is used to do some collateral thing which he could

21    not legally be compelled to do.

22         And simply, Judge, when you have a denial of a

23    motion, it doesn't compel anybody to do anything.  So that

24    can't be sufficient for an abuse of process claim, and we

25    believe that that claim should be dismissed for that

1  additional reason.

2  And if there aren't any other questions from the

3  Court, I will turn it over.

4  THE COURT:  Thank you.

5  MR. PIOLI:  Thank you.

6  THE COURT:  And for the plaintiff.

7  MR. TIEVSKY:  Thank you, your Honor.

8  So I would like to step back to start and kind of

9  respond to all of defendants' arguments, but I'd just like to

10  give an overview of who these defendants are and what it is

11  they actually do.

12  So Bandas is the country's most prolific serial

13  objector.  He has done this, we think, close to 100 times.

14  And he is well-known to the federal courts across the

15  country.  If you will permit me, I have got some quotations

16  from federal courts in written opinions.

17  "Bandas routinely represents objectors purporting

18  to challenge class action settlements and does so not to

19  effectuate changes to settlements but does so for his own

20  personal financial gain."  That's *In Re: Cathode Ray Tube*

21  *Litigation*, Northern District of California, 2012.

22  "Mr. Bandas said that he was willing to wager that

23  Mr. Reid's client would glady pay him somewhere in the

24  neighborhood of $400,000 to make his objection go away.

25  Otherwise, he could hold up the settlement process for two to

1    three years through the appeal process."  That's *In Re:*

2    *Hydroxycut Marketing and Sales Practices Litigation*, chief

3    judge of the Southern District of California, 2013.

4          And finally just a few months ago, "Bandas'

5    behavior throughout this proceeding has been unfitting for

6    any member of the legal profession."  That's *Garber* against

7    *Office of the Commissioner of Baseball*.

8          He does this all over the country.  Here is what he

9    does.  He has got several different enterprises.  The one

10   involved in this case is here in Illinois.  He recruits

11   associate attorneys, people like Mr. Thut and Mr. Palmer, who

12   has not appeared.  They find class members in settlements who

13   are willing to take a bribe to submit a sworn statement that

14   they are objecting to a settlement.  They file a boilerplate

15   objection signed by the objector.  They don't fight it that

16   hard in court.  They don't because they can't win.  If they

17   win, this doesn't work.  The reason for that is that Rule 23

18   requires that courts approve withdrawals of objections.  So

19   they have got to make sure they get overruled.

20         Once they get overruled, they appeal.  They get in

21   touch with class counsel, and they say exactly what

22   Mr. Bandas said in *Hydroxycut*.  Pay us or we are going to

23   hold this up for years in the appellate courts.

24         At this point class counsel's back is against the

25   wall.  They have got a fiduciary duty to their class.  They

1    have got -- the court has approved their fees and found them

2    reasonable.  And they have got someone saying, pay us and

3    we'll go away.

4           You know, it used to be -- people have been doing

5    this for years.  It used to be they would ask for $5,000.

6    They would ask for $10,000.  You know, it's like the patent

7    trolls, right?  It's kind of a cost of doing business.  It's

8    still extortion.  You still don't feel good about it, but you

9    pay it.

10          Mr. Bandas started asking for -- half a million

11   dollars is his first demand.  That's got to end.

12          So with that, I will get into the legal arguments.

13          THE COURT:  Let me back up to that question,

14   though.

15          Why doesn't Mr. Edelson and others on the other

16   side of the table just say:  No.  I'm not going to pay you a

17   dime.  We will go ahead -- I mean, obviously there are issues

18   with respect to fiduciary duty to class members.  But why not

19   at some point or another blow the whistle on this man by

20   waiting for the Court of Appeals to actually look at the

21   objections and see how frivolous they are?  Because they are

22   frivolous.  I have seen -- I have had them in my own cases.

23          MR. TIEVSKY:  The problem is -- so, for example, in

24   the Ninth Circuit it can take three years to get an appeal

25   resolved.  We've got class members calling our office every

1    day asking, "Where is my money?"  So eventually -- you know,

2    yes, you could wait it out.  But you shouldn't have to,

3    right?

4         When somebody is exerting serious, serious economic

5    fear, fear of economic harm in that you are going to have

6    to -- you have got -- you know, your firm is expecting money;

7    your class members are expecting money; and they are not

8    getting it because of this wrongful action, I don't think you

9    have to tell them no and litigate -- you know, basically give

10   in to their demands.  When the mob comes to your house and

11   says, we are going to burn down your liquor store if you

12   don't pay us, you don't have to let them burn down your

13   liquor store.  It's not that different here.  Yeah, you could

14   say no, but then this really, really bad consequence is going

15   to happen.  That's what they do.

16        THE COURT:  All right.  You wanted to return.  Go

17   ahead to the beginning of your argument.

18        MR. TIEVSKY:  Sure.  So I will start with

19   jurisdiction, then immunity, and then get into the

20   substantive RICO arguments.

21        So as far as jurisdiction is concerned, there is

22   federal jurisdiction in RICO cases unless they are

23   extraordinarily frivolous.  We are talking about -- I think

24   the example the Seventh Circuit has given is saying that

25   bananas are securities so that you can get into court on

1  federal securities laws.

2       That's not what's going on here.  These are --

3  obviously the Court will decide if we win or lose on RICO,

4  but they are not outlandish, frivolous allegations by any

5  stretch.

6       We have also alleged more than $5 million in

7  damages here.  We have alleged 12 attempted extortions.  If

8  you do the math, as we did in our response brief, with the

9  treble damages from RICO and/or punitive damages, which are

10  authorized by Illinois law in the abuse of process context,

11  there is enough here to get us over the $5 million minimum

12  for CAFA jurisdiction.

13       Rooker-Feldman doctrine, there is not a whole lot

14  to be said on this.  It's a very narrow doctrine.  They talk

15  about the proceedings in the state court case, but we are not

16  a party to the state court case.  Our clients have a

17  sanctions motion proceeding against Mr. Thut, but we do not

18  have anything pending in state court against any of these

19  defendants.

20       In any case, there is no request to upset any state

21  court judgment.  No state court loser here.  Rooker-Feldman

22  just doesn't apply at all.  I think that should take care of

23  jurisdiction.

24       As far as immunity is concerned, so all the

25  defendants here make this argument about the Noerr-Pennington

1    doctrine, which is a First Amendment-based doctrine.  It

2    basically says you have this First Amendment right to

3    petition the government.  That includes courts.  And we don't

4    want to impinge upon that.

5         But there is two reasons why it just does not make

6    sense here.  The first of which is that they try as hard as

7    they can, as your Honor mentioned at the beginning of this

8    discussion, to keep this away from the courts.  They have got

9    confidentiality provisions.  In fact, in the sham mediation

10   in *Gannett* when we said that we were going to bring it before

11   the court, that's when Mr. Bandas hired his counsel to tell

12   us not to do it.

13        You can't -- it doesn't make any sense to say on

14   the one hand, oh, we have this right to petition the

15   government, so we are immune from suit; and on the other

16   hand, to try as hard as you possibly can to make sure the

17   government never finds out what you are doing.  That's simply

18   not -- it does not make sense as far as that First Amendment

19   right is concerned.

20        There is a second separate reason, which is the

21   sham litigation exception.  They cite the test from

22   *Professional Real Estate*.  The Seventh Circuit has not yet

23   decided on this, but every other circuit that's looked at

24   this -- and that is the Ninth, Fourth, Second, and Third --

25   have looked at this and said, that test applies when you are

1    talking about a single lawsuit.  You look at whether that

2    single lawsuit is objectively baseless.  But that test

3    doesn't work for a pattern of litigation because you have to

4    look at the whole picture of a pattern of frivolous

5    litigation.

6            So when you have got a pattern of litigation, as we

7    absolutely allege here -- and Mr. Bandas even concedes that

8    on Page 25 of his response -- or sorry; of his motion, that

9    there is a pattern of activity here -- you use a holistic

10   test.  You are looking at the win-loss ratio.  They always

11   lose.

12           I should mention that that's not just, we have

13   alleged a bunch of cases where they lose in our complaint.

14   There was some discussion earlier that Mr. Bandas says that

15   sometimes he does not lose.  That's very, very misleading.

16   Mr. Bandas is sometimes involved in cases where objections

17   are sustained on appeal.  In those cases, he has objected.

18   He appeals.  He does nothing.  The real objectors, the *bona*

19   *fide* objectors, the ones who actually want to change the

20   settlement, they are the ones who write the briefs and do the

21   argument and do the actual work.  Mr. Bandas just sits back

22   and takes credit later.

23           THE COURT:  Has Mr. Bandas ever argued one of his

24   objections to a Court of Appeals?

25           MR. TIEVSKY:  I don't know, your Honor.  I have not

1  seen any case where he has.  My review of his objections,

2  every time they have gone up to a Court of Appeals it's been

3  somebody else.  I think his associate may have argued and

4  lost one in the Eighth Circuit.  And in that case, they

5  had -- the class counsel refused to pay them or refused to

6  discuss paying them.

7  THE COURT:  Okay.  Let's talk about that case.

8  In that case, he filed an objection.  His associate

9  argued the objection on appeal.  Class counsel declined the

10  extortionate demands.  And the Eighth Circuit overruled his

11  objections.  Is that right?

12  MR. TIEVSKY:  The Eighth Circuit affirmed.

13  THE COURT:  They approved the settlement and thus

14  overruled any objections.

15  MR. TIEVSKY:  That's correct.

16  THE COURT:  All right.  Go ahead.

17  MR. TIEVSKY:  And that's the one where the

18  objection was filed on behalf of Mr. Thut's daughter, who was

19  purportedly *pro se* but actually represented by Thut and

20  Bandas.

21  THE COURT:  Mr. Bandas -- let's go back to

22  Mr. Bandas' role in that.

23  He filed the objection.  Did he and Mr. Thut's

24  daughter sign the objection?

25  MR. TIEVSKY:  Mr. Thut's daughter signed the

1   objection herself.

2          THE COURT:  She signed it herself.

3          And the brief on appeal -- did he sign the brief on

4   appeal?

5          MR. TIEVSKY:  I believe his associate signed his

6   brief on appeal.

7          THE COURT:  I know because there was a flavor in

8   your brief about Mr. Bandas being relatively slippery about

9   filing appearances.  He would not get admitted or not show up

10  or not actually be physically in the courtroom.

11         MR. TIEVSKY:  That's almost always true.  He is

12  extremely slippery about filing appearances.

13         In fact, this is what happened in the *Gannett* case.

14  Mr. Bandas -- the first paragraph of his reply brief in this

15  case is, oh, Judge Meyerson didn't sanction me.

16  Judge Meyerson didn't sanction him because he didn't sign

17  anything.  And under Illinois Supreme Court Rule 137, you

18  can't get sanctioned unless you sign something.  That's the

19  third time in the third different state that he has gotten

20  off that same way.  He has done it in California.  He has

21  done it in New York.  And then he did it again here in Cook

22  County.  Yes, he is extraordinarily slippery in that regard.

23         The times that he has appeared -- one time in the

24  Western District of Washington, he had his *pro hac* revoked

25  for willfully failing to post an appeal bond, which was

1    entered against him.  This is -- his standard practice is to
2    avoid appearing.
3           Now, in the appellate courts he will sometimes
4    appear, maybe even frequently.  And part of the reason for
5    that, I think, is that he judges, perhaps correctly, that the
6    appellate courts are not interested in hearing -- they are
7    interested in hearing about the case in front of them and not
8    hearing about his pattern of activity.
9           So as far as the sham litigation exception is
10   concerned, his poor win-loss ratio, as I discussed; the
11   enterprise's bad faith, plenty of evidence of bad faith here,
12   including their actual attempts to extort us; and then
13   collateral harm.  There is lots of collateral harm here.
14   There is harm to the class members.  There is harm to the
15   judicial system.
16          The Seventh Circuit has recognized -- this as
17   *Vollmer v. Selden* -- that what they do is not okay.  It is
18   extortion, and it has numerous consequences across the
19   system.
20          Touching briefly on the last immunity doctrine
21   here, federal and state litigation privilege.
22          Federal litigation privilege may or may not even
23   exist.  The Seventh Circuit has not conclusively said that it
24   does.  But if it does, it relates to defamation.  Attorneys
25   are privileged from potentially defamatory statements that

1   they make in the course of litigation.

2           Illinois has extended this a little bit to say that

3   if you take your defamation claim and you dress it up as

4   something else, like intentional infliction of emotional

5   distress or some other kind of claim, but really what you are

6   getting at is defamatory statements, then you are protected

7   there, too.  This case has nothing to do with anything like

8   that.  There is no alleged defamatory statements about

9   Edelson or about anybody else here.

10          Mr. Thut makes a little bit of a strange argument

11  about this.  In his motion to dismiss he says he is only

12  alleging state litigation privilege with regard to the state

13  law claims.  In his reply he says actually it doesn't apply

14  to the state law claims.  I'm arguing it for everything.  So

15  I think it is probably waived.  I don't really understand

16  what he was doing, frankly.

17          So that gets into the substantive allegations here,

18  the largest of which is RICO.  RICO, as we discussed, is

19  conduct of an enterprise through a pattern of racketeering

20  activity.

21          Thut and Bandas only really dispute the

22  racketeering activity part of it, and Mr. Stewart says that

23  he touches on conduct.  Most of his arguments are on pattern,

24  and I will discuss that at the end.

25          So the main argument here that they are all making

1   is that, oh, these things might be bad.  They might be

2   ethical violations.  They might be sanctionable, but they are

3   not crimes.  We disagree.  They are crimes.  They are

4   felonies.  They are extortion, bribery, obstruction of

5   justice, money laundering.  All of these federal crimes that

6   their conduct meets the elements of.

7          So I'm going to start with extortion.  As I

8   mentioned before, the Seventh Circuit in *Vollmer* said

9   straight out, citing the Black's Law definition of extortion,

10  that in the context of a class action settlement, when you

11  intervene or object with a purpose of demanding money to go

12  away, that is improper and that is extortion.  I understand

13  that that is not in the Hobbs Act context or the RICO

14  context, but I would argue that it's very persuasive as far

15  as the sort of idea of what it is they are doing.

16         And also to your Honor's point earlier about, well,

17  couldn't Mr. Edelson just walk away?  The Seventh Circuit is

18  saying he doesn't have to.  We don't have to walk away.  They

19  are extorting us.  We have a right not to be extorted by

20  defendants or by anybody else.

21         They don't really make any arguments in their brief

22  regarding whether or not the fear here is enough for

23  extortion.  Fear of significant economic harm, as the Seventh

24  Circuit has held, is enough.

25         They do say that they can't be extorting because

1  they have a claim of right to this money.  A claim of right

2  doctrine basically says you can't extort something that's

3  yours or that reasonably you think could be yours.  And that

4  makes sense.  You don't want every lawsuit to turn into a

5  federal extortion case.

6         But here the idea that they think they are entitled

7  to this money or could reasonably think that they are

8  entitled to this money doesn't make sense.

9         First of all, as I said, you have got *Vollmer*

10  saying that it is not proper for objectors to get paid when

11  they don't benefit the class.  They dress this up as kind of

12  a fiduciary duty argument.  We agree with both defendants and

13  with your Honor.  They don't have a fiduciary duty to the

14  class.  Absolutely not.  But that doesn't mean that they are

15  entitled to get paid hundreds of thousands of dollars for

16  attorneys' fees.

17         In this country clients pay their own attorneys'

18  fees.  We have the American rule.  You have to have a reason

19  to ask for attorneys' fees from the other side.  There are

20  three.  You can have a contract.  There is no contract here.

21  You can have a statute.  Again, there is no statute here.  Or

22  you can have a common law rule.  And there is one here.  It's

23  the common fund doctrine.  It says, if you are an objector

24  and you provide a substantial benefit to the class, you can

25  ask the court to be compensated for that.  But when you don't

1    provide any benefit to the class or, frankly, any benefit to

2    your client, then you have no grounds to ask for money for

3    any reason.

4         The rest of their arguments involve policy.  They

5    say over and over again -- Mr. Bandas' attorney got up here

6    and talked over and over again about litigation.  This isn't

7    litigation in the traditional sense.

8         In their brief they say, a nonfrivolous claim in

9    hope of getting paid.  There is no claim here.  There's no

10   complaint.  There's no document that they file that could

11   reasonably be used in a court to demand money from somebody.

12   What they filed is an objection to a class action settlement.

13   They say, this settlement is bad, your Honor.  You shouldn't

14   approve it.  It's unfair.  The attorneys are getting paid too

15   much.

16        The paradigm of objections, the whole idea of them,

17   doesn't allow for the single objector to demand money for

18   themselves.  There is no legal basis in the -- you don't have

19   to read past the word "objection" to understand that it's not

20   the kind of document that allows you to demand money.

21        Mr. Thut says that he wasn't involved in this at

22   all extortion-wise or anything else.  I would point the Court

23   to Paragraph 216(e), which is on Page 72 of the complaint,

24   which is our detailed allegation that Mr. Thut participated

25   very deeply in the management and operation of the objector

1    enterprise here in Illinois.

2         Moving on to the next predicate act, unless the

3    Court has questions about extortion.

4         THE COURT:  No.  That's fine.

5         MR. TIEVSKY:  Is bribery.  And it's really simple,

6    as the Court alluded to earlier.  You can't pay your clients,

7    and you especially can't pay your clients to file sworn

8    statements or make testimony in a court.  It doesn't matter

9    why you are paying somebody to testify in a court.  If it's

10   not authorized by law, it's bribery.

11        So the law authorizes paying experts.  The law

12   authorizes the United States Attorney to offer inducements to

13   witnesses to testify in criminal cases, right?  They can

14   offer immunity or recommendations for a sentence reduction.

15   But you can't pay a fact witness.  You can't pay your client

16   to submit a sworn statement in connection with a case.

17        And here, our allegation is that they agreed to pay

18   Mr. Stewart and Mr. Stewart agreed to accept a sum of money

19   to sign a sworn statement along with his objection that is

20   testimony to a court.  Under the very clear language of the

21   statute, that's bribery.  It's conspiracy.  It's an agreement

22   to do that.  And it's something in which all three of the

23   defendants over here were involved in.

24        As far as money laundering is concerned, I think

25   that the defendants are a little bit confused about what we

1    are alleging here.

2            There is more than one type of money laundering.

3            First of all, the idea that money laundering must

4    have to do with drugs, there is no basis for that.  The type

5    of money laundering here is the promotion type.  And the

6    elements are -- this is *United States v. Malone*, Seventh

7    Circuit, that the defendant conducted a financial transaction

8    with the proceeds of illegal activity.  We allege that they

9    paid a mediator $2500 with the proceeds of previous

10   extortionate endeavors.  That they knew that the property

11   represented illegal proceeds.  We say that that's how

12   Mr. Bandas makes all his money, so he knew that that's where

13   it came from.  And that they conducted the transaction with

14   the intent to promote the carrying on of the unlawful

15   activity.  And here the sham mediation is a key part of this

16   because it's what they used and they believe that they can

17   use to keep what they are doing a secret to keep it away from

18   the courts so that nobody ever finds out that they are

19   extorting people.

20           They say, "Congress did not intend to convict

21   attorneys using prior settlement funds to pay for a

22   mediation."  There is no citation for that.  That's just a

23   statement of counsel in Mr. Bandas' reply brief.  I don't

24   know where it comes from.  It's flatly contradicted by the

25   statute itself.

1          As far as mail and wire fraud is concerned, it is

2     true that when the mail and wire fraud is the only allegation

3     that you are making with regard to RICO, then that's not

4     enough.  But we cite several cases in our brief that discuss

5     that when the mail and wire fraud is part of a larger

6     fraudulent scheme, then it doesn't matter that it's part of

7     litigation.

8          Bandas' other comment that he makes is that

9     Mr. Stewart's sworn statement or the statement is that they

10    are making a good faith objection, that that's mere puffery.

11    The fact that the objection is in good faith is required by

12    federal law.  Rule 11 prohibits filing papers not in good

13    faith.  It is not puffery to say that the objection is in

14    good faith if it is a key component to filing a real *bona*

15    *fide* objection.  It's a lie.  It's not true.  It's all a

16    fraud.

17         Quickly with regard to obstruction and witness

18    tampering, those are based mainly on the bribery.  So both of

19    those are based on the fact that they pay their clients in

20    order to get testimony, in order to get the testimony that

21    they want.  And that is not allowed.  As I said, you can't

22    pay your client.  You can't pay fact witnesses.

23         In a class action context, there have been

24    attorneys who have gone to prison for paying their clients

25    under RICO.  In fact, it's not an accepted practice by any

1    stretch.

2            Moving on to malicious prosecution, it's very

3    strict elements in Illinois.  It requires an original

4    judicial procedure -- original judicial prosecution.  A

5    sanctions motion is not even good enough.

6            Here, as I said before, they are not filing a

7    complaint.  The there is no lawsuit between the objector and

8    class counsel.  Malicious prosecution -- we didn't bring the

9    claim because we looked at it, and we determined that

10   probably we would not win.  The proper method to deal with a

11   criminal enterprise like they are involved in is RICO.

12           With regard to Mr. Stewart, he challenges the

13   conduct element, saying over and over again that he doesn't

14   manage the enterprise.  The rule is operated or managed the

15   enterprise.  You can operate an enterprise from the lower

16   rungs of it, too, especially -- especially if you are being

17   bribed to do so.

18           That's what's going on here.  It doesn't work

19   without Mr. Stewart there to sign the objection, to give them

20   his claim form, to do the things that they need him for.  The

21   idea that he is providing them a service and therefore gets

22   off -- if he is providing his attorneys a service, that's him

23   taking a bribe.  You can't provide your attorneys a service

24   so that they can make money in an enterprise.

25           And the idea that he didn't know anything about

1   this, many of the objectors don't, which is why some of the

2   allegations in the class action complaint are like they are.

3   Mr. Stewart does.  He has been friends with Mr. Palmer for

4   many, many years.  He is well aware of what Mr. Palmer does,

5   what Mr. Bandas does and how this all works.  That is also in

6   our complaint.

7        He also challenges pattern.  We tried to give him

8   the benefit of the doubt about this.  In his motion to

9   dismiss in the memorandum he says he is adopting Mr. Bandas'

10   arguments about jurisdiction.  But in the short motion he

11   says he is adopting most of the briefs.  We took the smaller

12   one.  In his reply he insisted he was adopting the whole

13   thing.  Mr. Bandas concedes that there is a pattern of

14   activity here.  That pretty much waives it for Mr. Stewart.

15        But in any event, the Supreme Court answered the

16   case in *Salinas*.  He didn't have to be personally involved in

17   more than one predicate act.  When you get involved in a RICO

18   conspiracy like this knowing what you are doing, you are

19   involved in the whole thing.

20        So in *Salinas* the deputy had only taken one, two

21   small bribes, but he agreed to facilitate this sheriff's sort

22   of larger scheme of accepting bribes, and I think he was

23   helping people get contraband in the prison.  The sheriff did

24   it a bunch of times.  The deputy is only accused of having

25   done it once, but that's enough because the whole point of

1  RICO is to recognize that criminal enterprises are damaging,

2  and being involved in one -- that's the conspiracy part --

3  being involved in one of them just once is enough to convict

4  someone of conspiracy or to hold someone liable for

5  conspiracy in the civil context.

6          So wrapping up, their theme on this whole thing is,

7  deal with this with sanctions.  Deal with this with

8  professional responsibility.  Deal with it another way.  It

9  doesn't work.  It especially doesn't work on Bandas.  He gets

10  away every time because he doesn't sign stuff.  He is the man

11  behind the curtain pulling the strings.

12          But more importantly, we don't have to.  Congress

13  has given private litigants the right to go after people who

14  are involved in a criminal enterprise and who injure them.

15  And that's exactly what's going on here.  They have set up a

16  criminal enterprise.  They used it to injure us and a whole

17  bunch of other people, and we would like it to stop.  And for

18  that reason, the motion to dismiss should be denied.

19          THE COURT:  Thank you.

20          Any rebuttal, Mr. Vesselinovitch?

21          MR. VESSELINOVITCH:  Judge, I could be brief.

22          I think my main -- first of all, I think I can

23  speak for everyone here to thank you for your time and

24  attention to this motion.  It's important to both sides of

25  the case.

1       My main purpose here is to answer any questions or

2   lingering questions you have.  But if not, I just have two or

3   three relatively quick points I could make.

4       THE COURT:  Okay.

5       MR. VESSELINOVITCH:  The first one is that I was

6   listening to the argument very carefully, and I think one

7   thing that came through was that all of the conduct that's

8   alleged here, all of the conduct that forms a basis for this

9   complaint arises in the context of litigation activities and

10  litigation settlements and negotiations to reach settlements.

11      Some of the conduct they allege is improper.  They

12  allege it's offensive.  They allege it may violate Rules of

13  Professional Conduct.  They even suggest, I think pretty

14  explicitly, that it's unethical.  But none of it's criminal.

15  You are not working on a clean slate here.  There is case

16  law, and there is good case law that's addressed this.

17      And the *Vollmer* case, just very briefly, was a 2003

18  Seventh Circuit case that, as counsel correctly pointed out,

19  had nothing to do with RICO and had nothing to do with Hobbs

20  Act.  And that's why I have hounded a little bit on cases

21  that have dealt with Hobbs Act and have dealt with mail and

22  wire fraud in this contest.  Unlike *Vollmer,* I find the law

23  in the Southern District of New York case and by *Pendergraft*

24  in the circuit court -- I think it was Fifth -- those cases

25  address this situation in this setting in the context of

1  litigation activity, settlements, malicious prosecution, and

2  none of them have sustained this as criminal predicate acts

3  to sustain a civil RICO.

4  Another quick point I want to make is just on the

5  money laundering, I have one more thing to say.  I think it's

6  an absurd predicate, frankly, and I don't say that lightly.

7  They are alleging that the settlement funds that

8  Mr. Bandas received from prior litigation, funds which were

9  received with the consent and approval of the prior settling

10  party constituted illegally obtained funds, and that then the

11  Bandas defendants used those funds to pay a mediator's fee in

12  a separate litigation, and that amounts to money laundering.

13  It's silly.  It's not -- it's a frivolous predicate.

14  And really I think the only other thing I would say

15  is that no one -- I think the *Pendergraft* case is very, very

16  instructive.

17  When that Court of Appeals, which is the --

18  THE COURT:  Eleventh.

19  MR. VESSELINOVITCH:  -- Eleventh Circuit -- sorry

20  about that -- talks about a little bit of the policy

21  considerations here and why this should not be criminalized.

22  And they are saying they are troubled by any use of this

23  federal criminal statute that is RICO to punish civil

24  litigants.  "Sanctions for filing lawsuits, such as malicious

25  prosecution, lead to collateral disputes and 'a piling of

1    litigation on litigation without end.'"

2           "Allowing litigants to be charged here with

3    extortion would open yet another collateral way for litigants

4    to attack one another.  The reality is that litigating

5    parties often accuse each other of bad faith.  The prospect

6    of such civil cases ending as criminal prosecutions gives"

7    that court pause.

8           And they didn't accept these kinds of activities as

9    viable predicate acts under either the Hobbs Act, under the

10   mail fraud, or the wire fraud statute.

11          So that's really all I had to say.  And we think

12   for these reasons and the reasons in our brief, we think the

13   RICO case should be dismissed at this point with prejudice,

14   the RICO conspiracy should be dismissed with prejudice, and

15   that the case lacks subject matter jurisdiction for that

16   reason, because it doesn't amount to diversity.

17          THE COURT:  Okay.  Just a couple of questions.

18          I know you said earlier that a RICO action is not a

19   way to remedy whatever it is plaintiff believes Bandas is

20   doing wrong, and instead there could be, for example, a

21   professional responsibility allegation or malicious

22   prosecution.  I am hearing from counsel that that won't work.

23          Are you confident that a malicious prosecution

24   complaint in this case would not be dismissed?

25          MR. VESSELINOVITCH:  I'm not confident of that.

1    And, frankly, I'm not at all suggesting here or conceding for

2    a minute, frankly --

3             THE COURT:   That there is any malicious

4    prosecution.

5             MR. VESSELINOVITCH:   -- that there has been

6    malicious prosecution and, far less, unethical conduct.

7             And the reason I say that is that, look, we may not

8    like the law.  We may not like the rules.  But here is what

9    it is:  Mr. Bandas and his law firm do not have a fiduciary

10   duty to the class.  That's number one.  They don't have that.

11   And their only fiduciary duty is -- and they don't have a

12   fiduciary duty, of course, to the Edelson law firm.

13            What they have a fiduciary duty to is their

14   objector, their objector client.  There isn't a single

15   objector griping about Mr. Bandas or the law firm.  That's

16   not at stake here.  No one has come forward to gripe about

17   whom he has represented, and they are not alleging so.

18            The second point is, if this really amounts to some

19   kind of tort action, they can bring it.  Nothing is stopping

20   them.  Whether it would survive or not, I'm not conceding

21   that it would because we think that it may or may not.  But

22   we don't want for a second for the Court to believe that we

23   think any of this was unethical.  The rules allowed it.  And

24   his fiduciary duties were limited to the objectors he

25   represents and to no one else.

1    THE COURT:  The fact that they are not complaining

2  doesn't move me.  They are not harmed.  The person that's

3  harmed here is -- according to the allegations of the

4  complaint, Edelson and the people he represents are harmed.

5  So why would -- the objectors have nothing to complain about.

6  They are not being harmed.

7    MR. VESSELINOVITCH:  Well --

8    THE COURT:  And, you know, there is something

9  distasteful about saying, you know, this may sort of be

10  improper.  It may even be unethical, but there are policy

11  reasons that we shouldn't allow litigation to right that

12  wrong.  That's really what the argument amounts to.

13    MR. VESSELINOVITCH:  The argument really amounts

14  to, is this criminal activity?  Is it criminal?  That's what

15  they are saying it is, because all the predicates they allege

16  criminalize this activity.

17    THE COURT:  Well, that's the only way to proceed on

18  a RICO claim.

19    MR. VESSELINOVITCH:  And, frankly, it's either

20  viewed as criminal or it isn't.  But the courts that have

21  addressed this issue -- all of them that we could find have

22  not crossed that line.  They have said, you can call this

23  what you want.  You can treat it any way you wish.  It's not

24  criminal mail fraud.  It's not extortion.  It's not -- I

25  couldn't see any bribery or obstruction of justice or witness

1    tampering support for any of this.  And the courts that have

2    addressed it and wrestled with it have just about uniformly

3    turned this down.

4         THE COURT:  Well, there haven't been other cases

5    like this one.

6         MR. VESSELINOVITCH:  Well, I think *FindTheBest* is

7    close.  It's patent trolls.  And they were even more

8    aggressive.  They were telling -- they claim that they had --

9    you know, these patents, they were threatening to go to the

10   defendants' -- to the plaintiffs' customers.  They are

11   threatening to up the ante if they didn't settle.  There was

12   no allegation that they were holding these patents in good

13   faith.  In fact, there was some allegation that they were

14   doing it with wrongful intent.  And Judge Cote turned it

15   down.  She turned it down as a criminal -- as amounting to

16   criminal activities.  And I think -- you know, it's not -- it

17   wasn't reviewed, I don't think, by the Second Circuit, but I

18   think her analysis is sound.  I think it's correct.

19        THE COURT:  And what ended up happening in that

20   case?  So the court says it's not a RICO violation to bring

21   baseless claims of patent infringement on behalf of a troll.

22   So what's happening now?  Is that troll continuing its

23   activities?

24        MR. VESSELINOVITCH:  I don't know.  I don't know

25   the answer.

1    THE COURT:  I am curious about that because I guess

2    I am back to where I began and where I think plaintiff's

3    counsel ended up as well.  They are saying they just want it

4    to stop.  I am not hearing that it's going to stop.

5    MR. VESSELINOVITCH:  Well, I will tell you how it

6    could stop if you want my view.

7    THE COURT:  I would love to hear your view on this.

8    MR. VESSELINOVITCH:  It could stop by amending the

9    federal rules with respect to class actions.  The federal

10   rules could be amended tomorrow if Congress wanted to.  But

11   this kind of conduct is allowed under the rules.

12   Now, if they didn't want to allow it, they could

13   amend the rules in 30 days, not that I'm optimistic about

14   Congress doing anything in 30 days.  Don't get me wrong.  But

15   that's the answer.  The answer is, if there is a gap in a

16   rule of procedure, you fix it.  You fill the gap.  And they

17   can do that.

18   THE COURT:  The rules -- I'm somewhat familiar with

19   the rules-making procedure in the federal courts.  It's not

20   30 days.  It's not one year.  It's years.  It's a process

21   that is ridiculously arduous.  And after it's complete, there

22   is a long period of time in which people can make objections.

23   And after that, Congress nevertheless gets to vote up or

24   down, or if they fail to vote down, then they become rules.

25   It's very, very complicated.

1       In the meantime, I suspect, from what I'm hearing,

2   Mr. Bandas goes on about this activity of filing what

3   plaintiffs believe -- and I haven't heard to the contrary --

4   are essentially -- well, we are adopting the allegations of

5   the complaint -- objections that are intended for no purpose

6   other than to get some of the money out of class counsels'

7   pockets and not necessarily into the hands of the class

8   members -- that's a goal we can all applaud -- but into the

9   hands of another lawyer, who really didn't do much of

10  anything on the litigation itself.  That's really what the

11  allegation is.

12      MR. VESSELINOVITCH:  Yeah, but, you know, you

13  can -- I think that a lot of class objectors, whatever their

14  motive is, whatever their counsel's motive is, they serve a

15  purpose.  And either they serve a purpose or they don't.  But

16  the courts have recognized they serve a purpose, and that is

17  to keep the class counsels' noses clean with respect to the

18  cut they take for their attorneys' fees.

19      THE COURT:  How about this argument?  How about

20  this argument?  It actually makes things worse because the

21  plaintiffs' attorneys, knowing that Bandas and his ilk are

22  going to be involved, will actually need a larger share of

23  the settlement proceeds in order to insure themselves against

24  this activity.

25      MR. VESSELINOVITCH:  Well, I get back to the point

1    you raise and I made before.  They can turn them down.  They

2    can turn them down.

3              THE COURT:  Well, they did at least in one of the

4    Eighth Circuit cases.

5              MR. VESSELINOVITCH:  They can just say no.  They

6    can just say no.  And I think that there is nothing stopping

7    that other than convenience.

8              THE COURT:  All right.  Anything further?

9              MR. VESSELINOVITCH:  I wanted to thank you for your

10   time and attention to the case.  Thank you very much.

11             THE COURT:  I think it's a fascinating case.

12             MR. VanPUYMBROUCK:  Your Honor, there are a couple

13   of quick points I wanted to make very shortly.

14             THE COURT:  Mr. VanPuymbrouck, sure.

15             MR. VanPUYMBROUCK:  I just wanted to make sure that

16   the Court was clear.  There was a comment that Mr. Stewart's

17   opposition was not mostly based on conduct but on pattern.  I

18   think what I presented to this Court this morning was all

19   about conduct initially; that is, that they do not allege

20   that he conducted the affairs of the enterprise.

21             THE COURT:  Your argument was conduct.  It relates

22   to the fact that he did not direct the affairs of this

23   enterprise.  He was involved in a few little activities.

24             MR. VanPUYMBROUCK:  And the other thing I would say

25   is they talked about cases that say that even lower-rung

1    participants can conduct the affairs of an enterprise.  They

2    don't allege it here.  Even though Mr. Stewart was on a lower

3    rung, they do not allege that he conducted the affairs of

4    this enterprise, and that's why this case should be dismissed

5    against Mr. Stewart.

6         The last thing I will say, there was an argument

7    that Mr. Stewart -- and I didn't quite understand it, to be

8    honest with you -- had somehow waived his pattern argument.

9    But I would submit to you, to the extent that Mr. Stewart has

10   adopted any of the arguments made by the Bandas defendants,

11   it's with a recognition that the Bandas defendants have not

12   conceded that there is a pattern of activity here.  There is

13   no concession admission in their papers, so there could be no

14   waiver.

15        THE COURT:  Is Mr. Stewart continuing with the

16   process that's alleged here?

17        MR. VanPUYMBROUCK:  Well, it's been -- you know,

18   there is a parallel proceeding in the circuit court that's

19   ongoing.  So his --

20        THE COURT:  The circuit court case that's up for

21   next week.

22        MR. VanPUYMBROUCK:  Right.  Exactly.  So that

23   continues.

24        Thank you, Judge.

25        THE COURT:  Thanks.

1        Did you want to say anything on behalf of Mr. Thut?

2        MR. PIOLI:  I would, Judge, just very briefly.

3        THE COURT:  Sure.

4        MR. PIOLI:  I would say with regard to the parallel

5   state court proceedings, the only thing that's left in that

6   case is a Rule 137 motion against Mr. Thut.  There is nothing

7   pending with relation to Mr. Stewart, and there is nothing in

8   relation to Mr. Bandas.

9        And I would like to add that, you know, there is a

10  lot of talk about filing frivolous claim forms and

11  objections.  They had an opportunity to contest that in the

12  *Clark v. Gannett* case, and they chose not to proceed on it.

13       Rule 137 is the same as Rule 11.  You can proceed

14  on -- you know, it's objectively unreasonable, frivolous, or

15  is filed for an improper purpose.  They didn't challenge it

16  as objectively unreasonable.  The only thing they are

17  bringing against Mr. Thut is that he filed it for an improper

18  purpose.

19       So this notion that -- you know, they had an

20  opportunity to say that it was frivolous and unreasonable and

21  they didn't take it, and now they want to allege it in this

22  courtroom, and it's improper, Judge.

23       But the other thing I wanted to touch on, Judge,

24  counsel mentioned about Paragraph 216(e) of the complaint.

25  That's just a conclusory allegation, Judge.  I stand by what

1  I said earlier.

2      The only predicate acts that are pleaded against

3  Mr. Thut are located in Paragraphs 162 to 166 of the

4  complaint, and they are wholly insufficient to state a claim

5  for mail or wire fraud.

6      And then finally, I just want to touch on the state

7  law litigation privilege.

8      Contrary to what counsel said, it's not limited to

9  just defamation cases or cases where a defamation claim is

10  dressed up as something else.  If you look at the case that

11  we cite, *O'Callaghan v. Satherlie* -- it's an Illinois

12  appellate court case from 2015 -- it explicitly states that

13  the privilege is not limited solely to causes of action for

14  defamation and is not limited to communications as opposed to

15  conduct.

16      So if it's expanded to include conduct, it

17  obviously has to include more than defamation because

18  defamation can only be spoken words and communications.

19      And then finally --

20      THE COURT:  Which case was that?  You just told me,

21  but I --

22      MR. PIOLI:  That was *O'Callaghan* v. Satherlie, and

23  that's 2015 IL App (1st) 142152.  That's at Paragraphs 26 and

24  27.

25      And with that, I want to thank the Court on behalf

1  of Mr. Thut and Noonan Perillo & Thut for your time, Judge.

2  THE COURT:  Well, again, it's a great case.  I wish

3  I could tell you I am going to have my opinion out next week,

4  but it's likely to take me a few weeks to get this together.

5  I do want to look at the case law.  I think it's difficult.

6  I know you have got a proceeding in state court

7  next week.  I don't know whether -- I don't think it's too

8  soon for you to at least talk about the possibility this one

9  can be settled.  I hope you will talk about it right now.

10  There is always a basis for a resolution.  I can imagine some

11  right here.  So if you are involved in that process and you

12  want the assistance of the Court, please do let me know.

13  MR. VanPUYMBROUCK:  Thank you, Judge.

14  MR. VESSELINOVITCH:  Thank you.

15  THE COURT:  All right.  Thank you.

16  (An adjournment was taken at 11:27 a.m.)

17  *   *   *   *   *

18  I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.

19

20  /s/ Frances Ward_____May 17, 2019.
   Official Court Reporter

21  F

22

23

24

25